5/3/2021                                 Case Details - CourtView Justice Solutions

## 2006 CR 00019 STATE OF OHIO SOTO, TRAVIS D

- Case Type:
- CRIMINAL
- Case Status:
- Closed
- File Date:
- 03/31/2006
- DCM Track:
-
- Action:
- INVOLUNTARY MANSLAUGHTER
- Status Date:
- 04/07/2006
- Case Judge:
- BASINGER, RANDALL L.
- Next Event:
-

| All Information | Party | Charge | Event | Docket | Financial | Receipt |

### Docket Information

| Date | Docket Text | Amount Owed |
|---|---|---|
| 01/01/1900 | PREVIOUSLY MICROFILM AND FILED IMAGES PRIOR TO 12/5/11 | |
| 03/31/2006 | CRIMINAL INITIAL COSTS  Receipt: 43712  Date: 03/08/2007 | $129.00 |
| 03/31/2006 | FILING FEE  Receipt: 42761  Date: 12/07/2006 | $25.00 |
| 03/31/2006 | CRIMINAL INDICTMENT -1 CT INVOLUNTARY MANSLAUGHTER (F-1); 1 CT CHILD ENDANGERING (F-3)  Attorney: LAMMERS, GARY (0000042040) | |
| 03/31/2006 | PROSECUTING ATTORNEY'S REQUEST FOR ISSUANCE OF WARRANT UPON INDICTMENT  Attorney: LAMMERS, GARY (0000042040) | |
| 03/31/2006 | WARRANT TO ARREST  Receipt: 42761  Date: 12/07/2006 | $2.00 |
| 03/31/2006 | ATTORNEY 2 PROS  Receipt: 42761  Date: 12/07/2006 | $4.00 |
| 04/03/2006 | ARRAIGNMENT  Event: ARRAIGNMENT  Date: 04/03/2006  Time: 1:00 pm  Judge: BASINGER, RANDALL L.  Location: | |
| 04/03/2006 | OWN RECOGNIZANCE BOND ISSUED: MUST RESIDE AT ROAD 18, BOX 5604, CONTINENTAL, OH 45831  Receipt: 42761  Date: 12/07/2006 | $2.00 |
| 04/03/2006 | WARRANT TO ARREST RETURNED BY PUTNAM COUNTY SHERIFF  Receipt: 43712  Date: 03/08/2007 | $39.00 |
| 04/03/2006 | STENOGRAPHER FEE BY JILL SIEFKER ON 4//06 -CD#44  Receipt: 43712  Date: 03/08/2007 | $25.00 |
| 04/07/2006 | JUDGMENT ENTRY: PRETRIAL ORDER; IT IS ORDERED THAT DEFEFDANT'S BOND BE SET AT HIS OWN RECOGNIZANCE WITH CONDITION THAT HE LIVE AT ROAD 18 BOX 5604 CONTINENTAL OH 45831.  IT IS FURTHER ORDERED:  1)PRE-TRIAL SCHEDULED FOR 5-11-06 AT 11:30 AM.  FURTHER ORDERED:  1)ANY DEMAND FOR DISCOVERY UNDER RULE 16 OF THE OHIO RULES OF CRIMINAL PROCEDURE SHALL BE MADE BY THE DEFENDANT BY 4-17-06.  2)ALL DISCOVERY BY THE STATE OF OHIO IS TO BE PROVIDED TO THE DEFENDANT BY 4-24-06  3)ANY DISCOVERY REWPONSE REQUIRED BY THE DEFENDANT SHALL BE PROVIDED BY 5-1-06.  CC'S:PROS, C.BATES, PROB OFFICER, CVS, SHERIFF, T. SOTO  Receipt: 42761  Date: 12/07/2006  Receipt: 43043  Date: 01/08/2007 | $6.00 |
| 04/13/2006 | NOTICE OF REPRESENTATION  Attorney: BATES, E CHARLES (0000034462) | $0.00 |
| 04/13/2006 | ENTRANCE OF WRITTEN PLEA AND JURY DEMAND  Attorney: BATES, E CHARLES (0000034462) | |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 04/13/2006 | REQUEST FOR DISCOVERY<br>Attorney: BATES, E CHARLES (0000034462) | |
| 04/13/2006 | NOTICE OF INTENTION TO USE EVIDENCE<br>Attorney: BATES, E CHARLES (0000034462) | |
| 04/13/2006 | REQUEST FOR BILL OF PARTICULARS<br>Attorney: BATES, E CHARLES (0000034462) | |
| 04/13/2006 | ATTORNEY FOR DEF<br>Attorney: BATES, E CHARLES (0000034462)  Receipt: 43043  Date: 01/08/2007 | $2.00 |
| 04/17/2006 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 05/11/2006   Time: 11:30 am<br>Judge: BASINGER, RANDALL L.   Location:<br><br>Result: HEARING WAS HEARD | |
| 04/24/2006 | BILL OF PARTICULARS<br>Attorney: LAMMERS, GARY (0000042040) | |
| 04/24/2006 | NOTICE OF INTENDED EVIDENCE<br>Attorney: LAMMERS, GARY (0000042040) | |
| 04/24/2006 | DISCOVERY<br>Attorney: LAMMERS, GARY (0000042040) | |
| 05/04/2006 | SUPPLEMENTAL DISCOVERY<br>Attorney: LAMMERS, GARY (0000042040) | |
| 05/17/2006 | JUDGMENT ENTRY -PRE-TRIAL ORDER - 1)ANY PRE-TRIAL MOTIONS TO BE FILED BY 6/12/06; 2)PRE-TRIAL HEARING & HEARING ON ANY PENDING MOTIONS 7/6/06 AT 2:30 PM; 3)JURY TRIAL 8/9/06 AT 9 AM. CC: PROS., C.BATES, CVS, T.SOTO  Receipt: 43043  Date: 01/08/2007 | $3.00 |
| 05/17/2006 | COPIES  Receipt: 43043  Date: 01/08/2007 | $1.00 |
| 05/17/2006 | POSTAGE DUE  Receipt: 43043  Date: 01/08/2007 | $0.78 |
| 05/22/2006 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 05/11/2006 at 11:30 am has been resulted as follows:<br><br>Result: HEARING WAS HEARD<br>Judge: BASINGER, RANDALL L.   Location: | |
| 05/22/2006 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 07/06/2006   Time: 2:30 pm<br>Judge: BASINGER, RANDALL L.   Location:<br><br>Result: CHANGE OF PLEA | |
| 05/22/2006 | JURY TRIAL SCHEDULED<br>Event: JURY TRIAL<br>Date: 08/09/2006   Time: 9:00 am<br>Judge: BASINGER, RANDALL L.   Location:<br><br>Result: EVENT IS VACATED | |
| 07/07/2006 | STENOGRAPHER FEE BY JILL SIEFKER ON 7//06 -CD#49  Receipt: 43712  Date: 03/08/2007 | $25.00 |
| 07/07/2006 | JUDGMENT ENTRY -PLEA OF GUILTY -DEF PLEAD GUILTY TO COUNT II CHILD ENDANGERING ORC SECTION 2919.22 (A)E(1)(C) LEVEL F-3. STATE SILENT AS TO SENTENCE; COUNT I IS DISMISSED. COURT FINDS THE DEFENDANT GUILTY TO THE OFFENSE TO WHICH DEFENDANT PLEAD. PRE-SENTENCE REPORT IS ORDERED. BOND IS CONTINUED. PROS, C BATES, PROB OFF, CVS,  Receipt: 43043  Date: 01/08/2007  Receipt: 43343  Date: 02/05/2007 | $12.00 |
| 07/07/2006 | COPIES  Receipt: 43343  Date: 02/05/2007 | $4.00 |
| 07/07/2006 | POSTAGE DUE  Receipt: 43343  Date: 02/05/2007 | $0.39 |
| 08/08/2006 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 07/06/2006 at 2:30 pm has been resulted as follows:<br><br>Result: CHANGE OF PLEA<br>Judge: BASINGER, RANDALL L.   Location: | |
| 08/18/2006 | SENTENCING<br>Event: SENTENCING<br>Date: 08/31/2006   Time: 10:30 am<br>Judge: BASINGER, RANDALL L.   Location: | |

| Date | Docket Text | Amount Owed |
|---|---|---|
| 08/18/2006 | ASSIGNMENT NOTICES -SENTENCING ON 8/31/06 AT 10:30 AM. CC: T.SOTO, E.BATES, PROS, SHERIFF, PROB OFFICER, CVS  Receipt: 43343  Date: 02/05/2007  Receipt: 43698  Date: 03/08/2007 | $12.00 |
| 08/18/2006 | POSTAGE DUE  Receipt: 43698  Date: 03/08/2007 | $0.78 |
| 08/31/2006 | STENOGRAPHER FEE BY JILL SIEFKER ON 8/31/06 -CD#50  Receipt: 43712  Date: 03/08/2007 | $25.00 |
| 08/31/2006 | JUDGMENT ENTRY -DEF REMANDED TO CUSTODY OF PC SHERIFF UNTIL FURTHER ORDER OF COURT. CC: SHERIFF, PROB OFFICER, PROS.  Receipt: 43698  Date: 03/08/2007  Receipt: 43712  Date: 03/08/2007 | $3.00 |
| 08/31/2006 | COPIES  Receipt: 43712  Date: 03/08/2007 | $0.75 |
| 09/05/2006 | JUDGMENT ENTRY OF SENTENCE - DEF CONVICTED OF CHILD ENDANGERING (F-3); SENTENCED TO 5 YEARS AT ODRC W/CREDIT FOR 1 DAY SERVED; DEF TO PAY $10,000 FINE & COURT COSTS. DEF SUBJECT TO POST RELEASE CONTROL FOR A PERIOD 5 YEARS. REMANDED TO CUSTODY OF PC SHERIFF FOR EXECUTION OF SENTENCE. CC: PROS., E.BATES, PROB OFFICER, CVS, SHERIFF  Receipt: 43712  Date: 03/08/2007 | $6.00 |
| 09/05/2006 | COPIES  Receipt: 43712  Date: 03/08/2007 | $2.50 |
| 09/05/2006 | POSTAGE DUE  Receipt: 43712  Date: 03/08/2007 | $0.39 |
| 09/05/2006 | WARRANT TO CONVEY  Receipt: 43712  Date: 03/08/2007 | $6.00 |
| 09/06/2006 | FINE OTHER THAN DRUGS  Receipt: 43712  Date: 03/08/2007  Receipt: 44000  Date: 04/06/2007  Receipt: 44372  Date: 05/11/2007  Receipt: 44957  Date: 07/02/2007  Receipt: 45281  Date: 08/06/2007  Receipt: 45600  Date: 09/07/2007  Receipt: 46145  Date: 11/02/2007  Receipt: 46175  Date: 11/05/2007  Receipt: 46460  Date: 12/06/2007  Receipt: 46482  Date: 12/10/2007  Receipt: 46924  Date: 01/28/2008  Receipt: 46966  Date: 01/30/2008  Receipt: 47148  Date: 02/19/2008  Receipt: 47568  Date: 03/28/2008  Receipt: 48139  Date: 05/29/2008  Receipt 67876 reversed by 67877 on 06/02/2014. | $10,000.00 |
| 09/08/2006 | WARRANT TO CONVEY RETURNED BY PUTNAM COUNTY SHERIFF  Receipt: 43712  Date: 03/08/2007 | $150.50 |
| 09/14/2006 | NOTICE OF COMMITMENT AND CALCULATION OF SENTENCE: CALCULATED RELEASE/PAROLE BOARD DATE: 08-28-2011 | |
| 09/20/2006 | PRECIPE FILED FOR WRIT OF EXECUTION  Attorney: LAMMERS, GARY (0000042040) | |
| 09/20/2006 | EXECUTION ISSUED FOR 2005 DODGE NEON & 2005 HONDA  Receipt: 43712  Date: 03/08/2007 | $2.00 |
| 10/06/2006 | LETTER FROM TRAVIS SOTO REQUESTING AN APPEAL | |
| 10/11/2006 | NOTICE OF APPEAL FILED BY TRAVIS SOTO | $0.00 |
| 10/23/2006 | NOTICE OF SHERIFF'S SALE ON NOVEMBER 9, 2006 AT 10:00 A.M. | $0.00 |
| 10/23/2006 | APPRAISAL OF $4,000.00 FOR 1998 CHEVY S10 TRUCK; $3,500.00 FOR 2005 HONDA TRX | |
| 10/25/2006 | AFFIDAVIT OF INDIGENCY FILED BY TRAVIS SOTO, PRO SE | |
| 10/25/2006 | LETTER ASKING FOR A MOTION FOR AN APPEAL FILED BY TRAVIS SOTO, PRO SE | |
| 10/25/2006 | STATEMENT AND PRECIPE FILED BY TRAVIS SOTO, PRO SE | |
| 10/25/2006 | CRIMINAL APPEAL DOCKETING STATEMENT FILED BY TRAVIS SOTO, PRO SE | |
| 11/13/2006 | LEGAL NOTICE FEES  Receipt: 43712  Date: 03/08/2007 | $155.25 |
| 11/13/2006 | SHERIFF FEES- PUTNAM COUNTY SHERIFF -CRIMINAL EXECUTION RETURNED - SALE CANCELLED DUE TO LACK OF BIDDERS  Receipt: 43712  Date: 03/08/2007 | $81.39 |
| 11/13/2006 | APPRAISER FEES  Receipt: 43711  Date: 03/08/2007 | $150.00 |
| 11/22/2006 | PRECIPE FOR WRIT OF EXECUTION FILED BY Attorney: LAMMERS, GARY (0000042040) | |
| 11/24/2006 | EXECUTION ISSUED FOR 2005 DODGE NEON AND HONDA  Attorney: LAMMERS, GARY (0000042040)  Receipt: 43712  Date: 03/08/2007 | $2.00 |
| 12/27/2006 | APPRAISER FEES  Receipt: 43711  Date: 03/08/2007 | $150.00 |
| 12/27/2006 | SHERIFF FEES- PUTNAM COUNTY SHERIFF  Receipt: 43712  Date: 03/08/2007 | $72.50 |
| 12/27/2006 | DEPOSIT CHECK FROM PUTNAM COUNTY SHERIFF ON CHATTEL SALE FOR DEF'S VEHICLES  Receipt: 42942  Date: 12/27/2006 | $5,633.34 |
| 12/28/2006 | LEGAL NOTICE FEES  Receipt: 43712  Date: 03/08/2007 | $172.50 |
| 02/28/2007 | COMMON-LAW MOTION TO REDUCE SENTENCE WITH ORAL HEARING DEMANDED FOR | |
| 02/28/2007 | MOTION: SECURITY DEPOSITS, FILING FEES , COPY FEES AND TO FILE REDUCED NUMBER OF COPYS PURSUANT TO RC 2503.17, RC 2503.18 | |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 02/28/2007 | JUDGMENT ENTRY CONFIRMING SALE AND DISTRIBUTION OF PROCEEDS. MARTHA HERMILLER WAS SUCCESSFULL BIDDER ON THE 1998 CHEVROLET S-10 FOR $3300; & TIM CRAMER WAS SUCCESSFUL BIDDER ON THE 2005 HONDA TRX 400 EX FOUR WHEELER FOR $2333.34. PROCEEDINGS OF SHERIFF & SALE ARE APPROVED & CONFIRMED. SALE PROCEEDS OF $5633.34 BE APPLIED IN ORDER OF THEIR STATED PRIORITY: 1)APPRAISAL FEES OF $300; 2)PUBLICATION TO SENTINEL OF $327.75; 3)BALANCE BE APPLIED TO DEF'S COURT COSTS. CC: PROS., T.SOTO, PROB OFFICER, CVS, SHERIFF, TITLE DEPT (2 CERT COPIES)  Receipt: 43712  Date: 03/08/2007 | $6.00 |
| 02/28/2007 | COPIES  Receipt: 43712  Date: 03/08/2007 | $3.50 |
| 02/28/2007 | POSTAGE DUE  Receipt: 43712  Date: 03/08/2007 | $0.39 |
| 02/28/2007 | CERTIFIED COPY TO TITLE DEPT.  Receipt: 43712  Date: 03/08/2007 | $2.00 |
| 03/07/2007 | JUDGMENT ENTRY -DEFS' COMMON LAW MOTION TO REDUCE SENTENCE W/ORAL HEARING DEMANDED AND APPLIED FOR IS OVERRULED. CC: PROS., T.SOTO  Receipt: 43712  Date: 03/08/2007 | $3.00 |
| 03/07/2007 | COPIES  Receipt: 43712  Date: 03/08/2007 | $0.50 |
| 03/07/2007 | POSTAGE DUE  Receipt: 43712  Date: 03/08/2007 | $0.39 |
| 03/08/2007 | APPRAISERS FEES PAID TO: TERRY DOCKERY | $100.00 |
| 03/08/2007 | APPRAISERS FEES PAID TO: TIM SCHNIPKE | $100.00 |
| 03/08/2007 | APPRAISERS FEES PAID TO: TIMOTHY IMM | $100.00 |
| 03/08/2007 | LEGAL NOTICE FEES PAID TO PUBLISHER PUTNAM COUNTY SENTINEL | $327.75 |
| 01/28/2008 | LETTER TO ACI SUSPENDING COLLECTION OF COSTS AS FAMILY IS MAKING PAYMENTS | |
| 05/19/2009 | LETTER FROM DEF REQUESTING SENTENCING ENTRY | |
| 05/19/2009 | COPIES  Receipt: 60690  Date: 01/25/2012 | $0.75 |
| 05/19/2009 | POSTAGE DUE  Receipt: 60690  Date: 01/25/2012 | $0.44 |
| 06/08/2009 | CRIMINAL CASE REOPENED  Receipt: 60742  Date: 02/01/2012  Receipt: 61979  Date: 06/21/2012  Receipt: 62451  Date: 08/20/2012  Receipt: 68662  Date: 09/10/2014 | $35.00 |
| 06/08/2009 | MOTION FOR JUDICIAL RELEASE | |
| 06/15/2009 | JUDGMENT ENTRY -DEF'S MOTION FOR JUDICIAL RELEASE IS OVERRULED. CC: PROS., T.SOTO  Receipt: 60690  Date: 01/25/2012 | $3.00 |
| 06/15/2009 | COPIES  Receipt: 60690  Date: 01/25/2012 | $0.50 |
| 06/15/2009 | POSTAGE DUE  Receipt: 60690  Date: 01/25/2012 | $0.44 |
| 06/17/2009 | LETTER SENT TO ALLEN CORRECTIONAL REQUESTING REINSTATING COLLECTION OF COURT COSTS/FINES | |
| 09/23/2009 | CRIMINAL CASE REOPENED  Receipt: 62451  Date: 08/20/2012  Receipt: 62668  Date: 09/17/2012  Receipt: 62852  Date: 10/10/2012  Receipt: 63495  Date: 12/27/2012  Receipt: 68924  Date: 10/14/2014 | $35.00 |
| 09/23/2009 | MOTION FOR JUDICIAL RELEASE FILED BY DEF | |
| 10/01/2009 | JUDGMENT ENTRY - MOTION FOR JUDICIAL RELEASE IS OVERRULED. CC: PROS., T.SOTO  Receipt: 60690  Date: 01/25/2012 | $3.00 |
| 10/01/2009 | COPIES  Receipt: 60690  Date: 01/25/2012 | $0.50 |
| 10/01/2009 | POSTAGE DUE  Receipt: 60690  Date: 01/25/2012 | $0.44 |
| 03/19/2010 | LETTER SENT TO DEF'S FAMILY NOTIFYING THEM THAT WE REINSTATED COLLECTION OF COSTS FROM ALLEN CORRECTIONAL | |
| 09/20/2010 | FAX CORRESPONDENCE @ 4:03 PM FROM Attorney: BATES, E CHARLES (0000034462)  Receipt: 60690  Date: 01/25/2012  Receipt: 60742  Date: 02/01/2012 | $3.00 |
| 09/20/2010 | MOTION FOR JUDICIAL RELEASE<br>Attorney: BATES, E CHARLES (0000034462) | |
| 09/21/2010 | CRIMINAL CASE REOPENED  Receipt: 63495  Date: 12/27/2012  Receipt: 63966  Date: 02/19/2013  Receipt: 64488  Date: 04/15/2013 | $35.00 |
| 09/23/2010 | JUDGMENT ENTRY -DEF'S MOTION FOR JUDICIAL RELEASE IS OVERRULED. CC: PROS, E.BATES  Receipt: 60742  Date: 02/01/2012 | $3.00 |
| 09/23/2010 | COPIES  Receipt: 60742  Date: 02/01/2012 | $0.50 |
| 09/23/2010 | POSTAGE DUE  Receipt: 60742  Date: 02/01/2012 | $0.44 |
| 03/03/2011 | CRIMINAL CASE REOPENED  Receipt: 64488  Date: 04/15/2013  Receipt: 67878  Date: 06/02/2014  Receipt: 68081  Date: 06/26/2014  Receipt: 68662  Date: 09/10/2014 | $35.00 |

5/3/2021                          Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 03/03/2011 | MOTION FOR JUDICIAL RELEASE FILED BY TRAVIS SOTO, PRO SE | |
| 03/09/2011 | JUDGMENT ENTRY -DEF'S MOTION FOR JUDICIAL RELEASE IS OVERRULED. CC: PROS, T.SOTO Receipt: 60742  Date: 02/01/2012 | $3.00 |
| 03/09/2011 | COPIES  Receipt: 60742  Date: 02/01/2012 | $0.50 |
| 03/09/2011 | POSTAGE DUE  Receipt: 60742  Date: 02/01/2012 | $0.44 |
| 09/12/2011 | MEMORANDUM - DEF CALLED STATING HE HAS BEEN RELEASED FROM INCARCERATION AND WILL START MAKING MONTHLY PAYMENTS | |
| 06/12/2012 | MEMORANDUM - NOTIFICATION FROM ODRC THAT DEF RELEASED FROM ALLEN CORRECTIONAL ON 8/20/11 WITH FORWARDING ADDRESS OF BOX 5604, ROAD 18, CONTINENTAL, OH | |
| 05/07/2014 | LETTER SENT TO DEF AT 316 ROSEWOOD AVE, APT 45, DEFIANCE, OH RE COSTS OWED | |

# INDICTMENT
### Crim. Rule 6,7

**The State of Ohio**
**Putnam County**

**COURT OF COMMON PLEAS**

**PUTNAM COUNTY GRAND JURY**

**March 31, 2006**

Case No. 06 CR 19 _____

## COUNT I

    **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, at Putnam County, State of Ohio, **TRAVIS D. SOTO** did cause the death of another as a proximate result of the offender committing or attempting to commit a felony; to-wit:  did cause the death of his son, John Doe, DOB: 11-21-2003, as a proximate result of committing felony Child Endangering in violation of Ohio Revised Code Section 2919.22(A) and (E)(1)(c), while at 5064 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.04(A), **INVOLUNTARY MANSLAUGHTER,** a felony of the 1st degree.

## COUNT II

    **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, at Putnam County, State of Ohio, **TRAVIS D. SOTO** did, while being the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen (18) years of age, create a substantial risk to the health or safety of the child by violating a duty of care, protection or support, and which resulted in serious physical harm to said child: to-wit: his son, John Doe, DOB: 11-21-2003, by striking him with an ATV and/or failing to seek medical attention for said child thereafter resulting in serious physical harm to said child, while at 5064 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2919.22(A) and (E)(1)(c), **CHILD ENDANGERING,** a felony of the 3rd degree.

A TRUE BILL

Office of the Prosecuting Attorney
Of Putnam County, Ohio

*Kimberly A. Schreiber*
Grand Jury Foreperson

*Gary L. Lammers*
By:    Gary L. Lammers
        Prosecuting Attorney

> THE STATE OF OHIO
> Putnam County, ss
>      I, KIMBERLY A. REDMAN, CLERK OF THIS COURT OF COMMON PLEAS. WITHIN AND FOR SAID COUNTY.
> HEREBY **CERTIFY** THAT THE ABOVE AND FORE-GOING IS **TRULY** TAKEN AND COPIED FROM THE ORIGINAL **INDICTMENT** NOW ON FILE IN MY OFFICE
> WITNESS MY HAND AND SEAL OF SAID COURT THIS 24 DAY OF MAY A.D. 2021
> By _____ Deputy
>     KIMBERLY A. REDMAN, Clerk

J209    P143

## IN THE COURT OF COMMON PLEAS OF PUTNAM COUNTY, OHIO

STATE OF OHIO

                         CASE NO. 2006-CR-19

       Plaintiff

       VS.

TRAVIS SOTO

                         PRE-TRIAL ORDER

       Defendant

---

This 3rd day of April, 2006, came Gary Lammers, Prosecuting Attorney, representing the State of Ohio, and Charles Bates, Attorney for the Defendant and Travis Soto, the Defendant, having been advised of the nature of the charge against him and of his rights under the constitution, waived the requirement of having the Indictment read to him and waived the requirement of 24 hours notice to receiving a copy of such Indictment, and arraigned upon said Indictment for a plea thereto says he is not guilty.

IT IS ORDERED, ADJUDGED AND DECREED that the Defendant's bond be set at his own recognizance with condition that he live at Road 18, Box 5604, Continental, OH 45831.

IT IS FURTHER ORDERED that a Pre-trial is scheduled for **May 11, 2006 at 11:30 A.M.**

IT IS FURTHER ORDERED as follows:

Λ



J209 P744

1)    Any demand for Discovery under Rule 16 of the Ohio Rules of Criminal

Procedure shall be made by the Defendant by **April 17, 2006**.

2)    All Discovery by the State of Ohio is to be provided to the Defendant by

**April 24, 2006**.

3)    Any Discovery response required by the Defendant shall be provided by

**May 1, 2006**.

JUDGE RANDALL L. BASINGER

cc:
- Gary L. Lammers, Prosecuting Attorney
- Charles Bates, 922 East Second St., Defiance, OH 43512
- Probation Officer
- CVS
- Sheriff's Department
- Travis Soto, Road 18, Box 5604, Continental, OH 45831

COMMON PLEAS CLERK
TERESA J. LAMMERS
PUTNAM COUNTY OHIO
2006 APR -1 P 2:49

1

```
 1         IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO

 2
    STATE OF OHIO
 3
           PLAINTIFF              July 6, 2006
 4
           -vs-                   Case No. 2006-CR-19
 5
    TRAVIS D. SOTO                Change of Plea Hearing
 6
           DEFENDANT
 7   _____
              This matter came on before the Honorable
 8   Randall L. Basinger the 6th day of July, 2006 at the Putnam
    County Courthouse, Ottawa, Ohio.
 9
                          APPEARANCES
10

11   For the State of Ohio:      Mr. Gary Lammers
                                 Prosecuting Attorney
12                               East Main Street
                                 Ottawa, Ohio 45875
13

14   For the Defendant:         Mr. Charles Bates
                                 922 E. Second Street
15                               Defiance, Ohio  43512

16

17

18

19

20

21

22   _____

23                       WESTRICK REPORTING
                    Registered Professional Reporters
24                         13426 Road M
                           Ottawa OH 45875
25       Lisa Westrick, RPR              (419) 538-6347
```

2

1  (3:15 p.m.)

2            THE COURT:  Travis Soto.  Mr. Bates, do

3  you have the change of pleas?

4            MR BATES:  Yes, or no, I gave them to

5  her.

6            THE COURT:  We are present on Case 06-19

7  State of Ohio versus Travis Soto. The defendant is present in

8  court along with Attorney Charles Bates. The State of Ohio is

9  represented by Prosecuting Attorney Gary Lammers.  We are

10  here for what I understand to be a change of plea,

11  Mr. Lammers?

12            MR. LAMMERS:  Thank you, Your Honor. May

13  it please the Court, State and the defendant have agreed to

14  the following resolution: The State moves to dismiss Count 1

15  of the within indictment.  In exchange for that dismissal,

16  the defendant would withdraw his former plea of not guilty

17  and enter a plea of guilty to Count 2, that being child

18  endangering, a violation of Ohio Revised Code Section

19  2919.22(A)(E)1(c), that being a felony of the third degree.

20  In exchange for that dismissal and resulting plea, the State

21  would agree to remain silent as to sentence.

22            THE COURT:  Mr. Bates, is that your

23  understanding of any negotiations in this case?

24            MR BATES:  It is, Your Honor. I had the

25  opportunity to review the discovery, view the applicable case

1  law to go over those matters with Mr. Soto, he's received

2  copies of the State's discovery, it's my understanding after

3  being explained all his rights, his options, and the risks

4  involved, that he's willing to withdraw his previously

5  tendered plea of not guilty, enter a plea of guilty to Count

6  2 as described by the prosecuting attorney.

7  EXAMINATION BY THE COURT OF DEFENDANT SOTO:

8      Q.    Mr. Soto, do you understand what has been

9  stated here today?

10     A.    Yes, Your Honor.

11     Q.    Do you understand that Count 2 is a single

12  count of child endangering, a felony of the third degree?

13     A.    Yes, Your Honor.

14     Q.    Do you understand that that carries with it a

15  potential prison term of up to five years and a potential

16  fine of up to $10,000?

17     A.    Yes, Your Honor.

18     Q.    Do you understand that the Court can also

19  impose financial sanctions such as court costs and

20  restitution?

21     A.    Yes, Your Honor.

22     Q.    What plea are you entering to Count 2 of child

23  endangering?

24     A.    Not guilty, or guilty.

25     Q.    Do you understand my question? Let me ask it

1   again so that it is clear for the record.  First of all, you

2   understand all the potential sentence ramifications of the

3   Count 2 with the child endangering?

4            A.     Yes.

5            Q.     And you understand that that's a felony of the

6   third degree; is that correct?

7            A.     Yes, yes.

8            Q.     It's my understanding today that you are

9   prepared to change your plea; is that correct?

10           A.     Yes.

11           Q.     What plea are you entering to that charge?

12           A.     Guilty.

13           Q.     Are you entering that plea voluntarily?

14           A.     Yes.

15           Q.     Are you currently on probation or parole?

16           A.     No, Your Honor.

17           Q.     Do you understand that if you were sent to

18   prison, that after being released, there would be a potential

19   period of post-release control for up to three years?

20           A.     Yes, Your Honor.

21           Q.     Do you understand that if you violate the

22   conditions of supervision under post-release control, that

23   you could be returned to prison for up to one-half the stated

24   prison term?

25           A.     Yes, Your Honor.

5

1          Q.       Do you understand the nature of the charge and

2    any possible defenses that you may have to the charge?

3          A.       Yes.

4          Q.       Are you satisfied with your attorney's advice

5    and with his competence?

6          A.       Yes.

7          Q.       Are you presently under the influence of any

8    alcohol or drugs?

9          A.       No.

10         Q.       Have there been any threats made to you

11   concerning entering a plea?

12         A.       No.

13         Q.       Have there been any plea negotiations other

14   than what you've heard here in the courtroom today?

15         A.       No.

16         Q.       Do you understand that by entering a plea you

17   are waiving your right to a trial by a jury?

18         A.       Yes.

19         Q.       Do you understand you are waving your right to

20   confront witnesses and to have your attorney question

21   witnesses on your behalf?

22         A.       Yes.

23         Q.       Do you understand that you are waiving your

24   right to use your power of subpoena to call witnesses to

25   testify on your behalf?

6

1        A.      Yes.

2        Q.      Do you understand that you have a

3   constitutional right not to testify and could not be forced

4   to testify against yourself at any trial?

5        A.      Yes.

6        Q.      Do you understand that no one would comment

7   upon that if you chose not to testify, and that that right

8   would be explained to the jury?

9        A.      Yes, sir.

10       Q.      Do you understand that the State of Ohio is

11  required to prove your guilt beyond a reasonable doubt on

12  every element of the charge?

13       A.      Yes.

14       Q.      Do you understand that by pleading guilty you

15  are admitting the offense and telling the Court the facts and

16  circumstances surrounding your guilt?

17       A.      Yes.

18       Q.      Do you understand that I could sentence you

19  today?

20       A.      Yes.

21       Q.      Do you understand that you are limiting your

22  rights to an appeal?

23       A.      Yes, Your Honor.

24       Q.      An appeal, if it were to be filed, would have

25  to be filed within 30 days of the sentencing entry, but you

1    should consider the matter to be largely unappealable; do you

2    understand that?

3            A.      Yes.

4            Q.      Are you currently a citizen of the United

5    States?

6            A.      Yes.

7            Q.      Are all of your actions here today voluntary?

8            A.      Yes.

9            Q.      How far did go in school?

10           A.      All the way.

11           Q.      Do you have any difficulty in reading or

12   understanding the English language?

13           A.      No.

14           Q.      Do you have any questions concerning the

15   proceedings here today?

16           A.      No.

17           Q.      The indictment states that on or about the

18   23rd of January of this year that you, being a person having

19   custody or control of a minor child, did create a substantial

20   risk to the health or safety of the child, which resulted in

21   serious physical harm, that by striking him with an ATV and

22   failing to seek medical intervention or attention, that it

23   resulted in serious physical harm, and to my understanding,

24   that the ultimate death of the child.  I would like you to

25   tell me what you did.

8

1          A.      I went out that day.

2          Q.      And what happened?

3          A.      And I was going to use -- driving around and I

4   dropped him off between the barn and garage, or the barn and

5   the trailer. I was going around the pole barn in the back of

6   the yard and went around the corner, and smacked him.

7          Q.      And you hit him with the ATV?

8          A.      Yes, Your Honor.

9          Q.      And where was he at that time?

10         A.      On the ground.

11         Q.      Where did you strike him with the ATV?

12         A.      In the back of the yard in the corner.

13         Q.      Where on his body?

14         A.      I'm not for sure.

15         Q.      And what happened after that?

16         A.      I jumped off the four-wheeler and picked him

17  up and ran to the trailer.

18         Q.      And you brought him into the trailer at that

19  time; is that correct?

20         A.      Yes.

21         Q.      And, it's my understanding that you did not

22  seek medical attention at that time; is that correct?

23         A.      That's correct.

24         Q.      And what happened next?

25         A.      I didn't do anything. I rocked him in the

1  rocking chair and laid him down.

2       Q.      And it's my understanding that within

3  approximately an hour or hour and a half that he was no

4  longer breathing; is that correct?

5       A.      Yeah.  Excuse me.

6       Q.      And you agree that during that period that you

7  did not seek any medical attention; is that also correct?

8       A.      Yes, Your Honor.

9               THE COURT: The Court has before it the

10  written plea of guilty, which outlines those questions which

11  we have just reviewed.  I would ask that you review it, if

12  you agree with what is stated in the plea, you are to sign it

13  on page 4 on the line indicated as defendant.

14               The Court has before it the written plea of

15  guilty, which has been signed by the defendant in open court.

16  Mr. Soto, do you understand the document that you just

17  signed?

18               DEFENDANT SOTO: Yes, Your Honor.

19               THE COURT: Do you have any questions

20  concerning the written change of plea?

21               DEFENDANT SOTO: No, Your Honor.

22               THE COURT: At this time, the Court is

23  accepting the plea.  I am finding the defendant guilty of a

24  single count of child endangering.  I'm ordering a

25  pre-sentence report.  The report will be prepared either by

10

 1    Mr. Coleson or someone in his office.  It is to your benefit

 2    to cooperate with him in the preparation of the report. When

 3    it is completed, it is normally 30 to 45 days, we will return

 4    to court for purposes of sentencing.  In the interim, bond

 5    will be continued.

 6              Mr. Lammers, is there anything further today?

 7                         MR. LAMMERS: No, Your Honor.

 8                         THE COURT: Mr. Bates?

 9                         MR. BATES: No, Your Honor.

10                         THE COURT:  Court is in recess.

11                         MR. LAMMERS:  Thank you.

12

13              (This hearing concluded at 3:24 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

11

1

2                          CERTIFICATE OF REPORTER

3   STATE OF OHIO

4   COUNTY OF PUTNAM

5

6                          I,  Lisa Westrick, Notary Public, in and

7   for the State of Ohio, do hereby certify that the foregoing

8   CHANGE OF PLEA HEARING, held in the Common Pleas Court of

9   Putnam County, Ohio, on July 6, 2006, consisting of 11 pages

10  is a true and correct transcription of said proceedings as

11  transcribed by me from an audio recording, and I do further

12  certify that I only did the transcribing of the hearing, and

13  that I was not personally present in the courtroom during

14  said proceedings.

15                                   _____

16                                   Lisa Westrick

17

18  My Commission Expires:

19      5-22-17

20

21

22

23

24

25

J211 P286

## IN THE COURT OF COMMON PLEAS OF PUTNAM COUNTY, OHIO

STATE OF OHIO

      PLAINTIFF                  CASE NO.  06 CR 19

      VS-

Travis D. Soto

                                 PLEA OF GUILTY

      DEFENDANT

                                 Hon. RANDALL L. BASINGER

I withdraw my former not guilty plea and enter a plea of guilty to the following offenses:

| Count or Specification | Offense/Specification | ORC Section | Level |
|---|---|---|---|
| II | Child Endangering | 2919.22 (A) E(1)(c) | F-3 |

**Maximum Penalty.**  I understand that the maximum penalty as to each count is as follows:

| Offense/ Specification | Maximum Stated Prison Term (Yrs/Mos) | Maximum Fine | Mandatory Fine | License Suspension | Prison Term is Mandatory/ Consecutive | Prison Term is Presumed Necessary |
|---|---|---|---|---|---|---|
| II | 5 yrs. | $10,000 | no | | no | no | no |

Prison terms for multiple charges, even if consecutive sentences are not mandatory, may be imposed consecutively by the Court.

1

19

J211  P287

Court costs, restitution and other financial sanctions including fines, day fines, and reimbursement for the cost of any sanctions may also be imposed.

I understand that if I am now on felony probation, parole, under a community control sanction, or under post release control from prison, this plea may result in revocation proceedings and any new sentence could be imposed consecutively. I know any prison term stated will be served without good time credit.

**Post Release Control.**  In addition, a period of supervision by the Adult Parole Authority after release from prison is required in this case.  If I am sentenced to prison for a felony 1 or felony sex offense, after my prison release I will have 5 years of post release control under conditions determined by the Parole Board.  If I am sentenced to prison for a felony 2 or felony 3 which involved causing or threatening physical harm, I will have mandatory post release control of 3 years.  If I receive prison for a felony 3,4, or 5, I may be given up to 3 years of post release control. A violation of any post release control rule or condition can result in a more restrictive sanction while I am under post release control, and increased duration of supervision or control, up to the maximum term and reimprisonment even though I have served the entire stated prison term imposed upon me by this Court for all offenses.  If I violate conditions of supervision while under post release control, the Parole Board could return me to prison for up to nine months for each violation, for a total of ½ of my originally stated prison term.  If the violation is a new felony, I could receive a prison term of the greater of one year or the time remaining on post release control, in addition to any other prison term imposed for the offense.

**Community Control.** If this Court is not required by law to impose a prison sanction, it may impose community control sanctions or non-prison sanctions upon me.  I understand that if I violate

2

JAll  P288

the terms or conditions of a community control sanction, the Court may extend the time for which I am subject to this sanction up to a maximum of 5 years, impose a more restrictive sanction, or imprison me for up to the maximum stated term allowed for the (offense/offenses) as set out above.

I understand the nature of these charges and the possible defenses I might have. I am satisfied with my attorney's advice and competence. I am not under the influence of drugs or alcohol. No threats have been made to me. No promises have been made except as part of this plea agreement stated entirely as follows;

State silent as to Sentence ; Count 1 Dismissed

I understand by pleading guilty I give up my right to a jury trial or court trial, where I could confront and have my attorney question witnesses against me, and where I could use the power of the court to call witnesses to testify for me. I know at trial I would not have to take the witness stand and could not be forced to testify against myself and that no one could comment if I chose not to testify. I understand I waive my right to have the prosecutor prove my guilt beyond a reasonable doubt on every element of each charge.

By pleading guilty I admit committing the offense and will tell the Court the facts and circumstances of my guilt. I know the judge may either sentence me today or refer my case for a presentence report. I understand my right to appeal a maximum sentence, my other limited appellate rights and that any appeal must be filed within 30 days of my sentence. I understand the consequences of a conviction upon me if I am not a U.S. Citizen. I enter this plea voluntarily.

3

J211   P289

Signed and Dated: _7/6/06_

_Travis Soto_
Signature of Defendant

_____
Attorney for Defendant

_____
Prosecuting Attorney

## JUDGMENT ENTRY OF GUILTY

The Court finds that this day the defendant, in open court, was advised of all constitutional

rights and made a knowing, intelligent, and voluntary waiver of those rights pursuant to Crim. R. 11.

The plea is accepted and is ordered filed.  The Court finds the Defendant guilty of each offense to

which defendant has entered this plea.  It is HEREBY ORDERED that a pre-sentence report be

prepared.  A sentencing hearing is scheduled on _____ , 2006 at _____ .  Bond

is _continued_ .

_7/6/06._
Date

_____
JUDGE RANDALL L. BASINGER

2006 JUL -7  A 9 18

CC : PROS
    C BATES
    PROB OFF
    CVS

4

1

```
 1           IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO

 2
     STATE OF OHIO
 3
           PLAINTIFF                    August 31, 2006
 4
           -vs-                         Case No. 2006-CR-19
 5
     TRAVIS D. SOTO                     Sentencing Hearing
 6
           DEFENDANT
 7   _____
                   This matter came on before the Honorable
 8   Randall L. Basinger the 31st day of August, 2006 at the
     Putnam County Courthouse, Ottawa, Ohio.
 9
                              APPEARANCES
10

11   For the State of Ohio:       Mr. Gary Lammers
                                  Prosecuting Attorney
12                                East Main Street
                                  Ottawa, Ohio 45875
13

14   For the Defendant:          Mr. Charles Bates
                                  922 E. Second Street
15                                Defiance, Ohio  43512

16

17

18

19

20

21
     _____
22
                         WESTRICK REPORTING
23               Registered Professional Reporters
                         13426 Road M
24                       Ottawa OH 45875
        Lisa Westrick, RPR                  (419) 538-6347
25
```

2

1   (10: 42 a.m.)

2                   THE COURT:  Please be seated, Ladies and

3   Gentlemen.  We are present on Case 06-19, State of Ohio

4   versus Travis Soto.  The Defendant is present in court along

5   with attorney Charles Bates. The State of Ohio is represented

6   by Prosecuting Attorney Gary Lammers. We are here for

7   purposes of sentencing on a previously entered plea, that

8   being to a single count of child endangering, a felony of the

9   third degree, Count 2 of the indictment.  The pre-sentence

10  report was ordered, the report has been completed and

11  reviewed by the Court.  The report has also been made

12  available to counsel for the defendant and counsel for the

13  State of Ohio.  The Court is also in receipt of a Victim

14  Impact Summary. The Victim Impact Summary has also been made

15  available to counsel and reviewed by the Court. The Victim

16  Impact Summary and the pre-sentence report are ordered to be

17  made part of the record here today.

18          Mr. Lammers, do you have any further statement on

19  behalf of the State of Ohio?

20                  MR. LAMMERS:  No, Your Honor, although I

21  will note that the victim's mother, Lucille Baldoza, is

22  present in the courtroom does not wish to make a statement.

23                  THE COURT: Mr. Bates, do you have any

24  statement on behalf of the defendant?

25                  MR BATES:  Yes, Your Honor.  Your Honor,

3

```
1   we discussed in chambers and we discussed previously this is
2   a very difficult case to try to formulate what is an
3   appropriate sentence.  Clearly there has been a tragedy here
4   and one that's been suffered by not only the child's mother
5   but also Travis the child's father.  He has a punishment that
6   he already carries with him and will carry with him for the
7   rest of his days that can never be undone.  I had a chance to
8   read the pre-sentence investigation, and I see in that that
9   he's made mistakes as a youth, as a juvenile.  I also see
10  that he and his, and the mother of the child had some
11  problems shortly before this.  It's my belief that that may
12  have factored into unfortunately Travis's handling of the
13  situation once the child was injured.  This is unfortunately
14  not a situation where the child's injuries were readily
15  apparent to an observer.  Travis had taken steps to comfort
16  the child, and what he felt was caring for the child at the
17  time, not knowing the extent of the internal injuries.
18                  THE COURT:  Let me clarify your
19  statement.  You indicated that you felt that the injuries
20  were not readily available?
21                  MR BATES:  There were numerous scratches
22  and bruises, and obviously things were different at the time
23  when Travis would have seen them than when the child was seen
24  hours later.
25                  THE COURT:  The Court has reviewed the
```

4

1  series of autopsy photos, and the injuries that appear on

2  those photos you agree that those would have been apparent to

3  your client at the time that he had the child; is that

4  correct?

5            MR BATES:  There is no doubt the child

6  was injured, it's the extent of the internal injuries, Your

7  Honor, as I'm stating that he would not have been necessarily

8  aware of.  Clearly, Your Honor --

9            THE COURT:  But you agree that all the

10  injuries that were apparent on the autopsy photos would have

11  been readily available and observable by the defendant; is

12  that correct?

13            MR BATES:  They would have been, they

14  would have been fresh scratches and things of that nature.

15  Clearly this was postmortem photographs, they may have been

16  different in the way that the Court saw them and I saw them

17  in the photos than Travis would have experienced them.

18            There is no question, Your Honor, this child suffered

19  injuries. There is no question that he should have taken

20  different action, that's why he's here, Your Honor, that's

21  why he has been convicted of a serious crime.  He should have

22  taken different action.  We cannot say what the outcome of,

23  had he taken different action would have been, but there's no

24  questions, and that's why the plea was made that he should

25  have acted differently, and in doing so, endangered the child

5

1   and caused the loss of a child.

2          What I'm expressing, Your Honor, is some of the

3   mitigating circumstances that may have caused for his

4   wrongful action, which was not to get the child immediate

5   care.  And I believe some of that was that he had problems

6   with the mother previously, I think he was scared. I think he

7   --

8                    THE COURT:  I'm not understanding your

9   statement that he had problems with the mother previously,

10  what that has to do with his lack of seeking treatment at the

11  time of the accident?

12                   MR BATES:  I think he was afraid of what

13  she would say if she found out the child had been hurt in his

14  care.

15                   THE COURT:  So the fact that he was

16  charged and convicted of a domestic violence offense six

17  months earlier somehow prevented him from making, taking

18  appropriate action in this event?

19                   MR BATES:  Clearly he made the wrong

20  choice, clearly he made bad choices, and there may have been

21  a lot of things, I can't say, I can't speak for Travis what

22  his mindset was.

23                   THE COURT:  I'm not understanding your

24  link between the two, that somehow this prevented him from

25  making the appropriate determination at the time of these

1 events.

2                    MR BATES:  I think he was afraid, and I

3 think he was afraid that if he contacted the, he contacted a

4 hospital, I don't think if he took the child to a hospital,

5 she would be upset with him, et cetera. And I think in his

6 mind he thought he comforted the child, the child had calmed

7 and the child was okay.  Clearly that wasn't the case, we

8 know that now.  Had he acted and done what we would have

9 expected and hoped he would have done, there may have been a

10 different outcome.  And because he made that wrong choice he

11 is going to have that decision to deal with.

12        We are asking the Court to consider as a mitigating

13 circumstance, the severe impact and loss to Travis as well as

14 the mother, as well his youth, his relatively young age, and

15 asking the Court to consider a sentence that will allow him

16 to get some type of treatment and developmental skills so he

17 can better himself in his life, and not purely a punishment

18 for this case.  I understand there is different factors the

19 Court needs to consider, and we're asking the Court to

20 consider his youth and the impact it has already had on his

21 life.  Thank you.

22 EXAMINATION BY THE COURT OF DEFENDANT SOTO:

23        Q.     Mr. Soto, do you have a statement on your own

24 behalf?

25        A.     No, Your Honor.

7

1          Q.     Mr. Soto, I have reviewed this pre-sentence

2    report in detail, and I've reviewed the series of statements

3    that you've made, and you've made a series of contradictory

4    statements about what happened on the events in question.

5    You first of all made a statement that you were coming around

6    the garage and you struck the child and that that caused the

7    injuries.  You then made some additional statements that you

8    were riding along the railroad tracks?

9          A.     Yes, Your Honor.

10         Q.     Well, tell me which of those two is correct?

11         A.     The second one is incorrect, I didn't know

12   what I was thinking, just something to say.

13         Q.     You need to speak up.

14         A.     The second story was -- I didn't, it wasn't

15   true, it was just something I said. I was scared, I didn't

16   know what to say.

17         Q.     So your version today is that you were riding

18   the four wheeler at the edge of the garage and that Julio

19   came walking out and that you struck him?

20         A.     Yeah, yes, Your Honor.

21         Q.     So you claim that all the injuries that have

22   been shown are evident on the autopsy photos come from

23   striking him with the four wheeler, and it was soft ground or

24   grass at that location?

25         A.     It was ground and dirt, yes, Your Honor.

1      Q.      Well, I simply don't believe that version of

2   what happened, Mr. Soto.  How do you explain the numerous

3   injuries that appear in the autopsy photos from head to toe

4   where there appear to be a series of bruises, abrasions,

5   contusions that are all over the body front and back; how do

6   you explain that given your version of how this happened?

7      A.      I didn't recall seeing any bruises on him.

8                 THE COURT: Deputy, if you would hand this

9   photo to the defendant.

10                MR BATES:  Your Honor, Your Honor, just

11   may I explain?  I purposely did not provide the photos to

12   Mr. Soto in the discovery.  We did provide him the other

13   documents.  I didn't feel it was necessary to put him through

14   that distress, so he has not seen these photos previously.

15      Q.      Well, Mr. Soto, the photos in front of you,

16   you see a series of injuries to the child.  Your explanation

17   as to how this happened does not match that series of

18   injuries; do you have any explanation for that?

19      A.      No, I don't.

20      Q.      You gave an explanation upon inquiry to the

21   sheriff's department that this accident happened along the

22   railroad track; is that correct?  I mean is that correct that

23   you made that statement?

24      A.      Yes, Your Honor.

25      Q.      Well, let's go through your statements.   You

9

1  first of all, when you were questioned at the examination

2  room, you stated that you were riding a four wheeler, Julio

3  ran out, and you ran over him?

4          A.     That's correct.

5          Q.     Is that what happened; is that what you're

6  saying what happened?

7          A.     Yeah.

8          Q.     Then a little bit later you repeated the

9  statement that he ran out and you hit him.  Then you repeated

10 a statement that he ran out between the trailer and the

11 garage and you hit him; is that correct that you made those

12 statements?

13         A.     That's only one statement, though, Your Honor.

14         Q.     Well, it was repeated on a second occasion

15 according to the investigation report that I reviewed and

16 cataloged here. And you stated that that accident happened

17 about 3 p.m.?

18         A.     No, I'm not sure what time it was, but yeah.

19         Q.     Well, that was your statement at or about the

20 time of the initial questioning; is that correct, that that's

21 what you stated?

22         A.     That's what I said, yes.

23         Q.     And then you showed the officers what had

24 happened. They asked for the clothes, and the clothes that

25 you produced had no grass stain or mud on them; is that

10

 1  correct?

 2          A.      Yes, Your Honor.

 3          Q.      Well, where did this happen, was it muddy?

 4          A.      No.

 5          Q.      Was it grassy?

 6          A.      It was dry.

 7          Q.      It was dry. This was January 23rd; correct?

 8          A.      Correct.

 9          Q.      It was a grassy area?

10          A.      Yes.  Those, I can't remember where, it was

11  grassy dirt.

12          Q.      Well, I'm not clear as to what your version of

13  events is even today.  You claim that you were riding the

14  four wheeler, you came around the edge of the garage; is that

15  correct?

16          A.      I came around the edge of the garage, I came

17  around the garage.

18          Q.      Around a corner?

19          A.      Yes.

20          Q.      And on the other side of this garage around

21  the corner Julio was standing?

22          A.      He was in between the trailer and the garage.

23          Q.      How far away is the trailer from the garage?

24          A.      20 feet away in between.

25          Q.      And how far away from the garage were you?

11

1          A.      I was out on the back side of the garage.

2          Q.      How far away from the garage were you?

3          A.      About 10 feet.

4          Q.      10 feet away from the garage; is that what

5     you're stating here today?

6          A.      Yeah, Your Honor.

7          Q.      So you come around the corner 10 feet away

8     from the garage; is that correct?

9          A.      It's far enough away from the garage where my

10    four wheeler is not going to go around beside it.

11         Q.      Well, explain to me why you are not able to

12    see him at that time then, if you are coming, if you are 10

13    feet away from the garage and you're coming around the

14    corner, why are you not able to see him?

15         A.      As I was coming around, I wasn't paying

16    attention in front of me.

17         Q.      You were not paying attention, and where were

18    you looking?

19         A.      I was just looking off, I was just looking

20    off.

21         Q.      You knew he was in the area, you knew he was

22    outside?

23         A.      I knew he was beside the garage and beside the

24    garage door.

25         Q.      And tell me then what you claim happened next?

12

1          A.      I was going around the garage and he came out,

2    I didn't see him.

3          Q.      He came out, he was walking?

4          A.      I'm not for sure.

5          Q.      Well, what did you see?

6          A.      I didn't see nothing.

7          Q.      You didn't see anything at this point, your 10

8    feet away from the garage, and you didn't see anything. Well,

9    what do you remember next?

10         A.      I jumped off the four wheeler.

11         Q.      Why did you jump off the four wheeler?

12         A.      Because I, well, when I ran over him, I looked

13   back and I seen him on the ground.

14         Q.      Did you know before that time that you had

15   struck him?

16         A.      I know that I struck him, but when I felt a

17   bump, I looked back and knew.

18         Q.      You felt a bump, and you had run over him with

19   all four wheels of the four wheeler?

20         A.      No.

21         Q.      How do you know that?

22         A.      I don't know that, he's not that big.

23         Q.      Was he standing when you struck him?

24         A.      I wasn't paying attention, I don't know.

25         Q.      You don't know, you don't know where he was?

13

1          A.     I wasn't looking at the time.

2          Q.     And, you then stopped the four wheeler and

3    this was on still a grassy surface that his body was laying;

4    is that correct?

5          A.     That's correct.

6          Q.     And then you went back and lifted him from the

7    ground and took him into the house; is that correct?

8          A.     That's correct.

9          Q.     And that's the statement that you expect the

10   Court to believe here today?

11         A.     Yes.

12         Q.     You then gave a statement on the 24th of

13   January that you were distracted because you were looking at

14   a train?

15         A.     Yes.

16         Q.     Is that correct that you gave that statement?

17         A.     Yes, I gave that statement.

18         Q.     And you later on admitted that that was not

19   true; is that correct?

20         A.     That's correct, I didn't know, I wasn't paying

21   attention, I didn't know.

22         Q.     But you made up this story about the train and

23   then later admitted that was a lie; is that correct today?

24         A.     I don't understand.

25         Q.     Well, let me back up then. You made a

1  statement that you were distracted by a train?

2          A.      Right.

3          Q.      Is that true or not?

4          A.      I don't know if there was a train, there

5  wasn't a train there.

6          Q.      There was no train?

7          A.      I just wasn't paying attention and that's what

8  --

9          Q.      Well, tell me why did you make up a story

10 about a train?

11         A.      Because I wasn't paying attention.

12         Q.      You also then made a statement that a short

13 time after 3 p.m. he did not appear to be breathing; is that

14 correct, that you made that statement?

15         A.      I can't recall.

16         Q.      Well, is it correct that a short time after

17 this occurred he did not appear to be breathing?

18         A.      Correct.

19         Q.      And that would have been shortly after 3 p.m.?

20         A.      I'm not for sure what time it was, but after I

21 hit him, yeah.

22         Q.      You admitted to Officer Schwiebert later on

23 that you lied about the train whistle and about the train; is

24 that correct?

25         A.      The train, yeah.

15

1       Q.     And at that point your statement was that you

2  were simply going too fast and you struck him?

3       A.     That's correct.

4       Q.     Is that what you said at that time?

5       A.     Yeah.

6       Q.     Then later on on the 24th of January you were

7  questioned about some statements about being on the railroad

8  tracks, and you said that you laid them out on the tracks and

9  you were riding on the back of the tracks holding onto Julio;

10  was that your statement?

11       A.     I didn't, I didn't say laying him on the

12  tracks, he asked me about that.

13       Q.     This was with Officer Dockery, do you remember

14  talking with Officer Dockery?

15       A.     Yeah.

16       Q.     And let me repeat exactly what is stated in

17  the pre-sentence report, and I'm reading at the bottom of

18  page 7 approximately 10 lines from the bottom. He, meaning

19  Officer Dockery, told Travis, meaning you, of the bruises and

20  he thought that the incident occurred on the railroad bank

21  because of the large rocks and the bruising being consistent

22  with large rocks. At that point Travis, being you, began to

23  cry, and stated that he laid him out on the tracks; did you

24  say that?

25       A.     I didn't say that.

16

1          Q.          You further stated that you were riding on the

2     bank of the tracks and were holding Julio; is that what you

3     said?

4          A.          That's what I said, yes.

5          Q.          That you were going too fast and lost control,

6     that he fell off the four wheeler, and that you may have run

7     over him; is that what you said?

8          A.          Yes.

9          Q.          Is that what happened?

10         A.          No, Your Honor.

11         Q.          So that portion there is not true?

12         A.          No, Your Honor.

13         Q.          Tell me why you're making that statement if

14    it's not true?

15         A.          I didn't know, I didn't know what to do or

16    think.

17         Q.          You didn't know what to do or think, so you

18    made up a statement that was not true, is that what you're

19    saying here today?

20         A.          Yes.

21         Q.          You then continue to make a statement saying

22    that you had that day ridden with Julio in front of you, and

23    that you were going south on Road 18 to the next house, and

24    you rode around the yard a few times, and then went up the

25    railroad bank in the large stone.  You were westbound going

17

1  town the railroad going pretty fast, lost control, dropped

2  Julio onto the rocks, may have run over Julio; is that what

3  you said?

4          A.      I never said nothing none of that.

5          Q.      You never said any of that?  So that

6  recitation by the officer that is in this pre-sentence report

7  is not true?

8          A.      The statement that you just said was with the

9  statement -- with the statement that I, is with the statement

10 that I said the first time.

11         Q.      Well, the statements that I've just made,

12 again, recite your statement to the officer that you stated

13 that you were riding down Road 18, that you came back along

14 the railroad bank, that you drove up over the railroad bank,

15 you were going pretty fast, lost control, and then ultimately

16 ran over Julio; did you make those statements?

17         A.      I didn't make that statement, no.

18         Q.      You didn't make any of those statements.  So

19 you're saying that the officer is making misstatements in

20 this report?

21         A.      I didn't say anything that I was going to -- I

22 started the four wheeler and I went up and down the road to

23 warm it up, and then I started giving him a ride, and then I

24 didn't say anything like that.

25         Q.      You never made any statement about the

18

1  railroad tracks or driving along the railroad tracks?

2          A.      Yeah, I did, but not the way you're saying it.

3          Q.      Well, tell me what statement did you make

4  about being on the railroad tracks with Julio?

5                          MR BATES:  Your Honor, may I have a

6  second? Your Honor, may I?

7                          THE COURT:  No, you may not.

8          Q.      Mr. Soto, what statement did you make about

9  riding along the railroad track?

10         A.      I only made one statement.

11         Q.      And what was that statement?

12         A.      That I was riding around or riding at the

13  railroad tracks.

14         Q.      You indicated that you were riding on the

15  railroad tracks with Julio on the four wheeler?

16         A.      That's correct.

17         Q.      Was that true?

18         A.      No, this wasn't true.

19         Q.      Pardon?

20         A.      No.

21         Q.      It was not true.  It then continues a

22  statement that was made in response to some questioning of

23  two other individuals who indicated to the sheriff's

24  department and an investigator of the sheriff's department

25  that on prior occasions that, and I'm referring to a

1  statement made to an Edward Bower, Jr. and an Eric Good in

2  the fall of 2005, that you made statements to these two

3  individuals that on occasion that you would lay Julio down in

4  the yard and jump over him with the four wheeler?

5          A.      I don't even know those people.

6          Q.      I'm sorry, I didn't understand your answer.

7          A.      I don't even know those people.

8          Q.      You don't know these people, you don't know

9  Edward Bowers, Jr.?

10          A.      No.

11          Q.      Your statement to this Court that you don't

12  know and you never met Edward Bower, Jr.?

13          A.      Well the only name, well, his name's Eddie, I

14  wasn't for sure.

15          Q.      All right. Well, then Eddie, you know Eddie

16  Bower?

17          A.      I hung out with him in the past, but not like

18  in the past year.

19          Q.      Fall of 2005?

20          A.      That's correct.

21          Q.      And Eric Good?

22          A.      That's correct.

23          Q.      And there was an occasion in which you talked

24  with both of them?

25          A.      I never said that.

1          Q.       My question is, was there an occasion in which

2     you talked with both of them?

3          A.       Not that I remember, no.

4          Q.       They made statements indicating, and I'm

5     referring directly to the statement of Eric Good, that you

6     indicated to them on that date, and I'm going to read

7     directly from this report, that you laid Julio down in the

8     yard and jumped over him with the four wheeler. And Eric

9     told, made this statement to the sheriff's department, Eric

10    stated that he, Edward, and Travis, meaning you, were out in

11    the garage when they walked down the side door and Travis

12    started telling them about jumping over Julio with his four

13    wheeler.  Eric stated that he got upset and told Travis he

14    could kill his boy by doing that.  Eric stated that Travis

15    said no, Julio likes doing it, he lays real still.  Eric

16    stated that he had told Travis that if he sat up when he did

17    it, at which time Travis just laughed and stated he doesn't

18    he just lies real still.  Eric also said that Travis says he

19    does not do it when Julio's mom is at home.  He was

20    questioned when he was told this by Travis, and was told that

21    it was in the fall of 2005.  Is it your statement to the

22    Court today that those statements that I just recited to you

23    are not true?

24         A.       They are not true.

25         Q.       So you claim that you never made these

21

1  statements?

2          A.      I didn't make those statements.

3          Q.      On subsequent occasions you made statements

4  that you were driving the four wheeler and you may have

5  struck Julio; is that correct, that you really didn't know?

6          A.      Yes.

7          Q.      But on some occasions you stated clearly that

8  you did strike him, and you knew you struck him at the time;

9  is that correct?

10         A.      I didn't know I struck him at the time until I

11  looked.

12         Q.      At the time that this occurred, you then took

13  him into the house, and at what point did you know that he

14  was no longer breathing?

15         A.      After I laid him down.

16         Q.      How long after the incident was that, that you

17  knew he was no longer breathing?

18         A.      Maybe 15, 20 minutes.

19         Q.      15 or 20 minutes.  The doctor indicated that

20  he possibly lived for one to two hours after the impact.  Is

21  it your statement to this Court that he died within 15 or 20

22  minutes after the impact?

23         A.      I wasn't watching time, I'm not for sure how

24  long it --

25         Q.      Well, you were the one that was there.  What

1    is your best estimate as to how long after the impact before

2    he was no longer breathing?

3           A.      I don't know.

4           Q.      15 minutes is your estimate?

5           A.      Yeah.

6           Q.      And he was in the bed at that time?

7           A.      Yeah.

8           Q.      And still you did not seek any medical

9    treatment?

10          A.      That's correct.

11          Q.      Do you have any explanation for that?

12          A.      No.

13          Q.      Your attorney gives some statement about how

14   it is due to the domestic relationship that you had with your

15   wife; is that your statement here today?

16          A.      No, that is not my statement, no.

17          Q.      Well, the domestic relationship or the

18   domestic violence relationship occurred back in August of

19   2005, is that correct, or September of 2005?

20          A.      That's correct.

21          Q.      And that was an incident in which you had

22   struck your wife several times?

23          A.      I only smacked her.

24          Q.      Pardon?

25          A.      I only smacked her.

1      Q.      You need to speak up.  I didn't understand
2  your answer.
3      A.      I smacked her.
4      Q.      You smacked her?
5      A.      Yeah.
6      Q.      What does that mean, what did you do?
7      A.      That we got into it and I smacked her.
8      Q.      The report shows that you slapped Lucille
9  Baldoza so in the face and the ear causing injury and
10  bleeding to the ear, continuing to punch her in the abdomen
11  and knee, and knee her in the abdomen and slapping her in the
12  arm and upper leg with a part from a broken fan, and then
13  grabbed her by the throat and pushed her up against the wall;
14  is that a correct recitation?
15      A.      No, that was just a statement that she gave.
16      Q.      So that's not true?
17      A.      At the time she said that, she said things
18  that wasn't that true.
19      Q.      And you were convicted of what I've just
20  described of domestic violence?
21      A.      Yes.
22      Q.      And you were ordered to go into a batterer's
23  treatment?
24      A.      That's correct.
25      Q.      And you were really under supervision or had

24

1  180 days suspended at that time; correct?

2          A.      Yes, sir.

3          Q.      And that 180 days would have extended about to

4  the time that the event we're talking about here in January;

5  is that also correct?

6          A.      What was that?

7          Q.      The 180 days from September to January would

8  have still been under a suspended jail time; is that correct?

9          A.      Mostly, yeah.

10         Q.      The file also shows, beginning with your first

11 juvenile record, a series of convictions as a juvenile; is

12 that correct?

13         A.      In vehicles, yes.

14         Q.      Pardon?

15         A.      Yes, of vehicles.

16         Q.      And I'm showing an approximate 11 convictions

17 for various offenses as a juvenile; is that correct?

18         A.      I don't recall how many but, yeah.

19         Q.      Well, we can go through them if necessary.

20 I've got them recited here.

21                 MR BATES:  Your Honor, can I speak with

22 my client? May I speak with my client

23                 THE COURT:  Pardon?

24                 MR BATES:  Can I speak with my client?

25                 THE COURT:  The file begins in January of

1  2000 with a disorder --

2  MR. BATES: Your Honor, may I speak on

3  behalf of my client?  It's clear from the tone of the

4  Court's questioning and the cross-examination that the Court

5  has problems with the story, has problems with a lot of

6  things.  My client wishes not to answer any more questions

7  and proceed to sentencing.

8  THE COURT:  Mr. Soto, is that correct

9  that you do not wish to answer anymore questions?

10  DEFENDANT SOTO: Yes, sir.

11  THE COURT:  The file shows that there are

12  some 11 prior convictions including a disorderly conduct in

13  the year 2000, a no operator's license in 2001, an unruly

14  charge in 2001, an unauthorized use of motor vehicle in the

15  year 2001, three probation violations that continued shortly

16  thereafter, and no operator's license in 2002, an

17  unauthorized use of a vehicle in 2002, a probation violation

18  in 2002, a criminal damaging in 2002, a grand theft in 2002,

19  a theft which was dismissed in 2002.  In 2004 the file shows

20  an unauthorized use of a motor vehicle.  It shows in 2004 a

21  dismissal of a consumption charge. It shows in 2004 a theft

22  charge in which there was conviction based upon an

23  unauthorized use of a vehicle.  The file further shows that

24  supervision was not successful in that there were repeated

25  motions to revoke probation.  The file then shows the

1  domestic violence charge as an adult with the facts having

2  been recited by the Court as to what happened in that

3  particular offense in which it appears that significant

4  domestic violence was directed toward the spouse of the

5  defendant in August of 2005.  And puzzling to the Court, that

6  is used as some sort of and explanation as to mitigation as

7  to why he did not act appropriately in the events before the

8  Court today.

9        The Court finds that there have been serious physical

10  injuries resulting in the death of a child.  That they were

11  exacerbated by the age of this two year old victim.  That the

12  offender had a position of trust and was a parent in charge,

13  and should have been seeking medical treatment for this child

14  rather than disdaining medical treatment and ignoring any of

15  the ill effects that have been caused by the defendant

16  himself.

17        It puzzles the Court that you would use the loss of

18  this child as some sort of mitigating circumstance when you

19  in fact were the one fully responsible.  The Court's

20  conclusion is that it was clearly your reckless behavior

21  which caused the death of this child.  You failed to seek

22  medical attention.  You failed even upon the death of the

23  child to take any action.  You made a series of statements in

24  an attempt to cover up your responsibility, and made what the

25  Court concludes to be a series of untruthful statements as to

1  how this actually occurred.

2       Your past has been one of sustained irresponsibility,

3  as described in the series of offenses that the Court has

4  outlined here today.  One of the most disturbing aspects of

5  this, Mr. Soto, is even after the accident itself, you did

6  nothing to protect the health or what may have been the

7  survival of your child. You did nothing. You stood by.  The

8  only thing that is described is at some point you turned the

9  child's face towards the wall after he was in bed so you

10 wouldn't have to be looking at his face after he apparently

11 had stopped breathing.

12      As a result of what has been described by the Court,

13 the Court is imposing a period of five years at the Ohio

14 Department of Correction and Rehabilitation.  I'm granting

15 credit for one day previously served.  I'm remanding the

16 defendant to the custody of the Putnam County Sheriff's

17 Department.  I'm imposing a fine of $10,000 and the cost of

18 this action.  I'm ordering that there will be a period of

19 post-release control.  The post-release control was a

20 possible period of five years. If you violate the conditions

21 of post-release control, you are subject to an additional

22 period of incarceration of up to one-half of the stated

23 prison time today.  The defendant is remanded to the Putnam

24 County Sheriff's Department.

25      Mr. Lammers, is there anything further today?

28

1           MR. LAMMERS:  No, Your Honor.

2           THE COURT:  Mr. Bates?

3           MR BATES:  No, Your Honor.

4           THE COURT:  Court is in recess.

5

6        (This hearing concluded at 11:18 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4   STATE OF OHIO

 5   COUNTY OF PUTNAM

 6

 7                     I,  Lisa Westrick, Notary Public, in and

 8   for the State of Ohio, do hereby certify that the foregoing

 9   SENTENCING HEARING, held in the Common Pleas Court of Putnam

10   County, Ohio, on August 31, 2006, consisting of 29 pages is a

11   true and correct transcription of said proceedings as

12   transcribed by me from an audio recording, and I do further

13   certify that I only did the transcribing of the hearing, and

14   that I was not personally present in the courtroom during

15   said proceedings.

16                                    _____

17                                    Lisa Westrick

18

19   My Commission Expires:

20        5-22-17

21

22

23

24

25
```

J.212 P.125

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | CASE NO. 2006 CR 19 |
| Plaintiff | : | |
| -vs- | : | JUDGMENT ENTRY OF SENTENCE |
| TRAVIS D. SOTO | : | |
| Defendant | : | |

On the 31st day of August, 2006, a sentencing hearing was held pursuant to Ohio Revised Code Section 2929.19, Defense Attorney, E. Charles Bates, Putnam County Prosecuting Attorney, Gary L. Lammers was present, as was the Defendant Travis D. Soto, who was afforded all rights pursuant to Criminal Rule 32.

The Court has considered the record, oral statements, any victim impact statements, the nature of the offense and the pre-sentence report prepared, as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and the seriousness and recidivism factors under Ohio Revised Code Section 2929.12.

The Court finds that the Defendant has been convicted of **CHILD ENDANGERING**, in violation of Ohio Revised Code Section 2919.22(A)&(E)(1)(c), a felony of the 3rd degree.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Defendant be ordered to serve a term of five (5) years at the Ohio Department of Correctional Rehabilitation with credit for one day previously served.

IT IS FURTHER ORDERED that the Defendant is to pay a ten thousand dollar ($10,000.00) fine and the court costs of this action.

IT IS FURTHER ORDERED that the Defendant be subject to post release control for a period of five (5) years as determined by the Adult Parole Authority, any violation of the terms

J.212  P. 124

of post release control may lead to a more restrictive sentence for the Defendant of an additional

prison term of one half (1/2) of the Defendant's stated prison term.

IT IS FURTHER ORDERED that the Defendant shall be remanded to the custody of the

Putnam County Sheriff's Office for execution of sentence.

_____
JUDGE

APPROVAL:

_____
Gary L. Lammers, #0042040
Putnam County Prosecuting Attorney

2006 SEP -5 P 3:14

COMMON PLEAS COURT
TERESA J LAMMERS, CLERK
PUTNAM COUNTY, OHIO

## CERTIFICATE

I do hereby certify that a copy of the foregoing Judgment Entry was forwarded to
Attorney E. Charles Bates, 922 East Second Street, Defiance, Ohio 43512, by regular US Mail,
postage prepaid, on this _1st_ day of _Sept_ 2006.

_____
Gary L. Lammers, #0042040

cc
PROS
E. BATES
PROB. OFFICER
CVS
SHERIFF

5/3/2021                          Case Details - CourtView Justice Solutions

## 2016 CR 00057 STATE OF OHIO SOTO, TRAVIS

- Case Type:
- CRIMINAL
- Case Status:
- Open
- File Date:
- 08/03/2016
- DCM Track:
-
- Action:
- AGGRAVATED MURDER
- Status Date:
- 11/05/2020
- Case Judge:
- SCHIERLOH, KEITH H
- Next Event:
-

| All Information | Party | Charge | Event | Docket | Financial |

### Docket Information

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/03/2016 | CRIMINAL INITIAL COSTS | $157.00 |
| 08/03/2016 | SPECIAL PROJECTS FUND - 149 REC | $50.00 |
| 08/03/2016 | FILING FEE | $25.00 |
| 08/03/2016 | TRANSCRIPT FROM PUTNAM COUNTY MUNICIPAL COURT | $168.00 |
| 08/15/2016 | CRIMINAL INDICTMENT -CT 1-AGGRAVATED MURDER 2903.01(C) UNCLASSIFIED FELONY; CT II-MURDER 2903.02(B) UNCLASSIFIED FELONY; CT III -FELONIOUS ASSAULT 2903.11(A)(1) F-1; CT IV -KIDNAPPING 2905.01 F-1; CT V-TAMPERING WITH EVIDENCE 2921.12(A)(1) F-3. Attorney: LAMMERS, GARY (0000042040) | |
| 08/15/2016 | PERSONAL INFORMATION | |
| 08/15/2016 | PROSECUTING ATTORNEY'S REQUEST FOR ISSUANCE OF WARRANT UPON INDICTMENT Attorney: LAMMERS, GARY (0000042040) | |
| 08/15/2016 | ARRAIGNMENT Event: ARRAIGNMENT Date: 08/17/2016   Time: 1:00 pm Judge: BASINGER, RANDALL L.   Location:  Result: HELD | |
| 08/15/2016 | WARRANT TO ARREST ISSUED | $3.00 |
| 08/15/2016 | ASSIGNMENT NOTICES -ARRAIGNMENT IS SCHEUDLED ON 8/17/16 AT 1 PM. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $10.00 |
| 08/15/2016 | FAX CORRESPONDENCE | $8.00 |
| 08/16/2016 | WARRANT TO ARREST RETURNED BY PUTNAM COUNTY SHERIFF | $28.00 |
| 08/17/2016 | REQUEST FROM PUTNAM COUNTY SENTINEL FOR PERMISSION TO RECORD & PHOTOGRAPH THE ARRAIGNMENT | |
| 08/17/2016 | REQUEST FOR DISCOVERY Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 08/17/2016 | MOTION FOR  REQUEST OF PROSECUTING ATTORNEY'S INTENT TO USE EVIDENCE Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 08/17/2016 | MOTION FOR BILL OF PARTICULARS Attorney: BENAVIDEZ, JOSEPH (0000042447) | |

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 08/17/2016 | JUDGMENT ENTRY -PUTNAM COUNTY SENTINEL IS PERMITTED TO VIDEOTAPE OR PHOTGRAPH ALL PROCEEDINGS IN THIS CASE. PHOTOGRAPHS OF JURORS SHALL NOT BE PERMITTED. FLASH PHOTOGRAPHY SHALL NOT BE PERMITTED. | $4.00 |
| 08/17/2016 | RESULTS: The following event: ARRAIGNMENT scheduled for 08/17/2016 at 1:00 pm has been resulted as follows: Result: HELD Judge: BASINGER, RANDALL L.   Location: | |
| 08/17/2016 | NOTICE OF HEARING Event: PRE-TRIAL Date: 09/06/2016   Time: 3:30 pm Judge: BASINGER, RANDALL L.   Location: Result: HELD | |
| 08/17/2016 | STENOGRAPHER FEE BY JILL SIEFKER ON 8/17/16 -TD#6 | $25.00 |
| 08/18/2016 | JUDGMENT ENTRY-PRE-TRIAL ORDER - DEF PLEAD NOT GUILTY. DEF'S BOND SET AT $50,000.00 CASH OR SURETY. UNLESS FINGERPRINTING PROCESS HAS BEEN COMPLETED, DEF MUST APPEAR AT PC SHERIFF'S DEPT FOR BOOKING/PROCESSING PURPOSES W/IN NEXT 24 HRS. PRE-TRIAL IS SCHEDULED FOR 9/6/16 AT 3:30 PM. 1)ANY DEMAND FOR DISCOVERY UNDER RULE 16 SHALL BE MADE BY DEF BY 8/24/16; 2)ALL DISCOVERY BY STATE OF OHIO IS TO BE PROVIDED TO DEF BY 8/31/16; 3)ANY DISCOVERY RESPONSE REQUIRED BY DEF SHALL BE PROVIDED BY 9/2/16. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $8.00 |
| 08/18/2016 | FAX CORRESPONDENCE | $13.00 |
| 08/18/2016 | MEMORANDUM -INDICTMENT EMAILED TO SUPREME COURT | |
| 08/19/2016 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 08/31/2016 | MOTION FOR DISCOVERY Attorney: SCHROEDER, TODD C (75265) | |
| 08/31/2016 | BILL OF PARTICULARS Attorney: SCHROEDER, TODD C (75265) | |
| 08/31/2016 | NOTICE OF INTENDED EVIDENCE Attorney: SCHROEDER, TODD C (75265) | |
| 08/31/2016 | DISCOVERY Attorney: SCHROEDER, TODD C (75265) | |
| 09/06/2016 | STENOGRAPHER FEE BY JILL SIEFKER ON 9/6/16 -TD#6 | $25.00 |
| 09/07/2016 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 09/08/2016 | RESULTS: The following event: PRE-TRIAL scheduled for 09/06/2016 at 3:30 pm has been resulted as follows: Result: HELD Judge: BASINGER, RANDALL L.   Location: | |
| 09/08/2016 | NOTICE OF HEARING Event: HEARING Date: 10/25/2016   Time: 9:00 am Judge: BASINGER, RANDALL L.   Location: Result: HEARING WAS HEARD | |
| 09/13/2016 | JUDGMENT ENTRY -PRE-TRIAL ORDER - 1)ALL PRE-TRIAL MOTIONS ARE TO BE FILED BY 10/4/16; 2)ALL RESPONSES TO ANY PRE-TRIAL MOTIONS ARE TO BE FILED BY 10/11/16, W/REPLIES BY 10/18/16; 3)HEARING ON PRE-TRIAL MOTIONS IS SCHEDULED ON 10/15/16 AT 9 AM. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO | $4.00 |
| 09/13/2016 | JUDGMENT ENTRY -DEF WAIVES HIS RIGHT TO A SPEEDY TRIAL UNDER THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION AND AS SET FORTH UNDER ORC SECTIONS 2945.71 THROUGH 2945.73. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $4.00 |
| 09/13/2016 | FAX CORRESPONDENCE | $13.00 |
| 10/11/2016 | FAX CORRESPONDENCE @3:32 PM Attorney: BENAVIDEZ, JOSEPH (0000042447) | $6.00 |
| 10/11/2016 | MOTION TO DISMISS ON THE GROUNDS OF DOUBLE JEOPARDY Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 10/18/2016 | RESPONSE TO DEFENDANT'S MOTION TO DISMISS Attorney: SCHROEDER, TODD C (75265) | |
| 10/25/2016 | STENOGRAPHER FEE BY JILL SIEFKER ON 10/25/16 -TD#6 | $25.00 |

5/3/2021                                    Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|---|---|---|
| 10/25/2016 | JUDGMENT ENTRY -PRE-TRIAL ORDER - ANY ADDITIONAL PRE-TRIAL MOTIONS ARE TO BE FILED BY 11/23/16. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $4.00 |
| 10/25/2016 | FAX CORRESPONDENCE | $8.00 |
| 10/25/2016 | COURT DIAGNOSTIC & TREATMENT CENTER -COURT ORDER FOR PSYCHIATRIC/PSYCHOLOGICAL EVALUATION | |
| 10/26/2016 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 10/26/2016 | FAX CORRESPONDENCE @ 4:23 PM FROM Attorney: BENAVIDEZ, JOSEPH (0000042447) | $7.00 |
| 10/26/2016 | MOTION FOR COMPETENCY EXAM Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 10/31/2016 | JUDGMENT ENTRY -DEF'S MOTION FOR COMPETENCY EXAMINATION IS GRANTED. CC: PROS, J.BENAVIDEZ | $4.00 |
| 10/31/2016 | POSTAGE DUE | $0.48 |
| 10/31/2016 | WARRANT TO CONVEY TO COURT DIAGNOSTIC & TREATMENT CENTER ON 11/10/16 AT 10:30 AM | $7.00 |
| 11/04/2016 | AMENDED WARRANT TO CONVEY TO COURT DIAGNOSTIC CENTER ON 11/15/16 AT 12:30 PM | $7.00 |
| 11/08/2016 | WARRANT RETURNED BY PUTNAM COUNTY SHERIFF -N/C - AMENDED WARRANT ISSUED WITH NEW DATE | $0.00 |
| 11/09/2016 | AMENDED WARRANT TO CONVEY TO COURT DIAGNOSTIC & TREATMENT CENTER ON 11/18/16 AT 2 PM | $7.00 |
| 11/22/2016 | AMENDED WARRANT TO CONVEY RETURNED BY PUTNAM COUNTY SHERIFF | $131.00 |
| 12/16/2016 | MOTION FOR FURLOUGH ON 1/6/17 FOR A 12:10 PM DR'S APPT. Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 12/21/2016 | JUDGMENT ENTRY -MOTION FOR FURLOUGH FILED IS OVERRULED. FAXED: PROS, J.BENAVIDEZ | $4.00 |
| 12/21/2016 | FAX CORRESPONDENCE | $5.00 |
| 12/28/2016 | WARRANT TO CONVEY TO COURT DIAGNOSTIC & TREATMENT CENTER ON 1/12/17 AT 1 PM. | $7.00 |
| 01/05/2017 | NOTICE RETURNED FROM SUPREME COURT OF FILING INDICTMENT CHARGING AGGRAVATED MURDER WITH SPECIFICATIONS OF AGGRAVATING CIRCUMSTANCES. FILED IN SUPREME COURT ON 12/3/16 - CC16015 | $0.00 |
| 01/05/2017 | WARRANT TO CONVEY TO COURT DIAGNOSTIC & TREATMENT CENTER ON 1/12/17 @1 PM | $7.00 |
| 01/17/2017 | WARRANT TO CONVEY RETURNED BY PUTNAM COUNTY SHERIFF | $131.00 |
| 01/17/2017 | RESULTS: The following event: HEARING scheduled for 10/25/2016 at 9:00 am has been resulted as follows: Result: HEARING WAS HEARD Judge: BASINGER, RANDALL L.    Location: | |
| 01/17/2017 | NOTICE OF HEARING Event: PRE-TRIAL Date: 01/23/2017    Time: 3:45 pm Judge: BASINGER, RANDALL L.    Location: | |
| 01/17/2017 | ASSIGNMENT NOTICES -PRE-TRIAL IS SCHEDULED ON 1/23/17 AT 3:45 PM. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $10.00 |
| 01/17/2017 | FAX CORRESPONDENCE | $8.00 |
| 01/20/2017 | FAX CORRESPONDENCE FROM WLIO LIMA | $5.00 |
| 01/20/2017 | WLIO LIMA REQUEST FOR PERMISSION TO BE IN COURTROOM ON 1/23/17 @3:45 HEARING | |
| 01/23/2017 | STENOGRAPHER FEE BY JILL SIEFKER ON 1/23/17 -TD#7 | $25.00 |
| 01/24/2017 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 01/31/2017 | FAX CORRESPONDENCE @10:10 AM Attorney: BENAVIDEZ, JOSEPH (0000042447) | $7.00 |
| 01/31/2017 | MOTION FOR LEAVE TO FILEE WRITTEN NOT GUILTY BY REASON OF INSANITY Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 02/01/2017 | WARRANT TO CONVEY TO FORENSIC PSYCHIATRY CENTER FOR WESTERN OHIO ON 2/7/17 AT 10 AM FOR EVALUATION | $7.00 |
| 02/01/2017 | COURT ORDERED EVALUATION REFERRAL FORM FOR FORENSIC PSYCHIATRY CENTER FOR WESTERN OHIO | |
| 02/01/2017 | JUDGMENT ENTRY GRANTING LEAVE TO FILE WRITTEN NOT GUILTY FOR REASON OF INSANITY. CC: PSYCHIATRY CENTER, PROS, J.BENAVIDEZ, PROB OFFICER, CVS | $4.00 |

5/3/2021              Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|---|---|---|
| 02/01/2017 | COPIES | $0.50 |
| 02/01/2017 | WRITTEN NOT GUILTY BY REASON OF INSANITY<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 02/01/2017 | POSTAGE DUE | $0.48 |
| 02/10/2017 | WARRANT TO CONVEY RETURNED BY PUTNAM COUNTY SHERIFF | $206.00 |
| 02/23/2017 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 02/24/2017  Time: 11:00 am<br>Judge: BASINGER, RANDALL L.  Location:<br><br>Result: HELD | |
| 02/23/2017 | ASSIGNMENT NOTICES -PRE-TRIAL IS SCHEDULED ON 2/24/17 AT 11 AM. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $10.00 |
| 02/23/2017 | FAX CORRESPONDENCE | $8.00 |
| 02/24/2017 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 02/24/2017 at 11:00 am has been resulted as follows:<br><br>Result: HELD<br>Judge: BASINGER, RANDALL L.  Location: | |
| 02/24/2017 | NOTICE OF HEARING<br>Event: HEARING<br>Date: 03/16/2017  Time: 9:00 am<br>Judge: BASINGER, RANDALL L.  Location:<br><br>Result: HELD | |
| 02/24/2017 | ASSIGNMENT NOTICES -HEARING ON MOTION FOR COMPETENCY TO STAND TRIAL IS SCHEDULED ON 3/16/17 AT 9 AM (3 HRS ALLOTTED). FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $10.00 |
| 02/24/2017 | FAX CORRESPONDENCE | $8.00 |
| 02/27/2017 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 02/28/2017 | STENOGRAPHER FEE BY JILL SIEFKER ON 2/24/17 -TD#7 | $25.00 |
| 03/01/2017 | PRECIPE FOR SUBPOENA FILED<br>Attorney: SCHROEDER, TODD C (75265) | |
| 03/01/2017 | SUBPOENA ISSUED TO DR. THOMAS SHERMAN AND KARA E.A. MARCIANA | $6.00 |
| 03/15/2017 | NOTICE OF INTENT<br>Attorney: SCHROEDER, TODD C (75265) | $0.00 |
| 03/16/2017 | STENOGRAPHER FEE BY DAKOTA BEACHLER ON 3/16/17-TD#7 | $25.00 |
| 03/22/2017 | JUDGMENT ENTRY -BASED ON REPORTS FILED & TESTIMONY GIVEN, COURT FINDS DEF TO BE COMPETENT TO STAND TRIAL PURSUANT TO REVISED CODE SECTION 2925.371)G)(3). FAXED: PROS, J.BENAVIDEZ | $8.00 |
| 03/22/2017 | FAX CORRESPONDENCE | $7.00 |
| 04/13/2017 | JUDGMENT ENTRY -DEF'S MOTION TO DISMISS ON THE GROUNDS OF DOUBLE JEOPARDY IS OVERRULED. FAXED: PROS, J.BENAVIDEZ | $24.00 |
| 04/13/2017 | FAX CORRESPONDENCE | $15.00 |
| 04/18/2017 | RESULTS:<br>The following event: HEARING scheduled for 03/16/2017 at 9:00 am has been resulted as follows:<br><br>Result: HELD<br>Judge: BASINGER, RANDALL L.  Location: | |
| 04/18/2017 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 04/20/2017  Time: 2:00 pm<br>Judge: BASINGER, RANDALL L.  Location:<br><br>Result: HELD | |
| 04/18/2017 | FAX CORRESPONDENCE @10:05 AM | $5.00 |
| 04/18/2017 | REQUEST FOR PERMISSION TO BE IN COURTROOM FOR PRE-TRIAL | |
| 04/18/2017 | ASSIGNMENT NOTICES -PRE-TRIAL IS SCHEDULED ON 4/20/17 AT 2 PM. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $10.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 04/18/2017 | FAX CORRESPONDENCE | $8.00 |
| 04/20/2017 | STENOGRAPHER FEE BY JILL SIEFKER ON 4/20/17 -TD#7 | $25.00 |
| 04/20/2017 | JUDGMENT ENTRY -ANY RECOMMENDATION BY STATE OF OHIO FOR A NEGOTIATED PLEA IS TO BE COMPLETED BY 4/27/17. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $4.00 |
| 04/20/2017 | FAX CORRESPONDENCE | $8.00 |
| 04/21/2017 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 05/03/2017 | NOTICE OF APPEAL<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | $0.00 |
| 05/03/2017 | MOTION FOR APPOINTMENT OF COUNSEL<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 05/03/2017 | MOTION FOR TRANSCRIPT AT STATE EXPENSE<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 05/12/2017 | JUDGMENT ENTRY - TRANSCRIPT AT STATE EXPENSE - THE COURT REPORTER IS INSTRUCTED TO PREPARE OF COPY OF TRANSCRIPT OF HEARING HELD ON 2/28/17, 3/16/17 AND 4/13/17 AT STATE'S EXPENSE | $4.00 |
| 05/12/2017 | JUDGMENT ENTRY - MICHAEL SHORT BE COURT APPOINTED AS COUNSEL FOR PURPOSE OF APPEAL IN THIS MATTER  CC:  MICHAEL SHORT, PROS ATTY, JOSEPH BENAVIDEZ | $4.00 |
| 05/12/2017 | FAX CORRESPONDENCE | $6.00 |
| 05/24/2017 | TRANSCRIPTS FILED - PRE-TRIAL HEARING 2/24/17; COMPETENCY HEARING 3/16/17; PRE-TRIAL HEARING 4/20/17 | $0.00 |
| 06/26/2017 | AFFIDAVIT OF INDIGENCY | $25.00 |
| 06/26/2017 | MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 02/08/2018 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 02/15/2018   Time: 10:30 am<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: HELD | |
| 02/08/2018 | ASSIGNMENT NOTICES -PRE-TRIAL IS SCHEDULED ON 2/15/18 AT 10:30 AM. FAXED: PROS, J.BENAVIDEZ, PROB OFFICER, CVS, T.SOTO %JAIL | $15.00 |
| 02/08/2018 | FAX CORRESPONDENCE | $8.00 |
| 02/15/2018 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 04/20/2017 at 2:00 pm has been resulted as follows:<br><br>Result: HELD<br>Judge: BASINGER, RANDALL L.    Location: | |
| 02/15/2018 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 02/15/2018 at 10:30 am has been resulted as follows:<br><br>Result: HELD<br>Judge: SCHIERLOH, KEITH H    Location: | |
| 05/31/2018 | JUDGMENT ENTRY - APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES TO JOSEPH A BENAVIDEZ $2,975.00 | $10.00 |
| 11/13/2018 | MOTION FOR PERSONAL RECOGNIZANCE BOND OR TO REDUCE BOND PENDING APPEAL<br>Attorney: EDELSTEIN, CARLY A (0095950) | |
| 11/15/2018 | JUDGMENT ENTRY -DEF'S MOTION FOR PERSONAL RECOGNIZANCE BOND OR TO REDUCE BOND PENDING APPEAL IS OVERRULED. FAXED: PROS, C.EDELSTEIN, PROB OFFICER, CVS, T.SOTO %JAIL | $5.00 |
| 11/15/2018 | FAX CORRESPONDENCE | $8.00 |
| 11/05/2019 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 11/15/2019   Time: 11:30 am<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: RESCHEDULE EVENT | |
| 11/05/2019 | ASSIGNMENT NOTICES -PRE-TRIAL IS SCHEDULED ON NOVEMBER 15, 2019 AT 11:30 AM. FAXED: PROS, C.EDELSTEIN, PROB OFFICER, CVS, T.SOTO %JAIL | $15.00 |
| 11/05/2019 | FAX CORRESPONDENCE | $8.00 |

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 11/06/2019 | NOTICE OF HEARING <br><br> The following event: PRE-TRIAL scheduled for 11/15/2019 at 11:30 am has been rescheduled as follows: <br><br> Event: PRE-TRIAL <br> Date: 11/25/2019  Time: 12:30 pm <br> Judge: SCHIERLOH, KEITH H    Location: <br><br> Result: HELD | |
| 11/06/2019 | ASSIGNMENT NOTICES - COURT RE-SETS THE PRE-TRIAL FROM 11/15/19 TO NOVEMBER 25, 2019 AT 12:30 PM. FAXED: PROS, WM.KLUGE, PROB OFFICER, CVS, T.SOTO %JAIL | $15.00 |
| 11/06/2019 | FAX CORRESPONDENCE | $8.00 |
| 11/13/2019 | FAX CORRESPONDENCE | $4.00 |
| 11/14/2019 | FAX CORRESPONDENCE @ 9:29 AM FROM WLIO TV | $5.00 |
| 11/14/2019 | REQUEST PERMISSION TO BE IN COURTROOM FOR NOVEMBER 25, 2019 HEARING FILED BY WLIO TV | |
| 11/18/2019 | CERTIFIED COPY OF JUDGMENT ENTRY / APPEAL FROM THE COURT OF APPEALS - THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THIS CAUSE IS REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS, CONSISTENT W/THE OPINION RENDERED HEREIN FILED BY THE SUPREME COURT OF OHIO | $5.00 |
| 11/18/2019 | JUDGMENT ENTRY -TODD CUMMINS /WLIO NBC SHALL BE PERMITTED TO VIDEOTAPE OR PHOTOGRAPH DURING ALL PROCEEDINGS IN THIS CASE. PHOTOGRAPHS OF JURORS SHALL NOT BE PERMITTED. FLASH PHOTOGRAPHY SHALL NOT BE PERMITTED. FAXED: T.CUMMINS | $5.00 |
| 11/18/2019 | FAX CORRESPONDENCE | $4.00 |
| 11/20/2019 | FAX CORRESPONDENCE @11:40 AM <br> Attorney: KLUGE, WILLIAM (0000022433) | $14.00 |
| 11/20/2019 | DEMAND FOR DISCOVERY <br> Attorney: KLUGE, WILLIAM (0000022433) | |
| 11/20/2019 | REQUEST FOR NOTICE OF PROSECUTOR'S INTENT TO USE EVIDENCE <br> Attorney: KLUGE, WILLIAM (0000022433) | |
| 11/20/2019 | DEFENDANT'S REQUEST FOR BILL OF PARTICULARS <br> Attorney: KLUGE, WILLIAM (0000022433) | |
| 11/25/2019 | REQUEST FROM LIMA NEWS TO TAKE PHOTOGRAPHS OF PROCEEDINGS | |
| 11/25/2019 | JUDGMENT ENTRY -JENNIFER PERYAM/LIMA NEWS SHALL BE PERMITTED TO VIDEOTAPE OR PHOTOGRAPH DURING ALL PROCEEDINGS IN THIS CASE. PHOTOGRAPHS OF JURORS SHALL NOT BE PERMITTED. FLASH PHOTOGRAPHY SHALL NOT BE PERMITTED. | $5.00 |
| 11/25/2019 | RESULTS: <br> The following event: PRE-TRIAL scheduled for 11/25/2019 at 12:30 pm has been resulted as follows: <br><br> Result: HELD <br> Judge: SCHIERLOH, KEITH H    Location: | |
| 11/25/2019 | NOTICE OF HEARING <br> Event: PRE-TRIAL <br> Date: 12/19/2019   Time: 12:30 pm <br> Judge: SCHIERLOH, KEITH H    Location: <br><br> Result: HELD | |
| 11/25/2019 | ASSIGNMENT NOTICES - STATUS PRE-TRIAL CONFERENCE IS SCHEDULED ON DECEMBER 19, 2019 AT 12:30 PM  CC:  GARY LAMMERS, WILLIAM KLUGE, ROBERT GRZYBOWSKI, PROB OFFR, CVS, TRAVIS SOTO, PC JAIL | $21.00 |
| 11/25/2019 | FAX CORRESPONDENCE | $6.00 |
| 11/26/2019 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 11/26/2019 | JUDGMENT ENTRY - WILLIAM F KLUGE BE APPOINTED AS LEAD COUNSEL AND ROBERT A GRZYBOWSKI BE COURT APPOINTED AS CO-COUNSEL TO REPRESENT THE DEFENDANT IN THIS MATTER  CC:  PROS ATTY, WILLIAM F KLUGE, ROBERT A GRZYBOWSKI | $5.00 |
| 11/26/2019 | FAX CORRESPONDENCE | $9.00 |
| 12/06/2019 | FAX CORRESPONDENCE @11:36 AM <br> Attorney: GRZYBOWSKI, ROBERT (0000044014) | $16.00 |
| 12/06/2019 | DEFENDANT'S MOTION FOR APPROPRIATION OF FUNDS FOR  A CONSULTING MITIGATION EXPERT <br> Attorney: GRZYBOWSKI, ROBERT (0000044014) <br> Attorney: KLUGE, WILLIAM (0000022433) | |

5/3/2021            Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 12/18/2019 | WLIO NBC LIMA REQUEST PERMISSION TO BE COURTROOM FOR THE PRE-TRIAL ON DECEMBER 19, 2019 | |
| 12/19/2019 | JUDGMENT ENTRY -TODD CUMMINS/WLIO LIMA SHALL BE PERMITTED TO VIDEOTAPE OR PHOTOGRAPH DURING ALL PROCEEDINGS IN THIS CASE. PHOTOGRAPHS OF JURORS SHALL NOT BE PERMITTED. FLASH PHOTOGRAPHY SHALL NOT BE PERMITTED. | $5.00 |
| 12/19/2019 | RESULTS: The following event: PRE-TRIAL scheduled for 12/19/2019 at 12:30 pm has been resulted as follows: Result: HELD Judge: SCHIERLOH, KEITH H    Location: | |
| 12/19/2019 | JUDGMENT ENTRY -TIME WAIVER - DEF WAIVES HIS RIGHT TO A SPEEDY TRIAL UNDER THE OHIO CONSTITUTION & THE UNITED STATES CONSTITUTION & AS SET FORTH UNDER ORC SECTIONS 2945.71 THROUGH 2945.73. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $5.00 |
| 12/19/2019 | JUDGMENT ENTRY -A)DEF DID EXECUTE A NEW TIME WAIVER IN OPEN COURT; B)UPON THE FILING OF DEF'S REQUEST TO THE SUPREME COURT OF THE UNITED STATES THAT COUNSEL FOR DEF SHALL FILE AN APPROPRIATE MOTION FOR STAY; C)COURT WOULD SET THIS MATTER FOR A PRE-TRIAL ON THURSDAY, FEBRUARY 6, 2020 AT 1 PM; D)COURT SHALL NOT RESERVE THE OPPORTUNITY TO RULE ON DEF'S MOTION FOR FUNDS FOR A MITIGATION EXPERT; E)COUNSEL FOR DEF SHALL SUBMIT A PERIODIC BILLING AS TO THIS MATTER. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $5.00 |
| 12/19/2019 | FAX CORRESPONDENCE | $15.00 |
| 12/19/2019 | ASSIGNMENT NOTICES - PRE-TRIAL IS SCHEDULED ON FEBRUARY 6, 2020 AT 1 PM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 12/19/2019 | FAX CORRESPONDENCE | $9.00 |
| 12/19/2019 | NOTICE OF HEARING Event: PRE-TRIAL Date: 02/06/2020   Time: 1:00 pm Judge: SCHIERLOH, KEITH H    Location: Result: RESCHEDULE EVENT | |
| 01/21/2020 | FAX CORRESPONDENCE @8:43 AM Attorney: KLUGE, WILLIAM (0000022433) | $11.00 |
| 01/21/2020 | MOTION FOR CONTINUANCE - PRE-TRIAL ON FEBRUARY 6, 2020 Attorney: KLUGE, WILLIAM (0000022433) | |
| 01/22/2020 | NOTICE OF HEARING The following event: PRE-TRIAL scheduled for 02/06/2020 at 1:00 pm has been rescheduled as follows: Event: PRE-TRIAL Date: 03/11/2020   Time: 8:30 am Judge: SCHIERLOH, KEITH H    Location: Result: EVENT IS VACATED | |
| 01/22/2020 | JUDGMENT ENTRY OF CONTINUANCE - PRE-TRIAL IS CONTINUED & RE-SCHEDULED TO MARCH 11, 2020 AT 8:30 AM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $5.00 |
| 01/22/2020 | ASSIGNMENT NOTICES -UPON REQUEST OF THE DEF, PRE-TRIAL SCHEDULED ON 2/6/20 IS RE-SCHEDULED TO MARCH 11, 2020 AT 8:30 AM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 01/22/2020 | FAX CORRESPONDENCE | $15.00 |
| 03/10/2020 | FAX CORRESPONDENCE @2:12 PM Attorney: KLUGE, WILLIAM (0000022433) | $10.00 |
| 03/10/2020 | MOTION TO VACATE -PRE-TRIAL SCHEDULED FOR MARCH 11, 2020 -APPEAL HAS BEEN FILED IN US SUPREME COURT Attorney: KLUGE, WILLIAM (0000022433) | |
| 03/10/2020 | ASSIGNMENT NOTICES -PRE-TRIAL SCHEDULED ON MARCH 11, 2020 AT 8:30 AM IS VACATED DUE TO US SUPREME COURT FILING. FAXED: PROS, WM.KLUGE, PROB OFFICER, CVS, T.SOTO %JAIL | $3.00 |
| 03/10/2020 | FAX CORRESPONDENCE | $15.00 |
| 06/26/2020 | NOTICE OF HEARING Event: PRE-TRIAL Date: 07/13/2020   Time: 11:30 am Judge: SCHIERLOH, KEITH H    Location: Result: RESCHEDULE EVENT | |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 61

5/3/2021                                     Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 06/26/2020 | ASSIGNMENT NOTICES - PRE-TRIAL IS SCHEDULED ON JULY 13, 2020 AT 11:30 AM. FAXED: PROS, WM.KLUGE, R.GRZBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 06/26/2020 | FAX CORRESPONDENCE | $9.00 |
| 07/01/2020 | FAX CORRESPONDENCE @11:04 AM<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | $7.00 |
| 07/01/2020 | MOTION TO CONTINUE -PRE-TRIAL SCHEDULED FOR JULY 13, 2020 AT 11:30 AM<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |
| 07/01/2020 | NOTICE OF HEARING<br><br>The following event: PRE-TRIAL scheduled for 07/13/2020 at 11:30 am has been rescheduled as follows:<br><br>Event: PRE-TRIAL<br>Date: 08/03/2020   Time: 11:00 am<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: HELD | |
| 07/01/2020 | JUDGMENT ENTRY -PRE-TRIAL SCHEDULED FOR JULY 13, 2020 AT 11:30 AM IS REASSIGNED FOR AUGUST 3, 2020 AT 11:00 AM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $5.00 |
| 07/01/2020 | ASSIGNMENT NOTICES -UPON MOTION OF DEF, PRE-TRIAL SCHEDULED ON JULY 13, 2020 IS RE-SCHEDULED TO AUGUST 3, 2020 AT 11:00 AM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 07/01/2020 | FAX CORRESPONDENCE | $15.00 |
| 08/03/2020 | #4 -MOTION TO DETERMINE ELIGIBILITY FOR DEATH PENALTY<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #5 -MOTION FOR ALL MOTIONS TO BE HEARD ON RECORD<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #6 -MOTION TO EXTEND TIME FOR FILING PRE-TRIAL MOTIONS<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #7 -MOTION TO COMPEL DISCLOSURE OF PROSECUTING ATTORNEY'S JURY SELECTION DATA<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #8 -MOTION TO PROHIBIT ANY REFERENCES TO THE FIRST PHASE OF THESES PROCEEDINGS AS THE "GUILT PHASE"<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #9 -MOTION TO PERMIT ACCUSED TO APPEAR IN CIVILIAN CLOSING AT ALL PROCEEDINGS<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #10 -MOTION TO PROHIBIT THE FILMING, PHOTOGRAPHING OR VIDEOTAPING OF THE DEFENDANT WHILE IN THE COURTROOM<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #11 -MOTION TO HAVE REASONS FOR DEFENSE OBJECTIONS AND REASONS FOR OVERRULING DEFENSE OBJECTIONS PLACED ON THE RECORD<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #12 -DEFENDANT'S MOTION TO COMPEL LAW ENFORCEMENT OFFICIALS TO TURN OVER AND ADVISE THE PROSECUTING ATTORNEY OF ALL INFORMATION ACQUIRED DURING THE COURSE OF INVESTIGATION<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 08/03/2020 | #13 -MOTION FOR PREPARATION OF DAILY TRANSCRIPTS AT COUNTY EXPENSES<br>Attorney: KLUGE, WILLIAM (0000022433)<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |
| 08/03/2020 | #14 -MOTION TO INCREASE THE BURDEN OF PROOF TO BEYOND ALL DOUBT AT THE PENALTY PHASE OF TRIAL<br>Attorney: KLUGE, WILLIAM (0000022433)<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |
| 08/03/2020 | #15 -MOTION TO RESTRAIN CERTAIN PARTIES FROM DISCUSSING THE CASE WITH ACCUSED<br>Attorney: KLUGE, WILLIAM (0000022433)<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |
| 08/03/2020 | #16 -MOTION TO APPEAR AT ALL PROCEEDINGS WITHOUT RESTRAINTS<br>Attorney: KLUGE, WILLIAM (0000022433)<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |
| 08/03/2020 | #17 -MOTION FOR CLOSURE OF PRE-TRIAL HEARINGS<br>Attorney: KLUGE, WILLIAM (0000022433)<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 62

| Date | Docket Text | Amount Owed |
|---|---|---|
| 08/03/2020 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 08/03/2020 at 11:00 am has been resulted as follows:<br><br>Result: HELD<br>Judge: SCHIERLOH, KEITH H    Location: | |
| 08/03/2020 | NOTICE OF HEARING<br>Event: HEARING ON MOTION<br>Date: 09/10/2020   Time: 2:00 pm<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: COURT CONTINUES | |
| 08/03/2020 | JUDGMENT ENTRY - ORDER - A)DEF SHALL USE NUMBERS TO IDENTIFY MOTIONS &/OR RESPONSES TO STATE MOTIONS FOR IDENTIFICATION PURPOSES; B)STATE OF OHIO SHALL USE LETTERS TO IDENTIFY MOTIONS &/OR RESPONSES TO DEFENDANT MOTIONS FOR IDENTIFICATION PURPOSES; C)STATE OF OHIO SHALL HAVE UNTIL AUGUST 28, 2020 TO RESPOND TO SAID MOTIONS &/OR FILE APPROPRIATE MOTIONS TO STATE'S BEHALF; D)COURT WOULD SET THIS MATTER FOR HEARING ON PENDING DEF MOTIONS #4 THROUGH #17 ON THURSDAY, SEPTEMBER 10, 2020 AT 2:00 PM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $5.00 |
| 08/03/2020 | FAX CORRESPONDENCE | $9.00 |
| 08/04/2020 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 08/13/2020 | RESULTS:<br>The following event: HEARING ON MOTION scheduled for 09/10/2020 at 2:00 pm has been resulted as follows:<br><br>Result: COURT CONTINUES<br>Judge: SCHIERLOH, KEITH H    Location: | |
| 08/13/2020 | NOTICE OF HEARING<br>Event: HEARING ON MOTION<br>Date: 09/17/2020   Time: 2:00 pm<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: HELD | |
| 08/13/2020 | ASSIGNMENT NOTICES - COURT RE-SCHEDULES THE HEARING ON MOTION SCHEDULED ON SEPTEMBER 10, 2020 AT 2:00 PM TO SEPTEMBER 17, 2020 AT 2:00 PM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $15.00 |
| 08/13/2020 | FAX CORRESPONDENCE | $9.00 |
| 08/14/2020 | FAX CORRESPONDENCE @10:04 AM<br>Attorney: KESLAR, STEVEN A (0090743) | $14.00 |
| 08/14/2020 | BRIEF IN OPPOSITION OF AIM MEDIA MIDWEST OPERATING, LLC dba THE LIMA NEWS TO THE DEFENDANT'S MOTION FOR CLOSURE OF PRE-TRIAL HEARINGS - ORAL ARGUMENT REQUESTED<br>Attorney: KESLAR, STEVEN A (0090743) | |
| 08/14/2020 | FAX CORRESPONDENCE @10:11 AM<br>Attorney: KESLAR, STEVEN A (0090743) | $11.00 |
| 08/14/2020 | BRIEF IN OPPOSITION OF AIM MEDIA MIDWEST OPERATING, LLC dba THE LIMA NEWS TO THE DEFENDANT'S MOTION TO PROHIBIT THE FILMING, PHOTOGRAPHING OR VIDEOTAPING OF THE DEFENDANT WHILE IN THE COURTROOM - ORAL ARGUMENT REQUESTED<br>Attorney: KESLAR, STEVEN A (0090743) | |
| 08/18/2020 | FAX CORRESPONDENCE @ 8:08 AM FROM Attorney: LEMON, DANIEL (0097113) | $8.00 |
| 08/18/2020 | MOTION OF THE OHIO COALITION FOR OPEN GOVERNMENT JOINING LIMA NEWS IN OPPOSITION TO (1)DEFENDANT'S MOTION TO PROHIBIT THE FILMING, PHOTOGRAPHING OR VIDEOTAPING OF THE DEFENDANT WHILE IN THE COURTROOM; AND (2) DEFENDANT'S MOTION FOR CLOSURE OF THE PRETRIAL PROCEEDINGS Attorney: LEMON, DANIEL (0097113) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION FOR ALL MOTIONS TO BE HEARD ON RECORD #5-E<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION TO EXTEND TIME FOR FILING PRE-TRIAL MOTIONS #6-F<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF PROSECUTING ATTORNEY'S JURY DATE #7-G<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #8-H<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #9-I<br>Attorney: SCHROEDER, TODD C (75265) | |

5/3/2021                                       Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|---|---|---|
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #10-J<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #11-K<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #12-L<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION FOR PREPARATION OF DAILY TRANSCRIPTS AT COUNTY EXPENSE #13-M<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #14-N<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #15-O<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION #16-P<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/24/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION FOR CLOSURE OF PRE-TRIAL HEARINGS #17-Q<br>Attorney: SCHROEDER, TODD C (75265) | |
| 08/28/2020 | STATE'S RESPONSE TO DEFENDANT'S MOTION TO DETERMINE ELIGIBILITY FOR DEATH PENALTY #4<br>Attorney: SCHROEDER, TODD C (75265) | |
| 09/14/2020 | FAX CORRESPONDENCE @2:15 PM<br>Attorney: KLUGE, WILLIAM (0000022433) | $6.00 |
| 09/14/2020 | MOTION TO WITHDRAW MOTIONS 10 & 17 AS FILED ON AUGUST 3, 2020<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #1 - IS APPROVED & STATE OF OHIO HAS ACKNOWLEDGED ON THE RECORD THAT THE STATE HAS PROVIDED SAID DISCOVERY AND ACKNOWLEDGES THE ONGOING DUTY TO CONTINUE COMPLIANCE W/DEF'S REQUEST. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #2 - IS APPROVED & STATE OF OHIO HAS ACKNOWLEDGED ON THE RECORD THAT THE STATE HAS PROVIDED SAID INTENDED USE OF EVIDENCE TO DEF ON AUGUST 31, 2018 AND SAID RESPONSE IS CURRENTLY UNCHANGED & IS AVAILABLE TO DEF VIA THE MATRIX DISCOVERY SYSTEM. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #3 - IS APPROVED & STATE OF OHIO HAS ACKNOWLEDGED ON THE RECORD THAT THE STATE HAS PROVIDED SAID  BILL OF PARTICULARS TO DEF ON AUGUST 31, 2018 AND SAID RESPONSE IS CURRENTLY UNCHANGED & IS AVAILABLE TO DEF VIA THE MATRIX DISCOVERY SYSTEM. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #4 - COURT SHALL APPROVE DEF'S MOTION #4 AND FIND THAT DEF IS NOT "DEATH ELIGIBLE" UPON THE LANGUAGE USED WITHIN THE INDICTMENT. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $20.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #5 - COURT SHALL APPROVE DEF'S MOTION #5 AND HEAR ALL MOTIONS ON THE RECORD. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #6 - COURT SHALL APPROVE DEF'S MOTION #6 AND EXTEND TIME TO FILE MOTIONS UNTIL MONDAY, NOVEMBER 30, 2020. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #7 - COURT SHALL APPROVE DEF'S MOTION #7 AND COMPEL DISCLOSURE OF JURY SELECTION DATA. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #8 - COURT SHALL APPROVE DEF'S MOTION #8 AND PROHIBIT THE USE OF GUILT PHASE IN THE TRIAL PHASE OF THE PROCEEDINGS. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY  ON DEFENDANT'S MOTION #9 - COURT SHALL APPROVE DEF'S MOTION #9 AND ALLOW TO WEAR CLOTHING, TO BE PROVIDED & AT DEF'S COST. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #10 - MOTION #10 HAS BEEN WITHDRAWN BY DEF. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #11 -COURT SHALL APPROVE DEFENDANT'S MOTION #11 AND RULINGS ON DEFENSE OBJECTIONS ON THE RECORD. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #12 -IS APPROVED AND STATE OF OHIO HAS ACKNOWLEDGED ON THE RECORD THAT STATE HAS PROVIDED SAID DISCOVERY AND ACKNOWLEDGES THE ONGOING DUTY TO CONTINUE COMPLIANCE WITH THE DEF'S REQUEST. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 64

| Date | Docket Text | Amount Owed |
|------|-------------|-------------|
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #13 -COURT SHALL APPROVE DEF'S MOTION #13 IN ELECTRONIC FORMAT AND PROVIDE DAILY RECORDINGS OF THE DAILY TRIAL PROCEEDINGS. BOTH COUNSEL FOR STATE OF OHIO & DEF MAY PROVIDE AN APPROPRIATE ELECTRONIC DEVICE (THUMB DRIVE) AT CONCLUSION OF EACH DAY AND RECEIVE THE RECORDINGS. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #14 -BASED UPON THE REQUEST OF DEF AND THE FILED OBJECTION BY STATE OF OHIO, THAT THE BURDEN OF PROOF IN THE SENTENCING PHASE WOULD BE IDENTIFIED AS "BEYOND A REASONABLE DOUBT." COURT WOULE PERMIT THE DEF & STATE OF OHIO TO PROVIDE SUGGESTED JURY INSTRUCTION FOR THE CONSIDERATION AT THE APPROPRIATE TIME. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #15 -BASED UPON THE REQUEST OF DEF AND OVER NO OBJECTION BY STATE OF OHIO, COURT SHALL APPROVE DEF'S MOTION #15 AND RESTRAIN CERTAIN PARTIES FROM DISCUSSING THE CASE W/ACCUSED. SPECIFICALLY, STATE OF OHIO, OR THEIR AGENTS, SHALL NOT INITIATE ANY DISCUSSIONS W/DEF W/OUT FIRST HAVING THE DISCUSSIONS BEING KNOWINGLY, VOLUNATARILY & INTELLIGENTLY BY WAIVING HIS RIGHT TO REMAIN SILENT AND A WAIVER FOR HIS COUNSEL TO BE PRESENT. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #165 -BASED UPON THE REQUEST OF DEF AND OVER NO OBJECTION BY STATE OF OHIO, COURT WOULD APPROVE DEF'S MOTION #16 AND PERMIT THE DEF TO APPEAR AT ALL PROCEEDINGS IN THE COURT ROOM WITHOUT RESTRAINTS. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | JUDGMENT ENTRY ON DEFENDANT'S MOTION #17 - MOTION #17 HAS BEEN WITHDRAWN BY DEF. FAXED: PROS, WM.KLUGE; CC: R.GRZYBOWSKI | $5.00 |
| 09/17/2020 | FAX CORRESPONDENCE | $43.00 |
| 09/17/2020 | COPIES | $2.00 |
| 09/18/2020 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 09/18/2020 | RESULTS:<br>The following event: HEARING ON MOTION scheduled for 09/17/2020 at 2:00 pm has been resulted as follows:<br><br>Result: HELD<br>Judge: SCHIERLOH, KEITH H    Location: | |
| 09/18/2020 | NOTICE OF HEARING<br>Event: PRE-TRIAL<br>Date: 11/12/2020   Time: 2:00 pm<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: HELD | |
| 09/18/2020 | ASSIGNMENT NOTICES - PRE-TRIAL IS SCHEDULED ON NOVEMBER 12, 2020 AT 2:00 PM. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 09/18/2020 | FAX CORRESPONDENCE | $9.00 |
| 09/23/2020 | JUDGMENT ENTRY - BASED UPON THE DEATH PENALTY SPECIFICATION BEING REMOVED FROM THE W/IN CASE, EFFECTIVE TODAY; i.e. SEPTEMBER 23, 2020 & MOVING FORWARD, ATTORNEY FEES FOR COURT APPOINTED CO-COUNSEL WILLIAM KLUGE & ROBERT GRZYBOWSKI TO REPRESENT THE DEFENDANT WILL BE PAID AT A RATE OF $75.00 PER HOUR. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI | $5.00 |
| 09/23/2020 | FAX CORRESPONDENCE | $6.00 |
| 10/01/2020 | MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 10/01/2020 | MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES<br>Attorney: GRZYBOWSKI, ROBERT (0000044014) | |
| 10/06/2020 | JUDGMENT ENTRY -APPROVING PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES OF $4,737.50.<br>CC: WM.KLUGE | $10.00 |
| 10/06/2020 | JUDGMENT ENTRY -APPROVING PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES OF $1,917.50.<br>CC: R.GRZYBOWSKI | $15.00 |
| 11/12/2020 | FAX CORRESPONDENCE FROM WLIO-TV CHANNEL 35 | $5.00 |
| 11/12/2020 | REQUEST FROM WLIO-TV CHANNEL 35 TO BE IN COURTROOM FOR PRE-TRIAL ON NOVEMBER 12, 2020 | |
| 11/12/2020 | RESULTS:<br>The following event: PRE-TRIAL scheduled for 11/12/2020 at 2:00 pm has been resulted as follows:<br><br>Result: HELD<br>Judge: SCHIERLOH, KEITH H    Location: | |

TRAVIS SOTO v. SIEFKER, SHERIFF<br>CASE NO. 3:21-cv-167<br>APPENDIX - Page 65

Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|---|---|---|
| 11/12/2020 | JURY TRIAL SCHEDULED<br>Event: JURY TRIAL<br>Date: 03/29/2021   Time: 8:30 am<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: EVENT IS VACATED | |
| 11/12/2020 | JURY TRIAL SCHEDULED<br>Event: JURY TRIAL<br>Date: 03/30/2021   Time: 8:30 am<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: EVENT IS VACATED | |
| 11/12/2020 | JURY TRIAL SCHEDULED<br>Event: JURY TRIAL<br>Date: 03/31/2021   Time: 8:30 am<br>Judge: SCHIERLOH, KEITH H    Location:<br><br>Result: EVENT IS VACATED | |
| 11/12/2020 | ASSIGNMENT NOTICES - 1)FINAL PRE-TRIAL ON MARCH 8, 2021 AT 1:00 PM; 2)JURY TRIAL IS SCHEDULED ON MARCH 29, 2021 AT 8:30 AM (3 DAYS ALLOTTED). FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 11/12/2020 | FAX CORRESPONDENCE | $9.00 |
| 11/13/2020 | SHERIFF FEES- PUTNAM COUNTY SHERIFF | $5.00 |
| 02/22/2021 | FAX CORRESPONDENCE RECEIVED FROM<br>Attorney: KLUGE, WILLIAM (0000022433) | $6.00 |
| 02/22/2021 | MOTION: REQUESTING STAY OF TRIAL COURT PROCEEDINGS PENDING HABEAS CORPUS REVIEW<br>Attorney: KLUGE, WILLIAM (0000022433) | |
| 02/22/2021 | ASSIGNMENT NOTICES - JURY TRIAL SCHEDULED ON MARCH 29, 2021 IS VACATED. FAXED: PROS, R.GRZYBOWSKI, WM.KLUGE, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 02/22/2021 | FAX CORRESPONDENCE | $9.00 |
| 03/05/2021 | ASSIGNMENT NOTICES - FINAL PRE-TRIAL SCHEDULED ON MARCH 8, 2021 AT 1:00 PM IS VACATED. FAXED: PROS, WM.KLUGE, R.GRZYBOWSKI, PROB OFFICER, CVS, T.SOTO %JAIL | $18.00 |
| 03/05/2021 | FAX CORRESPONDENCE | $9.00 |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 66

# INDICTMENT
### Crim. Rule 6,7

**The State of Ohio**
**Putnam County**

### COURT OF COMMON PLEAS

### PUTNAM COUNTY GRAND JURY

**August 12, 2016**

Case No. ___16 CR 59_____

## COUNT I

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did purposely cause the death of another who is under thirteen (13) years of age at the time of the commission of the offense; to-wit: did cause the death of his son, John Doe, DOB xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.01(C), **AGGRAVATED MURDER**, an unclassified felony and against the peace and dignity of the State of Ohio.

## COUNT II

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code; to-wit: his son, John Doe, DOB xx/xx/2003, as a proximate result of committing felonious assault upon him, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.02(B), **MURDER**, an unclassified felony and against the peace and dignity of the State of Ohio.

## COUNT III

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did knowingly cause serious physical harm to another; to-wit: his son, John Doe, DOB xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.11(A)(1), **FELONIOUS ASSAULT**, a felony of the 1st degree and against the peace and dignity of the State of Ohio.

## COUNT IV

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio,

**TRAVIS D. SOTO,** did in the case of a victim under the age of thirteen, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person to inflict serious physical harm on the victim; to-wit: his son, John Doe, DOB xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2905.01, **KIDNAPPING**, a felony of the 1st degree and against the peace and dignity of the State of Ohio.

**COUNT V**

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did while knowing that an official proceeding or investigation was in progress or was about to be or likely to be instituted, alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation; to-wit: did alter, conceal or destroy evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, while in Putnam County, Ohio, in violation of Ohio Revised Code Section 2921.12(A)(1), **TAMPERING WITH EVIDENCE**, a felony of the 3rd degree and against the peace and dignity of the State of Ohio.

A TRUE BILL

_____
Grand Jury Foreperson

Office of the Prosecuting Attorney
Of Putnam County, Ohio

By: _____
        Todd C. Schroeder
        Assistant Prosecuting Attorney

This bill of Indictment found upon testimony sworn and sent before the Grand Jury at the request of the Prosecuting Attorney.

_____
Grand Jury Foreperson

2014 AUG 15  A 9: 02

THE STATE OF OHIO      I, KIMBERLY A. REDMAN, CLERK
Putnam County, ss      OF THIS COURT OF COMMON
                       PLEAS, WITHIN AND FOR SAID
                       COUNTY.
HEREBY CERTIFY THAT THE ABOVE AND FORE-
GOING IS TRULY TAKEN AND COPIED FROM THE
ORGINAL _INDICTMENT_
NOW ON FILE IN MY OFFICE
WITNESS MY HAND AND SEAL OF SAID COURT
THIS _____ DAY OF _MAY_ _____ A.D. 20_21_
      KIMBERLY A. REDMAN, Clerk
By _____ Deputy

*J.2bo  P.167*

# IN THE COURT OF COMMON PLEAS OF PUTNAM COUNTY, OHIO

STATE OF OHIO

     CASE NO. 2016 CR 57

      Plaintiff

   VS.           PRE-TRIAL ORDER

TRAVIS SOTO

      Defendant

---

   This 17th day of August 2016, came Todd Schroeder, Prosecuting Attorney, representing the State of Ohio, Joseph Benavidez, Court Appointed Attorney for Defendant, and Defendant Travis Soto.  The Defendant having been advised of the nature of the charge against him and of his rights under the constitution, waived the requirement of having the Indictment read to him and waived the requirement of 24 hours notice to receiving a copy of such Indictment, and arraigned upon said Indictment for a plea thereto says he is not guilty.

   IT IS ORDERED, ADJUDGED AND DECREED that the Defendant's bond be set at Five Hundred Thousand Dollars ($500,000.00) cash or surety.

   IT IS FURTHER ORDERED unless the fingerprinting process has been completed, you must appear at the Putnam County Sheriff's Department for booking/processing purposes within the next 24 hours.

   IT IS FURTHER ORDERED that a Pre-trial is scheduled for **September 6, 2016 at 3:30 P.M.**

J.265    P 168

IT IS FURTHER ORDERED as follows:

1)      Any demand for Discovery under Rule 16 of the Ohio Rules of Criminal

        Procedure shall be made by the Defendant by **August 24, 2016.**

2)      All Discovery by the State of Ohio is to be provided to the Defendant by

3)      **August 31, 2016**.

4)      Any Discovery response required by the Defendant shall be provided

        by **September 2, 2016**.

JUDGE RANDALL BASINGER

cc:
- Prosecuting Attorney – faxed
- Joseph Benavidez – faxed 419-228-3367
- Probation Officer - faxed
- CVS-faxed
- Travis Soto – faxed to PC Jail

2016 AUG 18  A 10: 34
COMMON PLEAS COURT
TERESA J LAMMERS, CLERK
PUTNAM COUNTY, OHIO

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 70



## IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
### OTTAWA, OHIO

| | | |
|---|---|---|
| **STATE OF OHIO** | * | **CASE NO. 2016 CR 00057** |
| Plaintiff | * | |
| | * | |
| **vs** | * | |
| | * | |
| **TRAVIS SOTO** | * | **MOTION TO DISMISS ON** |
| | | **THE GROUNDS OF DOUBLE** |
| Defendant | * | **JEOPARDY** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The defendant was brought before this court upon an indictment citing violations of involuntary man slaughter (a felony of the1st degree, ORC 2903.04 (A) and child endangering ( a felony if the 3rd degree, ORC 2919.22) (A) and (E)(1)(C) dated March 31, 2006. The defendant appeared back in front of this court on July 7, 2006, after initially entering pleas of not guilty, and submitted a negotiated plea of guilty to endangering children (court II of the original indictment). The defendant was sentenced by this court in August 31, 2006, to five years of actual incarceration with the Ohio Department of Rehabilitation and Correction and a monetary fine of $ 10,000, the maximum alterable penalties for a felony of the third degree.

The defendant served his ordered time with the Ohio Department of Rehabilitation and Corrections and was released in2012 and he obtained employment at Campbell's Soup in Napoleon Ohio. On August 15, 2016 a five count indictment was filed with the clerk of this court alleging violations of: Aggravated Murder, and unclassified felony ORC 2903.01(c); Murder, an unclassified felony, O.R.C. 2903.02 (B); Felonious Assault, a felony of the first degree. O.R.C. 2903.11 (A) (1); Kidnapping, a felony of the 1st degree, O.R.C 2905.01; and Tampering with Evidence, a felony of the 3rd degree, O.R.C. 2921.12 (A)(i). All six counts in the indictment allege to the date of January 23, 2006.

The defendant has tendered not guilty pleas to all of the charges and the case is pending awaiting Final resolution.

The defendant is now claiming that the prosecution of him pursuant to the pending indictment violates the double jeopardy clause of the United States

Constitutions, Specifically the Fifth Amendment, nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb". In Brown v Ohio, 432 U.S. 161 cites that "whatever the sequence maybe, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense.

Earlier the defendant, as previously stated, entered a plea of guilty to child endangering, and the disposition of count 1, involuntary manslaughter was dismissed. Neither the judgment entries or transcripts of the proceeding address how the matters would be disposed, with or without prejudice. The entries in the record makes one think that a change of pleas to child endangering also disposed of the involuntary manslaughter charge. There is no debate that involuntary manslaughter is a lesser included offense of murder and aggravated murder thereby barring the persecution of defendant on these charges.

Therefore the admission of child endangering charge at the August, 2006 hearing and subsequent dismissal of the involuntary manslaughter charge would bar the further prosecution of any charged involving murder of the deceased.

Respectfully Submitted,

Joseph Benavidez #0042447
Attorney for Defendant
212 North Elizabeth St Ste 322
Lima, Ohio 45801
(419) 228-0189

**Proof of Service**

I hereby certify that a copy of the foregoing was hand delivered to the Putnam County Prosecutor's Office this 11th day of October, 2016.

Joseph Benavidez
Attorney for Defendant

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO | : | CASE NO. | 2016 CR 57 |
| Plaintiff | : | | |
| -vs- | : | | |
| TRAVIS SOTO | : | RESPONSE TO DEFENDANT'S | |
| | | MOTION TO DISMISS | |
| Defendant | : | | |

Now comes the Putnam County Assistant Prosecuting Attorney, Todd C. Schroeder, and hereby submits to this Honorable Court his reply to Defendant's Motion to Dismiss on Double Jeopardy grounds.

**The 2006 Prosecution**

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of R.C. 2903.04(A), a felony of the 1st degree. Critically important are the elements and factual basis of each count.

As charged, Defendant was alleged to have committed Child Endangering by creating a substantial risk of harm, and actually causing serious physical harm to his child, and was alleged to have committed Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering.

The factual basis of both counts relied heavily on Defendant's representations to law enforcement, which varied each time he recounted the details, but were always premised on describing the cause of death by way of an ATV accident wherein Defendant was the driver and struck his son. The Lucas County Coroner conducted an autopsy, was given Defendant's version

of the events, and concluded the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering, the Involuntary Manslaughter charge was dismissed, and he was sentenced to five (5) years incarceration.

On July 25, 2016, Defendant voluntarily appeared at the Putnam County Sheriff's Office, indicated he wanted to provide the truthful account of what occurred, and proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, and reports from 2006 and present, were reviewed by Dr. Randall Schlievert, a pediatric abuse specialist qualified as an expert multiple times by this Court. Dr. Schlievert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son, and importantly concluded that Defendant's 2006 misrepresentations led to the reasonable yet faulty conclusions of the Lucas County Coroner.

Defendant was then Indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C).

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

**Double Jeopardy Test**

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense*." *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

## ARGUMENT – PART I

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*.

Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.[1]

---

[1] The State asserts that the six (6) year Statute of Limitations does not bar prosecution for Felonious Assault and Tampering with Evidence since these crimes were not discovered until Defendant's confession; nonetheless judicial review of this issue would be prudent.

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore Double Jeopardy does not bar prosecution of this offense.

It thus appears that the charge of Murder and Involuntary Manslaughter, both of which involve causing the death of another through the commission of a felony, requires more careful scrutiny. However, as described below, Double Jeopardy will not bar prosecution of the charge of Murder.

## ARGUMENT – PART II

A.    The 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

Clearly the Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his false narrative of the events would bar prosecution of subsequent charges based on a truthful narrative of the events, and which further transformed the case from one about an accidental death to one involving excessive violence committed purposefully.

B.    Involuntary Manslaughter with a felony Child Endangering predicate is **not** the *same offense* as Murder with a Felonious Assault predicate. Therefore, a resolution on the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

*State v. Resor*, 2010 Ohio 397 reviewed the *Blockburger* same offense test with respect to these two charges:

Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).

Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate.

C.    Even if Murder and Involuntary Manslaughter constitute the same offense, an exception applies.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. If application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, the subsequent prosecution is barred. *Grady v. Corbin* [1990], 110 S. Ct. 2084,

2090; *Brown v. Ohio* [1977], 432 U.S. 161, 166, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, 261.

An exception to the *Blockburger* test exists where the state is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been discovered despite the exercise of due diligence until Defendant appeared and confessed to the actual details of his son's death. The 2006 investigation relied heavily on Defendant's assertions of what occurred since Defendant was the only person present when the facts giving rise to his son's death occurred. Dr. Schlievert's report dated September 30, 2016, highlights the reasonableness of the investigative conclusions in 2006 as follows:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> ... What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

From:                                          10/18/2016 11:26      #836 P.007/007

Hence, the false narrative led to a false medical diagnosis. As such, the fact necessary to support

this subsequent prosecution could not have been discovered until July 2016 despite the exercise

of due diligence.

    WHEREFORE, the State of Ohio respectfully requests that this Honorable Court overrule

Defendant's Motion to Dismiss on Double Jeopardy grounds.


                           Respectfully submitted,

                           Todd C. Schroeder, #0075265
                           Putnam County Assistant Prosecuting Attorney
                           336 E. Main Street, Suite B
                           Ottawa, Ohio 45875
                           Phone: 419-523-3600
                           Fax: 419-523-4519


                      CERTIFICATE

    I hereby certify that a copy of the foregoing has been served to Attorney At Law, Joseph
Benavidez, 212 North Elizabeth Street, 3rd Floor, Suite 322, Lima, Ohio 45801, via US Mail,
postage prepaid, on this 18th day of October 2016.

                           Todd C. Schroeder, #0075265

1

1        IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO

2

   STATE OF OHIO

3

        PLAINTIFF           October 25, 2016

4

        -vs-              Case No. 2016-CR-57

5

   TRAVIS D. SOTO         Motion Hearing

6

        DEFENDANT

7

           This matter came on before the Honorable

8

   Randall L. Basinger the 25th day of October, 2016 at the
Putnam County Courthouse, Ottawa, Ohio.

9

                 APPEARANCES

10

11

   For the State of Ohio:   Mr. Todd Schroeder
                                 Assistant Prosecuting Attorney

12

13

   For the Defendant:     Mr. Joseph Benavidez

14

15

16

17

18

19

20

21

22

                 WESTRICK REPORTING

23

         Registered Professional Reporters
               13426 Road M

24

              Ottawa OH 45875

25

   Lisa Westrick, RPR         (419) 538-6347

2

1  (9:13 a.m.)

2              THE COURT:  Please be seated.  We are

3  present on Case 16-57 State of Ohio versus Travis Soto.  The

4  defendant is present in Court along with Attorney Joseph

5  Benavidez.  The State of Ohio is represented by Assistant

6  Prosecuting Attorney Todd Schroeder.  We are here on a

7  previously filed motion to dismiss.  A motion to dismiss was

8  based upon the grounds of double jeopardy.  There has been

9  filed with the Court not only a motion, but as well as a

10  response.

11      We've had some discussion in chambers concerning the

12  status of this hearing, and first of all, Mr. Benavidez, it's

13  my understanding that you are raising a separate issue; is

14  that correct?

15              MR. BENAVIDEZ:  That is correct, Your

16  Honor.

17              THE COURT:  And if you would state that

18  for the record, please.

19              MR. BENAVIDEZ:  Thank you, Your Honor.

20  This -- It was in representing Mr. Soto, we've had

21  communications, and I had some concerns wondering whether

22  Mr. Soto questioning the competency during these proceedings

23  of Mr. Soto at this time.  So therefore, I'm informing the

24  State of Ohio and the Court that I'll be filing a motion to

25  have him evaluated competency-wise.

3

1              THE COURT:  The question being raised is

2      the defendant's current competence to stand trial; is that

3      correct?

4              MR. BENAVIDEZ: Yeah, in aiding the

5      defense.

6              THE COURT: And you're asking for an

7      evaluation at Court Diagnostic and Treatment on that issue?

8              MR. BENAVIDEZ: Yes, Your Honor.

9              THE COURT: I'm going to grant that

10     request and refer the defendant to Court Diagnostic and

11     Treatment for an evaluation of competence to stand trial.

12          In the interim, we've had some discussion as to

13     whether or not the motion to dismiss based upon double

14     jeopardy could proceed.  The Court's understanding is that

15     the State's request is that we proceed with any argument on

16     that motion, that any ruling be delayed until a determination

17     has been made by Court Diagnostic and Treatment, and that the

18     matter would be submitted to the Court based upon any finding

19     on the question of competence to stand trial; is that your

20     request, Mr. Schroeder?

21              MR. SCHROEDER:  It is, Your Honor.

22              THE COURT:  And Mr. Benavidez, are you

23     opposed to that request?

24              MR. BENAVIDEZ:  No.

25              THE COURT:  The Court would also note

4

1  that we've had some discussion concerning some separate

2  issues.  First of all, there is a speedy trial question that

3  has been discussed, and it's my understanding that you are

4  acknowledging, Mr. Benavidez, that not only the competence

5  question and a referral, but also the motion to dismiss based

6  upon double jeopardy would in fact result in a delay of

7  trial, and you're acknowledging that that delay would be

8  attributed to the defendant; is that correct?

9              MR. BENAVIDEZ: That is correct, Your

10  Honor.

11              THE COURT: The Court would also note we

12  talked about the issue of statute of limitations on two of

13  the charges, that being the felonious assault charge and the

14  tampering with evidence charge, and after that discussion the

15  Court anticipates there would be a separate motion to dismiss

16  filed on those two charges based upon the statute of

17  limitations being the six year statute of limitations; is

18  that correct, Mr. Benavidez?

19              MR. BENAVIDEZ: Yes, Your Honor.

20              THE COURT: I'm going to instruct that any

21  additional motion to dismiss based upon the statute of

22  limitations be filed within 30 days, which would be the 23rd

23  of November.

24          As to the motion that is before the Court, being the

25  motion to dismiss based on double jeopardy, the Court

1  understands also that both parties are willing to stipulate

2  to what is the past record including the past court case,

3  being Case Number 06-19 as well as any of the documents in

4  that case. Ffirst of all, is that correct, Mr. Schroeder?

5          MR. SCHROEDER:  Yes, Your Honor.

6          THE COURT:  Mr. Benavidez?

7          MR. BENAVIDEZ:  Yes, Your Honor.

8          THE COURT:  It's my understanding that in

9  submitting this to the Court, as well as any arguments that

10  may be made today, that the parties are also willing to

11  stipulate to any transcripts that arose out of that case as

12  well as the pre-sentence report that was submitted to the

13  Court with a fact pattern in that case; is that correct,

14  Mr. Schroeder?

15          MR. SCHROEDER: It is, Your Honor.

16          THE COURT: Is that correct,

17  Mr. Benavidez?

18          MR. BENAVIDEZ:  Yes, Your Honor.

19          THE COURT:  And it's my understanding

20  that the parties are willing to stipulate and submit that any

21  additional documents in the present case being 16-57 would

22  also be submitted to the Court for consideration in the

23  motion to dismiss based on double jeopardy; is that correct,

24  Mr. Schroeder?

25          MR. SCHROEDER:  It is, Your Honor.

6

1              THE COURT:  Mr. Benavidez?

2              MR. BENAVIDEZ:  Yes, Your Honor.

3              THE COURT:  It's my understanding that

4  the State is also offering an additional exhibit?

5              MR. SCHROEDER:  Yes, Your Honor.

6              THE COURT:  Court has before it what has

7  been marked as State's Exhibit Number 1, which appears to be

8  an evaluation from a Dr. Randall Schlievert.  Any objection

9  to the admission of that Exhibit, Mr. Benavidez?

10             MR. BENAVIDEZ:  No, Your Honor.

11             (STATE'S EXHIBIT 1 MARKED)

12             THE COURT:  So admitted.  Are there any

13 other documents or exhibits that you are asking to have

14 admitted, Mr. Schroeder?

15             (STATE'S EXHIBIT 1 ADMITTED)

16             MR. SCHROEDER:  Your Honor, I wonder if

17 the Court has in it's possession a copy of the transcript of

18 the defendant's interview of July 25, 2016?

19             THE COURT:  I do not.

20             MR. SCHROEDER:  The State would ask that

21 it be permitted to make a copy now or after the hearing and

22 provide that to the Court as an additional document for

23 consideration.

24             THE COURT:  Any objection, Mr. Benavidez?

25             MR. BENAVIDEZ:  No, Your Honor.

1          THE COURT:  So admitted.

2          (STATE'S EXHIBIT 2 ADMITTED)

3          THE COURT:  Do you have anything further

4  as to exhibits, Mr. Schroeder?

5          MR. SCHROEDER:  No, Your Honor.

6          THE COURT:  Do you have anything further

7  as to exhibits, Mr. Benavidez?

8          MR. BENAVIDEZ:  No, Your Honor.

9          THE COURT:  I'm going to allow counsel to

10  argue the motion to dismiss based upon double jeopardy.

11  Mr. Benavidez, it being your motion, you may proceed.

12          MR. BENAVIDEZ:  Thank you, Your Honor.

13  May it please the Court on behalf of Mr. Soto, we have raised

14  the issue of a motion to dismiss the charges of murder and

15  aggravated murder based upon double jeopardy because of his

16  prior entrance of a plea to child endangerment and the

17  attempted prosecution of involuntary manslaughter, Your

18  Honor.  We raise the issue that involuntary manslaughter is

19  the lesser included offense of murder and aggravated murder,

20  and I guess started from the beginning, the Constitution of

21  the United States protects Mr. Soto from being subject to the

22  -- to being put twice in jeopardy and being prosecuted for

23  offenses, and it would be argument of the defendant that,

24  that he had already faced the violations of involuntary

25  manslaughter and child endangering, and that he entered into

8

1   negotiated plea where he pled guilty to child endangering,

2   and part of that deal was the dismissal as a negotiated plea

3   was not placed on the record whether it was with or without

4   prejudice, involuntary manslaughter was dismissed.

5                     THE COURT:  You would agree,

6   Mr. Benavidez, that the Supreme Court, U.S. Supreme Court

7   test in Blockburger provides in far for a comparison of

8   elements of each of the offenses?

9                     MR. BENAVIDEZ:  Yes.

10                     THE COURT:  And you would agree that the

11   charges, particularly the two charges that we are really

12   discussing here today, being murder and aggravated murder, do

13   include the additional mens rea of purposely?

14                     MR. BENAVIDEZ: Yes.

15                     THE COURT: And you would agree that those

16   are not part of what was the involuntary, the involuntary

17   manslaughter or the child endangering that were both indicted

18   in the original case; isn't that correct?

19                     MR. BENAVIDEZ: That's is correct.

20                     THE COURT: And in looking, and in looking

21   at what are any of the subsequent cases, and the State cited

22   a case out of, I believe, the Sixth District, this Resor case

23   that was one that had some similar claims of different

24   occasions, do you have any statement or response to what was

25   the finding in that case? The Resor case talked about the

9

1  acquittal on what was a murder charge, and whether or not it

2  could proceed down on the involuntary, and the Sixth District

3  essentially reversed the Common Pleas Court and said that

4  they could proceed.  Doesn't that have application in this

5  case?

6              MR. BENAVIDEZ:  Your Honor, I didn't

7  review that case, but, on it's face it appears that, that it

8  would be similar to this matter, but.

9              THE COURT: The one case also that was

10  cited is the Bridges case, which in part again states that

11  negotiated plea bars, successive prosecution where the

12  defendant would reasonably believe that his or her plea would

13  bar further prosecution for any greater offense relating to

14  the same factual scenario.  Now, in this particular case, the

15  original case, you would agree which based in large part

16  seemingly on what were the factual recitations made by the

17  defendant himself?

18              MR. BENAVIDEZ:  Yes.

19              THE COURT:  And that a subsequent

20  prosecution here or the subsequent indictment, is again based

21  upon additional statements largely by the defendant himself

22  in addition to whatever factual evidence or reports by Dr.

23  Schlievert?

24              MR. BENAVIDEZ:  I think it's clear from

25  the record, Your Honor, from the transcripts and from what

1  was discussed even by the Court itself at his own allocution

2  of the defendant, it's very apparent that the Court doubted

3  Mr. Soto and his recitation of what occurred, and that the --

4  also the transcripts, the State itself doubted that things

5  happened the way Mr. Soto had described to the authorities.

6  There was a lot of questions, there was something more.

7              THE COURT:  But the entire fact pattern

8  in the first prosecution was based upon a scenario that

9  really surrounded or centered upon what was an ATV or the all

10  terrain vehicle either accident or putting the child in

11  danger; isn't that correct?

12              MR. BENAVIDEZ:  That's correct.

13              THE COURT:  And within indictment is

14  largely based upon purposely of the defendant causing the

15  death through either the felonious assault or whatever other

16  actions of purposely by the defendant, isn't that the

17  allegation in the second of the two indictments?

18              MR. BENAVIDEZ:  Yes.

19              THE COURT:  Do you have anything further,

20  Mr. Benavidez?

21              MR. BENAVIDEZ:  No.

22              THE COURT:  Mr. Schroeder?

23              MR. SCHROEDER:  Thank you. Your Honor,

24  you've already highlighted much of my response to the motion.

25              THE COURT:  Do you agree that the

1    involuntary manslaughter would be a lesser included of the

2    murder charge?

3                        MR. SCHROEDER:  Generally, it is a lesser

4    included offense of murder.

5                        THE COURT:  All right.  And, when you

6    look at the exceptions, or wait, the application of the

7    double jeopardy provisions, isn't it correct that we're

8    basically, in both of these indictments, looking at the same

9    broad events of that particular day, that being the 23rd of

10   January of 2006?

11                       MR. SCHROEDER: Yes.

12                       THE COURT: And, that the prosecution on

13   the first case involved also an investigation that's recited

14   in what is the pre-sentence report and all the documents that

15   are before the Court?

16                       MR. SCHROEDER:  Yes.

17                       THE COURT:  So, in the first prosecution,

18   the case, excuse me, the State had before it all of the

19   either fact pattern or potential fact pattern that also

20   constitutes what is the second indictment; isn't that

21   correct?

22                       MR. SCHROEDER:  I would disagree with

23   that statement, Your Honor.

24                       THE COURT:  And how so?

25                       MR. SCHROEDER:  Because the facts in

12

1  front of the State in 2006, as already indicated by the

2  Court, relied heavily on the defendant's statements about

3  what occurred.  The defendant being the only person present

4  at the time of his son's death, therefore, in light of those

5  facts given by the defendant in 2006, that's really what

6  drove the investigation. It was reviewed by the Lucas County

7  Coroner, who relying on the version of events provided by a

8  parent, which Dr. Schlievert says is the appropriate

9  consideration by a coroner in that case, concluded that it

10  was an ATV accident, again, relying on the defendant's

11  statements.

12          And the second prosecution or in the second

13  indictment, of course, it's focused on felonious assault, a

14  very different version of what had occurred and how the death

15  resulted.

16                      THE COURT: So the factual differentiation

17  and the triggering events is simply a subsequent statements

18  of the defendant; you would agree?

19                      MR. SCHROEDER:  Yes, coupled with Dr.

20  Schlievert's review that that subsequent version of events

21  more closely matches the injuries and manner of death to a

22  reasonable degree of medical certainty.

23                      THE COURT:  Do you have anything further,

24  Mr. Schroeder?

25                      MR. SCHROEDER:  As indicated by the Court

1   already, I would just highlight that because of the mens rea,

2   of course being a critical element in any criminal

3   prosecution, is different in this case than in the 2006 case.

4   These are not the same offenses for purposes of double

5   jeopardy, to the extent that murder and involuntary

6   manslaughter is being lesser or greater offenses of one

7   another could be considered the same offense in this

8   particular fact pattern as already highlighted by the Resor

9   case. They are not the same offense. They are not the same

10  offense because each has a different predicate offense than

11  the other.  The involuntary manslaughter in 2006 had the

12  child endangering predicate offense which had the mens rea of

13  recklessly, acting recklessly, and creating a substantial

14  risk of harm through reckless conduct, which is very

15  different and not the same offense as murder in this case,

16  which has the predicate offense of felonious assault, which

17  involves knowingly causing serious physical harm to the child

18  in this case resulting in the child's death. And so those two

19  offenses are not the same offenses for purposes of

20  Blockburger.  It was already concluded that that's the case

21  as indicated by the appellate court in Resor.

22          In addition, Your Honor, I would indicate even if

23  this Court were to conclude that all of these subsequent

24  charges are the same offenses as those originally charged,

25  and that double jeopardy does apply, even if that is the

1   Court's conclusion, which is not the State's conclusion, an

2   exception here exists.  The exception is recognized by the

3   United States Supreme Court, the Ohio Supreme Court, it's

4   indicated in the last section of my response to this motion

5   that even if we're talking about same offenses, this

6   prosecution could not have moved forward in 2006 despite the

7   exercise of due diligence by the investigators in this case

8   because they didn't have all of the information needed to

9   proceed forward on the charges that are before the Court at

10  this time.  Highlighted is Dr. Schlievert's review of the

11  reasonable conclusions in 2006 in light of the version of

12  events provided by the defendant, and his conclusion that the

13  current version of events more accurately reflects the manner

14  of death, and therefore Dr. Schlevert, the medical expert,

15  someone who has been deemed to be an expert by this Court on

16  multiple cases, concludes that the investigation in '06 was

17  reasonable but that again the conclusions were faulty and

18  therefore that exception would apply in this case.

19                  THE COURT:  Going back to one question on

20  the second part of your argument, and that is the issue of

21  whether or not, I guess it's listed in section A of part 2,

22  whether or not the defendant would reasonably believe that

23  his or her plea would bar further prosecution to any greater

24  offense.  Given the fact that this was a negotiated plea back

25  in '06 and that the involuntary was dismissed as part of a

15

1 negotiated agreement on the record, wouldn't that result in a

2 reasonable expectation that there would be no further

3 prosecution on that matter?

4                      MR. SCHROEDER:  Not from the State's

5 perspective because the reasonable belief of an objective

6 person would be that the plea negotiation in 2006 would bar

7 any further prosecution based on the fact pattern present in

8 2006.  In 2016, as will be shown in the transcript that will

9 be provided to the Court, it was the defendant's expectation

10 that when he entered the sheriff's office on that day that he

11 would be arrested and charged with the subsequent offenses.

12 So he indicates within the transcript himself what his

13 reasonable expectation was from the '06 negotiated plea and

14 the consequences of entering the sheriff's office on July 25,

15 2016.

16                      THE COURT:  What language led you to that

17 conclusion?  And again I don't have the transcript in front

18 of me but.

19                      MR. SCHROEDER:  One moment, Your Honor.

20                      THE COURT:  Yes.

21                      MR. SCHROEDER:  Would you like a copy at

22 this point?

23                      THE COURT:  No.

24                      MR. SCHROEDER: Okay.

25                      THE COURT: You may submit it after the

1   hearing.

2           MR. SCHROEDER:  Okay.  On page 15 of the

3   transcript, line 22, which would occur after the defendant's

4   recitation of the updated version of events, the

5   investigating officer asked what do you think should happen,

6   and the defendant responded I guess go to prison or whatever.

7   He continues to indicate his motivation was based on religion

8   and that any subsequent punishment as a result of his

9   confession would be in line with what he was trying to

10  accomplish that day.

11          THE COURT:  Do you have anything further,

12  Mr. Schroeder?

13          MR. SCHROEDER:  No, Your Honor.

14          THE COURT:  Mr. Benavidez, as to that

15  last question, whether or not the defendant would reasonably

16  believe that his prior plea would bar prosecution for any

17  other offense, given what are the factual allegations here,

18  isn't it unreasonable that you would expect that it would bar

19  what is now this prosecution for a murder, aggravated murder?

20          MR. BENAVIDEZ:  I don't believe so, Your

21  Honor, because if you read that transcript closely, Mr. Soto

22  made it clear when he went into the Sheriff's Department was

23  that he, that he had found religion and that these events

24  were weighing heavily on his mind and on his conscious, he

25  made the confession, and he expected to be released and to go

1   to work.  He made calls from the jail, and his employment was

2   discussed, and the fact he would not be released, he would

3   not be, you know, he would not be permitted to go to work,

4   and he was expecting to be released and to go. So that would

5   make you think that he didn't fully consider what all the

6   punishment was and what could happen here. I think it's clear

7   from the record of this now.

8                     THE COURT: Do you have anything further,

9   Mr. Benavidez?

10                    MR. BENAVIDEZ:  No, Your Honor.

11                    THE COURT:  The Court is going to take

12  this matter under advisement.  As indicated, I am going to

13  refer the matter to Court Diagnostic and Treatment for the

14  competence evaluation.  Upon the completion of the

15  evaluation, we will return to Court.  Should the evaluation

16  result in the Defendant being found to be competent to stand

17  trial, this motion today will be taken under advisement by

18  the Court and I will issue a ruling.  Should there be a

19  determination that the Defendant is found not to be

20  competent, we will take further proceedings as warranted.

21          Is there anything further today, Mr. Benavidez?

22                    MR. BENAVIDEZ:  No, Your Honor.

23                    THE COURT:  Anything further today, Mr.

24  Schroeder?

25                    MR. SCHROEDER:  No, Your Honor.

18

1          THE COURT:    Court is in recess.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19

```
 1
 2                     CERTIFICATE OF REPORTER
 3   STATE OF OHIO
 4   COUNTY OF PUTNAM
 5
 6                     I,  Lisa Westrick, Notary Public, in and
 7   for the State of Ohio, do hereby certify that the foregoing
 8   Motion Hearing, held in the Common Pleas Court of Putnam
 9   County, Ohio, on October 25, 2016, consisting of 19 pages is
10   a true and correct transcription of said proceedings as
11   transcribed by me from an audio recording, and I do further
12   certify that I only did the transcribing of the hearing, and
13   that I was not personally present in the courtroom during
14   said proceedings.
15                                _____
16                                Lisa Westrick
17
18   My Commission Expires:
19       5-22-22
20
21
22
23
24
25
```


**MERCYHEALTH**

September 30, 2016

Mr. Todd Schroeder
Asst. Prosecuting Attorney
Putnam County Prosecutor's Office
Annex Building
336 E. Main St., Suite B
Ottawa, OH  45875

RE: Julio Baldazo

Dear Mr. Schroeder:

This letter is a medical opinion regarding injuries sustained by the above child.  This review was conducted at your request.  To conduct this review, I reviewed the following items you provided:

1. Cover letter dated August 3, 2016
2. Putnam County Sherriff's Office (PCSO) Incident/Offense Report 1-06-000363 (23 pages)
3. Lucas County Coroner's Report Autopsy 65-06 (6 pages)
4. Printed photo of the ATV
5. Interview of Travis Soto, July 25, 2016 (38 pages)

I will refer the reader to the original documents for details.  I will be summarizing those documents below followed by my opinion.

Julio died on January 23, 2006.  He was 2 years old at the time.  Per Travis, he reportedly ran into Julio with an ATV.  The story did change.  He initially hit Julio when he wasn't looking (he was watching a train).  Travis said he rounded a corner of a barn and hit Julio.  Later, Travis said he hit Julio on the train track bed/rocky area.  The coroner opined that Julio died of multiple blunt force trauma from the ATV accident.  Travis was convicted of child endangering and served 5 years.  In a motion for judicial release, you indicated to me that Travis had reverted to the story that he cornered a barn and ran into Julio.

Recently, Travis appeared that PCSO.  He stated he had been worried about going to heaven and wanted to fully confess what happened.  He said after mom (Lucy) left for work that day at 1 PM, Travis became angry with Julio.  Travis felt that Julio did not love him.  He stated that he "tortured" Julio and beat him to death.  He would not provide details on the torture.  He said he punched Julio, though, and threw him up against the wall. He said that Julio finally died after a blow to his chest or stomach.  He said he staged the ATV accident and lied about how he got injured knuckles (previously said he got injured in a fight with his brother).

Per the Incident reports, at the ER, Travis reported to Dr. Shanfransky that Julio ran out in front of him while Travis was riding the ATV.  Travis said Julio was crying and he took him into the house.  After 15 minutes, Julio reported indicated he was ok.  Travis put Julio in the bed.  Later, Travis checked on him and believed he was dead.  Travis said the accident occurred around 3 PM.  Travis had reddened knuckles and one had an abrasion.  Travis said that he had punched his brother the night before.



A Catholic healthcare ministry serving Ohio and Kentucky

 **MERCYHEALTH**

Later during another interview, Travis said he "laid him (Julio) on the tracks, or he laid him out on the tracks." Travis said he was holding Julio. He went to fast and lost control. Julio fell off and Travis may have ran over Julio. He cleaned Julio up and put him in the bed. He checked on him later and felt Julio was dead. He did not call 911. He waited for mom to get home and told her he had accidentally killed Julio.

Further investigation developed a timeline of the "accident" at around 1:45-2:35 PM and that 911 was called around 5:30 PM. Julio did have some degree of rigor mortis per EMS.

Travis did have a history of hitting Lucy (per her report).

In Travis' 2016 interview, he indicated that he "abused" Travis. He had a religious change and wanted to confess. Travis said he "tormented" Julio. He had beat him before that day. He reported punching Julio in the head and face and hitting his feet. Travis said he punched and smacked him in the face and stomach. He added "I used to drag him around on the floor and stuff, I mean, I swung him around on the floor, and just basically just really tortured the boy." On the day in question, Travis admitted throwing Julio against the wall a couple of times. Travis punched him in the stomach and Julio took his last breath. He said he never ran Julio over with the ATV. Travis admitted to smoking weed that day. Travis admitted knowing Julio was dead then, stating "I ended up freaking hitting him in his chest or stomach or chest and he stopped moving then."

The autopsy was conducted on January 24, 2009. The following were the findings:

1. 5" x 4" purple bruise on the occipital portion of the scalp.
2. ½" linear red abrasion on posterior aspect of the right ear.
3. ¼" linear red abrasion posterior aspect of left ear.
4. Multiple red-brown contusions and tan abrasions on face and chin. Lips with dried abrasions.
5. Diffuse red-brown contusions are noted on the torso, pubis and proximal thighs.
6. 3 1/2" x ½" area of red-brown contusion is on the posterior aspect of the left shoulder.
7. 5 ½" x 4" area of purple abrasion and red-brown contusions in lower midline of the back.
8. Multiple red-brown contusions on forearms and hands, knees, right lower leg and feet.
9. No remote trauma was noted externally.
10. Heavy subgaleal blood in occipital and vertex regions of scalp.
11. Few small contusions on base of left lung.
12. About 50 ml of fluid blood in left hemithorax.
13. Large contusion in the entire base of the left lobe of the liver.
14. Abundant blood in the mesentery.
15. Focal blood in the serosa of the small bowel.
16. Heavy retroperitoneal soft tissue hematomas.
17. 100 ml of fluid blood in abdominal cavity.

Dr. Beisser indicated he died of multiple blunt trauma. The manner of death was accident.

**Impression and Recommendations**: Julio was a two year old male who died as the result of fatal physical abuse. The abuse was massive, and by report, occurred more than once.





 **MERCYHEALTH**

It is understandable that Dr. Beisser certified this as an accident from the ATV at the time.  After all, doctors rely on parent reports of their children's injuries/problems to make a proper diagnosis.  When the history is false, the diagnosis can often be wrong.  Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax).  I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident.  Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

Obviously, now in 2016 the truth has come out.  What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016.  The match very well.  Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

Please call 419-251-8047 if you have any questions.  Thank you for referring this case to me.

Sincerely,

Randall Schlievert, M.D.
Director, Child Abuse Program

A Catholic healthcare ministry serving Ohio and Kentucky

1

INTERVIEW OF TRAVIS SOTO

AT THE

PUTNAM COUNTY SHERIFF'S DEPARTMENT

OTTAWA, OHIO


JULY 25, 2016

WESTRICK REPORTING
Registered Professional Reporters
13426 Road M
Ottawa, OH  45875
Lisa K. Westrick, RPR                    (419) 538-6347

2

1   (6:19 p.m.)

2   <u>EXAMINATION OF TRAVIS SOTO BY DETECTIVE ROY SARGENT:</u>

3           Q.      Travis?

4           A.      Hey, how you doing?

5           Q.      Good. Remember me?

6           A.      No, I don't.

7           Q.      Roy Sargent.  It's been a lot of years since

8   I've seen you.

9           A.      Nope, I don't remember you, man.

10          Q.      What was your dad's name?

11          A.      Carlos Soto.

12          Q.      Carlos, yeah, when you, when you were the boy,

13  and I was out to your house a couple of times.  Talked to

14  you, talked to you a couple of times.

15          A.      Yeah, I haven't been around there for a while.

16  I'm now in Napoleon (inaudible).

17          Q.      You live in Napoleon now?

18          A.      Yep, yep.

19          Q.      How long have you lived up there?

20          A.      Uh, a little over year now.

21          Q.      Okay.  Travis, they kind of told me a little

22  bit of what's going on; okay?

23          A.      Uh-huh.

24          Q.      I want to talk to you about it if you'll talk

25  to me?

3

1       A.      Yeah.

2       Q.      Okay. Before I do, okay, I've got to advise

3  you of your rights.

4       A.      Okay.

5       Q.      Okay?  Before I ask any questions, you must

6  understand your rights. You have the right to remain silent,

7  anything you say can and will be used against you in court.

8  You have the right to talk to an lawyer for advice before we

9  ask any question, and have him with you during questioning.

10  If you cannot afford a lawyer, one will be appointed for you

11  before any question if you wish.  If you decide to answer

12  questions now without a lawyer present, you will still have

13  the right to stop answering at any time.  You also have the

14  right to stop answering at any time until you talk to a

15  lawyer.  Do you understand them, Travis?

16       A.      Yeah.

17       Q.      Okay.  What is the date? 25th, yep.  Okay.

18  Travis, you can just sign that right there and just show me I

19  read you this. You can read it over if you like.

20                     (TRAVIS SOTO SIGNING FORM)

21       Q.      Okay.  You say you live up in Napoleon now?

22       A.      Yeah, yeah, I been over there.

23       Q.      How long, you said a year?

24       A.      Uh, yes, since I got a job over there.

25       Q.      Where you work at?

4

1        A.       Campbell Soup.

2        Q.       Campbell's?

3        A.       Yeah, been up there, got hired in there, been

4   over there for little over a year.  But --

5        Q.       Huh?

6        A.       But out for five year, since 2011.

7        Q.       You got out? Got out of prison?

8        A.       Got out of prison, did five years for child

9   endangering, but I mean it was supposed to be a manslaughter

10  charge and just did the five, and then I basically went to

11  work.  I denied it and said I covered -- I end up covering it

12  up, I mean, and saying it was the four-wheeler, but that

13  wasn't true.

14       Q.       You went to court, you went to court and

15  trial; did you go to trial?

16       A.       Did I go to trial?

17       Q.       Yeah, or did you make a plea agreement?

18       A.       Took (inaudible) and went to jail.

19       Q.       Okay, but you didn't go to a trial, you had a

20  plea agreement?

21       A.       No, they just basically told me go to jail for

22  -- or take the plea bargain, go to jail for five years.

23       Q.       Okay.

24       A.       I end up getting --

25       Q.       And that was for whatever with -- for your son

5

```
 1  when you hit him with the four-wheeler; right?
 2          A.      Yeah, more or less I said I hit him with the
 3  four-wheeler, but I really just --
 4          Q.      Okay. But that's what you went to prison,
 5  though, for?
 6          A.      Yeah, yes.
 7          Q.      Okay.
 8          A.      Yep.
 9          Q.      And you're here to tell us apparently that's
10  not what happened?
11          A.      That's not what happened.  I basically covered
12  it up, and basically my past became my life and (inaudible)
13  apologies.  Basically trying to follow our Lord and Savior,
14  man, this is what needs to happen, I mean.
15          Q.      Why don't you tell me, tell me what happened?
16          A.      Basically, basically abused him (inaudible). I
17  was raised up in the wrong matter, wrong way.  Basically just
18  didn't understand how to raise a child, basically at the
19  time, I mean, just --
20          Q.      Were you home alone with --
21          A.      Yeah, we was home alone.
22          Q.      I'm sorry, was your son Julio?
23          A.      Julio.
24          Q.      Julio. Were you home alone when all this
25  happened?
```

6

1          A.     Yeah, yeah, we was at home.

2          Q.     Was it just you and Julio?

3          A.     Yeah, yeah. I was babysitting, Lucy was at
4    work.

5          Q.     Okay. And Lucy was the mother; right?

6          A.     Yeah, yeah, she was at work and I was at home.
7    I quit my job and just was (inaudible) doing a bunch of drugs
8    and stuff, used to do whatever, drink and party and stuff,
9    and then, I mean, I just beat him, beat him up really,
10   basically. I mean basically it was a torment, tortmenture
11   (sic), I mean.

12         Q.     were you doing drugs when you beating him up?

13         A.     No, man, I smoked weed, I was doing weed, I
14   mean I was -- my drug of choice, I was doing crack and stuff,
15   not crack but coke and stuff, I mean, we was just always
16   partying and stuff and not worried about it, you know, I was
17   doing demos. I mean so we had him when we was 17, 18, 19, and
18   when I was 20 is when it happened.  It was basically just,
19   basically tormented him. I mean he didn't deserve it.

20         Q.     what do you mean when you said you tortured
21   him?

22         A.     Like just beat many up, give him, I mean, I
23   can't like --

24         Q.     And I know this is hard if you're coming in --

25         A.     Yeah.

```
 1          Q.      -- trying to confess and, you know --
 2          A.      Yeah.
 3          Q.      -- tell the truth and everything, Travis, but
 4   I guess, I'm sorry, I'm going to ask you for a lot of
 5   details.
 6          A.      Yeah, yeah, yeah, for sure.
 7          Q.      I mean you said you tortured him?
 8          A.      I used to (inaudible).
 9          Q.      Are you saying you hit him other times?
10          A.      Yeah, I used to, yeah I used to beat him.
11          Q.      I mean before you, before you ended up beating
12   him that he died?
13          A.      Yeah.
14          Q.      Okay.
15          A.      I was raised up young and a punk kid, I mean
16   that was a way of life. You know, I mean I don know, I was
17   (inaudible) daddy's beating, and just I was raised up that
18   way, and figured (inaudible) my life, I mean, I'm not trying
19   to (inaudible).  I was young and raised up, you know, I mean
20   I basically followed my father, and this is all blame on me,
21   you know what I mean? I'm trying to do everything right,
22   trying to tell the truth about everything. I mean just
23   tortured him, punched him in his head and face and stuff, I
24   mean, freaking hit his feet a couple of times when he
25   (inaudible) mean dad. I was one mean dad, man, I was freaking
```

8

1  --

2       Q.    Okay, the day that you beat him, that he died,

3  what did you do to him?  Was he in his bed? Was he in the

4  couch, was he in the front room?

5       A.    He was in the bathroom, I mean I had a water

6  fountain on him, or water, I had water and stuff on him and

7  stuff.  And, I mean, freaking, I mean I basically just

8  tortured him, punched him, freaking just not knowing anything

9  about what a father should have been doing, I mean, freaking

10  --

11       Q.    Did you punch him like in the face?

12       A.    I just punched him, smacked him in the face,

13  punch him in the face, and then just basic (inaudible), you

14  deserve everything you get man, freaking.

15       Q.    Where are the -- Did you punch him in the

16  other parts of his body?

17       A.    I punched him in the stomach and stuff, I

18  mean, I don't remember everything (inaudible). I used to drag

19  him around on the floor and stuff, I mean, I swung him around

20  on the floor, and just basically just really tortured the

21  boy, something that I just shouldn't have done.

22       Q.    How long did you do this?

23       A.    I don't know.

24       Q.    I mean that day, that day, Travis; do you

25  remember at all?

9

1        A.      Probably about an hour or so, I'm assuming, I

2   mean can't remember everything, it's been a while, but it is,

3   I mean basically he suffered really, I mean.   (Inaudible),

4   I mean, I don't remember everything.

5        Q.      Did you, I mean did you smash his head up

6   against the walls or anything like that or?

7        A.      I threw him against the wall one time, a

8   couple of times, I mean basically.

9        Q.      How did you know he was dead?

10       A.      Uh, I punched him in the stomach. I punched

11  him in the stomach and then basically he took the last

12  breath, and then I mean I started panicking and stuff, you

13  know what I mean, flipped out, I guess, really.  And just

14  called (inaudible) in me, and (inaudible) this is the way to

15  do it, so.  And then I end up basically wiping his, wiping

16  his -- he had blood on his lips and stuff and had a gash

17  whatever, but end up going to the, freaking, wiped him up and

18  changed his diaper and stuff, and laid him in bed, you know,

19  freaking waiting for Lucy really. I mean I was standing

20  there, I was scared, I didn't know what to do, I basically

21  ran outside, that was my first reaction, I mean just freaking

22  really tormented him, man. I mean, you know he didn't deserve

23  it really.

24       Q.      Did you run him over with the four-wheeler?

25       A.      No, I never ran him over. I mean that was

10

1  false accusation, I basically just (inaudible), you know what

2  I mean?

3      Q.    I don't remember where, where he was at when

4  the EMS got there?

5      A.    He was in his bed.

6      Q.    He was in his bed?

7      A.    Yeah.

8      Q.    What did you do, did you get the four-wheeler

9  out and run it around or?

10      A.    I basically just, I basically just freaking

11  set it up, (inaudible). I basically just, I basically set it

12  up for failure, freaking set it up. I didn't know what else

13  to do.  (Inaudible) so I basically that's what I did.

14      Q.    You said what now?

15      A.    That's basically what I did, set it up at the

16  time. I mean --

17      Q.    Did this happen like in the morning, I mean?

18      A.    It was around 3 or something, right before she

19  got off work.

20      Q.    It was right before she got off work?

21      A.    Yeah.

22      Q.    Or was it, I mean.

23      A.    This was after she got off work. I mean

24  basically just.

25      Q.    Because I can't remember, did she come home

11

1    and then you guys called the EMS?

2           A.    Yeah.  I was waiting for her, you know, man, I

3    was basically panicking and stuff and told her, I set her

4    down, I was like hey, you know what I mean, I got to tell you

5    something, man.

6           Q.    Did you tell her what really happened?

7           A.    I never told her, basically just, basically

8    just freaking, basically said, Lucy, I mean, our son's dead,

9    and she just started flipping out like, what, what, what and.

10   Well, I was too scared to call the cops, man, I was on drugs

11   and freaking not understanding, I mean, freaking.

12          Q.    Okay. Now that's twice now you told me you

13   were on drugs?

14          A.    Yeah.

15          Q.    (Inaudible) Travis. Did you take drugs that

16   day? I know you said you smoked marijuana, but?

17          A.    All we did was smoke weed and stuff.

18          Q.    You just normally would smoke weed through the

19   day?

20          A.    Yeah, that is what I do is smoke weed.

21          Q.    Okay. Was you doing coke that day?

22          A.    No, no, I wasn't.

23          Q.    Did you do crack or anything that day?

24          A.    I never did anything like that.  I was

25   basically just straight smoking weed, man.

12

1          Q.      Okay. So you're saying all you smoked was weed
2     when that happened?
3          A.      Yeah.
4          Q.      Did you smoke weed after it happened?
5          A.      No.  Well, after, later on that night after
6     everything was said and done when I went over there to my
7     cousins I was smoking a joint, he gave me one to relax and
8     calm down my nerves and stuff because everybody, when
9     everything was going on, I mean it was pretty crazy.
10         Q.      Did you ever tell Lucy the truth?
11         A.      No, I never told her the truth.  Always,
12    always hid it, man.  Freaking I went to prison and found God,
13    I mean trying to get myself to Jesus (inaudible). I mean just
14    followed him the last year off and on trying to do everything
15    right, man, keeping (inaudible) bottle, get off the bottle, I
16    mean, prison straightened my life up again.  Everything I do
17    in prison straightened my life up, and then went out in the
18    world and just cause the same old problem, I keep running
19    from God.
20         Q.      Okay. Since you been out, you said you got out
21    in 2011; right?
22         A.      2011, I mean --
23         Q.      (Inaudible).
24         A.      (Inaudible) on the run. As soon as it's up,
25    man, I'm not walking the right way.  Just trying to make it

13

1  back home, I mean that's --

2      Q.    Since you been out since 2011, have you done

3  any drugs and stuff?

4      A.    Just weed.

5      Q.    Just weed?

6      A.    I did some like pain medication and stuff but.

7      Q.    Like pain pills and stuff?

8      A.    Yeah, just basically pain pills and stuff.

9      Q.    When did you find God?

10     A.    Uh, I've been chasing God for or been chasing

11  Jesus for a long time, man, freaking, I really never had him

12  in my life. When I went to prison I was really aware and I

13  really tried to straighten up from drinking, basically trying

14  to get back home really. And I felt guilty and to this day I

15  felt that calling, man, to go back home, man. Trying to get

16  to God to go to heaven. (Inaudible); right?

17     Q.    Uh-huh.

18     A.    And that's how we get home, right?

19     Q.    They say he forgives everybody.

20     A.    Yeah, he does, trying. It's not easy

21  (inaudible).

22     Q.    Nope.

23     A.    Trying to find him in our heart, but I think

24  about it (inaudible).

25     Q.    What made you decide today to come in?

14

```
1         A.     Just to me calling, I mean just.
2         Q.     I mean was something else getting to you,
3   Travis?
4         A.     Everything, man.  I don't want to go to hell.
5         Q.     Travis, you know you found Jesus and that
6   stuff, you know he'll forgive you?
7         A.     Yeah, yeah.  I don't know, man, I don't want
8   to go. That's the only way I seen to do it. To me I been
9   running from him for too long. (Inaudible) doing wrong, I
10  mean, not even just like wrong just feel like you're not
11  being that law abiding citizen, and I do everything right
12  really, I mean I work, so much has been going on in my life
13  where I keep on feeling this is the right place to do.
14        Q.     So it started in the morning that morning,
15  huh?
16        A.     Yeah, Lucy was out. (Inaudible).
17        Q.     And it started in the bathroom, or did it
18  start --
19        A.     I'm not really for sure where it started, I
20  mean, bedroom, bathroom, just basically, (inaudible) driving
21  around and it was like 1 o'clock or something, I'm not for
22  sure, like 11.   And those other two hours I can't remember,
23  and then it was 3 o'clock when Lucy came home.
24        Q.     Did you change his clothes, or you just had a
25  diaper on?
```

15

1       A.    He was in clothes and soaked from the water on

2 the ground and stuff.  And then I basically just drag him

3 around, I mean I drag him around the kitchen floor, the water

4 was soaked from me spraying water on him and stuff.

5       Q.    Where did you spray water on him at?

6       A.    In the kitchen and stuff, just.

7       Q.    Until you made his body look like it was wet

8 like it was outside or what?

9       A.    No, it was just basically, basically just took

10 him outside, well, didn't take him outside, took his shoes

11 outside put them in like, plot them basically after all that

12 happened, basically I just set the, you know, I mean I did

13 everything just look, I mean freaking, man, set him in his

14 bed, changed his clothes and stuff, he had a wet diaper,

15 whatever, and he had wet pants and wet diaper then set him in

16 the bed (inaudible), Lucy gave him a kiss, and freaking just

17 start panicking, just walking around I didn't know what to

18 do, so freaking. I mean (inaudible) just thinking about it. I

19 never really thought about it, basically just prison life

20 changed my life and stuff that I seen. (Inaudible) So I

21 figure this is the last chance I get.

22       Q.    What do you think should happen?

23       A.    I guess go to prison or whatever.  Whatever

24 Jesus says, I mean, trying to figure what he wants me to do.

25       Q.    You knew he was dead at a certain point;

16

1  right?

2       A.     Yeah. I ended up freaking hitting him in his

3  chest or stomach or chest and he stopped moving then.  It

4  scared the crap out of me. I just didn't know what to do so I

5  just.

6       Q.     I can't remember, did he have cuts on his face

7  from you hitting him, I mean or?

8       A.     I'm not for sure.

9       Q.     You don't remember?

10       A.     Yeah.

11       Q.     How about your hands, your knuckles, do you

12  remember did they --

13       A.     I don't know. The officer seen my hands were

14  bruised, and I blamed that on me and my brother were throwing

15  punches. I mean it was one more thing in life really I don't

16  understand yet.

17       Q.     But you -- That wasn't the only day that

18  abused him, in other words?

19       A.     I used to smack him around here and there. I

20  mean I freaking felt that he didn't love me as much as I

21  loved him.

22       Q.     But that day you just gave him a few too many

23  times, huh?

24       A.     Yeah.

25       Q.     How many times do you think you hit him?

17

```
 1          A.     I don't know, repeatedly, I mean.
 2          Q.     Did you hit him with anything other than your
 3   hands?  Did you kick him?
 4          A.     I'm not for sure, freaking.
 5          Q.     Okay.
 6          A.     I don't believe I did, I don't believe I ever
 7   did that, I mean.
 8          Q.     You said (inaudible)?
 9          A.     I kicked him in the butt, I mean, but.
10          Q.     You said you threw him up against the wall
11   maybe one time that you remember?
12          A.     Yeah.
13          Q.     Do you remember any other times?
14          A.     I didn't like throw him against the wall,
15   well, yeah, I did throw him against the wall, it was more
16   like a, yeah, I mean that's what I did.  Yeah, man, freaking
17   bad day, man, freaking, boy didn't deserve that, that's for
18   sure.
19          Q.     Have you talked to anybody else about this?
20          A.     No. Just over the years I mean like
21   girlfriends and stuff, but just basically I kept the same
22   story all my life saying it was a four-wheeler accident.
23          Q.     Just kept the same story with the
24   four-wheeler?
25          A.     Yes.  Only way home I figured, I mean, if I
```

18

1  tell the story about my son, man, pretty crazy.

2       Q.    Did anything else happen today other than you
3  just want to make it square with God?

4       A.    No, it didn't, man, just felt like with
5  everything I been hearing a lot, I mean just feels like I
6  been hearing the truth of God and I keep on running, running,
7  running, running, running.  Just feel like God is telling me
8  to do it today,  just said hey, you need to go turn in
9  yourself and basically tell your story.  (Inaudible) finding
10 my way back home, I feel like this way.

11      Q.    Did you work today?

12      A.    Yeah, I been up all night. I worked third
13 shift.

14      Q.    Oh, you worked third shift?

15      A.    Yeah.  I worked third shift and I would smoke
16 week, I smoke weed here and there, I take a couple of hits
17 and stuff because of my job and stuff, but it feels like I
18 been tormented for the last six months listening to craziness
19 in my head.

20      Q.    You haven't, you haven't done anything else
21 other than weed, though, I mean?

22      A.    No, I took like two or three hits.

23      Q.    No heroin or anything like that, that stuff?

24      A.    No, no.

25      Q.    Okay.

19

```
1        A.      I don't do no drugs, man, besides weed, and I
2    hit that vaporizer, man, I smoke cigars every once in a
3    while.
4        Q.      How much did you smoke today?
5        A.      Just took three hits.
6        Q.      Just three hits, huh?
7        A.      Two or three hits, man, freaking --
8        Q.      You haven't smoked a bunch then today at all?
9        A.      No, I basically do all weed. I just basically
10   do my job. I was in this relationship for a year and stuff,
11   man, just me and her fell in love, and that fell a part
12   because my past came up.  My cousin came up and told her that
13   I was a cheater and stuff and.
14       Q.      I'm sorry, your cousin what?
15       A.      My cousin came up saying I was a cheater.  But
16   I was in a relationship for -- with a woman I got a job with
17   at Campbell's whatever, basically fell in love with her and
18   freaking (inaudible).  She had a five year old daughter, went
19   over there and (inaudible) and she basically, my cousin had
20   knew me from the past, she's been in my family for 20 some
21   years, basically just freaking fell in love with her, and she
22   came up and brought my past up, and (inaudible) cheating and
23   pretty soon everything, her lives, I mean (inaudible) gossip
24   about her, things, you know she heard that I was a doing,
25   that's what it was.  We fell in love and.
```

20

1   Q.  When did all that happen?

2   A.  Well, we haven't spoke like for three months.

3   Q.  Been broke up for about three months?

4   A.  Three months and stuff. Been good for like

5 nine months, we was getting moved in there, but I kept on, I

6 kicked her out a couple of times because she was maybe

7 cheating and stuff.  (Inaudible) I started trying to slowly

8 take her to Jesus, man, for trying to change her life, change

9 her attitude, but basically she didn't understand that, I

10 guess.

11   Q.  Who was your attorney back then when all that

12 happened; do you remember?

13   A.  Charles Bates.

14   Q.  Oh, Charlie Bates was?

15   A.  Yeah.

16   Q.  And I just kind of want to sum it up, more or

17 less, you're just running from the partying and doing smoking

18 the dope and stuff, and you just didn't feel he loved you

19 and?

20   A.  Basically what it was, I mean not having the

21 knowledge of understanding him.  I mean basically just lack

22 the knowledge and not learning and not studying how to be a

23 parent basically. You know what I mean, being raised up

24 different (inaudible) grew up to be a partyier and drinker

25 and had a kid at a young age. Kid raising a kid basically is

21

1    what it was.

2           Q.     Was your dad abusive to you?

3           A.     Yeah, yeah.  We grew up with four kids and had

4    a bunch of kids around us at my grandpa's, and then my two

5    brothers and my brother and two sisters, freaking just a wild

6    life.

7           Q.     He passed away, how did he die?

8           A.     He died from an accident, freaking jumped on a

9    stake, man.

10          Q.     That was at home too, wasn't it?

11          A.     Yeah.

12          Q.     Was that an accident?

13          A.     Yeah, he ended up jumping on a stake, I'm not

14   sure how in the heck he did that, but I heard that he jumped

15   on the freaking, jumped over the ditch and freaking landed on

16   a stake, and I guess bled to death. He took --

17          Q.     You weren't there, Travis, when that happened?

18          A.     No, he took me to my sister's house that day.

19   He asked me to come mow the yard, or he asked me to mow the

20   yard before he left, and he just, I basically said I don't

21   want to do it, so I go freaking got to my sister's, I had to

22   work that morning. I went home, and later on that night I saw

23   -- I came back and -- well, he dropped me off and asked me to

24   come mow his yard and stuff, and he asked me to stay there

25   and mow his yard, and I was like no, take me to my sister's,

22

1  man, I mean we had to work that weekend. She ended up,

2  freaking, she ended up --  He dropped me off, and then told

3  me, that was the first time he told me he loved me, but.

4        Q.      He dropped you off at your sister's?

5        A.      Dropped me off at my sister's house.

6        Q.      Where did she live at from your guy's house?

7        A.      She lives in Oakwood.

8        Q.      Oakwood?

9        A.      And that night or later that day or whatever

10 when I got off work, whatever, my baby's mom came over, my

11 baby's mom and my cousin came over, and I was setting in the

12 living room with a girl or whatever and drinking, she bust in

13 there saying that like dad got in an accident, man, freaking,

14 we went over there and saw his tractor. I went back over

15 there and they basically argued with me here, she was arguing

16 with me because I had a friend over there with me. It was

17 just a wild time.

18        Q.      I am not trying blame you, Travis, but you

19 didn't have nothing to do with your dad's accident, did you?

20        A.      No, I mean we were good people.  We grew up, I

21 grew up respecting him, man, I had all of the respect for

22 him.  I wouldn't even smoke in front of him, I just smoked

23 cigarettes back in the day, but, we just always grew up, I

24 was the youngest one, runt of the family, brothers were

25 always mean, freaking, that's it basically.

23

```
 1          Q.     All right. And the reason I'm just asking you,
 2     said he was abusive to you, and I didn't know if maybe that
 3     bothered you that you took it out on your son?
 4          A.     I think it is more me following, more being a
 5     leader than a -- I was being a follower more than a leader,
 6     basically. I mean I was following my father's footsteps and
 7     realized it.  Basically I seen his -- I mean basically, you
 8     know, I was retarded in high school, didn't pay too much
 9     attention, I was too worried about chasing weed and partying
10     and drinking with friends being a follower, following
11     everybody else and not being my own person because of the
12     lack of knowledge I had. That is basically what it was.
13          Q.     He worked at GM too, didn't he?
14          A.     He worked at (inaudible).
15          Q.     Oh (inaudible), okay.
16          A.     Yeah. Yeah, that's what I've, I mean that's
17     how I see it, I forgive my father for all the torment
18     (inaudible) intend anything bad, he just spanked my butt for
19     everything, you know, basically, that's what gave me the
20     respect and learning from him being a hard worker, I mean
21     disciplinary, and learn more better and my life is going
22     (inaudible)  God and Jesus himself was learning how to be a
23     better father and better parent, better boyfriend/girlfriend,
24     you know what I mean, basically this.  Learning from my
25     experiences and my bad mistakes in life (inaudible).  I mean
```

24

1  it's hard ways of living growing up, you know what I mean.

2  After I got out, man, I think even in prison life had most

3  respective elements.  And all I did was work out and read.

4  And I freaking drank some hooch a couple of times and smoke

5  weed here and there, but that was about it. Never did

6  anything harder in my life.  I did some coke, and that was

7  about it.

8         Q.    Did some coke a little bit?

9         A.    No, never in prison.  I always, I just found

10  God in there and read the Bible in there and then started

11  working out and went to college a little bit.

12         Q.    After you got out?

13         A.    No, inside I was going to college.

14         Q.    Oh, okay.

15         A.    Basically reading everything I can, man,

16  freaking staying humble and, I mean, I felt like I was

17  following God the whole time there and doing the right thing.

18  I worked out for three and a half years, two and a half

19  years, freaking trying to do everything right myself. And I

20  seen, I took the death serious, man, it was a serious thing.

21  I mean it's hard. That's really what made me change. I mean

22  especially, well, my baby mama left me two years after I was

23  in prison, you know, man --

24         Q.    Who left you?

25         A.    My baby mama, the one.

25

1       Q.      Lucy?

2       A.      Yeah.

3       Q.      Uh-huh.

4       A.      I mean she wrote me, she was there in the

5  letters, we basically, she made me, I mean she helped me

6  through it for a little.

7       Q.      But you never told her the truth though

8  either?

9       A.      Never told her the truth. Never had the heart

10  too, I mean it was basically (inaudible) but freaking.

11       Q.      So what do you want me to do?

12       A.      I don't know, lock me away, whatever, I'm mean

13  I'm not sure.  I mean I don't want -- I got a job and stuff,

14  but, I mean, it's you're calling, I don't know if you're

15  following Christ (inaudible) what should happen.

16       Q.      Believe me, you're not the only one that talks

17  to me, I mean, there isn't a (inaudible) yet that I know

18  hasn't talked to me, many of times.

19       A.      It's hard, man, I'm trying. Yeah.

20       Q.      But you never took your son out and ran him

21  over with that four-wheeler then?

22       A.      No, no, that was all false.  They tried to say

23  things like I sit there.

24       Q.      Because you said, I think it was something you

25  said you come around the corner and he was there?

26

1         A.      Yeah.

2         Q.      And then you brought (inaudible).

3         A.      Yeah, it was just all.

4         Q.      Okay. And I don't know exact, I'm trying to

5    remember, you know, from years back.  I'll tell you what, why

6    don't you sit tight and I let me call the prosecutor and talk

7    to him.  Are you going to be okay?

8         A.      Yeah, oh, yeah, I'm fine.

9         Q.      Okay.  Anything else you want to tell me

10   before I go talk to the prosecutor?

11        A.      Ask me anything, what more do you need to

12   know, I mean?

13        Q.      I just, I do want to make one thing clear and

14   one thing sure that you didn't have nothing to do with your

15   father's death, because if you did, now is the time to tell

16   me?

17        A.      I don't think that would (inaudible)

18   psychology, your understanding.  You know what I'm saying,

19   freaking all in order, all in order of understanding I mean

20   growing up I seen (inaudible) I guess. I don't know really

21   what it is.

22        Q.      I mean, Travis --

23        A.      One excuse is I don't know, I mean.

24        Q.      Is that a yes or no answer?  I know he fell on

25   a stake?

27

```
 1        A.      Yeah, I mean, you're saying I'm basically mad
 2  at my dad.
 3        Q.      Huh?
 4        A.      So basically be mad at my dad or my father or
 5  something, I mean?
 6        Q.      I don't know. You said that your dad was
 7  abusive to you and that that was a little bit why you were
 8  kind of abusive to your son?
 9        A.      Yeah, definitely was following my father's
10  footsteps that's for sure.
11        Q.      And I don't know if he got so abusive to you,
12  Travis, that you had something to do with his death?
13        A.      I mean, basically that's what it was. I mean I
14  was raised up the wrong way.  I mean he beat my ass over
15  everything. I mean that was one thing he was good at, man. If
16  we didn't work, it was always work, work, work.
17        Q.      Okay. So I can actually walk out of this room
18  and say, no, Travis didn't put him down that stake or run
19  that stake through him, or did you?
20        A.      Basic force him to, force him to
21  --(inaudible). I mean he was, I left to go --
22        Q.      I know your dad could be hard at times, I know
23  that.  Like I said, I remember when you was a kid.
24        A.      Yeah, I was the last one to see him here.
25        Q.      That's why I just want to, I want to be clear,
```

28

1  you said you wanted to clear, you wanted to clear everything;
2  right?
3         A.    Yeah, I mean, yeah.  I was the last one I seen
4  him, and I blame myself for his death because I could have
5  stayed there and helped him with that yard, you know what I
6  mean?
7         Q.    But you're saying he took you there and
8  dropped you off; right?
9         A.    Yeah, he dropped me off at my sister's house.
10        Q.    And you didn't come back from your sister's
11 house and then go back to your sister's house, did you?
12        A.    No, he dropped me off and told me, or he asked
13 me to mow his yard.  It was sunset red, moon was red, and he
14 said, well, you want to mow the yard today, and I was like I
15 want to go to my sister's, we got to go to work in the
16 morning, and the next day, freaking, Lucy and my cousin Chris
17 came over and said, hey, freaking dad got in a big accident
18 and it's not good.  So we all jetted over there, man,
19 freaking (inaudible) to the hospital.
20        Q.    And you didn't have nothing to do with his
21 accident?
22        A.    I had nothing to do with his accident.
23        Q.    Okay, and that's just what --
24        A.    My father's accident?
25        Q.    Huh?

29

```
1        A.      My father's accident?

2        Q.      Yes.

3        A.      Oh, no way.

4        Q.      Okay. That's what I was trying to get out of

5   you, did you have anything to do with your father's accident?

6        A.      No, not on my life.

7        Q.      Okay, all right. That's what I wanted to make

8   sure of, all right?

9        A.      That would be crazy to think, no.

10       Q.      Because if you did, now is the time to get it

11  out of your system?

12       A.      It's a little scary to think.

13       Q.      Yeah, okay, all right, I feel better now.

14       A.      (Inaudible).

15       Q.      I feel better now.  Let me go talk to the

16  prosecutor.  You got some water, right?

17       A.      Yep.

18       Q.      Okay. And then I'll be back in and talk to

19  you; okay?

20       A.      All right.

21       Q.      All right.  Sit tight.

22       A.      Okay.

23                   (DETECTIVE SARGENT LEAVES ROOM)

24                   TRAVIS SOTO: Oh, man.

25                   (DETECTIVE SARGENT BACK IN ROOM)
```

30

1      Q.     How are you doing, bud?

2      A.     (Inaudible).

3      Q.     Okay. Prosecutor said he was calling me back,

4  he wants to check on something, okay? (Inaudible); is that

5  okay?

6      A.     Yeah, that's perfect.

7      Q.     All right. The other times that you said you

8  got physical with him, did you just know at a point when to

9  stop? (Inaudible).

10     A.     It was more I always just felt bad, but I

11  looked at him like basically I'm doing (inaudible).  There

12  was really, I mean, basically I'm doing, I'm being dumb. It

13  was more of lack of love, lack attention. I mean I was being

14  raised up as lack of attention and basically for myself being

15  tortured as a child, I mean.

16     Q.     I understand to a degree what you're saying,

17  Travis, but I mean, the time that you ended up killing him,

18  you kept going, and the other times apparently you must have

19  stopped. Something must have --something must have come to

20  your head or something that made you stop from hitting him,

21  you know, that you ended (inaudible).  That day, did you want

22  to kill him?

23     A.     No, never.  I mean, I don't know if I was mad

24  because Lucy, me and her was always arguing and stuff, it was

25  more a lack of attention.  Like my father raised me as an

31

```
 1  ass, so I was always with the kids and being picked on
 2  basically growing up, I mean I was the youngest so the kids
 3  pick on me in high school and whatever, lack of knowledge,
 4  and my dad always forcing me to try to be better, to be him,
 5  you know what I mean, he was always aggressive, and for going
 6  through high school and stuff, not self (inaudible)
 7  basically, basically like, I mean raised up, you know I was
 8  following my family and stuff, so I was basically raised up,
 9  I was a raised as a boy from my sisters and stuff, and
10  (inaudible) just not living the right way. I mean not going
11  to church or anything, just straight up just being abused as
12  a child growing up. I think my brother beat me up when I was
13  a kid all the time.
14          Q.    Your brother's older than you, Travis?
15          A.    Yeah, I'm the youngest, I'm 30, he's 32.
16          Q.    And you had how many sisters?
17          A.    Two sisters and one brother.
18          Q.    You had a sister younger than you, though,
19  right? Was your sister younger than you?
20          A.    No, I'm the youngest.
21          Q.    You're the youngest?
22          A.    I'm 30.
23          Q.    I was thinking there was a sister younger?
24          A.    30, 31, 32 and 39 (inaudible).
25          Q.    So your intent that day wasn't to kill him?
```

32

```
 1        A.      No.  Mad and just furious, I guess. More of
 2  looked down on me, made me mad, I guess, and because I think
 3  he didn't love me.
 4        Q.      But it wasn't like if you  -- The way you're
 5  describing it to me, though, it wasn't like a fit of rage and
 6  you just blew up?
 7        A.      No, it was just aggressiveness really, man,
 8  freaking.
 9        Q.      And you said you hit him before; right?
10        A.      Just basically spanked him around and
11  controlled him, tell him what to do and stuff.
12        Q.      I mean before this, right?
13        A.      Like he didn't -- Yeah, basically like.
14        Q.      But that's why you came to a point, though,
15  you stopped, though, Trav.  What made you stop at that time
16  and not this time?
17        A.      That was more like a, it was more like just
18  seeing him like not listening to me, he was always doing his
19  own like -- He was always following his mom and stuff, and I
20  set there and just -- I mean basically him being my son, I
21  was like, hey, you know, will you follow me, you know, I
22  wanted him to follow me. He won't listen to me, so more of
23  the aggressive keep on building up. Like I would see him,
24  like I also seen him play with his niece, he was two and a
25  half and stuff, (inaudible) and I went in there, and I was
```

33

1   like, hey, so I go in there and go play with them, and he
2   looks at me and like whimpers his face and then runs into the
3   bedroom and stuff, so I'm like, it kind of hurt me, it really
4   hurt me just seeing my son not love me.  That's what it was.
5         Q.      When the prosecutor calls us back, do you want
6   me to tell the prosecutor you want locked up?
7         A.      I mean if that's what's right.
8         Q.      I mean you come in here for a reason?
9         A.      Yeah, yeah, I definitely (inaudible). Yeah, I
10  freaking (inaudible) right? I got a job to attend to, but I
11  just got to freaking whatever the prosecutor says, man. I
12  feel like I deserve jail, I deserve to do my time.
13        Q.      Uh-huh.
14        A.      What you do for, I mean my job and stuff I
15  got, I mean, I'm not sure which way (inaudible) point, I
16  mean.
17        Q.      If the prosecutor says, no, don't lock you up
18  until we research it a little bit more or look into it a
19  little bit more, are you going to be okay?
20        A.      Oh, yeah, definitely.  I'm going back to work.
21  And anything I can do for myself, really. (Inaudible), work
22  at Campbell Soup. (Inaudible) right across the street from
23  church.
24        Q.      Where do you live at over there?
25        A.      22 or 226 and a half East Clinton Street.

34

1      Q.    I think I have your address. 22 what?

2      A.    226 and a half East Clinton Street.

3      Q.    East Clinton?  In Napoleon, right?

4      A.    Yeah. 435, 43545.

5      Q.    435 --

6      A.    43545.

7      Q.    All right.  Let me go out and see if I can

8  call him back if he didn't call me, so.

9      A.    Okay.

10      Q.    We'll go from there, all right?

11      A.    All right.

12                (DETECTIVE SARGENT LEAVES ROOM)

13                (DETECTIVE SARGENT BACK IN ROOM)

14      Q.    Travis?

15      A.    Yep.

16      Q.    I talked to the prosecutor, okay, we're going

17  to hold you.

18      A.    Okay.

19      Q.    Okay?  You're going to be booked in on murder

20  charge and tampering with evidence; okay?

21      A.    Yep.

22      Q.    You go to court tomorrow, and we will go from

23  there; okay?

24      A.    On a murder charge? How's it a murder charge?

25      Q.    That's what the prosecutor said just, you

35

```
 1  know, charge you with right now.
 2         A.    Okay.
 3         Q.    And tampering with evidence.
 4         A.    Okay.
 5         Q.    Okay?  I want to make sure you're okay,
 6  though, tonight?
 7         A.    Yeah, I'm fine, I'm perfect.
 8         Q.    Well, you've got, you know, a lot off your
 9  shoulders and stuff, bud?
10         A.    Yeah, a lot off of my shoulders, man.
11  (Inaudible).
12         Q.    Okay.  And I'll probably -- You go to court
13  tomorrow morning, Trav, and they'll set bond.  The
14  prosecutor, I'll know more maybe a little bit then by morning
15  with the prosecutor.
16         A.    I also got no money to bond out or nothing
17  like that so.
18         Q.    Well, I know, but I said I'll know a little
19  bit more in the morning and maybe I'll get you out before you
20  go to court.  If I can give you any more information, I will,
21  okay?
22         A.    All right.  I mean, do you know, I guess I'll
23  have to call my job if I'm not at work to let them know that
24  I will miss work tonight.
25         Q.    I will say something to the guy that takes you
```

36

1  back there to make sure that you can get that phone call

2  done; okay?

3          A.    Yep.  Okay. I'm ready when you are.

4          Q.    Okay.  Let me get Brent, and then we'll just

5  go from there; all right?

6          A.    Okay.

7          Q.    I wish there was something else I could tell

8  you right now, Travis?

9          A.    Oh, no, that's fine, I mean, hey, just letting

10  me know.

11          Q.    All right.  Like I said, I'll probably see you

12  first thing in the morning then, all right?

13          A.    Yeah, I mean I got to call my job because I

14  got, I got to freaking let them know. It ain't no big deal

15  whatever it is I'm going to be holding here.  (Inaudible) a

16  lawyer or nothing, so.

17          Q.    And like I say, I'll know more with the

18  prosecutor in the morning.  I'm sure they'll be in the books,

19  looking in the books and stuff; okay?

20          A.    Yep.

21          Q.    All right.  Let me get Brent here.

22                    (DETECTIVE SARGENT LEAVES ROOM)

23                    (DEPUTY BRENT MEYERS ENTERING ROOM)

24                    DEPUTY BRENT MEYERS: I'm here to take you

25  back there, Travis.  They said you need to call Campbell's?

37

```
1                    TRAVIS SOTO: Yes.

2                    DEPUTY BRENT MEYERS: Let me put these on

3    there.  Okay.

4

5                (This concludes the recorded interview)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

38

1

2                  CERTIFICATE OF REPORTER

3    STATE OF OHIO

4    COUNTY OF PUTNAM

5

6              I,  Lisa Westrick, Notary Public, in and

7    for the State of Ohio, do hereby certify that the foregoing

8    Recorded Interview at the Putnam County Sheriff's Office, on

9    July 25, 2016, consisting of 38 pages is a true and correct

10   transcription of said interview, to the best of my ability,

11   as transcribed by me from an video/audio recording, and I do

12   further certify that I only did the transcribing of the

13   interview, and that I was not personally present in the

14   interview room during said proceeding.

15                           _____

16                              Lisa Westrick

17

18   My Commission Expires:

19       5-22-17

20

21

22

23

24

25

5.208   P.460

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO | : | CASE NO. | 2016 CR 57 |
| Plaintiff | : | | |
| -vs- | : | JUDGMENT ENTRY | |
| TRAVIS SOTO | : | | |
| Defendant | : | | |

---

This matter came on for consideration of Defendant's previously filed **Motion to Dismiss** on the grounds of double jeopardy. The Court has reviewed Defendant's Motion and the response of the State of Ohio.

### FACTS

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of R.C. 2903.04(A), a felony of the 1st degree.

As charged, Defendant was alleged to have committed Child Endangering by creating a substantial risk of harm, and actually causing serious physical harm to his child, and was alleged to have committed Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering.

The factual basis of the 2006 prosecution relied, in part, on Defendant's representations to law enforcement indicating he was the driver of an All Terrain Vehicle that struck his son. The Lucas County Coroner conducted an autopsy and was given Defendant's version of the

1

Ō.268  P.401

events.  The coroner concluded that the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, the Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering.  The Involuntary Manslaughter charge was dismissed.  He was sentenced to five (5) years incarceration.

The State represents the following as a basis for a subsequent 2016 indictment:  On July 25, 2016, the Defendant voluntarily appeared at the Putnam County Sheriff's Office and indicated that he wanted to provide the truthful account of what occurred in 2006.  He proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene.  The Lucas County Coroner's Office report, photographs, as well as reports from 2006 to the present were reviewed by a pediatric abuse specialist previously qualified as an expert by this Court.  The expert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son.  He also concluded that Defendant's 2006 misrepresentations led to the reasonable, yet faulty, prior conclusions of the Lucas County Coroner.

Defendant was then indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C);

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

2

Ď.2⦵8   P.402

## DECISION

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense*." *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. The test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*. Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.

3

0268 PA03

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore, Double Jeopardy does not bar prosecution of this offense.

Furthermore, the 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

The Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his previous narrative of events would bar prosecution of subsequent charges based on newly discovered evidence which would transform the case from one of an accidental death to a purposeful homicide

Involuntary Manslaughter with a felony Child Endangering predicate is not the *same offense* as Murder with a Felonious Assault predicate. *State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these two charges:

> Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:
>
> "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
>
> The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).
>
> Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

4

O.268 P.404

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate. Therefore, a resolution of the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. Also, a further exception to the *Blockburger* test exists where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been previously discovered despite the exercise of due diligence until additional evidence was

5

Ō.268  P.405

uncovered, such as Defendant's appearance and confession to the actual details of his son's

death.  The coroner's report stated in part:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> … What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

The Court finds that the exception under *Grady vs. Corbin* also applies to the within case.

For reasons as stated, Defendant's **Motion to Dismiss** on the grounds of double jeopardy

is **hereby overruled**.


JUDGE RANDALL BASINGER


cc:
Prosecuting Attorney – faxed
Joseph Benavidez – faxed to 419-228-3367


6

## IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
### OTTAWA, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | * | CASE NO. 2016 CR 00057 |
| Plaintiff | * | 12-17-05 |
| vs. | * | |
| TRAVIS SOTO | * | **NOTICE OF APPEAL** |
| Defendant | * | |

**************************************************************************

Notice is hereby given that Appellant, **Travis Soto**, by and through his undersigned counsel, Joseph Benavidez, hereby appeals to the Third District Court of Appeals of Putnam County, Ohio, from the final Judgment Entry, (Attached) of the Putnam County Common Pleas Court, entered in this action on the 13th day of April, 2017, March 16, 2017 and February 28, 2017.

Joseph Benavidez # 0042447
Attorney for Defendant
212 North Elizabeth St STE 322
Lima, Ohio 45801
(419) 228-0189

### Proof of Service

I hereby certify that a copy of the foregoing Notice of Appeal was sent to the Putnam County Prosecutor's Office this 28th day of April, 2017.

Joseph Benavidez
Attorney for Defendant

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

STATE OF OHIO                    :        CASE NO.    2016 CR 57

    Plaintiff                    :

    -vs-                         :        JUDGMENT ENTRY

TRAVIS SOTO                       :

    Defendant                    :

This matter came on for consideration of Defendant's previously filed **Motion to Dismiss** on the grounds of double jeopardy. The Court has reviewed Defendant's Motion and the response of the State of Ohio.

## FACTS

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of R.C. 2903.04(A), a felony of the 1st degree.

As charged, Defendant was alleged to have committed Child Endangering by creating a substantial risk of harm, and actually causing serious physical harm to his child, and was alleged to have committed Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering.

The factual basis of the 2006 prosecution relied, in part, on Defendant's representations to law enforcement indicating he was the driver of an All Terrain Vehicle that struck his son. The Lucas County Coroner conducted an autopsy and was given Defendant's version of the

1

events. The coroner concluded that the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, the Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering. The Involuntary Manslaughter charge was dismissed. He was sentenced to five (5) years incarceration.

The State represents the following as a basis for a subsequent 2016 indictment: On July 25, 2016, the Defendant voluntarily appeared at the Putnam County Sheriff's Office and indicated that he wanted to provide the truthful account of what occurred in 2006. He proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, as well as reports from 2006 to the present were reviewed by a pediatric abuse specialist previously qualified as an expert by this Court. The expert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son. He also concluded that Defendant's 2006 misrepresentations led to the reasonable, yet faulty, prior conclusions of the Lucas County Coroner.

Defendant was then indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C),

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

2

## DECISION

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense*." *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. The test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*. Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.

3

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore, Double Jeopardy does not bar prosecution of this offense.

Furthermore, the 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

The Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his previous narrative of events would bar prosecution of subsequent charges based on newly discovered evidence which would transform the case from one of an accidental death to a purposeful homicide

Involuntary Manslaughter with a felony Child Endangering predicate is not the *same offense* as Murder with a Felonious Assault predicate. *State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these two charges:

Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).

Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

4

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate. Therefore, a resolution of the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. Also, a further exception to the *Blockburger* test exists where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been previously discovered despite the exercise of due diligence until additional evidence was

5

uncovered, such as Defendant's appearance and confession to the actual details of his son's

death. The coroner's report stated in part:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at
> the time. After all, doctors rely heavily on parent reports of their children's
> injuries/problems to make proper diagnosis. When the history is false, the
> diagnosis can often be wrong. Some of his injuries were compatible with the
> reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck
> by the lack of fractures (skull, extremity, ribs), as fractures are the most likely
> injuries from an ATV accident. Hence, while I could have also been fooled into
> thinking this was an accident (had I been involved in 2006), the lack of fractures
> and other items are odd.
>
> ... What I can say is that Julio's injuries are entirely consistent with Travis'
> confession in July 2016. They match very well. Overall, I can state to a
> reasonable degree of medical certainty that Julio died from the abuse that Travis
> inflicted on that day in 2006.

The Court finds that the exception under *Grady vs. Corbin* also applies to the within case.

For reasons as stated, Defendant's **Motion to Dismiss** on the grounds of double jeopardy

is **hereby overruled**.

JUDGE RANDALL BASINGER

cc:
Prosecuting Attorney – faxed
Joseph Benavidez – faxed to 419-228-3367

IN THE COURT OF COMMON PLEAS
PUTNAM COUNTY, OHIO

STATE OF OHIO,                         :

     Plaintiff-Appellant,           :

v.                                     :          Case No. 16 CR 0005?

TRAVIS SOTO,                           :          JUDGE KEITH H. SCHIERLOH

     Defendant-Appellee.            :

---

## MOTION FOR PERSONAL RECOGNIZANCE BOND
## OR TO REDUCE BOND PENDING APPEAL

---

Defendant-Appellant, Travis Soto, respectfully moves this Court for an Order either releasing him on his own recognizance with whichever conditions the Court deems appropriate or reducing his bond pending the disposition of his appeal. Crim.R. 46; App.R. 8(A) and (B). The reasons for this request are set forth in the attached memorandum.

Respectfully submitted,

OFFICE OF THE OHIO PUBLIC DEFENDER

CARLY M. EDELSTEIN, #0095950
Assistant State Public Defender

250 E. Broad Street - Suite 1400
Columbus, Ohio 43215
(614) 752-7033
(614) 728-3670 (Fax)

COUNSEL FOR TRAVIS SOTO

## MEMORANDUM IN SUPPORT

Travis Soto moves this Court to set a personal recognizance bond, allowing his release pending the outcome of the State's appeal to the Ohio Supreme Court. In the alternative, he seeks a reduction in bond.

During the pendency of his case, since August 2016, Mr. Soto has been incarcerated at the Putnam County Jail. This Court set bond on August 18, 2016, but Mr. Soto and his family were unable to raise sufficient funds to afford the bond payment. August 18, 2016 Judgment Entry. Since that time, Mr. Soto filed a motion to dismiss the most serious of his charges based on double jeopardy, and he prevailed before the Third District Court of Appeals. That court's favorable decision is currently pending before the Ohio Supreme Court, and due to the Court's schedule, will not be heard until March 6, 2019, and will likely not be decided for some time after that.

Ohio Criminal Rule 46(C) lists factors for this Court to consider in setting bail, including the nature and circumstances of the crime, whether a weapon was used, the defendant's family and community ties, previous history of court appearances, record of convictions, and risk of flight. At this point, due to the Third District Court of Appeals' favorable decision, Mr. Soto no longer faces the most serious of his charges. And prior to the death of his son, Mr. Soto did not have a record of criminal convictions. Exhibit A, November 7, 2018 Department of Rehabilitation and Correction Offender Information Details. This case began in 2016 when Mr. Soto turned himself in, suggesting that he does not pose a risk of flight. Mr. Soto's family lives in the Putnam County area, and his release on bond would allow him to both spend time with and financially assist his family during the pendency of his appeal. Therefore, the factors for granting bond weigh in Mr. Soto's favor.

Mr. Soto is indigent, and his family is only able to raise minimal funds toward a bond payment. Therefore, Mr. Soto respectfully requests that this Court release him on a personal recognizance bond during the pendency of his appeal. In the alternative, Mr. Soto requests that this Court set a hearing to calculate an appropriate reduction in bond.

Respectfully submitted,

OFFICE OF THE OHIO PUBLIC DEFENDER

CARLY M. EDELSTEIN, #0095950
Assistant State Public Defender

250 E. Broad Street - Suite 1400
Columbus, Ohio 43215
(614) 752-7033
(614) 728-3670 (Fax)

COUNSEL FOR TRAVIS SOTO

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **MOTION FOR PERSONAL RECOGNIZANCE BOND OR TO REDUCE BOND PENDING APPEAL** was sent by regular U.S. mail to Gary L. Lammers, Putnam County Prosecutor, 336 E. Main Street, Suite B, Ottawa, Ohio 45875 on this 9th day of November, 2018.

CARLY M. EDELSTEIN, #0095950
Assistant State Public Defender

COUNSEL FOR TRAVIS SOTO

2018 NOV 13  A 11: 05

COMMON PLEAS COURT
TERESA L. LAMMERS, CLERK
PUTNAM CO, OHIO

11/7/2018                                    Offender Information Details

 

# Ohio | Department of Rehabilitation & Correction

**John R. Kasich, Governor**
**Stuart C. Hudson, Interim Director**

Wednesday November 07, 2018 9:58 AM

## OFFENDER INFORMATION DETAILS



| | |
|---|---|
| **INMATE ID** | A529131 |
| **FIRST NAME** | TRAVIS |
| **LAST NAME** | SOTO |
| **LOCK** | - |
| **RACE** | WHITE |
| **INSTITUTION** | CO.WH |

### RELEASED - 08/19/2014 - FINAL RELEASE FROM PRC

| | | | |
|---|---|---|---|
| **HAIR COLOR** | BLACK | **EYE COLOR** | BROWN |
| **SECURITY LEVEL** | 1 | **DOB** | 04/28/1986 |
| **GENDER** | MALE | **HEIGHT** | 510 |
| **WEIGHT** | 165 | **ADMITTED** | 09/07/2006 |
| **LATEST JOB** | - | **COUNTY OF COMMITMENT** | PUTN |
| **COURT CASE NUMBER** | 2006CR19 | **MOST SERIOUS OFFENSE** | 2919.22 4 - ENDANGER CHILD |
| **FBI** | 538786AC0 | **BCI** | C135916 |

**EXHIBIT A**

11/7/2018

Offender Information Details



## RELEASE DATE: 08/28/2011

PRD DATE     -             PRC TERM    3.00 years

CCIS INVESTIGATION    Y            POA DATE     -
AVAILABLE

PRC START DATE    08/28/2011

## ALIAS NAMES

LAST NAME           FIRST NAME          MIDDLE NAME

## OTHER INMATE NUMBERS

OFFENDER NO.       NAME       STATUS       CURRENT NO.

## SENTENCE INFORMATION

NET SENTENCE: 5.00 TERM

**Aggregate Jail time Credit (days): 8**

| | | | | |
|---|---|---|---|---|
| **Exp. of Definite** | - | | **Exp. of Stated Term [EST]** | 08/20/2011 |
| **2/3 Exp. of Definite** | - | Fixed | 08/28/2011 | Zero Diminishing   08/28/2011 |
| **Board Date** | - | | **Board Month/Yr** | - |
| **2/3 Board Date** | - | Fixed | - | Zero Diminishing   - |
| **Al(non gun) date 2/3** | - | Fixed | - | Zero Diminishing   - |

11/7/2018                                    Offender Information Details

| | | | |
|---|---|---|---|
| Exp. of Gun/DBS Date | - | Shock Parole Hearing Date | - |
| EMS-Exp. of Maximum | - | Shock Parole Release Date | - |
| Exp. of Mandatory Term | - | Furlough/TRC Screening Date | - |
| Exp. of PRC | 08/19/2014 | Furlough/TRC Hearing Date | - |
| Commutation Review Date | - | Definite/Stated Term Exp. | 08/20/2011 |
| Expiration of EST HB86-1 Sentence | - | Expiration of EST HB86-5 Sentence | - |
| Expiration of EST HB86-0 Sentence | - | Expiration of EST SB2 Sentence | 08/20/2011 |
| Risk Reduction Release Date | - | 80% Release Eligibility Date | - |
| 92% Earn Credit CAP HB86-1 Sentence | - | 92% Earn Credit CAP HB86-5 Sentence | - |
| Earliest Risk Reduction Date | - | Risk Reduction Qualifying Date | - |

## OFFENSE DATA

| OFFENSE | START mmddyy | COUNTS | CL | JAIL TIME CREDIT | GUN YEARS | DEF / TERM | MIN / FULL | MAX SENTENCE | AN MANDATORY | LIFE DEATH | COUNTY | DOCKET NUMBER | C N | DI FI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ENDANGER CHILD | 09/07/2006 | 1 | C | 8 | - | 5.00 | - | - | - | - | PUTN | 2006CR19 | C | |

## JOB INFORMATION

| DATE | INSTITUTION | JOB DESCRIPTION | JOB LOCATION |
|---|---|---|---|
| 04/14/2015 | CO.WH | | |
| 05/15/2012 | CRC | RECEPTION | ADMINISTRATION |
| 08/22/2011 | ACI | UNASSIGNED | UNASSIGNED |
| 07/12/2011 | ACI | LC | LC-SEG |
| 06/28/2011 | ACI | DC | DC-SEG |
| 06/21/2011 | ACI | SC | SC-SEG |
| 03/04/2011 | ACI | PORTER | S&S DEPART |
| 08/07/2009 | ACI | PORTER | VISITING ROOM |
| 05/15/2009 | ACI | PORTER | S&S DEPART |
| 08/25/2008 | ACI | STUDENT ADVANCED | EDUCATION-UF |
| 01/18/2008 | ACI | FOOD SERVICE WKR | CAFE |

11/7/2018

Offender Information Details

| DATE | INSTITUTION | JOB DESCRIPTION | JOB LOCATION |
|------|-------------|-----------------|--------------|
| 01/02/2008 | ACI | ORIENTATION | ORIENTATION |
| 05/11/2007 | RCI | PORTER | H7B |
| 04/13/2007 | RCI | FOOD SERVICE WKR 2 | FS |
| 04/12/2007 | RCI | DC | H5A |
| 04/08/2007 | RCI | SC | H5A |
| 10/27/2006 | RCI | FOOD SERVICE WKR 2 | FS |
| 09/29/2006 | RCI | PORTER | H8 |
| 09/19/2006 | RCI | UNASSIGNED | ORIENTATION |
| 09/07/2006 | CRC | RECEPTION | RECEPTION |
| 09/07/2006 | CRC | ADD TO COUNT AND ROLLS | BLANK |

## DETAINER INFORMATION

| AGENCY NAME | TYPE | PLACED ON | WARRANT # |
|-------------|------|-----------|-----------|

## HEARING INFORMATION

| SCHEDULED MONTH | TYPE OF HEARING | RESULTS | ACTUAL DATE |
|-----------------|-----------------|---------|-------------|
| 02/2011 | TC02JVE | Judicial Veto BCSljw | 12/09/2010 |
| 01/2011 | TC01REC | TC RECOMMENDED PENDING JUDICIAL REVIEW | 11/29/2010 |
| 07/2010 | ASMTPRY | PRC YES - BASIC SUPERVISION, NO UNSUPERVISED CONTACT WITH MINORS WIT | 12/31/2008 |

## MOVEMENT INFORMATION

| MM/DD/YY | INSTITUTION | LOCK | | MM/DD/YY | INSTITUTION | LOCK |
|----------|-------------|------|---|----------|-------------|------|
| 04/14/2015 | CO.WH | | ◄ | 05/15/2012 | CRC | |
| 08/22/2011 | CRC | | ◄ | 07/08/2011 | ACI | S/SEG/11/B |
| 06/21/2011 | ACI | S/SEG/2/T | ◄ | 10/28/2010 | ACI | A2/H2B/204/T |
| 03/24/2010 | ACI | A2/H2B/210/T | ◄ | 11/07/2008 | ACI | A2/H2B/223/T |
| 11/06/2008 | ACI | A2/H2B/223/B | ◄ | 11/06/2008 | ACI | Z/MIS/1 |

11/7/2018                                    Offender Information Details

| MM/DD/YY | INSTITUTION | LOCK | | MM/DD/YY | INSTITUTION | LOCK |
|---|---|---|---|---|---|---|
| 07/22/2008 | ACI | Z/CMC/5 | ◄ | 06/02/2008 | ACI | A2/H2B/230/T |
| 06/02/2008 | ACI | Z/CMC/4 | ◄ | 05/21/2008 | ACI | A2/H2B/230/T |
| 05/21/2008 | ACI | Z/CMC/5 | ◄ | 04/24/2008 | ACI | A2/H2B/230/T |
| 04/04/2008 | ACI | A2/H2B/102/U | ◄ | 01/15/2008 | ACI | A2/H2B/111/U |
| 01/07/2008 | ACI | B4/H4B/211/T | ◄ | 01/04/2008 | ACI | B4/H4B/115/T |
| 01/02/2008 | ACI | | ◄ | 11/01/2007 | RCI | H7/B/216T |
| 04/13/2007 | RCI | H7/B/104T | ◄ | 04/08/2007 | RCI | H5/A/144B |
| 01/09/2007 | RCI | H8/A/247T | ◄ | 12/07/2006 | RCI | H8/A/129T |
| 09/19/2006 | RCI | H8/A/257T | ◄ | 09/19/2006 | RCI | |
| 09/12/2006 | CRC | C/03/2076/A | ◄ | 09/07/2006 | CRC | R/02/2054/B |
| 09/07/2006 | CRC | | | | | |

## CLASSIFICATION INFORMATION

| EFFECTIVE | LEVEL | TYPE | CLASS DATE | ANNIVERSARY | PRIV. REVIEW |
|---|---|---|---|---|---|
| 09/27/2010 | 1 B | ANNIVERSARY | 09/27/2010 | 09/27/2011 | - |
| 09/28/2009 | 1 B | ANNIVERSARY | 09/28/2009 | 09/28/2010 | - |
| 09/22/2008 | 1 B | ANNIVERSARY | 09/22/2008 | 09/22/2009 | - |
| 09/24/2007 | 2 | ANNIVERSARY | 09/14/2007 | 09/24/2008 | - |
| 09/13/2006 | 2 | CONFIRMED | 09/13/2006 | 09/13/2007 | - |
| 09/07/2006 | 3 | INITIAL | 09/07/2006 | - | - |

## STATUS INFORMATION

| EFFECTIVE DATE | STATUS | DETAIL | REPORTING DATE |
|---|---|---|---|
| 08/19/2014 | RELEASED | FINAL RELEASE FROM PRC | 07/21/2014 |
| 08/20/2011 | PAROLED | RELEASED UNDER PRC | 08/22/2011 |
| 07/22/2008 | INCARCERATED | RETURNED AWL | 07/22/2008 |
| 07/22/2008 | INCARCERATED | MEDICAL AWL TO CMC | 07/22/2008 |
| 06/02/2008 | INCARCERATED | RETURNED AWL | 06/02/2008 |
| 06/02/2008 | INCARCERATED | MEDICAL AWL TO CMC | 06/02/2008 |
| 01/02/2008 | INCARCERATED | ADMIN. TRANSFER | 01/02/2008 |

11/7/2018                                    Offender Information Details

| EFFECTIVE DATE | STATUS | DETAIL | REPORTING DATE |
|---|---|---|---|
| 09/07/2006 | INCARCERATED | NEW ADMISSION FROM COURT | 09/07/2006 |

J.22u  P.464

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO

STATE OF OHIO                          CASE NO. 2016 CR 57
    Plaintiff

VS.                                    JUDGMENT ENTRY

TRAVIS SOTO
    Defendant

---

This date, to-wit: November 15, 2018, this matter came on for consideration on the

**Defendant's Motion for Personal Recognizance Bond or to Reduce Bond Pending Appeal.**

The Court, having carefully considered said motion, finds it not well taken.

IT IS THEREFORE ORDERED AND DECREED that the **Defendant's Motion for**

**Personal Recognizance Bond or to Reduce Bond Pending Appeal be, and hereby is,**

**overruled.**

JUDGE KEITH H. SCHIERLOH

cc:
Prosecutor – faxed
Carly M. Edelstein – faxed to 614-728-3670
Probation Officer – faxed
CVS – faxed
Travis Soto – faxed to PC Jail



TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 162

5:285   P. 814

## IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
## OTTAWA, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | CASE NO. 2016-CR-57 |
| Plaintiff | : | |
| VS. | : | JUDGMENT ENTRY ON DEFENDANT'S MOTION #4 |
| TRAVIS SOTO | : | HON. KEITH H. SCHIERLOH |
| Defendant | : | |

---

Defendant's request in Motion #4 is to determine what is the potential sentence for the Defendant if convicted.  Specifically, is defendant death penalty eligible based upon the language of the indictment.  Defendant argues that the indictment does not list a specific aggravating circumstance as required by ORC 2929.03.  The defendant argues three points;

1. Vagueness as to the indictment.  That the indictment does not put the defendant on notice that the defendant is death eligible.

2. The indictment fails to narrow the defendant into a class of death eligible persons.

3. The specifications required by 2929.04 are not contained within the indictment.

The State of Ohio counter argues those points as follows;

A. An imposition of the death penalty for aggravated murder requires the indictment to contain one of the aggravating circumstances under ORC 2929.04(A)

4

J.285  P.815

B.  Specifically, that the indictment alleges that one such aggravating

circumstance is purposely causing the death of another under the

age of thirteen (ORC 2929.04(A)(9)).

C.  Since there is only one aggravating circumstance alleged by the

State of Ohio the need to separately number the specification is not

needed.

"The purposes of an indictment are to give an accused adequate
notice of the charge, and enable an accused to protect himself or herself
from any future prosecutions for the same incident. *Weaver v. Sacks*
(1962), 173 Ohio St. 415, 417, 20 O.O.2d 43, 183 N.E.2d 373; *State v. Sellards*
(1985), 17 Ohio St.3d 169, 170, 17 OBR 410, 478 N.E.2d 781. This court has
held:

"The sufficiency of an indictment is subject to the requirements of
Crim.R. 7 and the constitutional protections of the Ohio and federal
Constitutions. Under Crim.R. 7(B), an indictment 'may be made in ordinary
and concise language without technical averments or allegations not
essential to be proved. The statement may be in the words of the
applicable section of the statute, provided the words of that statute
charge an offense, or in words sufficient to give the defendant notice of
all the elements of the offense with which the defendant is charged.'

"An indictment meets constitutional requirements if it 'first, contains
the elements of the offense charged and fairly informs a defendant of the
charge against which he must defend, and, second, enables him to
plead an acquittal or conviction in bar of future prosecutions for the same
offense.' " *State v. Childs* (2000), 88 Ohio St.3d 558, 564-565, 2000 Ohio 425,
728 N.E.2d 379, quoting *Hamling v. United States* (1974), 418 U.S. 87, 117-
118, 94 S.Ct. 2887, 41 L.Ed.2d 590.

*State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d
1162, ¶7-9

Therefore, the question becomes "Is the specification sufficient
enough for the defendant to know which subsection and which offenses
he must defend himself against?"  The indictment filed is written as:

5

ʃ·285   P. 816

The Jurors of the grand jury of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, Travis D. Soto, did purposely cause the death of another, who is under thirteen (13) years of age at the time of the commission of the offense; to-wit: did cause the death of his son, John Doe, DOB (xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio in violation of Ohio Revised Code Section 2903.01(C), Aggravated Murder, an unclassified felony and against the peace and dignity of the State of Ohio.

As argued by the State of Ohio, the specification identified is that the defendant did purposely cause the death of another, who is under thirteen (13) years of age at the time of the commission of the offense. When comparing this to the language under ORC 2929.04 we find that the language is not an exact match.  The Court would note that the second prong of the specification is missing.  With the use of the word "and" within the language of the specification it would indicate that additional clarification in the indictment is needed.

The offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design.

ORC Ann. 2929.04

The Ohio Supreme Court indicated this view in State of Ohio verses Tazwell Lomax in 2002.  Although a different subsection of the ORC 2929.04, the argument is the same.  In Lomax, the State of Ohio failed to charge the defendant with specific language identifying him as either the principal offender or committed the murder with prior calculation and design.  And more so, the Court noted that the facts presented may have been clear for a jury to make that finding it ultimately came down that the indictment was deficient.

6

§.225   P 817

"While, given the facts of the case, it may have been obvious that appellant was the principal offender, that is not the issue. Appellant was not so charged, and for him to become death-eligible, the indictment must, when the specification is one charged pursuant to R.C. 2929.04(A)(7), specifically set forth that the appellant committed the murder with prior calculation and design and/or was the principal offender.

*State v. Lomax*, 96 Ohio St.3d 318, 2002-Ohio-4453, 774 N.E.2d 249, ¶24

Based upon the request of the Defendant and the findings and conclusions by this Court, the Court shall approve Defendant's Motion #4 and <u>find that the Defendant is not "death eligible" upon the language used within the indictment.</u>

JUDGE KEITH H. SCHIERLOH

Cc:   Prosecuting Attorney – faxed
William F. Kluge – faxed
Robert Grzybowski – faxed

7

5/3/2021                         Case Details - CourtView Justice Solutions

## 12-17-05 STATE OF OHIO SOTO, TRAVIS

- Case Type:
- COURT OF APPEALS
- Case Status:
- Closed
- File Date:
- 05/02/2017
- DCM Track:
-
- Action:
- APPEAL
- Status Date:
- 05/02/2017
- Case Judge:
-
- Next Event:
-

**All Information**   **Party**   **Docket**   **Financial**

### Docket Information

| Date | Docket Text | Amount Owed |
|---|---|---|
| 05/02/2017 | APPEAL | $26.00 |
| 05/02/2017 | FILING FEE | $25.00 |
| 05/02/2017 | NOTICE OF APPEAL<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | $0.00 |
| 05/02/2017 | MOTION FOR APPOINTMENT OF COUNSEL FOR APPEAL<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 05/02/2017 | MOTION FOR TRANSCRIPT AT STATE EXPENSE<br>Attorney: BENAVIDEZ, JOSEPH (0000042447) | |
| 05/02/2017 | AFFIDAVIT OF INDIGENCY | |
| 05/03/2017 | MEMORANDUM - MISSING DOCUMENTS LETTER TO ATTY | |
| 05/03/2017 | NOTICE OF FILING - NOTICE OF APPEAL FILED BY Attorney: BENAVIDEZ, JOSEPH (0000042447)  CC: COURT OF APPEALS, PROS ATTY | $3.00 |
| 05/23/2017 | FAX CORRESPONDENCE @ 11:50 AM FROM Attorney: SHORT, MICHAEL J (0063156) | $8.00 |
| 05/23/2017 | STATEMENT AND PRECIPE<br>Attorney: SHORT, MICHAEL J (0063156) | |
| 05/23/2017 | CRIMINAL APPEAL DOCKETING STATEMENT<br>Attorney: SHORT, MICHAEL J (0063156) | |
| 05/23/2017 | NOTICE OF FILING - 1)STATEMENT AND PRAECIPE AND 2)CRIMINAL APPEAL DOCKETING STATEMENT FILED BY Attorney: SHORT, MICHAEL J (0063156)  CC:  COURT OF APPEALS, PROS ATTY | $3.00 |
| 06/12/2017 | NOTICE OF FILING - COMPLETE RECORD W/TRANSCRIPT FILED BY CLERK OF COURTS   CC:  COURT OF APPEALS, PROS ATTY, MICHAEL SHORT | $3.00 |
| 06/12/2017 | COPIES | $0.30 |
| 06/12/2017 | POSTAGE DUE | $0.96 |
| 06/12/2017 | FAX CORRESPONDENCE @ 2:31 PM FROM Attorney: SHORT, MICHAEL J (0063156) | $5.00 |
| 06/12/2017 | MOTION TO SUPPLEMENT THE RECORD<br>Attorney: SHORT, MICHAEL J (0063156) | |
| 06/12/2017 | NOTICE OF FILING - MOTION TO SUPPLEMENT THE RECORD FILED BY Attorney: SHORT, MICHAEL J (0063156)  CC:  COURT OF APPEALS, PROS ATTY | $3.00 |
| 06/12/2017 | COPIES | $0.40 |

| Date | Docket Text | Amount Owed |
|---|---|---|
| 06/12/2017 | POSTAGE DUE | $0.48 |
| 06/19/2017 | JUDGMENT ENTRY - APPELLANT'S MOTION TO SUPPLEMENT THE RECORD ON APPEAL IS DENIED | $8.00 |
| 06/19/2017 | NOTICE OF FILING - JUDGMENT ENTRY FILED BY COURT OF APPEALS  CC:  MICHAEL SHORT, PROS ATTY | $3.00 |
| 06/19/2017 | COPIES | $0.60 |
| 06/19/2017 | POSTAGE DUE | $0.48 |
| 06/27/2017 | MERIT BRIEF OF APPELLANT<br>Attorney: SHORT, MICHAEL J (0063156) | |
| 06/27/2017 | NOTICE OF FILING ON APPEAL - MERIT BRIEF OF APPELLANT FILED BY Attorney: SHORT, MICHAEL J (0063156)  CC: COURT OF APPEALS, GARY LAMMERS | $2.00 |
| 06/27/2017 | COPIES | $0.20 |
| 06/27/2017 | POSTAGE DUE | $0.48 |
| 07/17/2017 | BRIEF OF PLAINTIFF - APPELLEE, STATE OF OHIO<br>Attorney: SHUN, LILLIAN R (0091706) | |
| 07/17/2017 | NOTICE OF FILING ON APPEAL - BRIEF OF PLAINTIFF-APPELLEE, STATE OF OHIO FILED BY Attorney: SHUN, LILLIAN R (0091706)  CC:  COURT OF APPEALS, MICHAEL SHORT | $9.00 |
| 07/17/2017 | COPIES | $0.30 |
| 07/17/2017 | POSTAGE DUE | $0.96 |
| 07/19/2017 | MOTION: | |
| 07/19/2017 | Issue Date:  07/19/2017<br>Service:  MOTION<br>Method:  CERTIFIED MAIL<br>Cost Per:  $10.00<br><br>COURT OF APPEALS<br>204 NORTH MAIN STREET<br>LIMA, OH  45801<br>Tracking No: 941472669904208243416 | $10.00 |
| 07/27/2017 | ASSIGNMENT NOTICES - ORAL ARGUMENT ON TUESDAY, AUGUST 22, 2017 AT 10:00 AM.  ALL REQUESTS FOR ORAL ARGUMENT MUST BE REC'D IN WRITING BY AUGUST 11, 2017  CC:  CLERK OF COURTS, MICHAEL SHORT, LILLIAN SHUN | $3.00 |
| 02/05/2018 | JUDGMENT ENTRY AND OPINION - JUDGMENT OF TRIAL COURT IS REVERSED W/COSTS ASSESSED TO APPELLEE FOR WHICH JUDGMENT IS RENDERED.  THE CAUSE IS HEREBY REMANDED TO TRIAL COURT FOR FURTHER PROCEEDINGS & FOR EXECUTION OF JUDGMENT FOR COSTS FILED BY COURT OF APPEALS | $105.00 |
| 02/05/2018 | NOTICE OF FILING ON APPEAL - JUDGMENT ENTRY AND OPINION FILED BY COURT OF APPEALS  CC: MICHAEL SHORT, PROS ATTY, JUDGE K. SCHIERLOH | $9.00 |
| 02/05/2018 | COPIES | $6.60 |
| 02/05/2018 | POSTAGE DUE | $0.48 |
| 02/15/2018 | MOTION TO SUSPEND PROCEEDINGS PENDING APPEAL TO THE OHIO SUPREME COURT Attorney: LAMMERS, GARY (0000042040) | |
| 02/15/2018 | NOTICE OF FILING ON APPEAL - MOTION TO SUSPEND PROCEEDINGS PENDING APPEAL TO THE OHIO SUPREME COURT FILED BY<br>Attorney: LAMMERS, GARY (0000042040)  CC:  COURT OF APPEALS, JOSEPH BENAVIDEZ | $6.00 |
| 02/15/2018 | COPIES | $0.20 |
| 02/15/2018 | POSTAGE DUE | $0.96 |
| 02/15/2018 | MOTION FOR APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES Attorney: SHORT, MICHAEL J (0063156) | |
| 02/15/2018 | POSTAGE DUE | $0.48 |
| 02/27/2018 | COST BILL STATEMENT | |
| 02/28/2018 | JUDGMENT ENTRY - APPROVAL OF PAYMENT OF APPOINTED COUNSEL FEES AND EXPENSES TO MICHAEL SHORT $805.00 | $10.00 |
| 03/08/2018 | JUDGMENT ENTRY - THE EXECUTION OF THE JUDGMENT MANDATE IN THE INSTANT CASE IS STAYED PENDING APPEAL TO THE OHIO SUPREME COURT | $5.00 |

5/3/2021                          Case Details - CourtView Justice Solutions

| Date | Docket Text | Amount Owed |
|---|---|---|
| 03/08/2018 | NOTICE OF FILING ON APPEAL - JUDGMENT ENTRY FILED BY COURT OF APPEALS  CC:  PROS ATTY, MICHAEL SHORT, JUDGE K SCHIERLOH | $9.00 |
| 03/08/2018 | COPIES | $0.60 |
| 03/08/2018 | POSTAGE DUE | $0.48 |
| 03/22/2018 | NOTICE OF APPEAL OF APPELLANT STATE OF OHIO TO THE SUPREME COURT OF OHIO | $0.00 |
| 05/29/2018 | JUDGMENT ENTRY - UPON CONSIDERATION OF THE JURISDICTIONAL MEMORANDA FILED IN THIS CASE, THE COURT ACCEPTS THE APPEAL. THE CLERK SHALL ISSUE AN ORDER FOR THE TRANSMITTAL OF RECORD FROM THE COURT OF APPEALS FOR PUTNAM COUNTY & THE PARTIES SHALL BRIEF THIS CASE IN ACCORDANCE W/THE RULES OF PRACTICE OF THE SUPREME COURT OF OHIO | $5.00 |
| 05/29/2018 | JUDGMENT ENTRY - ORDER TO CERTIFY RECORD TO CLERK OF COURTS OF APPEALS W/INSTRUCTIONS | $10.00 |
| 05/31/2018 | MEMORANDUM - CERTIFIED COPY OF DOCKET TO SUPREME COURT OF OHIO | |
| 05/31/2018 | Issue Date:  05/31/2018<br>Service:  JUDGMENT ENTRY<br>Method:  CERTIFIED MAIL<br>Cost Per:  $10.00<br><br><br>THE SUPREME COURT OF OHIO<br>65 SOUTH FRONT STREET<br>COLUMBUS, OH  43215<br>Tracking No: 94147266990421194 5162 | $10.00 |
| 11/18/2019 | CERTIFIED COPY OF JUDGMENT ENTRY / APPEAL FROM THE COURT OF APPEALS - THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED AND THIS CAUSE IS REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS, CONSISTENT W/THE OPINION RENDERED HEREIN FILED BY THE SUPREME COURT OF OHIO | $5.00 |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 169

IN THE COURT OF APPEALS OF OHIO, THIRD APPELLATE DISTRICT
PUTNAM COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | * | Case No. 12-17-05 |
| Appellee | * | APPEAL FROM THE COMMON |
| v. | * | PLEAS COURT OF PUTNAM |
| | | COUNTY, OHIO |
| TRAVIS SOTO | * | REGULAR CALENDAR |
| Appellant | * | |

## MERIT BRIEF OF APPELLANT

<table>
<tr><td>

MICHAEL J. SHORT  0063156
ATTORNEY FOR APPELLANT
P.O. BOX 1136
LIMA, OH  45802
419-303-9502 Phone
419-516-0125 Fax
MShort2@woh.rr.com

</td><td>

GARY LAMMERS
PUTNAM COUNTY PROSECUTOR
336 E. MAIN ST. SUITE B
OTTAWA,OH  45875
419-523-3600  Phone
419-523-4519  Fax

</td></tr>
</table>

COURT OF APPEALS
TERESA J. LAMMERS, CLERK
PUTNAM COUNTY, OHIO

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

ASSIGNMENTS OF ERROR PRESENTED FOR REVIEW ....................................................1

ISSUES PRESENTED FOR REVIEW ......................................................................................1

STATEMENT OF THE CASE....................................................................................................2

    STATEMENT OF FACTS ......................................................................................................2

ARGUMENT...............................................................................................................................3

    WITH REGARD TO ASSIGNMENT OF ERROR I.............................................................3

CONCLUSION............................................................................................................................7

PROOF OF SERVICE.................................................................................................................8

APPENDIX .................................................................................................................................9

i

# TABLE OF AUTHORITIES

**Cases**

*Blockburger v. United States*, 284 U.S. 299 (1932) .......................................................................3

*State v. Anderson*, 138 Ohio St.3d 264, 267, 2014-Ohio-542 ......................................................2

*State v. Carpenter*, 68 Ohio St.3d 59, 61 (1993)..........................................................................4

*State v. Dye*, 127 Ohio St.3d 357, 364, 2010-Ohio-5728, 932 N.E.2d 1217 .............................5

*State v. Harrison*, 122 Ohio St.3d 512, 519, 2009-Ohio-3547 ....................................................5

*State v. Kelly*, 2015-Ohio-1948, 34 N.E.3d 513, ¶ 14 (8th  Dist.) ................................................3

*State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284 787 N.E.2d 1185......................................4

*State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286..........................................................4

*State v. Tolbert*, 60 Ohio St.3d 89, 573 N.E.2d 617 (1991) ........................................................4

*State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542 ........................................3

**Statutes**

2903.02(B) ....................................................................................................................................3

R.C. 2903.01(C) ...........................................................................................................................3

R.C. 2903.04 (A) ..........................................................................................................................2

R.C. 2903.11 (A)(1) .....................................................................................................................3

R.C. 2905.01 .................................................................................................................................3

R.C. 2919.22 .................................................................................................................................2

R.C. 2921.12(A)(1) .......................................................................................................................3

ii

## ASSIGNMENTS OF ERROR PRESENTED FOR REVIEW

Assignment of Error I: The trial court erred overruled Defendant's Motion to Dismiss

on Double Jeopardy Grounds.

## ISSUES PRESENTED FOR REVIEW

With regard to Assignment of Error I: Whether the Defendant's earlier guilty plea to

involuntary manslaughter barred prosecution for murder and aggravated murder 11

years later.

1

## STATEMENT OF THE CASE

This case is before this Court on an appeal of the Putnam County Common Pleas Court's denial of a Motion to dismiss on grounds of double jeopardy. On October 11, 2016, the Defendant filed a Motion to Dismiss on the grounds of double jeopardy. The State filed a response on October 18, 2016.  On April 13, 2017, the trial court, without hearing,  overruled the defendant's motion. The denial of such a motion is a final, appealable order. *State v. Anderson*, 138 Ohio St.3d 264, 267, 2014-Ohio-542.

## STATEMENT OF FACTS

In March, 2006, Travis Soto was indicted on charges of Involuntary Manslaughter (R.C. 2903.04 (A), Felony 1) and Child Endangering (R.C. 2919.22, Felony 3). The charges stemmed from the death of his child. Mr. Soto claimed that the child was killed in an ATV accident in which Mr. Soto struck and killed his son. The coroner found the injuries consistent with Mr. Soto's explanation.

On July 7, 2006, Mr. Soto entered into a negotiated plea. He entered a guilty plea to the Child Endangering Charge, and the Involuntary Manslaughter charge.  On August 31, 2006, Mr. Soto was sentenced to 5 years in prison and ordered to pay a $10,000 fine. Mr. Soto served the entire prison term and was released in 2012.

On July 25, 2016, Mr. Soto went to the Putnam County Sheriff's Office and proceeded to confess that his earlier account of his son's death was inaccurate, and that

2

he had beaten his son do death and staged the accident.  As a result, Mr. Soto was charged with Aggravated Murder (R.C. 2903.01(C), unclassified felony), Murder (2903.02(B), unclassified felony), Felonious Assault (R.C. 2903.11 (A)(1), Felony 2), Kidnapping (R.C. 2905.01, F1), and Tampering With Evidence (R.C. 2921.12(A)(1), F3)

## ARGUMENT

### WITH REGARD TO ASSIGNMENT OF ERROR I:

The United States and Ohio Constitutions prohibit putting a person in jeopardy for the same offense. U.S. Cont. Amend. V, Section 10, Article I Ohio Constitution. This Court reviews a trial court's decision on double jeopardy de novo. *State v. Kelly*, 2015-Ohio-1948, 34 N.E.3d 513, ¶ 14 (8th Dist.).

The United States Supreme Court set forth the "same elements" test to make this determination. *Blockburger v. United States*, 284 U.S. 299 (1932). Ohio has adopted this test. *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542.

The Blockburger test holds that double jeopardy precluded "successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute requires proof of a fact which the other does not." *State v. Tolbert*, 60 Ohio St.3d 89, 573 N.E.2d 617 (1991).

3

Involuntary manslaughter is a lesser-included offense of aggravated murder and murder. Involuntary manslaughter is a lesser offense of these forms of murder because the only distinguishing factor is the mental state involved in the act. See *State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286. The same rationale applies in finding that involuntary manslaughter is a lesser-included offense of aggravated murder of a child under 13. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284 787 N.E.2d 1185.

Mr. Soto entered into a plea agreement that resulted in the dismissal of the involuntary manslaughter charge. A negotiated plea prohibits successive prosecutions where the defendant would reasonably believe his or her plea would bar further prosecution for any greater offense related to the same factual scenario." The trial court, without any explanation, found that Mr. Soto having such a belief was not reasonable.

Examples of cases in which the Defendant's belief that prosecution for greater offenses was precluded was found to be reasonable include *State v. Carpenter*, 68 Ohio St.3d 59, 61 (1993).

In *Carpenter*, the defendant was indicted on one count of felonious assault. In 1985, Carpenter entered a guilty plea to the lesser-included offense of attempted felonious assault. At the time of the guilty plea, the prosecution was aware that the victim was in a coma and could die, but the plea agreement was silent as to additional charges in the event of the victim's death. In March 1986, the victim died. In late 1987, Carpenter was released from prison. In January 1988, Carpenter was charged with the

4

murder of the stabbing victim. He filed a motion to dismiss the indictment, arguing that further prosecution was prohibited. The Supreme Court of Ohio affirmed the dismissal of the indictment. The Court held that if the state wished to reserve the right to bring further charges against Carpenter in the event of the victim's death, it was required to make that reservation a part of the record. Id. at 62. The court concluded that Carpenter had a "reasonable and justified" expectation that, by pleading guilty, he was "terminating the incident and could not be called on to account further on any charges regarding [the] incident" and that the prosecutor was aware of this expectation. Id. *See also State v. Dye*, 127 Ohio St.3d 357, 364, 2010-Ohio-5728, 932 N.E.2d 1217(the defendant had a reasonable expectation that guilty plea would preclude further prosecution because both the defendant and the prosecution knew the severity of the victim's injuries and the potential that the victim would die. The state failed to reserve the right to bring further charges); *State v. Harrison*, 122 Ohio St.3d 512, 519, 2009-Ohio-3547 (defendant had a reasonable expectation that guilty plea would bar further prosecution because the defendant signed a negotiated plea agreement on the same day the bill of information was filed, agreeing to plead guilty to all counts set forth in bill of information, and because both the prosecutor and the court that accepted the guilty plea had jurisdiction over all of the actual and potential charges).

A case where the court found a defendant's belief unreasonable is *State v. Zima, supra.* The Supreme Court of Ohio held that the defendant, Zima, failed to show why her belief that a guilty plea would prevent further prosecution was reasonable. Id. at 64.

5

On July 3, 2001, Zima struck an oncoming motorcycle with her car. On July 6, 2001, she was charged in the Cleveland Municipal Court with driving under the influence, driving under suspension, failure to yield, and failure to wear a seatbelt. Id. at 62. Later, on August 23, 2001, a Cuyahoga County Grand Jury indicted Zima on charges of aggravated vehicular assault based on driving under the influence, aggravated vehicular assault based on driving recklessly, and driving under the influence. Id. On August 27, 2001, Zima entered a no-contest plea in municipal court to the charge of driving under the influence, and the prosecution dismissed the three remaining municipal court charges. At the time of her no-contest plea, Zima was not aware of the indictment from the Cuyahoga County Grand Jury. Id. 62. After sentencing on the municipal court charges, Zima moved to dismiss the indictment from the Cuyahoga County Grand Jury. The trial court granted Zima's motion to dismiss. Id.

The Supreme Court of Ohio found *Carpenter* inapplicable to Zima's case. The Court found that, when Zima pled guilty in the municipal court, the Cuyahoga County Grand Jury had already indicted her on felony charges. Id. at 64. The Court noted "[n]either the municipal court nor the city prosecutor had the authority to dismiss those pending felony charges." Id. The court stated that a "'defendant should be aware that a plea taken before a municipal judge with limited criminal jurisdiction might not dispose of the matter fully.' "Id. The Court reasoned that, in *Carpenter*, the defendant's expectation that the guilty plea would terminate further prosecution was "inherently justified because the prosecutor and the court had jurisdiction over all the charges, both

6

actual and potential, and because the negotiated guilty plea included the dismissal of all pending charges." Id.  Without such circumstances, a belief that further prosecution was barred was inherently unreasonable. Id at 64.

In this case, there was no reservation of the State's right to bring additional charges. See Change of Further, the charges were all before a court of competent jurisdiction. This is, therefore, more analogous to *Carpenter* and related cases than *Zima*. Mr. Soto, therefore, had a reasonable belief that his plea agreement would preclude additional prosecution. As such, this Court should find that prosecution in this is barred by double jeopardy.

## CONCLUSION

For the foregoing reasons the Appellant respectfully requests that this court find error prejudicial to the appellant, and reverse the judgment of the Putnam County Court of Common Pleas.  Appellant further requests all other relief this Court finds just and equitable.

Respectfully submitted,

Michael J. Short  0063156
Attorney for Appellant
P.O. Box 1136
Lima, OH  45802
419-303-9502 Phone
419-516-0125 Fax
MShort2@woh.rr.com

7

## PROOF OF SERVICE

I certify that a copy of the foregoing was served upon the Putnam County Prosecutor,  204 N. Main St., Suite 302, Lima, OH  45801 on ⟋June 27⟍ , 2017 by placing a copy in the prosecutor's box in the Clerk of Court's office.

Michael J. Short

8

**APPENDIX**



9

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO | : | CASE NO. | 2016 CR 57 |
| Plaintiff | : | | |
| -vs- | : | JUDGMENT ENTRY | |
| TRAVIS SOTO | : | | |
| Defendant | : | | |

This matter came on for consideration of Defendant's previously filed **Motion to Dismiss** on the grounds of double jeopardy.  The Court has reviewed Defendant's Motion and the response of the State of Ohio.

### FACTS

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of R.C. 2903.04(A), a felony of the 1st degree.

As charged, Defendant was alleged to have committed Child Endangering by creating a substantial risk of harm, and actually causing serious physical harm to his child, and was alleged to have committed Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering.

The factual basis of the 2006 prosecution relied, in part, on Defendant's representations to law enforcement indicating he was the driver of an All Terrain Vehicle that struck his son. The Lucas County Coroner conducted an autopsy and was given Defendant's version of the

1

events.  The coroner concluded that the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, the Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering.  The Involuntary Manslaughter charge was dismissed.  He was sentenced to five (5) years incarceration.

The State represents the following as a basis for a subsequent 2016 indictment:  On July 25, 2016, the Defendant voluntarily appeared at the Putnam County Sheriff's Office and indicated that he wanted to provide the truthful account of what occurred in 2006.  He proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene.  The Lucas County Coroner's Office report, photographs, as well as reports from 2006 to the present were reviewed by a pediatric abuse specialist previously qualified as an expert by this Court.  The expert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son.  He also concluded that Defendant's 2006 misrepresentations led to the reasonable, yet faulty, prior conclusions of the Lucas County Coroner.

Defendant was then indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C);

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

2

## DECISION

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense*." *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. The test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*. Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.

3

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore, Double Jeopardy does not bar prosecution of this offense.

Furthermore, the 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

The Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his previous narrative of events would bar prosecution of subsequent charges based on newly discovered evidence which would transform the case from one of an accidental death to a purposeful homicide

Involuntary Manslaughter with a felony Child Endangering predicate is not the *same offense* as Murder with a Felonious Assault predicate. *State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these two charges:

Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).

Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

4

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate. Therefore, a resolution of the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. Also, a further exception to the *Blockburger* test exists where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been previously discovered despite the exercise of due diligence until additional evidence was

5

uncovered, such as Defendant's appearance and confession to the actual details of his son's

death. The coroner's report stated in part:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> ... What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

The Court finds that the exception under *Grady vs. Corbin* also applies to the within case.

For reasons as stated, Defendant's **Motion to Dismiss** on the grounds of double jeopardy

is **hereby overruled**.

JUDGE RANDALL BASINGER

cc:
Prosecuting Attorney – faxed
Joseph Benavidez – faxed to 419-228-3367

## Chapter 2903: HOMICIDE AND ASSAULT

### 2903.01 Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

(D) No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another.

(E) No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:

(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.

(2) It is the offender's specific purpose to kill a law enforcement officer.

(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

(G) As used in this section:

(1) "Detention" has the same meaning as in section 2921.01 of the Revised Code.

(2) "Law enforcement officer" has the same meaning as in section 2911.01 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Effective Date: 05-15-2002 .

### 2903.02 Murder.

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

(C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.

(D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

Effective Date: 06-30-1998.

## 2903.03 Voluntary manslaughter.

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.

(B) No person, with a sexual motivation, shall violate division (A) of this section.

(C) Whoever violates this section is guilty of voluntary manslaughter, a felony of the first degree.

(D) As used in this section, "sexual motivation" has the same meaning as in section 2971.01 of the Revised Code.

Amended by 129th General AssemblyFile No.178, SB 160, §1, eff. 3/22/2013.

Effective Date: 09-06-1996 .

## 2903.04 Involuntary manslaughter.

(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

(B) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor.

(C) Whoever violates this section is guilty of involuntary manslaughter. Violation of division (A) of this section is a felony of the first degree. Violation of division (B) of this section is a felony of the third degree.

(D) If an offender is convicted of or pleads guilty to a violation of division (A) or (B) of this section and if the felony, misdemeanor, or regulatory offense that the offender committed or attempted to commit, that proximately resulted in the death of the other person or the unlawful termination of another's pregnancy, and that is the basis of the offender's violation of division (A) or (B) of this section was a violation of division (A) or (B) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance or included, as an element of that felony, misdemeanor, or regulatory offense, the offender's operation or participation in the operation of a snowmobile, locomotive, watercraft, or aircraft while the offender was under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse, both of the following apply:

(1) The court shall impose a class one suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege as specified in division (A)(1) of section 4510.02 of the Revised Code.

(2) The court shall impose a mandatory prison term for the violation of division (A) or (B) of this section from the range of prison terms authorized for the level of the offense under section 2929.14 of the Revised Code.

## IN THE COURT OF APPEALS OF ALLEN COUNTY, OHIO
### THIRD APPELLATE JUDICIAL DISTRICT

STATE OF OHIO : CASE Nos. 2016 CR 57

    PLAINTIFF-APPELLEE : App. Case No. 12-17-05

    vs. :

TRAVIS SOTO : REGULAR CALENDAR

    DEFENDANT-APPELLANT :

---

## BRIEF OF PLAINTIFF-APPELLEE, STATE OF OHIO

---

**LILLIAN R. SHUN, #0091706**
**Assistant Prosecutor**
**336 East Main Street**
**Ottawa, Ohio 45875**
**Phone: (419) 523-3600**
**Fax: (419) 523-4519**
**lily.shun@putnamcountyohio.gov**

**MICHAEL J. SHORT, #0063156**
**Attorney for Defendant-Appellant**
**P.O. Box 1136**
**Lima, Ohio 45802**
**Phone: (419) 303-9502**
**Fax: (419) 516-0125**
**MShort2@woh.rr.com**

**ATTORNEY FOR PLAINTIFF-APPELLEE**

**ATTORNEY FOR DEFENDANT-APPELLANT**

## TABLE OF CONTENTS

Table of Contents ................................................................................…......i

Table of Authorities ...............................................................…..…..….….ii

Statement of the Case...............................................................................….1

Statement of Facts ................................................................................…...2

State's Response to Appellant's Sole Assignment of Error ...................................…...3

 **THE TRIAL COURT DID NOT ERR WHEN IT OVERRULED DEFENDANT'S MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS BECAUSE THE DEFENDANT'S EARLIER GUILTY PLEA TO CHILD ENDANGERING DID NOT BAR PROSECUTION FOR MURDER AND AGGRAVATED MURDER 11 YEARS LATER WHEN NEW EVIDENCE NOT PREVIOUSLY AVAILABLE WAS DISCOVERED.**

State's Argument of Law............................................................…...…..3

Conclusion...........................................................…...…................…..8

Proof of Service..........................................................................…...8

i

## TABLE OF AUTHORITIES

### CASES:

*Ash v. Swenson,* 397 U.S. 436 (1970)………………………………..……………………5

*Blockburger v. United States,* 284 U.S. 299 (1932)……….…………………..….4

*Brown v. Ohio,* 432 U.S. 161 (1977)…………………………..…………….…....5

*Diaz v. United States,* 223 U.S. 442 (1912)………………………………………5

*Grady v. Corbin,* 110 S. Ct. 2084 (1990)………………………………………….5

*State v. Best,* 42 Ohio St.2d, 330 N.E.2d 421………………………………………4

*State v. Carpenter,* 68 Ohio St.3d 59 (1993)………………………………………7

*State v. Thomas,* 61 Ohio St.2d 254 (1980)…………………..…………………..5

*State v. Resor,* 2010 Ohio 397………………………………………..……………5

*United States v. Dixon,* 509 U.S. 688, 113 S. Ct. 2849………………………….4

*State v. Zima,* 102 Ohio St.3d 61 (2004)……………………………………….3, 4

### STATUTORY AUTHORITY:

R.C. 2919.22………………………………………………………………………1

R.C. 2903.01………………………………………………………………………2

R.C. 2903.02……………………………………………………………………2, 5

R.C. 2903.04……………………………………………………………….......1, 5

R.C. 2903.11……………………………………………………………….......2, 5

R.C. 2905.01………………………………………………………………..........2

R.C. 2921.12…………………………………………………………….………..2

ii

**STATEMENT OF THE CASE**

On March 31, 2006, the Defendant, Travis Soto, was indicted on one count of Involuntary Manslaughter in violation of Ohio Revised Code Section 2903.04(A), a felony of the first degree and one count of Child Endangering in violation of Ohio Revised Code Section 2919.22(A)&(E)(1)(c), a felony of the third degree. On April 3, 2006 the Defendant was arraigned in Case Number 2006-CR-19. The Defendant was granted an own recognizance bond at that time.

On April 7, 2006, a pretrial was held on the matter. On April 13, 2006, the Defendant filed a Request for Discovery, a Notice of Intention to Use Evidence, and a Request for a Bill of Particulars. On April 24, 2006, the State furnished the Defendant with Discovery, a Notice of Intention to Use Evidence, and a Bill of Particulars. On May 4, 2006, the State filed supplemental discovery. The case was scheduled for a Jury Trial on August 9, 2006.

On May 11, 2006, a pretrial was held on the case. The case was then set for a second pretrial. On July 6, 2006, another pretrial was held. That same day, the Defendant entered into a plea agreement. Under the plea agreement, the Defendant entered a plea of Guilty to Count II in the Indictment, Child Endangering. The State agreed to remain silent. Count I of the Indictment was dismissed.

On August 18, 2006, the Defendant was sentenced. The Defendant was sentenced to 5 years at the Ohio Department of Rehabilitation and Corrections with credit for one day served. The Defendant had to pay a $10,000 fine and court costs. The Defendant was also subject to five years of Post Release Control. The Defendant was taken into custody that day.

1

After new evidence came to light, the Defendant was Indicted on August 12, 2016 for one count of Aggravated Murder, in violation of Ohio Revised Code Section 2903.01, an unclassified felony; one count of Murder, in violation of Ohio Revised Code Section 2903.02, an unclassified felony; one count of Felonious Assault, in violation of Ohio Revised Code Section 2903.11, a felony of the first degree; one count of Kidnapping, in violation of Ohio Revised Code Section 2905.01, a felony of the first degree; and one count of Tampering with Evidence, in violation of Ohio Revised Code Section 2921.12, a felony of the third degree.  On August 17, 2016, the Defendant was arraigned on these charges in Case Number 2016-CR-0057.

On September 6, 2016, a pretrial was held.  On October 11, 2016, the Defendant filed a Motion to Dismiss based on the grounds of double jeopardy.  On October 18, 2016 the State filed a response to the Defendant's Motion to Dismiss.  On April 13, 2017, the Court dismissed the Defendant's Motion.

On May 2, 2017, the Defendant filed his Notice of Appeal.  On June 27, 2017, the Defendant filed his brief on the appeal.

## STATEMENT OF THE FACTS

On or about the 23rd day of January 2006, the Defendant murdered his toddler, John Doe, DOB xx/xx/2003.  At that time, the Defendant successfully deceived law enforcement into believing that his toddler, John Doe DOB xx/xx/2003, had died as a result of an ATV accident.

Approximately four (4) years after the Defendant completed serving his five (5) year prison sentence, he went the Putnam County Jail and confessed that his toddler's death was not an accident.  Instead, the Defendant admitted that he had beaten his son to

2

death, and then staged an ATV accident to cover it up. After the Defendant confessed, the State indicted him on the charges of Aggravated Murder, Murder, Felonious Assault, Kidnapping, and Tampering with Evidence.

### STATE'S RESPONSE TO SOLE ASSIGNMENT OF ERROR

**THE TRIAL COURT DID NOT ERR WHEN IT OVERRULED DEFENDANT'S MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS BECAUSE THE DEFENDANT'S EARLIER GUILTY PLEA TO CHILD ENDANGERING DID NOT BAR PROSECUTION FOR MURDER AND AGGRAVATED MURDER 11 YEARS LATER WHEN NEW EVIDENCE NOT PREVIOUSLY AVAILABLE WAS DISCOVERED.**

### STATE'S ARGUMENT OF LAW

The State asserts that the Court did not err when it overruled the Defendant's Motion to Dismiss on double jeopardy grounds because the Defendant's earlier guilty plea to Child Endangering did not bar the State from pursuing the charges of Aggravated Murder and Murder when new evidence was discovered. While it is clear that the both the United States and Ohio Constitutions prohibit a person from being twice put to trial for the same offense, there are still exceptions to the Double Jeopardy Clause that exist to address unique cases, such as this case. *See State v. Zima,* 102 Ohio St.3d 61, 65, 806 N.E.2d 542, 2004-Ohio-1807.

The United States Supreme Court and Ohio Supreme Court have adopted the "same elements" test to determine whether a person is being subjected to double jeopardy. Under the Fifth Amendment, "'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not. A single act may be an offense against two statutes, and if each

3

statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other'." *Zima* at ¶19 citing *Best,* 42 Ohio St.2d at 533, 330 N.E.2d 421.

The *Blockburger* Test, therefore, requires that the Court determine "whether each offense contains an element not contained in the other; if not they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." *Zima* at ¶20 citing *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed. 556.

Here, the Defendant is facing five new charges as a result of new evidence which came to light. The State will now address the application of the *Blockburger* Test to each of these charges separately.

Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Felonious Assault has a *mens rea* of "knowingly" which is not required in either Child Endangering or Involuntary Manslaughter. Kidnapping contains several elements that are not required by Child Endangering or Involuntary Manslaughter. In this case, the Indictment required that the State show that the victim was under thirteen years of age and was removed from the place where he was found or had his liberty restrained. Tampering with Evidence requires completely different elements that either Child Endangering or Involuntary Manslaughter.

Additionally, Aggravated Murder requires two different elements that are not required or included in either Child Endangering or Involuntary Manslaughter.

4

Specifically, Aggravated Murder has a *mens rea* of "purposely" and also requires that the victim be under thirteen years of age.

In this case, Involuntary Manslaughter with a felony Child Endangering predicate is **not** the same offense as Murder with a Felonious Assault predicate; accordingly, a resolution of the Involuntary Manslaughter charge on any basis does not bar the State's prosecution in this matter.

*State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these the charges of Murder with a Felonious Assault predicate and Involuntary Manslaughter:

> Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:
>
> "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
>
> The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).
>
> Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:
>
> "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."
>
> The felony alleged is child endangering[.]
>
> * * *
>
> With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the

5

victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate.

Alternatively, even if this Court found that Murder and Involuntary Manslaughter constitute the same offense, there is an applicable exception. An exception to the *Blockburger* test exists where the state is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been discovered despite the exercise of due diligence until Defendant appeared and confessed to the actual details of his son's death. The 2006 investigation relied heavily on Defendant's assertions of what occurred since Defendant was the only person present when the facts giving rise to his son's death occurred.

The Defendant's misrepresentations regarding the events of that fatal night led to a false medical diagnosis by the medical professional who relied on the Defendant's lies. As such, the facts necessary to support this subsequent prosecution could not have been discovered until July 2016 despite the exercise of due diligence.

6

The Defendant has cited to a number of cases to support his assertion that this case should be barred by the Double Jeopardy Clause; however, these cases are markedly different factually and overlook the above-described exception that applies here.

The Defendant's primary argument relies on *State v. Carpenter*; however, in that particular case the facts are completely different than the facts in this matter. 68 Ohio St.3d. 59, 61, 1993 Ohio 226, 623 N.E.2d 66 (1993). In *Carpenter,* the defendant entered a guilty plea to attempted felonious assault. The victim was currently in a coma at that time, but the plea agreement was silent as to additional charges in the event the victim died. Years later the victim died, and the defendant was charged with murder. The Supreme Court of Ohio found that the prosecution was required to indicate on the record that it was preserving its right to pursue further charges against the defendant in the event of the victim's death. Otherwise, the Court held that the defendant had a "reasonable and justified expectation" that his guilty plea alleviated him from further exposure to additional charges. Id. at 62.

That case is significantly different than this case. Here, the toddler was already deceased at the time the Defendant was charged. This is not a situation where the State had an obligation to anticipate the victim's potential death. Rather the State was in a position where it had to work with investigators and medical experts to solve what caused the untimely death of the toddler. The investigators and medical experts had to rely on the Defendant's representations of what transpired that night to make their diagnoses. The Defendant was the only individual present at the time of the toddler's death; therefore his narrative was critical for providing the relevant facts to the medical experts involved. The Defendant at that time chose to provide false information; therefore,

7

leading to faulty medical diagnoses.  The State exercised its due diligence at the time of its investigation and during the pendency of the case; however, due to the Defendant's lies the true facts remained undiscovered until the Defendant confessed to his actions years later.  The State at that time exercised its due diligence and filed an Indictment listing charges based on the newly discovered evidence.

The Defendant's belief that his guilty plea would prevent further prosecution was unreasonable and unjustified because at the time he entered that guilty plea he knew he had tampered with the evidence in the case and provided false facts regarding the crimes he committed that night.  The Defendant knew the toddler's death was not an accident as he led investigators and medical professionals to believe.  The Defendant should have known that if the truth was discovered about his actions that night, his plea to one count of Child Endangering would not prevent further prosecution.

<strong><u>CONCLUSION</u></strong>

Accordingly the State respectfully requests that this Honorable Court overrule the Appellant's Sole Assignment of Error.

<strong><u>PROOF OF SERVICE</u></strong>

I hereby certify that a copy of the foregoing has been served to Attorney for Appellant, Michael Short, via fax (419) 523-4519 and via U.S. mail, postage prepaid 336 E. Main Street, Suite B, Lima, Ohio 45802 on this 17th day of July 2017.

Lillian Shun, #0091706

8

## INDICTMENT
### Crim. Rule 6,7

**The State of Ohio**
**Putnam County**

**COURT OF COMMON PLEAS**

**PUTNAM COUNTY GRAND JURY**

**March 31, 2006**

Case No. 06 CR 19

### COUNT I

    **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, at Putnam County, State of Ohio, **TRAVIS D. SOTO** did cause the death of another as a proximate result of the offender committing or attempting to commit a felony; to-wit: did cause the death of his son, John Doe, DOB: 11-21-2003, as a proximate result of committing felony Child Endangering in violation of Ohio Revised Code Section 2919.22(A) and (E)(1)(c), while at 5064 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.04(A), **INVOLUNTARY MANSLAUGHTER**, a felony of the 1st degree.

### COUNT II

    **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, at Putnam County, State of Ohio, **TRAVIS D. SOTO** did, while being the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen (18) years of age, create a substantial risk to the health or safety of the child by violating a duty of care, protection or support, and which resulted in serious physical harm to said child: to-wit: his son, John Doe, DOB: 11-21-2003, by striking him with an ATV and/or failing to seek medical attention for said child thereafter resulting in serious physical harm to said child, while at 5064 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2919.22(A) and (E)(1)(c), **CHILD ENDANGERING**, a felony of the 3rd degree.

**A TRUE BILL**

**Office of the Prosecuting Attorney**
**Of Putnam County, Ohio**

*Kimberly A. Schreiber*

**Grand Jury Foreperson**

*Gary L. Lammers*

By:     Gary L. Lammers
         Prosecuting Attorney

**State of Ohio**
**Putnam County**

I, the undersigned Clerk of Court of Common Pleas in and for said County, do hereby certify that the foregoing is a full, true and correct copy of the original indictment, with the endorsements thereon, now on file in my office.

WITNESS my hand and the seal of said Court at Ottawa, Ohio this _____ day of _____ 2005.

_____
Clerk

_____
By:     Deputy Clerk

This bill of Indictment found upon testimony sworn and sent before the Grand Jury at the request of the Prosecuting Attorney.

*Kimberly A. Schreiber*
Grand Jury Foreperson

COMMON PLEAS COURT
TERESA J. LAMMERS, CLERK
PUTNAM COUNTY, OHIO
2005 MAR 31  P 1: 52

# INDICTMENT
### Crim. Rule 6,7

**The State of Ohio**
**Putnam County**

**COURT OF COMMON PLEAS**

**PUTNAM COUNTY GRAND JURY**

**August 12, 2016**

Case No. ___16 CR 59___

## COUNT I

 **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did purposely cause the death of another who is under thirteen (13) years of age at the time of the commission of the offense; to-wit: did cause the death of his son, John Doe, DOB xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.01(C), **AGGRAVATED MURDER,** an unclassified felony and against the peace and dignity of the State of Ohio.

## COUNT II

 **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code; to-wit: his son, John Doe, DOB xx/xx/2003, as a proximate result of committing felonious assault upon him, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.02(B), **MURDER,** an unclassified felony and against the peace and dignity of the State of Ohio.

## COUNT III

 **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did knowingly cause serious physical harm to another; to-wit: his son, John Doe, DOB xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.11(A)(1), **FELONIOUS ASSAULT,** a felony of the 1st degree and against the peace and dignity of the State of Ohio.

## COUNT IV

 **THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio,

**TRAVIS D. SOTO,** did in the case of a victim under the age of thirteen, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person to inflect serious physical harm on the victim; to-wit: his son, John Doe, DOB xx/xx/2003, while at 5604 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2905.01, **KIDNAPPING,** a felony of the 1st degree and against the peace and dignity of the State of Ohio.

### COUNT V

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, in Putnam County, State of Ohio, **TRAVIS D. SOTO,** did while knowing that an official proceeding or investigation was in progress or was about to be or likely to be instituted, alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation; to-wit:  did alter, conceal or destroy evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, while in Putnam County, Ohio, in violation of Ohio Revised Code Section 2921.12(A)(1), **TAMPERING WITH EVIDENCE,** a felony of the 3rd degree and against the peace and dignity of the State of Ohio.


A TRUE BILL

Office of the Prosecuting Attorney
Of Putnam County, Ohio

_Alan Swartz_
Grand Jury Foreperson

By: _Todd C.S._
       Todd C. Schroeder
       Assistant Prosecuting Attorney

This bill of Indictment found upon testimony sworn and sent before the Grand Jury at the request of the Prosecuting Attorney.

_Alan Swartz_
Grand Jury Foreperson

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | CASE NO.    2016 CR 57 |
| Plaintiff | : | |
| -vs- | : | JUDGMENT ENTRY |
| TRAVIS SOTO | : | |
| Defendant | : | |

This matter came on for consideration of Defendant's previously filed **Motion to Dismiss** on the grounds of double jeopardy. The Court has reviewed Defendant's Motion and the response of the State of Ohio.

## FACTS

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of R.C. 2903.04(A), a felony of the 1st degree.

As charged, Defendant was alleged to have committed Child Endangering by creating a substantial risk of harm, and actually causing serious physical harm to his child, and was alleged to have committed Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering.

The factual basis of the 2006 prosecution relied, in part, on Defendant's representations to law enforcement indicating he was the driver of an All Terrain Vehicle that struck his son. The Lucas County Coroner conducted an autopsy and was given Defendant's version of the

1

events. The coroner concluded that the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, the Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering. The Involuntary Manslaughter charge was dismissed. He was sentenced to five (5) years incarceration.

The State represents the following as a basis for a subsequent 2016 indictment: On July 25, 2016, the Defendant voluntarily appeared at the Putnam County Sheriff's Office and indicated that he wanted to provide the truthful account of what occurred in 2006. He proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, as well as reports from 2006 to the present were reviewed by a pediatric abuse specialist previously qualified as an expert by this Court. The expert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son. He also concluded that Defendant's 2006 misrepresentations led to the reasonable, yet faulty, prior conclusions of the Lucas County Coroner.

Defendant was then indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C),

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

2

## DECISION

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense.*" *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. The test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*. Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.

3

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore, Double Jeopardy does not bar prosecution of this offense.

Furthermore, the 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

The Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his previous narrative of events would bar prosecution of subsequent charges based on newly discovered evidence which would transform the case from one of an accidental death to a purposeful homicide

Involuntary Manslaughter with a felony Child Endangering predicate is not the *same offense* as Murder with a Felonious Assault predicate. *State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these two charges:

> Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:
>
> "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
>
> The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).
>
> Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

4

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate. Therefore, a resolution of the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. Also, a further exception to the *Blockburger* test exists where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been previously discovered despite the exercise of due diligence until additional evidence was

5

uncovered, such as Defendant's appearance and confession to the actual details of his son's death. The coroner's report stated in part:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> ... What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

The Court finds that the exception under *Grady vs. Corbin* also applies to the within case.

For reasons as stated, Defendant's **Motion to Dismiss** on the grounds of double jeopardy is **hereby overruled**.

JUDGE RANDALL BASINGER

cc:
Prosecuting Attorney – faxed
Joseph Benavidez – faxed to 419-228-3367

2017 MAY -2 P 3: 35

COMMON PLEAS COURT OF APPEALS
TERESA J. LAMMERS, JR AMHERS, CLERK
PUTNAM COUNTY/PUTNAM COUNTY, OHIO

# 2919.22 Endangering children.

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child;

(2) Torture or cruelly abuse the child;

(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;

(4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development;

(5) Entice, coerce, permit, encourage, compel, hire, employ, use, or allow the child to act, model, or in any other way participate in, or be photographed for, the production, presentation, dissemination, or advertisement of any material or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter;

(6) Allow the child to be on the same parcel of real property and within one hundred feet of, or, in the case of more than one housing unit on the same parcel of real property, in the same housing unit and within one hundred feet of, any act in violation of section 2925.04 or 2925.041 of the Revised Code when the person knows that the act is occurring, whether or not any person is prosecuted for or convicted of the violation of section 2925.04 or 2925.041 of the Revised Code that is the basis of the violation of this division.

(C)

(1) No person shall operate a vehicle, streetcar, or trackless trolley within this state in violation of division (A) of section 4511.19 of the Revised Code when one or more children under eighteen years of age are in the vehicle, streetcar, or trackless trolley. Notwithstanding any other provision of law, a person may be convicted at the same trial or proceeding of a violation of this division and a violation of division (A) of section 4511.19 of the Revised Code that constitutes the basis of the charge of the violation of this division. For purposes of sections 4511.191 to 4511.197 of the Revised Code and all related provisions of law, a person arrested for a violation of this division shall be considered to be under arrest for operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of them or for operating a vehicle with a prohibited concentration of alcohol, a controlled substance, or a metabolite of a controlled substance in the whole blood, blood serum or plasma, breath, or urine.

(2) As used in division (C)(1) of this section:

(a) "Controlled substance" has the same meaning as in section 3719.01 of the Revised Code.

(b) "Vehicle," "streetcar," and "trackless trolley" have the same meanings as in section 4511.01 of the Revised Code.

(D)

(1) Division (B)(5) of this section does not apply to any material or performance that is produced, presented, or disseminated for a bona fide medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, member of the clergy, prosecutor, judge, or other person having a proper interest in the material or performance.

(2) Mistake of age is not a defense to a charge under division (B)(5) of this section.

(3) In a prosecution under division (B)(5) of this section, the trier of fact may infer that an actor, model, or participant in the material or performance involved is a juvenile if the material or performance, through its title, text, visual representation, or otherwise, represents or depicts the actor, model, or participant as a juvenile.

(4) As used in this division and division (B)(5) of this section:

(a) "Material," "performance," "obscene," and "sexual activity" have the same meanings as in section 2907.01 of the Revised Code.

(b) "Nudity-oriented matter" means any material or performance that shows a minor in a state of nudity and that, taken as a whole by the average person applying contemporary community standards, appeals to prurient interest.

(c) "Sexually oriented matter" means any material or performance that shows a minor participating or engaging in sexual activity, masturbation, or bestiality.

(E)

(1) Whoever violates this section is guilty of endangering children.

(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:

(a) Except as otherwise provided in division (E)(2)(b), (c), or (d) of this section, a misdemeanor of the first degree;

(b) If the offender previously has been convicted of an offense under this section or of any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, except as otherwise provided in division (E)(2)(c) or (d) of this section, a felony of the fourth degree;

(c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree;

(d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

(e) If the violation is a felony violation of division (B)(1) of this section and the offender also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section 2929.14 of the Revised Code and shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code.

(3) If the offender violates division (B)(2), (3), (4), or (6) of this section, except as otherwise provided in this division, endangering children is a felony of the third degree. If the violation results in serious physical harm to the child involved, or if the offender previously has been convicted of an offense under this section or of any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, endangering children is a felony of the second degree. If the offender violates division (B)(2), (3), or (4) of this section and the offender also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section2929.14 of the Revised Code and shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code. If the offender violates division (B)(6) of this section and the drug involved is methamphetamine, the court shall impose a mandatory prison term on the offender as follows:

(a) If the violation is a violation of division (B)(6) of this section that is a felony of the third degree under division (E)(3) of this section and the drug involved is methamphetamine, except as otherwise provided in this division, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree that is not less than two years. If the violation is a violation of division (B)(6) of this section that is a felony of the third degree under division (E)(3) of this section, if the drug involved is methamphetamine, and if the offender previously has been convicted of or pleaded guilty to a violation of division (B)(6) of this section, a violation of division (A) of section 2925.04 of the Revised Code, or a violation of division (A) of section 2925.041 of the Revised Code, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree that is not less than five years.

(b) If the violation is a violation of division (B)(6) of this section that is a felony of the second degree under division (E)(3) of this section and the drug involved is methamphetamine, except as otherwise provided in this division, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree that is not less than three years. If the violation is a violation of division (B)(6) of this section that is a felony of the second degree under division (E)(3) of this section, if the drug involved is methamphetamine, and if the offender previously has been convicted of or pleaded guilty to a violation of division (B)(6) of this section, a violation of division (A) of section 2925.04 of the Revised Code, or a violation of division (A) of section 2925.041 of the Revised Code, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree that is not less than five years.

(4) If the offender violates division (B)(5) of this section, endangering children is a felony of the second degree. If the offender also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section 2929.14 of the Revised Code and shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code.

(5) If the offender violates division (C) of this section, the offender shall be punished as follows:

(a) Except as otherwise provided in division (E)(5)(b) or (c) of this section, endangering children in violation of division (C) of this section is a misdemeanor of the first degree.

(b) If the violation results in serious physical harm to the child involved or the offender previously has been convicted of an offense under this section or any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, except as otherwise provided in division (E)(5)(c) of this section, endangering children in violation of division (C) of this section is a felony of the fifth degree.

(c) If the violation results in serious physical harm to the child involved and if the offender previously has been convicted of a violation of division (C) of this section, section 2903.06 or 2903.08 of the Revised Code, section 2903.07 of the Revised Code as it existed prior to March 23, 2000, or section 2903.04 of the Revised Code in a case in which the offender was subject to the sanctions described in division (D) of that section, endangering children in violation of division (C) of this section is a felony of the fourth degree.

(d) In addition to any term of imprisonment, fine, or other sentence, penalty, or sanction it imposes upon the offender pursuant to division (E)(5)(a), (b), or (c) of this section or pursuant to any other provision of law and in addition to any suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege under Chapter 4506., 4509., 4510., or 4511. of the Revised Code or under any other provision of law, the court also may impose upon the offender a class seven suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege from the range specified in division (A)(7) of section 4510.02 of the Revised Code.

(e) In addition to any term of imprisonment, fine, or other sentence, penalty, or sanction imposed upon the offender pursuant to division (E)(5)(a), (b), (c), or (d) of this section or pursuant to any other provision of law for the violation of division (C) of this section, if as part of the same trial or proceeding the offender also is convicted of or pleads guilty to a separate charge charging the violation of division (A) of section 4511.19 of the Revised Code that was the basis of the charge of the violation of division (C) of this section, the offender also shall be sentenced in accordance with section 4511.19 of the Revised Code for that violation of division (A) of section 4511.19 of the Revised Code.

(F)

(1)

(a) A court may require an offender to perform not more than two hundred hours of supervised community service work under the authority of an agency, subdivision, or charitable organization. The requirement shall be part of the community control sanction or sentence of the offender, and the court shall impose the community service in accordance with and subject to divisions (F)(1)(a) and (b) of this section. The court may require an offender whom it requires to perform supervised community service work as part of the offender's community control sanction or sentence to pay the court a reasonable fee to cover the costs of the offender's participation in the work, including, but not limited to, the costs of procuring a policy or policies of liability insurance to cover the period during which the offender will perform the work. If the court requires the offender to perform supervised community service work as part of the offender's community control sanction or sentence, the court shall do so in accordance with the following limitations and criteria:

(i) The court shall require that the community service work be performed after completion of the term of imprisonment or jail term imposed upon the offender for the violation of division (C) of this section, if applicable.

(ii) The supervised community service work shall be subject to the limitations set forth in divisions (B)(1), (2), and (3) of section 2951.02 of the Revised Code.

(iii) The community service work shall be supervised in the manner described in division (B)(4) of section 2951.02 of the Revised Code by an official or person with the qualifications described in that division. The official or person periodically shall report in writing to the court concerning the conduct of the offender in performing the work.

(iv) The court shall inform the offender in writing that if the offender does not adequately perform, as determined by the court, all of the required community service work, the court may order that the offender be committed to a jail or workhouse for a period of time that does not exceed the term of imprisonment that the court could have imposed upon the offender for the violation of division (C) of this section, reduced by the total amount of time that the offender actually was imprisoned under the sentence or term that was imposed upon the offender for that violation and by the total amount of time that the offender was confined for any reason arising out of the offense for which the offender was convicted and sentenced as described in sections 2949.08 and 2967.191 of the Revised Code, and that, if the court orders that the offender be so committed, the court is authorized, but not required, to grant the offender credit upon the period of the commitment for the community service work that the offender adequately performed.

(b) If a court, pursuant to division (F)(1)(a) of this section, orders an offender to perform community service work as part of the offender's community control sanction or sentence and if the offender does not adequately perform all of the required community service work, as determined by the court, the court may order that the offender be committed to a jail or workhouse for a period of time that does not exceed the term of imprisonment that the court could have imposed upon the offender for the violation of division (C) of this section, reduced by the total amount of time that the offender actually was imprisoned under the sentence or term that was imposed upon the offender for that violation and by the total amount of time that the offender was confined for any reason arising out of the offense for which the offender was convicted and sentenced as described in sections 2949.08 and 2967.191 of the Revised Code. The court may order that a person committed pursuant to this division shall receive hour-for-hour credit upon the period of the commitment for the community service work that the offender adequately performed. No commitment pursuant to this division shall exceed the period of the term of imprisonment that the sentencing court could have imposed upon the offender for the violation of division (C) of this section, reduced by the total amount of time that the offender actually was imprisoned under that sentence or term and by the total amount of time that the offender was confined for any reason arising out of the offense for which the offender was convicted and sentenced as described in sections 2949.08 and 2967.191 of the Revised Code.

(2) Division (F)(1) of this section does not limit or affect the authority of the court to suspend the sentence imposed upon a misdemeanor offender and place the offender under a community control sanction pursuant to section 2929.25 of the Revised Code, to require a misdemeanor or felony offender to perform supervised community service work in accordance with division (B) of section 2951.02 of the Revised Code, or to place a felony offender under a community control sanction.

(G)

(1) If a court suspends an offender's driver's or commercial driver's license or permit or nonresident operating privilege under division (E)(5)(d) of this section, the period of the

suspension shall be consecutive to, and commence after, the period of suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege that is imposed under Chapter 4506., 4509., 4510., or 4511. of the Revised Code or under any other provision of law in relation to the violation of division (C) of this section that is the basis of the suspension under division (E)(5)(d) of this section or in relation to the violation of division (A) of section 4511.19 of the Revised Code that is the basis for that violation of division (C) of this section.

(2) An offender is not entitled to request, and the court shall not grant to the offender, limited driving privileges if the offender's license, permit, or privilege has been suspended under division (E)(5)(d) of this section and the offender, within the preceding six years, has been convicted of or pleaded guilty to three or more violations of one or more of the following:

(a) Division (C) of this section;

(b) Any equivalent offense, as defined in section 4511.181 of the Revised Code.

(H)

(1) If a person violates division (C) of this section and if, at the time of the violation, there were two or more children under eighteen years of age in the motor vehicle involved in the violation, the offender may be convicted of a violation of division (C) of this section for each of the children, but the court may sentence the offender for only one of the violations.

(2)

(a) If a person is convicted of or pleads guilty to a violation of division (C) of this section but the person is not also convicted of and does not also plead guilty to a separate charge charging the violation of division (A) of section 4511.19 of the Revised Code that was the basis of the charge of the violation of division (C) of this section, both of the following apply:

(i) For purposes of the provisions of section 4511.19 of the Revised Code that set forth the penalties and sanctions for a violation of division (A) of section 4511.19 of the Revised Code, the conviction of or plea of guilty to the violation of division (C) of this section shall not constitute a violation of division (A) of section 4511.19 of the Revised Code;

(ii) For purposes of any provision of law that refers to a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code and that is not described in division (H)(2)(a)(i) of this section, the conviction of or plea of guilty to the violation of division (C) of this section shall constitute a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code.

(b) If a person is convicted of or pleads guilty to a violation of division (C) of this section and the person also is convicted of or pleads guilty to a separate charge charging the violation of division (A) of section 4511.19 of the Revised Code that was the basis of the charge of the violation of division (C) of this section, the conviction of or plea of guilty to the violation of division (C) of this section shall not constitute, for purposes of any provision of law that refers to a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code, a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code.

(I) As used in this section:

(1) "Community control sanction" has the same meaning as in section 2929.01 of the Revised Code;

(2) "Limited driving privileges" has the same meaning as in section 4501.01 of the Revised Code;

(3) "Methamphetamine" has the same meaning as in section 2925.01 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Effective Date: 01-01-2004; 08-11-2004; 05-17-2006; 08-17-2006; 2008 HB280 04-07-2009.

## 2903.01 Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

(D) No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another.

(E) No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:

(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.

(2) It is the offender's specific purpose to kill a law enforcement officer.

(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

(G) As used in this section:

(1) "Detention" has the same meaning as in section 2921.01 of the Revised Code.

(2) "Law enforcement officer" has the same meaning as in section 2911.01 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Effective Date: 05-15-2002 .

# 2903.02 Murder.

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

(C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.

(D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

Effective Date: 06-30-1998.

# 2903.04 Involuntary manslaughter.

(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

(B) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor.

(C) Whoever violates this section is guilty of involuntary manslaughter. Violation of division (A) of this section is a felony of the first degree. Violation of division (B) of this section is a felony of the third degree.

(D) If an offender is convicted of or pleads guilty to a violation of division (A) or (B) of this section and if the felony, misdemeanor, or regulatory offense that the offender committed or attempted to commit, that proximately resulted in the death of the other person or the unlawful termination of another's pregnancy, and that is the basis of the offender's violation of division (A) or (B) of this section was a violation of division (A) or (B) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance or included, as an element of that felony, misdemeanor, or regulatory offense, the offender's operation or participation in the operation of a snowmobile, locomotive, watercraft, or aircraft while the offender was under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse, both of the following apply:

(1) The court shall impose a class one suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege as specified in division (A)(1) of section 4510.02 of the Revised Code.

(2) The court shall impose a mandatory prison term for the violation of division (A) or (B) of this section from the range of prison terms authorized for the level of the offense under section 2929.14 of the Revised Code.

Effective Date: 01-01-2004.

# 2903.11 Felonious assault.

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

(B) No person, with knowledge that the person has tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome, shall knowingly do any of the following:

(1) Engage in sexual conduct with another person without disclosing that knowledge to the other person prior to engaging in the sexual conduct;

(2) Engage in sexual conduct with a person whom the offender knows or has reasonable cause to believe lacks the mental capacity to appreciate the significance of the knowledge that the offender has tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome;

(3) Engage in sexual conduct with a person under eighteen years of age who is not the spouse of the offender.

(C) The prosecution of a person under this section does not preclude prosecution of that person under section 2907.02 of the Revised Code.

(D)

(1)

(a) Whoever violates this section is guilty of felonious assault. Except as otherwise provided in this division or division (D)(1)(b) of this section, felonious assault is a felony of the second degree. If the victim of a violation of division (A) of this section is a peace officer or an investigator of the bureau of criminal identification and investigation, felonious assault is a felony of the first degree.

(b) Regardless of whether the felonious assault is a felony of the first or second degree under division (D)(1)(a) of this section, if the offender also is convicted of or pleads guilty to a specification as described in section 2941.1423 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, except as otherwise provided in this division or unless a longer prison term is required under any other provision of law, the court shall sentence the offender to a mandatory prison term as provided in division (B)(8) of section 2929.14 of the Revised Code. If the victim of the offense is a peace officer or an investigator of the bureau of criminal identification and investigation, and if the victim suffered serious physical harm as a result of the commission of the offense, felonious assault is a felony of the first degree, and the court, pursuant to division (F) of section 2929.13 of the Revised Code, shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the first degree.

(2) In addition to any other sanctions imposed pursuant to division (D)(1) of this section for felonious assault committed in violation of division (A)(2) of this section, if the deadly weapon used in the commission of the violation is a motor vehicle, the court shall impose upon the offender a class two suspension of the offender's driver's license, commercial driver's license, temporary

instruction permit, probationary license, or nonresident operating privilege as specified in division (A)(2) of section 4510.02 of the Revised Code.

(E) As used in this section:

(1) "Deadly weapon" and "dangerous ordnance" have the same meanings as in section 2923.11 of the Revised Code.

(2) "Motor vehicle" has the same meaning as in section 4501.01 of the Revised Code.

(3) "Peace officer" has the same meaning as in section 2935.01 of the Revised Code.

(4) "Sexual conduct" has the same meaning as in section 2907.01 of the Revised Code, except that, as used in this section, it does not include the insertion of an instrument, apparatus, or other object that is not a part of the body into the vaginal or anal opening of another, unless the offender knew at the time of the insertion that the instrument, apparatus, or other object carried the offender's bodily fluid.

(5) "Investigator of the bureau of criminal identification and investigation" means an investigator of the bureau of criminal identification and investigation who is commissioned by the superintendent of the bureau as a special agent for the purpose of assisting law enforcement officers or providing emergency assistance to peace officers pursuant to authority granted under section 109.541 of the Revised Code.

(6) "Investigator" has the same meaning as in section 109.541 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Effective Date: 03-23-2000; 08-03-2006; 03-14-2007; 04-04-2007; 2008 HB280 04-07-2009.

# 2905.01 Kidnapping.

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

(1) To hold for ransom, or as a shield or hostage;

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another;

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;

(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority;

(6) To hold in a condition of involuntary servitude.

(B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:

(1) Remove another from the place where the other person is found;

(2) Restrain another of the other person's liberty.

(C)

(1) Whoever violates this section is guilty of kidnapping. Except as otherwise provided in this division or division (C)(2) or (3) of this section, kidnapping is a felony of the first degree. Except as otherwise provided in this division or division (C)(2) or (3) of this section, if an offender who violates division (A)(1) to (5), (B)(1), or (B)(2) of this section releases the victim in a safe place unharmed, kidnapping is a felony of the second degree.

(2) If the offender in any case also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code and, except as otherwise provided in division (C)(3) of this section, shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section 2929.14 of the Revised Code.

(3) If the victim of the offense is less than thirteen years of age and if the offender also is convicted of or pleads guilty to a sexual motivation specification that was included in the indictment, count in the indictment, or information charging the offense, kidnapping is a felony of the first degree, and, notwithstanding the definite sentence provided for a felony of the first degree in section 2929.14 of the Revised Code, the offender shall be sentenced pursuant to section 2971.03 of the Revised Code as follows:

(a) Except as otherwise provided in division (C)(3)(b) of this section, the offender shall be sentenced pursuant to that section to an indefinite prison term consisting of a minimum term of fifteen years and a maximum term of life imprisonment.

(b) If the offender releases the victim in a safe place unharmed, the offender shall be sentenced pursuant to that section to an indefinite term consisting of a minimum term of ten years and a maximum term of life imprisonment.

(D) As used in this section:

(1) "Involuntary servitude" has the same meaning as in section 2905.31 of the Revised Code.

(2) "Sexual motivation specification" has the same meaning as in section 2971.01 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Amended by 128th General AssemblyFile No.58, SB 235, §1, eff. 3/24/2011.

Effective Date: 07-01-1996; 2007 SB10 01-01-2008; 2008 HB280 04-07-2009.

# 2921.12 Tampering with evidence.

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;

(2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation.

(B) Whoever violates this section is guilty of tampering with evidence, a felony of the third degree.

Effective Date: 01-01-1974.

COURT OF APPEALS
TERESA J. LAMMERS, CLERK
PUTNAM COUNTY, OHIO
2017 JUL 17 A 9 17

 Warning
As of: May 3, 2021 7:30 PM Z

## *State v. Soto*

Court of Appeals of Ohio, Third Appellate District, Putnam County

February 5, 2018, Date of Decision

CASE NO. 12-17-05

**Reporter**

2018-Ohio-459 *; 94 N.E.3d 618 **; 2018 Ohio App. LEXIS 467 ***; 2018 WL 704380

STATE OF OHIO, PLAINTIFF-APPELLEE, v. *TRAVIS SOTO*, DEFENDANT-APPELLANT.

**Subsequent History:** Discretionary appeal allowed by *State v. Soto, 152 Ohio St. 3d 1478, 2018-Ohio-1990, 2018 Ohio LEXIS 1331, 98 N.E.3d 294 (May 23, 2018)*

Motion granted by *State v. Soto, 2018-Ohio-2284, 2018 Ohio LEXIS 1545, 100 N.E.3d 421 (Ohio, June 14, 2018)*

Reversed by, Remanded by *State v. Soto, 2019-Ohio-4430, 2019 Ohio LEXIS 2264 (Ohio, Oct. 31, 2019)*

**Prior History:** [***1] Appeal from Putnam County Common Pleas Court. Trial Court No. 2016 CR 57.

**Disposition:** Judgment Reversed and Cause Remanded.

## Core Terms

Murder, involuntary manslaughter, Aggravated, felony, charges, trial court, lesser included offense, child endangerment, double jeopardy, indictment, prosecuted, plea agreement, convicted, jeopardy, sentence, subsequent prosecution, negotiated plea, guilty plea, grounds, argues, motion to dismiss, same offense, no person, predicate, offenses, successive prosecution, reasonably believe, assigned error, circumstances, calculation

## Case Summary

**Overview**

HOLDINGS: [1]-The principles of double jeopardy, *Ohio Const. art. I, § 10*, prevented a subsequent prosecution of defendant for aggravated murder and murder, involving the death of his son, because defendant was in jeopardy of being tried and convicted of involuntary manslaughter but-for the plea agreement, and involuntary manslaughter was a lesser included offense of aggravated murder and murder; [2]-A charge of involuntary manslaughter, *R.C. 2903.04(A)*, did not contain an "element" of the offense that was not subsumed within aggravated murder, *R.C. 2903.01(A)*, even if a rote matching test of the statute's language differed, because "prior calculation and design" was not an additional element but only an "enhancement" of the state of mind required for both homicide offenses; thus, an aggravated murder could not be committed without at least committing an involuntary manslaughter.

**Outcome**

Judgment reversed; matter remanded.

## LexisNexis® Headnotes

State v. Soto

Criminal Law & Procedure > ... > Accusatory
Instruments > Dismissal > Appellate Review

Criminal Law & Procedure > ... > Standards of
Review > De Novo Review > Motions to Dismiss

**HN1[⬇]  Dismissal, Appellate Review**

Appellate courts review the denial of a motion to dismiss an
indictment on the grounds of double jeopardy de novo
because it is a pure question of law.

Criminal Law & Procedure > ... > Double
Jeopardy > Double Jeopardy Protection > Convictions

**HN2[⬇]  Double Jeopardy Protection, Convictions**

Where successive prosecutions are at stake, the double
jeopardy guarantee serves a constitutional policy of finality
for the defendant's benefit.

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Double Jeopardy

**HN3[⬇]  Procedural Due Process, Double Jeopardy**

The *Double Jeopardy Clause of the Fifth Amendment to the
United States Constitution* provides that no person shall be
subject for the same offence to be twice put in jeopardy of life
or limb. Through the *Fourteenth Amendment to the United
States Constitution*, this protection applies to individuals
prosecuted by the State of Ohio. Similarly, the Ohio
Constitution provides that no person shall be twice put in
jeopardy for the same offense. *Ohio Const. art. I, § 10*. The
Supreme Court of Ohio has described the protections afforded
by the Ohio and *United States Constitutions' Double Jeopardy
Clauses* as "coextensive."

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Double Jeopardy

Criminal Law & Procedure > ... > Double
Jeopardy > Double Jeopardy Protection > Convictions

Criminal Law & Procedure > ... > Double
Jeopardy > Double Jeopardy Protection > Multiple
Punishments

**HN4[⬇]  Procedural Due Process, Double Jeopardy**

Principally, the Double Jeopardy Clauses of both the Ohio
and United States Constitutions protect against three abuses:
(1) a second prosecution for the same offense after acquittal;
(2) a second prosecution for the same offense after
conviction; and (3) multiple punishments for the same
offense.

Criminal Law & Procedure > ... > Double
Jeopardy > Double Jeopardy Protection > Tests for
Double Jeopardy Protection

**HN5[⬇]  Double Jeopardy Protection, Tests for Double
Jeopardy Protection**

In determining whether an accused is being successively
prosecuted for the same offense, the Supreme Court of Ohio
has adopted the "same elements" test articulated by the
Supreme Court of the United States in Blockburger. The
Blockburger test applies where the same act or transaction
constitutes a violation of two distinct statutory provisions and
requires the reviewing court to evaluate the elements of each
statutory provision to determine whether each provision
requires proof of a fact which the other does not. This test
focuses upon the elements of the two statutory provisions, not
upon the evidence proffered in a given case. The United
States Supreme Court has summarized the Blockburger test
as an inquiry that asks whether each offense contains an element
not contained in the other; if not, they are the "same offense"
and double jeopardy bars additional punishment and
successive prosecution.

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Double Jeopardy

Constitutional Law > ... > Fundamental
Rights > Procedural Due Process > Scope of Protection

**HN6[⬇]  Procedural Due Process, Double Jeopardy**

Whatever the sequence may be, the Fifth Amendment forbids
successive prosecution and cumulative punishment for a
greater and lesser included offense.

Criminal Law & Procedure > ... > Double
Jeopardy > Double Jeopardy Protection > Convictions

Criminal Law & Procedure > ... > Double

State v. Soto

Jeopardy > Double Jeopardy Protection > Tests for Double Jeopardy Protection

Criminal Law & Procedure > Criminal Offenses > Lesser Included Offenses

**HN7[⤓]  Double Jeopardy Protection, Convictions**

A misdemeanor conviction for a lesser included offense bars the State from indicting the same defendant for a felony that by definition included the misdemeanor offense within it as a lesser included offense, arising from the same facts.

Criminal Law & Procedure > ... > Double Jeopardy > Double Jeopardy Protection > Tests for Double Jeopardy Protection

**HN8[⤓]  Double Jeopardy Protection, Tests for Double Jeopardy Protection**

Blockburger actually requires that each offense contain an element that the other does not in order for a subsequent prosecution to be permissible. The Supreme Court of Ohio has determined that when comparing elements, the test is not a word game to be performed by rote by matching the words chosen by the legislature to define criminal offenses. Some offenses, such as aggravated murder and murder, lend themselves to such a simple matching test; others do not. The proper overall focus is on the nature and circumstances of the offenses as defined, rather than on the precise words used to define them.

Criminal Law & Procedure > ... > Murder > Aggravated Murder > Elements

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > Elements

Criminal Law & Procedure > Criminal Offenses > Acts & Mental States > Mens Rea

**HN9[⤓]  Aggravated Murder, Elements**

While aggravated murder does contain the language of "prior calculation and design," which involuntary manslaughter does not have, the Supreme Court of Ohio has held that aggravated murder with prior calculation and design, is defined as murder with an enhanced mental state. Thus the only distinguishing factor between _R.C. 2903.01(A)_ aggravated murder and involuntary manslaughter is, as in the case of murder, the

mental state involved. One cannot criminally cause another's death without committing an underlying felony or misdemeanor. Put another way, under the Supreme Court of Ohio's construction that prior calculation and design is not an additional element but only an "enhancement" of the state of mind required for both homicide offenses, an aggravated murder could not be committed without at least committing an involuntary manslaughter. As a result, under this construction, involuntary manslaughter does not contain an "element" of the offense that is not subsumed within aggravated murder, even if a rote matching test of language of the statute might differ.

Criminal Law & Procedure > ... > Double Jeopardy > Double Jeopardy Protection > Tests for Double Jeopardy Protection

**HN10[⤓]  Double Jeopardy Protection, Tests for Double Jeopardy Protection**

There is an exception to Blockburger that would allow a subsequent prosecution if the additional facts necessary to sustain a charge have not yet occurred or have not been discovered despite the exercise of due diligence.

**Counsel:** Michael J. Short for Appellant.

Lillian R. Shun for Appellee.

**Judges:** SHAW, J. WILLAMOWSKI, P.J., concurs. ZIMMERMAN, J., dissents.

**Opinion by:** SHAW

# Opinion

[**619] SHAW, J.

[*P1]  Defendant-appellant, _**Travis Soto**_ ("Soto"), brings this appeal from the April 13, 2017, judgment of the Putnam

State v. Soto

County Common Pleas Court denying Soto's motion to dismiss on the grounds of double jeopardy.

*Relevant Facts and Procedural History*

 [*P2]  On or about January 23, 2006, Soto's toddler son was killed. Soto represented to law enforcement and the Lucas County Coroner that his son was struck while Soto was driving an all-terrain vehicle ("ATV") and that his son died as a result. Consistent with Soto's representations to law enforcement, the coroner concluded that the child died of blunt force trauma caused by an ATV accident.

 [*P3]  On March 31, 2006, Soto was charged with Child Endangering in violation of *R.C. 2919.22(A)/(E)(1)(c)*, a felony of the third degree, and Involuntary Manslaughter in violation of *R.C. 2903.04(A)*, a [**620] felony of the first degree. It was alleged that Soto committed Involuntary Manslaughter by causing the death of his son while committing the predicate felony offense [***2] of Child Endangering.

 [*P4]  Subsequently, Soto entered into a negotiated plea agreement wherein he agreed to plead guilty to Child Endangering and in exchange the Involuntary Manslaughter charge was dismissed. As a result of Soto's conviction, the record indicates that Soto was sentenced to serve 5 years in prison.

 [*P5]  On or about July 25, 2016, Soto voluntarily appeared at the Putnam County Sheriff's Office and allegedly indicated that he wanted to provide a "truthful" account of what happened to his son. Soto told the police that he had actually beat his son to death back in 2006 and that he had staged the ATV accident scene.

 [*P6]  The Lucas County Coroner's original 2006 report was then reviewed by a pediatric abuse specialist who concluded that the toddler had actually died of multiple blunt force trauma due to Soto's violent actions. The expert concluded that Soto's original 2006 misrepresentations "led to the reasonably yet faulty conclusions of the Lucas County Coroner." (Doc. No. 29).

 [*P7]  On August 15, 2016, Soto was indicted by the Putnam County Grand Jury for Aggravated Murder in violation of *R.C. 2903.01(C)*, an unclassified felony, Murder in violation of *R.C. 2903.02(B)*, an unclassified felony, Felonious Assault in violation [***3] of *R.C. 2903.11(A)(1)*, a felony of the first degree, Kidnapping in violation of *R.C. 2905.01*, a felony of the first degree, and Tampering with Evidence in violation of *R.C. 2921.12(A)(1)*, a felony of the third degree.

 [*P8]  On October 11, 2016, Soto filed a "Motion to Dismiss on the Grounds of Double Jeopardy." In the motion, Soto argued that in his original 2006 prosecution, a charge of Involuntary Manslaughter was dismissed when he pled guilty to Child Endangering. Soto contended that the judgment entries and transcripts from that case did not address whether the matter would be dismissed with or without prejudice, but the "entries in the record makes one think that a change of pleas [sic] to child endangering also disposed of the involuntary manslaughter charge." (Doc. No. 28). Soto contended that Involuntary Manslaughter was a lesser included offense of both Murder and Aggravated Murder, which he argued would bar a subsequent prosecution of Soto on those charges.

 [*P9]  On October 18, 2016, the State filed a response. The State contended that pursuant to the United States Supreme Court's decision in *Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)*, Aggravated Murder contained different elements than Involuntary Manslaughter, which would allow multiple prosecutions. As to the Murder charge, [***4] the State argued that pursuant to *State v. Bridges, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480, ¶ 11*, a negotiated guilty plea only barred successive prosecutions where the defendant would "'"reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario."'" *Bridges* citing *State v. Church, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, ¶8*, quoting *State v. Edwards, 8th Dist. Cuyahoga No. 94568, 2011-Ohio-95, ¶ 23*.

 [*P10]  The State contended that because of his prior false narrative Soto could not have reasonably believed that his negotiated plea to Child Endangering would bar prosecution of subsequent homicide charges based on the truth. Further, the State argued that subsequent prosecution [**621] on a more serious crime was not barred in a situation where the State was unable to proceed on a more serious charge because the additional facts necessary to sustain the charge had not yet occurred or had not yet been discovered despite the exercise of due diligence. *See Brown v. Ohio, 432 U.S. 161, 169, fn. 7, 97 S.Ct. 2221, 2227, 53 L. Ed. 2d 187 (1977)*.

 [*P11]  On April 13, 2017, the trial court filed its judgment entry determining Soto's motion to dismiss. The trial court found that pursuant to *Blockburger*, Felonious Assault, Kidnapping, Tampering with Evidence, and Aggravated Murder all required proof of an element [***5] not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter, which would permit multiple prosecutions. As to the Murder charge, the trial court determined that Soto could not have reasonably believed that his 2006 negotiated plea based on his prior false narrative of

*State v. Soto*

events would bar prosecution of a purposeful homicide. Further, the trial court indicated that Involuntary Manslaughter with a Child Endangering predicate was not the same offense as Murder with a Felonious Assault predicate. Finally, the trial court determined that the facts to support the 2016 indictment could not have been discovered in the exercise of due diligence until the additional evidence was uncovered. Thus the trial court overruled Soto's motion to dismiss.

[*P12]  It is from this judgment that Soto appeals, asserting the following assignment of error for our review.[1]

## Assignment of Error

**The trial court erred [in] overrul[ing] Defendant's Motion to Dismiss on Double Jeopardy Grounds**.

[*P13]  In Soto's assignment of error, he contends that the trial court erred by overruling his motion to dismiss on double jeopardy grounds. Specifically, Soto argues that his 2006 plea that resulted in [***6] the dismissal of the Involuntary Manslaughter charge should bar the current prosecution because Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder. Further, Soto argues that the trial court did not support its finding that Soto could not have reasonably believed that the earlier dismissal would bar future prosecution for the death of Soto's son. Finally, Soto argues that the State did not reserve any right to bring additional charges in the original dismissal of his Involuntary Manslaughter charge.

## Standard of Review

[*P14]  *HN1*[⬆] Appellate courts review the denial of a motion to dismiss an indictment on the grounds of double jeopardy de novo, "because it is a pure question of law." *State v. Mutter, 150 Ohio St. 3d 429, 2017-Ohio-2928, ¶ 13, 82 N.E.3d 1141*, citing *State v. Morris, 132 Ohio St. 3d 337, 2012-Ohio-2407, ¶ 16, 972 N.E.2d 528*, citing *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership, 78 Ohio App.3d 340, 346, 604 N.E.2d 808 (2d Dist.1992)*.

---

[1] The Supreme Court of Ohio has determined that the denial of a motion to dismiss on double jeopardy grounds is a final appealable order. *State v. Anderson, 138 Ohio St.3d 264, 2014-Ohio-542, ¶ 61, 6 N.E.3d 23* ("We hold that an order denying a motion to dismiss on double-jeopardy grounds is a final, appealable order.")

## Relevant Authority and Analysis

[*P15]  *HN2*[⬆] "Where successive prosecutions are at stake, the double jeopardy guarantee serves 'a constitutional policy of finality for the defendant's benefit.'" *State v. Liberatore, 4 Ohio St.3d 13, 14, 4 Ohio B. 11, 445 N.E.2d 1116 (1983)*, quoting *United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 27 [**622] L. Ed. 2d 543 (1971)*. The question in this case is whether the State would violate that guarantee if it prosecuted Soto for Aggravated Murder and Murder after a charge of Involuntary Manslaughter was dismissed pursuant to a 2006 plea agreement with Soto for actions resulting in the death of his son. [***7] [2]

[*P16]  *HN3*[⬆] The *Double Jeopardy Clause of the Fifth Amendment to the United States Constitution* provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Through the *Fourteenth Amendment to the United States Constitution*, this protection applies to individuals prosecuted by the State of Ohio. *State v. Brown, 119 Ohio St. 3d 447, 2008-Ohio-4569, ¶ 10, 895 N.E.2d 149*, citing *Benton v. Maryland, 395 U.S. 784, 786, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)*. Similarly, the Ohio Constitution provides, "No person shall be twice put in jeopardy for the same offense." *Ohio Constitution, Article I, Section 10*. The Supreme Court of Ohio has described the protections afforded by the Ohio and *United States Constitutions' Double Jeopardy Clauses* as "coextensive." *Mutter, supra at ¶ 15*, citing *State v. Martello, 97 Ohio St.3d 398, 2002-Ohio-6661, ¶ 7, 780 N.E.2d 250*, citing *State v. Gustafson, 76 Ohio St. 3d 425, 432, 1996-Ohio-299, 668 N.E.2d 435 (1996)*.

[*P17]  *HN4*[⬆] Principally, "The *Double Jeopardy Clauses [of both Constitutions]* protect against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.'" *Mutter at ¶ 15* quoting *North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L. Ed. 2d 656 (1969)*, overruled on other grounds, *Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201,*

---

[2] All of Soto's arguments on appeal pertain to the charges of Aggravated Murder and Murder. He does not appear to contend that the remaining charges against him are barred by Double Jeopardy. In fact, in his summary of the issue presented for review in his brief, Soto states the issue as "Whether the Defendant's earlier guilty plea to involuntary manslaughter barred prosecution for murder and aggravated murder 11 years later." Notably the prior guilty plea was not to involuntary manslaughter, making that an incorrect statement; however, this summary is consistent with the position that Soto raises no challenges regarding the remaining counts against him.

State v. Soto

*104 L. Ed. 2d 865 (1989).*

[*P18]  *HN5*[⬆] "In determining whether an accused is being successively prosecuted for the 'same offense,' the [Supreme Court of Ohio] * * * adopted the 'same elements' test articulated [by the Supreme Court of the United States] in *Blockburger v. United States (1932), 284 U.S. 299, 304, 52 S.Ct. 180, 76 L. Ed. 306*[.]'" *State v. Zima, 102 Ohio St. 3d 61, 2004-Ohio-1807, ¶ 18, 806 N.E.2d 542.* The *Blockburger* test applies "where the same act or transaction constitutes a violation of two distinct statutory provisions" and requires the reviewing court to evaluate the elements of each statutory provision [***8] to determine "whether *each* provision requires proof of a fact which the other does not." (Emphasis added.) *Blockburger at 304.* "'This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case.'" *Zima* at ¶ 20, quoting *State v. Thomas, 61 Ohio St.2d 254, 259, 400 N.E.2d 897 (1980),* overruled on other grounds, *State v. Crago, 53 Ohio St.3d 243,  559 N.E.2d 1353 (1990), syllabus.* The United States Supreme Court has summarized the *Blockburger* test as an inquiry that asks "whether *each* offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."  [**623]  (Emphasis added.) *United States v. Dixon, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L. Ed. 2d 556 (1993).*

[*P19]  In this case, Soto argues that he should not be able to be prosecuted for Aggravated Murder and Murder due to the fact that his prior 2006 plea agreement disposed of a count of Involuntary Manslaughter against him. In support of his position, Soto cites multiple cases wherein the Supreme Court of Ohio has stated that Involuntary Manslaughter is a lesser included offense of both Aggravated Murder and Murder. *See State v. Lynch, 98 Ohio St. 3d 514, 2003-Ohio-2284, ¶ 79, 787 N.E.2d 1185* ("Involuntary manslaughter, *R.C. 2903.04,* is a lesser included offense of aggravated murder with prior calculation and design * * * and murder, *R.C. 2903.02* * * * because the only distinguishing factor is the mental state [***9] involved in the act."); *State v. Thomas, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988).* Soto argues that because Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder, a subsequent prosecution on these offenses now violates double jeopardy.

[*P20]  Both the Supreme Court of the United States and the Supreme Court of Ohio have addressed situations where government entities attempted to prosecute an individual for a greater offense after a defendant had been convicted of a lesser included offense. In *Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L. Ed. 2d 187 (1977),* the State of Ohio attempted to prosecute a defendant for the greater offense of Auto Theft after the defendant had pleaded guilty to the lesser included offense of Joyriding. *Brown, 432 U.S. at 168.* In *Brown,* the Supreme Court of the United States concluded that *HN6*[⬆] "[w]hatever the sequence may be, the *Fifth Amendment* forbids successive prosecution and cumulative punishment for a greater and lesser included offense." *Id. at 169.*

[*P21]  More recently, the Supreme Court of Ohio considered a situation where a defendant was prosecuted for a "misdemeanor offense that was a lesser included offense of the felony for which [he was] originally indicted." *Mutter, supra, at ¶ 22.* The Supreme Court of Ohio determined that *HN7*[⬆] "a misdemeanor conviction for a lesser included offense bars the state from indicting [***10] the same defendant for a felony that by definition included the misdemeanor offense within it as a lesser included offense, arising from the same facts." *Id.*

[*P22]  Here, Soto was never *convicted* of Involuntary Manslaughter; however, he was charged with Involuntary Manslaughter in 2006 and that charge was dismissed pursuant to a plea agreement wherein Soto agreed to plead guilty to Child Endangering, the predicate offense of the Involuntary Manslaughter. Notably, the new charges against Soto, which include Aggravated Murder and Murder, were also filed after Soto served his 5-year prison sentence on the Child Endangering conviction related to the death of his son. Thus while Soto was not convicted of Involuntary Manslaughter, he was in jeopardy of being tried and convicted of Involuntary Manslaughter but-for the plea agreement, resulting in his conviction and sentence for the predicate offense of Child Endangering. Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder, as the Supreme Court of Ohio has stated, thus it would seem that a subsequent prosecution would be barred in these circumstances.

[*P23]  The dissent argues that because the Involuntary Manslaughter count [***11] in the original prosecution was dismissed pursuant to a plea agreement Double Jeopardy should not be implicated here. In support, the dissent cites language from *State v.  [**624]  Bonarrigo, 62 Ohio St.2d 7, 12, 402 N.E.2d 530 (1980),* related to a State's dismissal of charges *prior to there ever being a trial or conviction on any operative offense.* Such authority has no relevance here, where the sole basis for dismissal of the Involuntary Manslaughter was the conviction and served sentence on the predicate offense to the Involuntary Manslaughter--Child Endangering. It is our view that the double jeopardy implication of a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal. Under any other interpretation, and barring any special

State v. Soto

exception or reservation in the record, the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense. There would be no finality under such a system and it would render plea agreements largely meaningless. Notably, neither of the parties [***12] raise the same argument as the dissent, and the trial court did not make a ruling on this issue either.

[*P24] Moreover, while the trial court found that under the *Blockburger* test Aggravated Murder and Murder contained additional elements that Involuntary Manslaughter did not have, *HN8*[↑] *Blockburger* actually requires that *each* offense contain an element that the other does not in order for a subsequent prosecution to be permissible. The Supreme Court of Ohio has determined that when comparing elements the

> **test is not a word game to be performed by rote by matching the words chosen by the legislature to define criminal offenses. Some offenses, such as aggravated murder and murder, lend themselves to such a simple matching test; others do not. [Citations omitted] * * * The proper overall focus is on the nature and circumstances of the offenses as defined, rather than on the precise words used to define them.**

*State v. Thomas, 40 Ohio St.3d 213, 216-217, 533 N.E.2d 286.*

[*P25] Turning then to the actual elements of the crimes involved with the Supreme Court of Ohio's standards in mind, the original 2006 charge of Involuntary Manslaughter was alleged to be a violation of *R.C. 2903.04(A)*, which reads, "No person shall cause the death of another or the unlawful termination of another's [***13] pregnancy as a proximate result of the offender's committing or attempting to commit a felony." *R.C. 2903.04(A)*.[3]

[*P26] The 2016 indictment alleges one count of Aggravated Murder, which requires proof that, "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." *R.C. 2903.01*. The 2016 indictment also alleges one count of Murder in violation of *R.C. 2903.02(B)*, which reads, "No person shall cause the death of another as a

proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of *section 2903.03* or *2903.04 of the Revised Code*." The offense of violence alleged in the 2016 indictment is Felonious Assault in violation [**625] of *R.C. 2903.11(A)(1)*, which reads, "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn."

[*P27] Based on the guidance of the Supreme Court of Ohio that an elements' test is not a "rote" matching test, we cannot agree with the trial court that *both* Aggravated Murder and Involuntary Manslaughter contain elements that the other does not. *HN9*[↑] While Aggravated Murder does contain the language of "prior calculation and design," which Involuntary Manslaughter [***14] does not have, the Supreme Court of Ohio has held that "[A]ggravated [M]urder with prior calculation and design, * * * is defined as [M]urder with an enhanced mental state. Thus the only distinguishing factor between *R.C. 2903.01(A)* [Aggravated Murder] and [I]nvoluntary [M]anslaughter is, as in the case of murder, the mental state involved." *Thomas, 40 Ohio St.3d at 216*. The Supreme Court of Ohio reasoned that "one cannot criminally cause another's death without committing an underlying felony or misdemeanor." *Id. at 216*. Put another way, under the Supreme Court of Ohio's construction that prior calculation and design is not an additional element but only an "enhancement" of the state of mind required for both homicide offenses, an Aggravated Murder could not be committed without at least committing an Involuntary Manslaughter. As a result, under this construction, Involuntary Manslaughter does not contain an "element" of the offense that is not subsumed within Aggravated Murder, even if a rote matching test of language of the statute might differ.

[*P28] Alternatively, the State argues that even if the offenses are considered the same under *Blockburger*, *HN10*[↑] there is an exception to *Blockburger* that would allow a subsequent prosecution if the additional [***15] facts necessary to sustain a charge have not yet occurred or have not been discovered despite the exercise of due diligence. *Brown v. Ohio, 432 U.S. 161, 169, 97 S. Ct. 2221, 53 L. Ed. 2d 187, at fn. 7*. Although the trial court found this argument persuasive, we do not. Key to this exception is the "exercise of due diligence." While the State may contend that it could not have known that Soto purposely killed his son until he purportedly admitted as much in 2016, this seems to place an unlikely constitutional burden on a criminal defendant to assist the prosecution in every respect despite his right to remain silent. It also implies that the State is constitutionally entitled to rely exclusively upon a defendant's explanation or narrative in investigating a criminal offense or in determining

---

[3] The felony allegedly committed was Child Endangering in violation of *R.C. 2919.22(A)/(E)(1)(c)*, which reads, "No person, who is the parent * * * of a child * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * * If the violation * * * results in serious physical harm to the child involved, [it is] a felony of the third degree[.]"

State v. Soto

[*P29]  We do not believe either of these assumptions are constitutionally tenable in making a double jeopardy determination. On the contrary, regardless of a criminal defendant's narrative, it is the State's responsibility to properly and thoroughly investigate the matter in regard to making an accurate assessment of what happened, determining the appropriate charges based on those facts, and determining what, if any, [***16] plea negotiations to accept once charges have been brought.

[*P30]  Notably, there is no evidence in the record before us, nor has the State presented any, to indicate that at the time of the original plea agreement the State reserved the right to bring additional charges related to the death of Soto's child. See *State v. Carpenter, 68 Ohio St. 3d 59, 1993-Ohio-226, 623 N.E.2d 66* ("Accordingly, we hold that the state cannot indict a defendant for murder after the court has accepted a negotiated guilty plea to a lesser offense and the victim later dies of injuries sustained in the crime, unless the state expressly reserves the right to file additional [**626] charges on the record at the time of the defendant's plea.")

[*P31]  Regardless of the status of the record as to any reservation of rights by the State at the original plea, the trial court determined that because Soto was not forthright in confessing his true culpability in his original statement to law enforcement, he could not have reasonably believed that his 2006 negotiated plea would have barred prosecution of the subsequent charges, citing a case from the Tenth District Court of Appeals in support. See *State v. Bridges, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480, ¶ 11*. *Bridges* is readily distinguishable from this case as the [***17] defendant in that case essentially noted on the record that he was pleading guilty to a case in municipal court specifically to avoid charges in a felony indictment that was expected to be filed any day. Moreover, the indictment in *Bridges* for the more serious charge was filed the day after the defendant's guilty plea on the lesser charge, and the Tenth District found the timing component important.

[*P32]  Furthermore, in *Bridges*, the Tenth District actually distinguished its own case in *State v. Church, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663*, which is slightly more similar to the case *sub judice* than *Bridges*. In *Church*, the Tenth District Court of Appeals found that a defendant who pled guilty to a charge of failure to use a crosswalk in exchange for the dismissal of a possession of a controlled substance charge had a reasonable expectation, based upon his negotiated plea agreement, that he would not be subject to more serious drug charges (trafficking in marijuana) arising out of the same incident. The case *sub judice* is more similar to *Church* than *Bridges*, though both contain different factual

scenarios than the case before us.

[*P33]  Finally, while we may be somewhat sympathetic to the notion that [***18] Soto's conduct, which may even constitute a separate crime, should not in any way be rewarded or might even be construed as a waiver of a defendant's constitutional rights in some circumstances, as noted earlier we are not convinced that this conduct supersedes either the duty of the State to independently investigate and prosecute crime, or the Double Jeopardy rights of the defendant where, as here, he has been convicted and served his sentenced for the offense pled to in exchange for dismissing the Involuntary Manslaughter.

[*P34]  Based on these circumstances and the holding of the United States Supreme Court in *Blockburger* and the Supreme Court of Ohio in *Thomas*, we find that because Involuntary Manslaughter constitutes a lesser included offense of Aggravated Murder and Murder, the principles of Double Jeopardy would prevent a subsequent prosecution of Soto for Aggravated Murder and Murder in this instance.

[*P35]  In sum, it is our conclusion that it was the responsibility of the State to thoroughly and forensically investigate the matter at the outset, and to thoroughly vet Soto's story when his son first died. The State did so to the extent it was satisfied back in 2006 and brought the original [***19] charges regarding the death of Soto's child. The State then negotiated a plea agreement based on those conclusions and dismissed the homicide charge without any indication in the record as to further reservation regarding future developments. Finally, Soto then served his entire sentence emanating from that negotiated plea agreement. Under these circumstances we are compelled to find that Soto cannot now be prosecuted, convicted, and sentenced [**627] again for the death of the same child. Accordingly, for all of these reasons Soto's assignment of error is sustained.

*Conclusion*

[*P36]  For the foregoing reasons the assignment of error is sustained and the judgment of the Putnam County Common Pleas Court is reversed. This cause is remanded to the trial court for further proceedings consistent with this opinion.

***Judgment Reversed and Cause Remanded***

**WILLAMOWSKI, P.J., concurs**.

**Dissent by:** ZIMMERMAN

State v. Soto

## Dissent

However, that issue is not before us.

**[\*P41]**  I therefore dissent.

---

**End of Document**

**ZIMMERMAN, J., dissents.**

**[\*P36]**  I start my dissent noting that our record does not contain *any* facts surrounding the defendant-appellant's original plea. Soto's underlying plea to the charge of Child Endangering and the State's voluntary dismissal of the Involuntary Manslaughter charge have relevance to the proceedings before us. **[\*\*\*20]**  Specifically, did Soto plead no contest; did the State *nolle* the charge of Involuntary Manslaughter; did the negotiated plea between Soto and the State occur after commencement of a trial? These questions are unanswered.

**[\*P37]**  However, for purposes of my dissent, I must presume that the underlying proceedings were "regular" since a "presumption of regularity" attaches to all judicial proceedings. *See generally,* _State v. Richardson, 2014-Ohio-3541, 17 N.E.3d 644_. Therefore, I will presume that Soto pled guilty to Child Endangering and the State *nolled* the Involuntary Manslaughter charge *before jeopardy attached* (i.e. prior to swearing a jury or swearing in the first witness).

**[\*P38]**  Herein, the *nolle* of the Involuntary Manslaughter count by the State neither operated as an acquittal nor prevented further prosecution of the offense. *See* _Bucolo v. Adkins, 424 U.S. 641, 642, 96 S.Ct. 1086, 47 L. Ed. 2d 301 (1976)_. Further, "a *nolle prosequi* dismisses the charges *without prejudice* to reindictment". _State v. Bonarrigo, 62 Ohio St.2d 7, 12, 402 N.E.2d 530 (1980)_. Thus, the majority's logic (that double jeopardy applies because Soto was merely charged with Involuntary Manslaughter) is misplaced because he was not punished or convicted of that offense. Double Jeopardy "applies to both successive punishments and to successive prosecutions **[\*\*\*21]**  for the same criminal offense". _United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993)_. Here, Soto was only punished for endangering his son, *not* for his murder. As such, and under the facts presented, jeopardy never attached in this case.

**[\*P39]**  Accordingly, I agree with the trial court's denial of Soto's motion to dismiss for different reasons, and contend that double jeopardy does not apply in this case because Soto was not convicted or punished for any offense that is a lesser included offense of the charges set forth in the new 2017 indictment.

**[\*P40]**  The *only* possible valid legal issue in this case is whether or not Soto's speedy trial rights were violated after his indictment for murder and aggravated murder charges.

5/3/2021                                    Public Docket

# THE SUPREME COURT OF OHIO
## CASE DOCKET

State of Ohio v. Travis Soto

**Case Information**

| | | |
|---|---|---|
| | **Number** | 2018-0416 |
| | **Type** | Jurisdictional Appeal |
| | **Date Filed** | 03/19/2018 |
| | **Status** | Disposed |
| | | |
| | **Prior Jurisdiction** | Putnam County, 3rd District Court of Appeals |
| | **Prior Decision Date** | 02/05/2018 |
| | **Prior Case Numbers** | 12-17-05 |

**Parties**
The Cuyahoga County Prosecutor's Office; Amicus Curiae on behalf of Appellant
*Represented by:*
Schroeder, Christopher David (89855), Counsel of Record
O'Malley, Michael Charles (59592)

State of Ohio; Appellant
*Represented by:*
Lammers, Gary Leo (42040), Counsel of Record
Schroeder, Todd Christopher (75265)

Travis Soto; Appellee
*Represented by:*
Edelstein, Carly Marissa (95950), Counsel of Record

**Docket**

| Date Filed | Description | Filed By |
|---|---|---|
| 03/19/2018 | Notice of appeal of State of Ohio | Appellant |
| 03/19/2018 | Memorandum in support of jurisdiction | Appellant |
| 03/19/2018 | Lower court decision | Appellant |
| 03/20/2018 | Copy of notice of appeal sent to clerk of court | |
| 03/21/2018 | Jurisdictional memorandum of amicus curiae The Cuyahoga County Prosecutor's Office in support of appellant | Amicus Curiae on behalf of Appellant |
| 03/29/2018 | Waiver of memorandum in response | Appellee |
| 05/23/2018 | **DECISION: Appeal accepted. See announcement at 2018-Ohio-1990 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2018/2018-ohio-1990.pdf).** | |
| 05/23/2018 | Order to clerk of court/custodian to certify record | |
| 06/05/2018 | Record | |
| 06/05/2018 | Clerk's notice of filing of record | |
| 06/05/2018 | Index of record on appeal | |
| 06/07/2018 | Motion of Joseph A. Benavidez to withdraw as counsel | Appellee |

5/3/2021                                     Public Docket

| Date Filed | Description | Filed By |
|---|---|---|
| | **06/14/18 Granted. See announcement at 2018-Ohio-2284 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2018/2018-ohio-2284.pdf).** | |
| 06/11/2018 | Motion for appointment of the office of the Ohio Public Defender as counsel | Appellee |
| | **06/14/18 Granted; The Ohio Public Defender's Office is appointed to represent appellee. See announcement at 2018-Ohio-2284 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2018/2018-ohio-2284.pdf).** | |
| 07/03/2018 | Appellant's merit brief | Appellant |
| 07/16/2018 | Stipulation to extension of time to file merit brief to 8/22/2018 | Appellee |
| 07/16/2018 | Brief of amicus curiae The Cuyahoga County Prosecutor's Office in support of appellant | Amicus Curiae on behalf of Appellant |
| 08/22/2018 | Appellee's merit brief | Appellee |
| 09/05/2018 | Stipulation to extension of time to file reply brief to 9/25/2018 | Appellant |
| 09/24/2018 | Reply brief | Appellant |
| 10/17/2018 | Oral argument scheduled for Wednesday, March 6, 2019 | |
| 10/24/2018 | Notice of oral argument to be held on Wednesday, March 6, 2019 | |
| 02/27/2019 | Additional authority | Appellee |
| 03/06/2019 | Oral argument held | |
| 10/31/2019 | **DECISION: Reversed and remanded to the trial court for further proceedings. See opinion at 2019-Ohio-4430 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2019/2019-ohio-4430.pdf). See announcement at 2019-Ohio-4454 (https://supremecourt.ohio.gov/rod/docs/pdf/0/2019/2019-ohio-4454.pdf).** | DISPOSITIVE |
| 11/14/2019 | Certified copy of judgment entry/mandate sent to clerk | |
| 11/21/2019 | Return of record to clerk of court/custodian | |
| 12/02/2019 | Return receipt | |
| 01/21/2020 | Notice of extension of time to 2/28/20 for filing petition for certiorari in U.S.S.C. | |
| 03/06/2020 | Notice of filing petition for certiorari in U.S.S.C. | |
| 06/25/2020 | Notice of U.S.S.C. denial of petition for writ of certiorari | |

End of Docket

◄ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ►

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 236

Supreme Court of Ohio Clerk of Court - Filed March 19, 2018 - Case No. 2018-0416

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | ON APPEAL FROM PUTNAM |
| | | COUNTY COURT OF APPEALS, |
| APPELLANT | : | THIRD APPELLATE DISTRICT |
| | | |
| v. | : | COURT OF APPEALS |
| | | CASE NO. 12-17-05 |
| TRAVIS SOTO | : | |
| | | |
| APPELLEE. | : | |

NOTICE OF APPEAL OF APPELLANT STATE OF OHIO

Gary L. Lammers (#0042040) (Counsel of Record)
Putnam County Prosecuting Attorney
336 East Main Street
Ottawa, Ohio 45875
Phone: (419) 523-3600
Fax: (419) 523-4519
gary.lammers@putnamcountyohio.gov

COUNSEL FOR APPELLANT
STATE OF OHIO

Joseph Benavidez
212 N. Elizabeth Street #322
Lima, Ohio 45801
419-228-0189
Fax No. 419-228-3367

COUNSEL FOR APPELLEE
TRAVIS SOTO

**NOTICE OF APPEAL OF APPELLANT STATE OF OHIO**

Appellant, State of Ohio, hereby gives notice of appeal to the Supreme Court of

Ohio from the judgment of the Putnam County Court of Appeals, Third Appellate

District, entered in Court of Appeals Case No. 12-17-05

This case raises a substantial constitutional question and is one of public or great

general interest.

Respectfully Submitted,

Gary L. Lammers (#0042040)
COUNSEL FOR APPELLANT
STATE OF OHIO

**CERTIFICATE OF SERVICE**

I certify that a copy of this Notice of Appeal was sent by ordinary mail to counsel
for Appellee, Joseph Benavidez, 212 N. Elizabeth Street, #322, Lima, Ohio 45801, on the
_19th_ day of March, 2018.

Gary L. Lammers (#0042040)
COUNSEL FOR APPELLANT
STATE OF OHIO

ii

Supreme Court of Ohio Clerk of Court - Filed March 19, 2018 - Case No. 2018-0416

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | ON APPEAL FROM PUTNAM COUNTY COURT OF APPEALS, |
| APPELLANT | : | THIRD APPELLATE DISTRICT |
| v. | : | COURT OF APPEALS CASE NO. 12-17-05 |
| TRAVIS SOTO | : | |
| APPELLEE. | : | |

MEMORANDUM IN SUPPORT OF JURISDICTION
OF APPELLANT STATE OF OHIO

Gary L. Lammers (#0042040) (Counsel of Record)
Putnam County Prosecuting Attorney
336 East Main Street
Ottawa, Ohio 45875
Phone: (419) 523-3600
Fax: (419) 523-4519
gary.lammers@putnamcountyohio.gov

COUNSEL FOR APPELLANT
STATE OF OHIO

Joseph Benavidez (#0042447)
212 N. Elizabeth Street #322
Lima, Ohio 45801
419-228-0189
Fax No. 419-228-3367

COUNSEL FOR APPELLEE
TRAVIS SOTO

TABLE OF CONTENTS

Page

EXPLANATION OF WHY THIS IS A CASE OF PUBLIC OR GREAT
GENERAL INTEREST AND INVOLVES A SUBSTANTIAL
CONSTITUTIONAL QUESTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT IN SUPPORT OF PROPOSITIONS OF LAW . . . . . . . . . . . . . . . . . 5

    Proposition of Law No. 1:  Involuntary Manslaughter with a
    child endangering predicate in violation of ORC 2903.04(A)
    is not the same offense for double jeopardy purposes as
    Aggravated Murder in violation of ORC 2901.01(C) or Murder
    with a felonious assault predicate in violation of ORC 2903.02 (B)
    under the Blockburger "same offense" test . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Proposition of Law No. 2:  Additional facts necessary to sustain
    a new charge that have not been discovered despite the exercise of
    due diligence acts as an exception to Blockburger to allow
    subsequent prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Proposition of Law No. 3: A negotiated plea does not bar
    successive prosecutions where the defendant would not reasonably
    believe that his or her plea would bar further prosecutions for any
    greater offense related to the same factual scenario . . . . . . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

APPENDIX                                                                Appx. Page

    Opinion of the Putnam County Court of Appeals
    (February 5, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Judgment Entry of the Putnam County Court of Appeals
    (February 5, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii

**EXPLANATION OF WHY THIS CASE IS ONE OF PUBLIC OR GREAT GENERAL INTEREST AND INVOLVES A SUBSTANTIAL CONSTITUTIONAL QUESTION**

This case warrants review because, after the trial court properly ruled that double jeopardy did not prohibit the prosecution of Defendant-Appellee on Aggravated Murder and Murder after a charge of Involuntary Manslaughter was dismissed pursuant to a 2006 plea agreement with Defendant for actions resulting in the death of his son, the appellate court, in a two to one decision, applied an incorrect analysis to reverse the trial court's ruling. Specifically, the appellate court applied an incorrect analysis of the *Blockburger* test, an incorrect analysis to the new facts exception to *Blockburger*, and erred in finding the facts of the case and Defendant's previous plea would cause Defendant to reasonably believe his negotiated plea was a bar to successive prosecution.

As a result of the appellate court's misapplication of the law in this case and other cases like it, the Defendant will be allowed to benefit from his deception and escape prosecution on these new charges.

**STATEMENT OF THE CASE AND FACTS**

On or about the 23rd day of January 2006 at 5:38 pm, a 911 call was made to the Putnam County Sheriff's office in reference to a code situation involving a two year old boy after being run over by a 4 wheeler. The child, Julio Baldazo, was taken by Continental EMS to the Putnam County Ambulatory Care Center where the child was pronounced dead. The child's death was investigated by the Putnam County Sheriff's Office. The Defendant through interviews stated that he was at home with his 2 year old son throughout the morning and that everything was fine. At noon, the child's mother, Lucy Baldazo, came home from work to have lunch and she left at 12:50 to go back to

work. The mother stated her son was fine when she left.  The Defendant told authorities after Ms Baldazo left, he got on the computer and at around 2 pm, messaged the child's maternal grandmother that Julio wanted to go outside and play.  The Defendant first stated he was riding a 4 wheeler and accidentally ran over the child as he came around a corner of an outbuilding.  The Defendant later changed his account stating that he was giving Julio a ride on the 4 wheeler on the railroad bed adjoining the property and that Julio fell off the 4 wheeler and he ran over him striking him with the 4 wheeler.

After striking him with the 4 wheeler, Defendant stated he picked Julio up off the ground, carried him inside the house, cleaned him up, changed his clothes and rocked Julio until he stopped crying whereupon he put Julio to bed.  After putting the 4 wheeler away, Defendant checked on Julio and discovered that Julio was not breathing.  It wasn't until 2 to 3 hours later when Julio's mother, Lucy Baldazo, came home that Defendant advised her that Julio wasn't with them anymore. Lucy Baldazo immediately went to check on Julio, found him unresponsive and called 911.

On January 24, 2006, an autopsy was done by Dr. Cynthia Bisser of the Lucas County Coroner's office. Dr. Bisser concluded that the injuries were consistent with the history given of it, that the child died from internal injuries and that the time of death was not at the moment of impact but rather 1 to 2 hours thereafter.

Defendant was indicted on March 31, 2006, for Child Endangering by creating a substantial risk of harm to his son which resulted in actual serious physical harm in violation of R.C. 2919.22(A) (E) (1) (c), a felony of the 3rd degree, and Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering, in violation of R.C. 2903.04(A), a felony of the 1st degree.

The factual basis of both counts relied heavily on Defendant's representations to law enforcement as the sole witness describing the cause of death by way of an ATV accident wherein Defendant was the driver and struck his son and the conclusion of the Lucas County Coroner's office who conducted the autopsy given Defendant's version of the events, and concluded the child died of multiple blunt force trauma caused by an ATV accident.

On August 31, 2006, Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering, the Involuntary Manslaughter charge was dismissed, and he was sentenced to five (5) years incarceration. The Defendant served and completed his sentence thereafter.

On July 25, 2016, Defendant voluntarily appeared at the Putnam County Sheriff's Office, indicated he wanted to provide the truthful account of what occurred regarding his son , Julio, and proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, and reports from 2006 and present, were reviewed by Dr. Randall Schlievert, a pediatric abuse specialist qualified as an expert multiple times by this Court. Dr. Schlievert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son, and importantly concluded that Defendant's 2006 misrepresentations led to the reasonable yet faulty conclusions of the Lucas County Coroner.

Defendant was then indicted on August 12, 2016 for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C).

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

On October 11, 2016, the Defendant filed a Motion to Dismiss based on the grounds of double jeopardy.   On April 13, 2017, the Trial Court overruled the Defendant's Motion to Dismiss finding that, in applying the *Blockburger* test, the 2016 Aggravated Murder charge requires proof of two different elements from Involuntary Manslaughter and that the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate. *See State v. Resor, 2010 Ohio 397.* The Trial Court also found that an exception to *Blockburger* existed in this case, stating that the facts necessary to support the 2016 indictment could not have been discovered despite the exercise of due diligence until additional evidence was uncovered such as the Defendant's appearance and confession and the new medical examiner's report. See *Grady v. Corbin*, [1990], 10 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161,169; *Ashe v Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

On May 2, 2017, the Defendant appealed the Trial Court's ruling to the Third

4

District Court of Appeals. On February 5, 2018, the Third District Court of Appeals

issued their opinion reversing the trial court's decision based on the United States

Supreme Court's holding in *Blockburger* and the Ohio Supreme Court's ruling in

*Thomas*, finding that Involuntary Manslaughter is a lesser included offense of

Aggravated Murder and Murder and would prevent a subsequent prosecution for

Aggravated Murder and Murder in these circumstances. The Appellate Court also ruled

that the exception to *Blockburger* allowing a subsequent prosecution if additional facts

necessary to sustain a charge have not occurred or have not been discovered despite the

exercise of due diligence did not apply in this case. The Appellate Court also concluded

that because the state did not reserve the right to bring additional charges regarding the

child's death at the time of the plea, the state was foreclosed from doing so based on the

holding of *State v. Carpenter,* 68 Ohio St. 3d 59, 1992-Ohio-226.

### ARGUMENT IN SUPPORT OF PROPOSITION OF LAW

**Proposition of Law No. 1:  Involuntary Manslaughter with a
child endangering predicate in violation of ORC 2903.04(A)
is not the same offense for double jeopardy purposes as
Aggravated Murder in violation of ORC 2901.01(C) or Murder
with a felonious assault predicate in violation of ORC 2903.02 (B)
under the Blockburger "same offense" test.**

"The Double Jeopardy Clauses of the Fifth Amendment to the United States

Constitution and Section 10, Article I of the Ohio Constitution protect the accused from

being put in jeopardy twice for the same offense. These provisions protect an individual

against successive punishments as well as successive prosecutions for the *same offense*."

*State v. Moore* (1996), 110 Ohio App.3d 649.

5

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*.

Here, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the victim being under the age of thirteen years which are elements not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.

It thus appears that the charge of Murder and Involuntary Manslaughter, both of which involve causing the death of another through the commission of a felony, requires more careful scrutiny. However, as described below, Double Jeopardy will not bar prosecution of the charge of Murder.

*State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these two charges:

6

Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).

Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate.

Appellant does recognize that this Court has held that Involuntary Manslaughter is a lesser included offense of both Aggravated Murder and Murder. *State v. Lynch*, 98 Ohio St. 3d 514, 2003- Ohio-2284. However, it is important to note and to distinguish those cases from the within case as those cases involved a defendant charged with

7

aggravated murder and/or murder and the Defendant wanted the Court to provide an instruction on Involuntary manslaughter as a lesser included offense.

To determine whether a criminal defendant was entitled to a jury instruction (charge) on a lesser included offense requires a two-step analysis. *State v. Davis* (1983), 6 Ohio St. 3d 91,95, 6 Ohio B. 131, 451 N.E. 2d 772: *State v. Kidder* (1987), 32 Ohio St. 3d 279, 281, 513 N.E. 2d 311. See, also, *State v. Mills* (Nov. 1, 1990), 3d Dist. No. 1-89-45, 1990 Ohio App. LEXIS 4797. First, the reviewing court must determine whether the one offense is, in fact, a lesser included offense of the other offense. An offense is a lesser included offense if: (1) one offense carries a greater penalty than the other; (2) some element of the greater offense is not required to prove commission of the lesser offense; and (3) the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed. *State v. Evans*, 122 Ohio St. 3d 381, 2009 Ohio 2974, 911 N.E. 2d 889, P26 (clarifying the three-part test set forth in *State v. Deem* (1988), 40 Ohio St. 3d 205, 533 N. E. 2d 294). Second, the reviewing court must determine whether the trial court was obligated to give a jury instruction on the lesser included offense under the specific facts of the case. Davis, 6 Ohio St. 2d at 95-96, citing *State v. Wilkins* (1980), 64 Ohio St. 2d 382, 387, 415 N. E. 2d 303. "[A] charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser included offense." *State v. Thomas* (1988), 40 Ohio St. 3d 213, 216, 533 N. E. 2d 286, citing *Kidder*, 32 Ohio St. 3d at 281; *Davis*, 6 Ohio St. 3d 91, 6 Ohio B. 131, 451 N.E. 2d 772; *Wilkins*, 64 Ohio St. 2d 382, 415 N.E. 2d 303.

8

In those circumstances, rather than analyzing the charges under the "same elements" test under *Blockburger* for double jeopardy purposes, the Court correctly focused on applying the lesser included test in determining whether or not to give a lesser included offense instruction. Id.   The tests and the analysis required in these circumstances are different and do not automatically result in the same outcome as demonstrated in the *Resor* case noted above. The fact that one can conclude involuntary manslaughter is a lesser included offense under the lesser included test but not be same offense under *Blockburger* is a basis to accept jurisdiction in this matter.

> **Proposition of Law No. 2**:  **Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to Blockburger to allow subsequent prosecution.**

An exception to the *Blockburger* test exists where the state is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been discovered despite the exercise of due diligence until Defendant appeared and confessed to the actual details of his son's death. The 2006 investigation relied heavily on Defendant's assertions of what occurred since Defendant was the only person present when the facts giving rise to his son's death occurred. Appellant's due diligence  is further evidenced by the Luca County Coroner's findings that Julio's death was caused by

the trauma suffered by being struck by a 4 wheeler. Thereafter, Dr. Schlievert's report

dated September 30, 2016, highlights the reasonableness of the investigative conclusions

in 2006 as follows:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> … What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

Hence, the false narrative led to a false medical diagnosis. As such, the facts necessary to

support this subsequent prosecution could not have been discovered until July 2016

despite the exercise of due diligence.

> **Proposition of Law No. 3: A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario.**

The 2006 negotiated plea resulting in the dismissal of the Involuntary

Manslaughter charge does not prohibit a successive prosecution on the greater offense of

Murder. A negotiated plea "bars successive prosecutions where the defendant *would*

*reasonably believe* that his or her plea would bar further prosecutions for any greater

offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

In the case at hand, the Defendant could not have reasonably believed that his

2006 negotiated plea to a charge based on his false narrative of the events which was

10

fully vetted by Appellant in the exercise of due diligence would bar prosecution of subsequent charges based on a truthful narrative of the events, and which further transformed the case from one of an accidental death to a purposeful homicide.

## CONCLUSION

For the reasons discussed above, this case involves matter of public and great general interest and a substantial constitutional question. The Appellant requests that this court accept jurisdiction in this case so that the important issues will be reviewed on the merits.

Respectfully submitted,

Gary L. Lammers (#0042040)
Putnam County Prosecuting Attorney
(COUNSEL OF RECORD)

COUNSEL FOR APPELLANT
STATE OF OHIO

336 E. Main Street
Ottawa, Ohio 45875
(419) 523-3600
(419) 523-4519 - Fax
email: gary.lammers@putnamcountyohio.gov

11

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Memorandum in Support of Jurisdiction was served by ordinary U. S. Mail on this _19th_ day of March, 2018 upon the following counsel of record:

Joseph Benavidez
212 N. Elizabeth Street #322
Lima, Ohio 45801
419-228-0189
Fax No. 419-228-3367

COUNSEL FOR APPELLEE
TRAVIS SOTO

Gary L. Lammers (#0042040)

12

**APPENDIX**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,               CASE NO.  12-17-05

     v.

TRAVIS SOTO,                         O P I N I O N

     DEFENDANT-APPELLANT.

---

Appeal from Putnam County Common Pleas Court
Trial Court No. 2016 CR 57

Judgment Reversed and Cause Remanded

Date of Decision:    February 5, 2018

---

APPEARANCES:

    *Michael J. Short* for Appellant

    *Lillian R. Shun* for Appellee

Case No. 12-17-05

**SHAW, J.**

{¶1} Defendant-appellant, Travis Soto ("Soto"), brings this appeal from the April 13, 2017, judgment of the Putnam County Common Pleas Court denying Soto's motion to dismiss on the grounds of double jeopardy.

*Relevant Facts and Procedural History*

{¶2} On or about January 23, 2006, Soto's toddler son was killed. Soto represented to law enforcement and the Lucas County Coroner that his son was struck while Soto was driving an all-terrain vehicle ("ATV") and that his son died as a result. Consistent with Soto's representations to law enforcement, the coroner concluded that the child died of blunt force trauma caused by an ATV accident.

{¶3} On March 31, 2006, Soto was charged with Child Endangering in violation of R.C. 2919.22(A)/(E)(1)(c), a felony of the third degree, and Involuntary Manslaughter in violation of R.C. 2903.04(A), a felony of the first degree. It was alleged that Soto committed Involuntary Manslaughter by causing the death of his son while committing the predicate felony offense of Child Endangering.

{¶4} Subsequently, Soto entered into a negotiated plea agreement wherein he agreed to plead guilty to Child Endangering and in exchange the Involuntary Manslaughter charge was dismissed. As a result of Soto's conviction, the record indicates that Soto was sentenced to serve 5 years in prison.

-2-

Case No. 12-17-05

{¶5} On or about July 25, 2016, Soto voluntarily appeared at the Putnam County Sheriff's Office and allegedly indicated that he wanted to provide a "truthful" account of what happened to his son.  Soto told the police that he had actually beat his son to death back in 2006 and that he had staged the ATV accident scene.

{¶6} The Lucas County Coroner's original 2006 report was then reviewed by a pediatric abuse specialist who concluded that the toddler had actually died of multiple blunt force trauma due to Soto's violent actions.  The expert concluded that Soto's original 2006 misrepresentations "led to the reasonably yet faulty conclusions of the Lucas County Coroner." (Doc. No. 29).

{¶7} On August 15, 2016, Soto was indicted by the Putnam County Grand Jury for Aggravated Murder in violation of R.C. 2903.01(C), an unclassified felony, Murder in violation of R.C. 2903.02(B), an unclassified felony, Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the first degree, Kidnapping in violation of R.C. 2905.01, a felony of the first degree, and Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.

{¶8} On October 11, 2016, Soto filed a "Motion to Dismiss on the Grounds of Double Jeopardy."  In the motion, Soto argued that in his original 2006 prosecution, a charge of Involuntary Manslaughter was dismissed when he pled guilty to Child Endangering.  Soto contended that the judgment entries and

-3-

Case No. 12-17-05

transcripts from that case did not address whether the matter would be dismissed with or without prejudice, but the "entries in the record makes one think that a change of pleas [sic] to child endangering also disposed of the involuntary manslaughter charge."  (Doc. No. 28).   Soto contended that Involuntary Manslaughter was a lesser included offense of both Murder and Aggravated Murder, which he argued would bar a subsequent prosecution of Soto on those charges.

{¶9} On October 18, 2016, the State filed a response.  The State contended that pursuant to the United States Supreme Court's decision in *Blockburger v. United States*, 284 U.S. 299 (1932), Aggravated Murder contained different elements than Involuntary Manslaughter, which would allow multiple prosecutions. As to the Murder charge, the State argued that pursuant to *State v. Bridges*, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480, ¶ 11, a negotiated guilty plea only barred successive prosecutions where the defendant would " ' "reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." ' "  *Bridges citing State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, ¶8, quoting *State v. Edwards*, 8th Dist. Cuyahoga No. 94568, 2011-Ohio-95, ¶ 23.

{¶10} The State contended that because of his prior false narrative Soto could not have reasonably believed that his negotiated plea to Child Endangering would bar prosecution of subsequent homicide charges based on the truth.  Further, the

-4-

Case No. 12-17-05

State argued that subsequent prosecution on a more serious crime was not barred in a situation where the State was unable to proceed on a more serious charge because the additional facts necessary to sustain the charge had not yet occurred or had not yet been discovered despite the exercise of due diligence. *See Brown v. Ohio*, 432 U.S. 161, 169, fn. 7, 97 S.Ct. 2221, 2227 (1977).

{¶11} On April 13, 2017, the trial court filed its judgment entry determining Soto's motion to dismiss. The trial court found that pursuant to *Blockburger*, Felonious Assault, Kidnapping, Tampering with Evidence, and Aggravated Murder all required proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter, which would permit multiple prosecutions. As to the Murder charge, the trial court determined that Soto could not have reasonably believed that his 2006 negotiated plea based on his prior false narrative of events would bar prosecution of a purposeful homicide. Further, the trial court indicated that Involuntary Manslaughter with a Child Endangering predicate was not the same offense as Murder with a Felonious Assault predicate. Finally, the trial court determined that the facts to support the 2016 indictment could not have been discovered in the exercise of due diligence until the additional evidence was uncovered. Thus the trial court overruled Soto's motion to dismiss.

-5-

Case No. 12-17-05

{¶12} It is from this judgment that Soto appeals, asserting the following assignment of error for our review.[1]

**Assignment of Error**
**The trial court erred [in] overrul[ing] Defendant's Motion to Dismiss on Double Jeopardy Grounds.**

{¶13} In Soto's assignment of error, he contends that the trial court erred by overruling his motion to dismiss on double jeopardy grounds.  Specifically, Soto argues that his 2006 plea that resulted in the dismissal of the Involuntary Manslaughter charge should bar the current prosecution because Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder. Further, Soto argues that the trial court did not support its finding that Soto could not have reasonably believed that the earlier dismissal would bar future prosecution for the death of Soto's son.  Finally, Soto argues that the State did not reserve any right to bring additional charges in the original dismissal of his Involuntary Manslaughter charge.

*Standard of Review*

{¶14} Appellate courts review the denial of a motion to dismiss an indictment on the grounds of double jeopardy de novo, "because it is a pure question of law." *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, ¶ 13, citing *State v.*

---

[1] The Supreme Court of Ohio has determined that the denial of a motion to dismiss on double jeopardy grounds is a final appealable order. *State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, ¶ 61 ("We hold that an order denying a motion to dismiss on double-jeopardy grounds is a final, appealable order.")

-6-

Case No. 12-17-05

*Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 16, citing *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership,* 78 Ohio App.3d 340, 346 (2d Dist.1992).

### Relevant Authority and Analysis

{¶15} "Where successive prosecutions are at stake, the double jeopardy guarantee serves 'a constitutional policy of finality for the defendant's benefit.' " *State v. Liberatore,* 4 Ohio St.3d 13, 14 (1983), quoting *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547 (1971). The question in this case is whether the State would violate that guarantee if it prosecuted Soto for Aggravated Murder and Murder after a charge of Involuntary Manslaughter was dismissed pursuant to a 2006 plea agreement with Soto for actions resulting in the death of his son.[2]

{¶16} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Through the Fourteenth Amendment to the United States Constitution, this protection applies to individuals prosecuted by the State of Ohio. *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 10, citing *Benton v. Maryland*, 395 U.S. 784, 786, 86 S.Ct. 2056 (1969). Similarly, the Ohio

---

[2] All of Soto's arguments on appeal pertain to the charges of Aggravated Murder and Murder. He does not appear to contend that the remaining charges against him are barred by Double Jeopardy. In fact, in his summary of the issue presented for review in his brief, Soto states the issue as "Whether the Defendant's earlier guilty plea to involuntary manslaughter barred prosecution for murder and aggravated murder 11 years later." Notably the prior guilty plea was not to involuntary manslaughter, making that an incorrect statement; however, this summary is consistent with the position that Soto raises no challenges regarding the remaining counts against him.

-7-

Case No. 12-17-05

Constitution provides, "No person shall be twice put in jeopardy for the same offense." Ohio Constitution, Article I, Section 10.  The Supreme Court of Ohio has described the protections afforded by the Ohio and United States Constitutions' Double Jeopardy Clauses as "coextensive." *Mutter*, *supra* at ¶ 15, citing *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, ¶ 7, citing *State v. Gustafson*, 76 Ohio St.3d 425, 432 (1996).

{¶17} Principally, "The Double Jeopardy Clauses [of both Constitutions] protect against three abuses:  (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.' " *Mutter* at ¶ 15 quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201 (1989).

{¶18} "In determining whether an accused is being successively prosecuted for the 'same offense,' the [Supreme Court of Ohio] * * * adopted the 'same elements' test articulated [by the Supreme Court of the United States] in *Blockburger v. United States* (1932), 284 U.S. 299, 304, 52 S.Ct. 180[.]' " *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, ¶ 18.  The *Blockburger* test applies "where the same act or transaction constitutes a violation of two distinct statutory provisions" and requires the reviewing court to evaluate the elements of each statutory provision to determine "whether *each* provision requires proof of a fact

-8-

Case No. 12-17-05

which the other does not." (Emphasis added.) *Blockburger* at 304. " 'This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case.' " *Zima* at ¶ 20, quoting *State v. Thomas*, 61 Ohio St.2d 254, 259 (1980), *overruled on other grounds*, *State v. Crago*, 53 Ohio St.3d 243 (1990), syllabus. The United States Supreme Court has summarized the *Blockburger* test as an inquiry that asks "whether *each* offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." (Emphasis added.) *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849 (1993).

{¶19} In this case, Soto argues that he should not be able to be prosecuted for Aggravated Murder and Murder due to the fact that his prior 2006 plea agreement disposed of a count of Involuntary Manslaughter against him. In support of his position, Soto cites multiple cases wherein the Supreme Court of Ohio has stated that Involuntary Manslaughter is a lesser included offense of both Aggravated Murder and Murder. *See State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 79 ("Involuntary manslaughter, R.C. 2903.04, is a lesser included offense of aggravated murder with prior calculation and design * * * and murder, R.C. 2903.02 * * * because the only distinguishing factor is the mental state involved in the act."); *State v. Thomas*, 40 Ohio St.3d 213, 216 (1988). Soto argues that because

-9-

Case No. 12-17-05

Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder, a subsequent prosecution on these offenses now violates double jeopardy.

{¶20} Both the Supreme Court of the United States and the Supreme Court of Ohio have addressed situations where government entities attempted to prosecute an individual for a greater offense after a defendant had been convicted of a lesser included offense. In *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221 (1977), the State of Ohio attempted to prosecute a defendant for the greater offense of Auto Theft after the defendant had pleaded guilty to the lesser included offense of Joyriding. *Brown* at 168. In *Brown*, the Supreme Court of the United States concluded that "[w]hatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense." *Id.* at 169.

{¶21} More recently, the Supreme Court of Ohio considered a situation where a defendant was prosecuted for a "misdemeanor offense that was a lesser included offense of the felony for which [he was] originally indicted." *Mutter, supra*, at ¶ 22. The Supreme Court of Ohio determined that "a misdemeanor conviction for a lesser included offense bars the state from indicting the same defendant for a felony that by definition included the misdemeanor offense within it as a lesser included offense, arising from the same facts." *Id.*

-10-

Case No. 12-17-05

{¶22} Here, Soto was never *convicted* of Involuntary Manslaughter; however, he was charged with Involuntary Manslaughter in 2006 and that charge was dismissed pursuant to a plea agreement wherein Soto agreed to plead guilty to Child Endangering, the predicate offense of the Involuntary Manslaughter. Notably, the new charges against Soto, which include Aggravated Murder and Murder, were also filed after Soto served his 5-year prison sentence on the Child Endangering conviction related to the death of his son. Thus while Soto was not convicted of Involuntary Manslaughter, he was in jeopardy of being tried and convicted of Involuntary Manslaughter but-for the plea agreement, resulting in his conviction and sentence for the predicate offense of Child Endangering. Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder, as the Supreme Court of Ohio has stated, thus it would seem that a subsequent prosecution would be barred in these circumstances.

{¶23} The dissent argues that because the Involuntary Manslaughter count in the original prosecution was dismissed pursuant to a plea agreement Double Jeopardy should not be implicated here. In support, the dissent cites language from *State v. Bonarrigo*, 62 Ohio St.2d 7, 12 (1980), related to a State's dismissal of charges *prior to there ever being a trial or conviction on any operative offense.* Such authority has no relevance here, where the sole basis for dismissal of the Involuntary Manslaughter was the conviction and served sentence on the predicate

-11-

Case No. 12-17-05

offense to the Involuntary Manslaughter--Child Endangering.  It is our view that the double jeopardy implication of a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal.  Under any other interpretation, and barring any special exception or reservation in the record, the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense.  There would be no finality under such a system and it would render plea agreements largely meaningless.  Notably, neither of the parties raise the same argument as the dissent, and the trial court did not make a ruling on this issue either.

{¶24} Moreover, while the trial court found that under the *Blockburger* test Aggravated Murder and Murder contained additional elements that Involuntary Manslaughter did not have, *Blockburger* actually requires that *each* offense contain an element that the other does not in order for a subsequent prosecution to be permissible.  The Supreme Court of Ohio has determined that when comparing elements the

> test is not a word game to be performed by rote by matching the words chosen by the legislature to define criminal offenses.  Some offenses, such as aggravated murder and murder, lend themselves to such a simple matching test; others do not.  [Citations omitted] * * * The proper overall focus is on the nature and circumstances

-12-

Case No. 12-17-05

**of the offenses as defined, rather than on the precise words used
to define them.**

*State v. Thomas*, 40 Ohio St.3d 213, 216-217.

{¶25} Turning then to the actual elements of the crimes involved with the
Supreme Court of Ohio's standards in mind, the original 2006 charge of Involuntary
Manslaughter was alleged to be a violation of R.C. 2903.04(A), which reads, "No
person shall cause the death of another or the unlawful termination of another's
pregnancy as a proximate result of the offender's committing or attempting to
commit a felony." R.C. 2903.04(A).[3]

{¶26} The 2016 indictment alleges one count of Aggravated Murder, which
requires proof that, "No person shall purposely, and with prior calculation and
design, cause the death of another or the unlawful termination of another's
pregnancy." R.C. 2903.01.  The 2016 indictment also alleges one count of Murder
in violation of R.C. 2903.02(B), which reads, "No person shall cause the death of
another as a proximate result of the offender's committing or attempting to commit
an offense of violence that is a felony of the first or second degree and that is not a
violation of section 2903.03 or 2903.04 of the Revised Code."  The offense of
violence alleged in the 2016 indictment is Felonious Assault in violation of R.C.

---

[3] The felony allegedly committed was Child Endangering in violation of R.C. 2919.22(A)/(E)(1)(c), which
reads, "No person, who is the parent * * * of a child * * * shall create a substantial risk to the health or safety
of the child, by violating a duty of care, protection, or support. * * * If the violation * * * results in serious
physical harm to the child involved, [it is] a felony of the third degree[.]"

-13-

Case No. 12-17-05

2903.11(A)(1), which reads, "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn."

{¶27} Based on the guidance of the Supreme Court of Ohio that an elements' test is not a "rote" matching test, we cannot agree with the trial court that *both* Aggravated Murder and Involuntary Manslaughter contain elements that the other does not. While Aggravated Murder does contain the language of "prior calculation and design," which Involuntary Manslaughter does not have, the Supreme Court of Ohio has held that "[A]ggravated [M]urder with prior calculation and design, * * * is defined as [M]urder with an enhanced mental state. Thus the only distinguishing factor between R.C. 2903.01(A) [Aggravated Murder] and [I]nvoluntary [M]anslaughter is, as in the case of murder, the mental state involved." *Thomas*, 40 Ohio St.3d at 216. The Supreme Court of Ohio reasoned that "one cannot criminally cause another's death without committing an underlying felony or misdemeanor." *Id*. at 216. Put another way, under the Supreme Court of Ohio's construction that prior calculation and design is not an additional element but only an "enhancement" of the state of mind required for both homicide offenses, an Aggravated Murder could not be committed without at least committing an Involuntary Manslaughter. As a result, under this construction, Involuntary Manslaughter does not contain an "element" of the offense that is not subsumed within Aggravated Murder, even if a rote matching test of language of the statute might differ.

-14-

Case No. 12-17-05

{¶28} Alternatively, the State argues that even if the offenses are considered the same under *Blockburger*, there is an exception to *Blockburger* that would allow a subsequent prosecution if the additional facts necessary to sustain a charge have not yet occurred or have not been discovered despite the exercise of due diligence. *Brown v. Ohio*, 432 U.S. 161, 169, at fn. 7.  Although the trial court found this argument persuasive, we do not.  Key to this exception is the "exercise of due diligence."  While the State may contend that it could not have known that Soto purposely killed his son until he purportedly admitted as much in 2016, this seems to place an unlikely constitutional burden on a criminal defendant to assist the prosecution in every respect despite his right to remain silent.  It also implies that the State is constitutionally entitled to rely exclusively upon a defendant's explanation or narrative in investigating a criminal offense or in determining the appropriate criminal charges in any given case.

{¶29} We do not believe either of these assumptions are constitutionally tenable in making a double jeopardy determination.  On the contrary, regardless of a criminal defendant's narrative, it is the State's responsibility to properly and thoroughly investigate the matter in regard to making an accurate assessment of what happened, determining the appropriate charges based on those facts, and determining what, if any, plea negotiations to accept once charges have been brought.

-15-

Case No. 12-17-05

{¶30} Notably, there is no evidence in the record before us, nor has the State presented any, to indicate that at the time of the original plea agreement the State reserved the right to bring additional charges related to the death of Soto's child. *See State v. Carpenter*, 68 Ohio St.3d 59, 1993-Ohio-226 ("Accordingly, we hold that the state cannot indict a defendant for murder after the court has accepted a negotiated guilty plea to a lesser offense and the victim later dies of injuries sustained in the crime, unless the state expressly reserves the right to file additional charges on the record at the time of the defendant's plea.")

{¶31} Regardless of the status of the record as to any reservation of rights by the State at the original plea, the trial court determined that because Soto was not forthright in confessing his true culpability in his original statement to law enforcement, he could not have reasonably believed that his 2006 negotiated plea would have barred prosecution of the subsequent charges, citing a case from the Tenth District Court of Appeals in support. *See State v. Bridges*, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480, ¶ 11. *Bridges* is readily distinguishable from this case as the defendant in that case essentially noted on the record that he was pleading guilty to a case in municipal court specifically to avoid charges in a felony indictment that was expected to be filed any day. Moreover, the indictment in *Bridges* for the more serious charge was filed the day after the defendant's guilty

-16-

Case No. 12-17-05

plea on the lesser charge, and the Tenth District found the timing component important.

{¶32} Furthermore, in *Bridges*, the Tenth District actually distinguished its own case in *State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, which is slightly more similar to the case *sub judice* than *Bridges*. In *Church*, the Tenth District Court of Appeals found that a defendant who pled guilty to a charge of failure to use a crosswalk in exchange for the dismissal of a possession of a controlled substance charge had a reasonable expectation, based upon his negotiated plea agreement, that he would not be subject to more serious drug charges (trafficking in marijuana) arising out of the same incident. The case *sub judice* is more similar to *Church* than *Bridges*, though both contain different factual scenarios than the case before us.

{¶33} Finally, while we may be somewhat sympathetic to the notion that Soto's conduct, which may even constitute a separate crime, should not in any way be rewarded or might even be construed as a waiver of a defendant's constitutional rights in some circumstances, as noted earlier we are not convinced that this conduct supersedes either the duty of the State to independently investigate and prosecute crime, or the Double Jeopardy rights of the defendant where, as here, he has been convicted and served his sentenced for the offense pled to in exchange for dismissing the Involuntary Manslaughter.

-17-

Case No. 12-17-05

{¶34} Based on these circumstances and the holding of the United States Supreme Court in *Blockburger* and the Supreme Court of Ohio in *Thomas*, we find that because Involuntary Manslaughter constitutes a lesser included offense of Aggravated Murder and Murder, the principles of Double Jeopardy would prevent a subsequent prosecution of Soto for Aggravated Murder and Murder in this instance.

{¶35} In sum, it is our conclusion that it was the responsibility of the State to thoroughly and forensically investigate the matter at the outset, and to thoroughly vet Soto's story when his son first died. The State did so to the extent it was satisfied back in 2006 and brought the original charges regarding the death of Soto's child. The State then negotiated a plea agreement based on those conclusions and dismissed the homicide charge without any indication in the record as to further reservation regarding future developments. Finally, Soto then served his entire sentence emanating from that negotiated plea agreement. Under these circumstances we are compelled to find that Soto cannot now be prosecuted, convicted, and sentenced again for the death of the same child. Accordingly, for all of these reasons Soto's assignment of error is sustained.

*Conclusion*

{¶36} For the foregoing reasons the assignment of error is sustained and the judgment of the Putnam County Common Pleas Court is reversed. This cause is

-18-

Case No. 12-17-05

remanded to the trial court for further proceedings consistent with this opinion.

***Judgment Reversed and***
***Cause Remanded***

**WILLAMOWSKI, P.J., concurs.**

**ZIMMERMAN, J., dissents.**

{¶36} I start my dissent noting that our record does not contain *any* facts surrounding the defendant-appellant's original plea.  Soto's underlying plea to the charge of Child Endangering and the State's voluntary dismissal of the Involuntary Manslaughter charge have relevance to the proceedings before us.  Specifically, did Soto plead no contest; did the State *nolle* the charge of Involuntary Manslaughter; did the negotiated plea between Soto and the State occur after commencement of a trial?  These questions are unanswered.

{¶37} However, for purposes of my dissent, I must presume that the underlying proceedings were "regular" since a "presumption of regularity" attaches to all judicial proceedings.  *See generally, State v. Richardson*, 3d Dist. Seneca No. 13-13-54, 13-13-55, 2014-Ohio-3541.  Therefore, I will presume that Soto pled guilty to Child Endangering and the State *nolled* the Involuntary Manslaughter charge *before jeopardy attached* (i.e. prior to swearing a jury or swearing in the first witness).

-19-

Case No. 12-17-05

{¶38} Herein, the *nolle* of the Involuntary Manslaughter count by the State neither operated as an acquittal nor prevented further prosecution of the offense. *See Bucolo v. Adkins*, 424 U.S. 641, 642, 96 S.Ct. 1086 (1976). Further, "a *nolle prosequi* dismisses the charges *without prejudice* to reindictment". *State v. Bonarrigo*, 62 Ohio St.2d 7, 12 (1980). Thus, the majority's logic (that double jeopardy applies because Soto was merely charged with Involuntary Manslaughter) is misplaced because he was not punished or convicted of that offense. Double Jeopardy "applies to both successive punishments and to successive prosecutions for the same criminal offense". *United States v. Dixon*, 509 U.S. 688, 696 (1993). Here, Soto was only punished for endangering his son, *not* for his murder. As such, and under the facts presented, jeopardy never attached in this case.

{¶39} Accordingly, I agree with the trial court's denial of Soto's motion to dismiss for different reasons, and contend that double jeopardy does not apply in this case because Soto was not convicted or punished for any offense that is a lesser included offense of the charges set forth in the new 2017 indictment.

{¶40} The *only* possible valid legal issue in this case is whether or not Soto's speedy trial rights were violated after his indictment for murder and aggravated murder charges. However, that issue is not before us.

{¶41} I therefore dissent.

/jlr

-20-

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,        CASE NO. 12-17-05

    v.

TRAVIS SOTO,                  J U D G M E N T

    DEFENDANT-APPELLANT.    E N T R Y

For the reasons stated in the opinion of this Court, the assignment of error is sustained and it is the judgment and order of this Court that the judgment of the trial court is reversed with costs assessed to Appellee for which judgment is hereby rendered. The cause is hereby remanded to the trial court for further proceedings and for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27, and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
JUDGE

_____
JUDGE

_____
ZIMMERMAN, J., DISSENTS
JUDGE

DATED:   February 5, 2018

-21-

Supreme Court of Ohio Clerk of Court - Filed March 21, 2018 - Case No. 2018-0416

In the
# Supreme Court of Ohio

| | |
|---|---|
| STATE OF OHIO, | Case No. 2018-0416 |
| Plaintiff-Appellant, | On Appeal from the Putnam County Court of Appeals, Third Appellate District |
| v. | |
| TRAVIS SOTO, | Court of Appeals Case No. 12-07-05 |
| Defendant-Appellee. | |

---

### MEMORANDUM IN SUPPORT OF JURISDICTION OF
### *AMICUS CURIAE* THE CUYAHOGA COUNTY PROSECUTOR'S OFFICE

---

**GARY L. LAMMERS (0042040)**
Putnam County Prosecutor
336 East Main Street
Ottawa, Ohio 45875
(419) 523-3600
gary.lammers@putnamcountyohio.gov

Counsel for Appellant
  State of Ohio

**JOSEPH BENAVIDEZ (0042447)**
212 North Elizabeth Street #322
Lima, Ohio 45801
(419) 228-0189
joebenavidez138@gmail.com

Counsel for Appellee
  Travis Soto

**MICHAEL C. O'MALLEY (0059592)**
Cuyahoga County Prosecutor

CHRISTOPHER D. SCHROEDER (0089855)
Assistant Prosecuting Attorney
  *Counsel of Record*
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113
(216) 443-7733
cschroeder@prosecutor.cuyahogacounty.us

Counsel for *Amicus Curiae*
  The Cuyahoga County Prosecutor's Office

i

# **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................. 1

STATEMENT OF AMICUS INTEREST .................................................................................. 3

STATEMENT OF THE CASE AND RELEVANT FACTS ........................................................ 4

    *Arguments in Support of Appellant's First Proposition of Law* ................................. 4

    *Arguments in Support of Appellant's Second and Third Propositions of Law* ................. 7

CONCLUSION ................................................................................................................. 10

CERTIFICATE OF SERVICE .......................................................................................... 11

ii

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Travis Soto murdered his two-year-old son Julio in 2006.  He then concocted a story in which he claimed that he accidentally struck and killed the boy while driving an ATV.  Based on that story – and given that Soto was the only surviving witness to the incident – the State offered Soto a plea to child endangering, a felony of the third degree, and a dismissal of another count of involuntary manslaughter.  Soto pleaded guilty to child endangering and served five years in prison.  After his release, Soto apparently had a crisis of conscience, and in 2016, confessed that he in fact beat his son to death and staged the ATV accident to cover up the crime.  Based on Soto's confession, the State indicted Soto for aggravated murder, murder, and other offenses.

Soto's motion to dismiss his 2016 indictment presented what should have been a *Carpenter* claim.  In *State v. Carpenter*, 68 Ohio St.3d 59, 623 N.E.2d 66 (1993), this Court held that the State cannot indict a defendant for murder after the defendant has entered a negotiated guilty plea to a lesser offense unless the State expressly reserves the right to bring further charges at the time of the plea.  The State had a compelling argument that *Carpenter* did not justify dismissal of Soto's charges.  *Carpenter* only applies where, at the time of the plea, "the prosecutor has knowledge of and jurisdiction over all [the] offenses[.]"  *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 13.  The prosecution did not have that knowledge in this case, and did not have it because Soto concealed it.

The actual issue before the Third District was thus whether *Carpenter* precluded the State from bringing additional charges against a defendant following a negotiated plea where it was undisputed that the State was unaware of the factual basis for the additional charges at the time of the plea solely as a result of the defendant's wrongdoing.  Now, this case

1

presents this Court with an excellent opportunity to address the applicability of *Carpenter* to a situation where the defendant obtains a prior negotiated plea to lesser charges through fraud or deception.   It is difficult to conceive of a cleaner and more concise fact pattern that might ever come before this Court allowing it to confront this issue.

The Third District, however, missed the *Carpenter* issue almost completely, citing *Carpenter* only once in its opinion in dicta. [1]  Instead, a 2-1 majority of the lower court found that double jeopardy barred the State from prosecuting Soto for aggravated murder because the State nolled the involuntary manslaughter charge as part of Soto's 2006 plea agreement. The Third District thus extended the Double Jeopardy Clause to cover, for the first time, charges dismissed without prejudice prior to the attachment of jeopardy.  And the court did so by declaring that it considered a dismissal without prejudice as part of a plea agreement the functional equivalent of an acquittal for purposes of double jeopardy.

The lower court erred at almost every step in its opinion.   There was no double jeopardy issue in this case.   Double Jeopardy only precluded the State from prosecuting Soto for the same offense of which he was already convicted.   The only count that Soto was convicted of was child endangering.   Child endangering was not the same offense under a *Blockburger* analysis as aggravated murder.   Instead, the court should have analyzed Soto's case using a *Carpenter* analysis, asking whether Soto had a reasonable expectation of finality in his plea where Soto induced that plea through fraud.   The court did none of this analysis.

---

[1] The lower court noted that the State did not reserve the right to bring additional charges at the time of Soto's 2006 plea.  *See State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 30, citing *Carpenter*.   But the court immediately seemed to declare that issue irrelevant: "Regardless of the status of the record as to any reservation of rights by the State at the original plea * * *."  *Id.*, ¶ 31.   The court did not discuss *Carpenter* any further in its opinion.

2

Instead, the court misapplied double jeopardy principles to a circumstance in which no double jeopardy issue existed, obscuring the *Carpenter* issue at the heart of this case.

The Third District's opinion demonstrates the amount of confusion that apparently exists in Ohio's appellate courts when confronted with *Carpenter* issues.  That opinion creates an entirely new category of double jeopardy protections never recognized in any decisions of the U.S. Supreme Court or of this Court.  And it will have the real world consequence of allowing a man who murdered his son to escape with nothing more than a conviction for child endangering as a result of his own deceit and manipulation of evidence. This Court cannot allow this decision to stand.  This Court must step in and provide clarity to what is, following this case, now a badly confused area of Ohio law.

Accordingly, Amicus Curiae the Cuyahoga County Prosecutor's Office asks this Honorable Court to accept jurisdiction over this case and reverse the Third District's decision, and hereby submits this jurisdictional memorandum pursuant to S.Ct.Prac.R. 7.06.

## STATEMENT OF AMICUS INTEREST

The Cuyahoga County Prosecutor's Office is responsible for all felony prosecutions in common pleas court in Cuyahoga County, Ohio.  The Cuyahoga County Prosecutor's Office has a special interest in this case and its outcome because it is responsible for prosecuting all homicide cases in Cuyahoga County.  The Third District's decision to expand the Double Jeopardy Clause to include counts dismissed without prejudice as part of a plea agreement will have, and is already having, significant repercussions in Cuyahoga County.  That decision risks chilling the willingness of the State to dismiss counts as part of plea bargains, out of concern that the State will be unable to resurrect those charges in the event that either (1) the defendant's plea is later vacated for any reason, or (2) the State learns of additional

3

evidence that would justify the bringing of further charges.  The Cuyahoga County Prosecutor's Office also has an interest in ensuring the uniform application of Ohio law in each of these cases to ensure consistency and to promote confidence in the justice system.

## STATEMENT OF THE CASE AND RELEVANT FACTS

Amicus Curiae the Cuyahoga County Prosecutor's Office hereby adopts and incorporates by reference the Statement of the Case and Facts as set forth by the Appellant, the State of Ohio, in its memorandum in support of jurisdiction.

## LAW AND ARGUMENT

### Arguments in Support of Appellant's First Proposition of Law

There should have been no double jeopardy issue in this case.  The Double Jeopardy Clause establishes three separate constitutional protections:  (1) "against a second prosecution for the same offense after acquittal[,]" (2) "against a second prosecution for the same offense after conviction[,]" and (3) "against multiple punishments for the same offense."  *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969). None of these three things were at issue in this case.  Soto was never "acquitted" of anything. Nor was there any issue of allied offenses ("multiple punishments"), given that this case proceeded as an interlocutory appeal prior to trial. [2]  This left Soto with only the second type of protection afforded by the Double Jeopardy Clause:  protection "against a second prosecution for the same offense after conviction." *Id.*

---

[2] The Third District, misconstruing Soto's *Carpenter* claim as a double jeopardy issue, allowed his appeal to proceed on an interlocutory basis under this Court's decision in *State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23, ¶ 61 ("We hold that an order denying a motion to dismiss on double jeopardy grounds is a final, appealable order").  Had the court correctly treated Soto's claim as a *Carpenter* issue, no authority exists for the proposition that the denial of such a motion is a final, appealable order.

4

The only offense of which Soto was convicted was child endangering. The Third District should have applied a *Blockburger* analysis to determine whether the 2016 prosecution involved that same offense for purposes of double jeopardy. *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 17. Using that *Blockburger* analysis, both child endangering and aggravated murder each contain an element not contained in the other offense. *See State v. Richey*, 64 Ohio St.3d 353, 369, 595 N.E.2d 915 (1992) ("The elements of child endangering are the defendant's custody or control of a child under eighteen and his creation of a substantial risk to the health or safety of the child by violating a duty of care or protection. Aggravated murder is a purposeful killing in the course of one of nine specified felonies, none of which is child endangering. These offenses have entirely different elements"). Accordingly, the only count of which Soto was ever convicted - child endangering - was not an allied offense to aggravated murder under *Blockburger*. This should have been the end of the lower court's double jeopardy analysis.

The Third District could not, as it purported to do, apply a double jeopardy analysis to the involuntary manslaughter count that the State dismissed as part of Soto's 2006 plea agreement. "The protections afforded by the [Double Jeopardy] clause are implicated only when the accused has actually been placed in jeopardy. This state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 97 S. Ct. 1349, 51 L.Ed.2d 642 (1977). Jeopardy does not attach to charges dismissed as part of a plea agreement before the jury is sworn.

> "It is unnecessary to determine whether the charges against the defendant in Cleveland Municipal Court in the present case were lesser included offenses of the charges contained in the felony indictment. For those charges were nolled in accordance with the terms of the plea bargain. The entry of a *nolle prosequi*

> restores an accused to the status of a person against whom charges have never been filed[.]  * * * [N]o jeopardy attaches where a *nolle prosequi* is entered before a jury is sworn."

*State v. Frost*, 8th Dist. Cuyahoga No. 45561, 1983 Ohio App. LEXIS 13860, *3-4 (June 23, 1983).  "Because jeopardy had not attached to the pretrial procedure, the defendant was precluded from asserting a double jeopardy defense."  *State v. Larabee*, 69 Ohio St.3d 357, 359, 632 N.E.2d 511 (1994).

The Third District erred by treating the State's nolle of the involuntary manslaughter count as part of Soto's 2006 plea as the functional equivalent of an acquittal.  *See Soto*, ¶ 23 ("It is our view that the double jeopardy implication of a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal").  A dismissal of charges as part of a plea agreement is *not* equivalent to an acquittal on those charges.  *See Frost*, *4 ("Further, the acceptance of a guilty plea on some counts and the nolle of others, is not functionally equivalent to a verdict of not guilty on the dismissed charges"); *In re M.C.H.*, 5th Dist. Delaware No. 12-CA-131, 2013-Ohio-2649, ¶ 20 ("As jeopardy has not attached and the accused can be re-prosecuted for the same offense, a dismissal or nolle is not the functional equivalent of an acquittal").

By deciding this case as it did, the Third District created a new, fourth category of double jeopardy protections not contemplated or discussed by the Supreme Court in *North Carolina v. Pearce*.  The Third District held, for the first time, that double jeopardy bars a second prosecution for the same offense after a nolle prosequi as part of a plea agreement. And it did so in a case in which the defendant acknowledged that the trial court did not dismiss the charge of involuntary manslaughter with prejudice.  *See Soto*, ¶ 8 ("Soto

contended that the judgment entries and transcripts from that case did not address whether the matter would be dismissed with or without prejudice * * *"); *City of Cleveland v. Primm*, 8th Dist. Cuyahoga No. 104963, 2017-Ohio-7242, ¶ 8 ("When an indictment or citation is dismissed without any indication of whether the dismissal is with or without prejudice, we presume the dismissal to be without prejudice").

To hold, as the Third District did in this case, that double jeopardy now bars successive prosecutions following a dismissal without prejudice would be a dramatic expansion of the Double Jeopardy Clause.  Such a rule would create an entirely new class of protections for criminal defendants never contemplated by the Supreme Court, or by any authority of which the State is aware.  It will prevent prosecutions and would deter the State's willingness to enter into plea bargains.  This Court must accept and reverse this case to correct the Third District's misapplication of Double Jeopardy principles to what should have been a *Carpenter* claim.

### Arguments in Support of Appellant's Second and Third Propositions of Law

It is clear from the Third District's opinion that what the lower court was truly troubled by was the prospect of the State re-indicting a defendant for additional offenses arising from the same incident after a plea:

> "Under any other interpretation, and barring any special exception or reservation in the record, the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense. There would be no finality under such a system and it would render plea agreements largely meaningless."

*Soto*, ¶ 23.  Whether this is a valid concern or not, the Third District did not need to stretch double jeopardy to cover this situation.  The scenario that the Third District described is exactly the fact pattern that this Court addressed in *Carpenter*.  The Third District should

7

therefore have simply applied *Carpenter* to this case.  Had the court done so, its analysis would have been completely different.

In *Carpenter*, at syllabus, this Court held the following:

"The state cannot indict a defendant for murder after the court has accepted a negotiated guilty plea to a lesser offense and the victim later dies of injuries sustained in the crime, unless the state expressly reserves the right to file additional charges on the record at the time of the defendant's plea."

Significantly, however, *Carpenter* "is not based on the Double Jeopardy Clause of the Constitution, but on contract law."  *City of Cleveland v. Evans*, 8th Dist. Cuyahoga No. 100721, 2014-Ohio-4567, ¶ 32.  "The holding in *Carpenter* is essentially a synthesis of contract and criminal law in a particular factual setting."  *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 11; *see also State v. Dye*, 127 Ohio St.3d 357, 2010-Ohio-5728, 939 N.E.2d 1217, ¶ 30 (Lundberg Stratton, J., dissenting) ("At the outset, the holding in *Carpenter* is not compelled by the Double Jeopardy Clause").

The crucial inquiry in any *Carpenter* claim is whether the defendant had an objectively reasonable expectation that his plea would terminate prosecution for all pending or future crimes arising from the incident.  This Court premised its decision in *Carpenter* on its finding that "under the circumstances of that case, the defendant reasonably 'anticipated that by pleading guilty to attempted felonious assault, and giving up rights which may have resulted in his acquittal, he was terminating the incident and could not be called on to account further on any charges regarding this incident.'"  *Zima*, ¶ 11, quoting *Carpenter* at 61-62.  "The key to the continued validity of the plea agreement in *Carpenter* was the reasonableness of the defendant's expectation that the prosecution would end[.]"  *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 43.

8

A defendant cannot have an objectively reasonable expectation of finality in his plea agreement where the defendant obtains that agreement through fraud.  It is undisputed in this case that Soto lied to authorities and concealed evidence of his own crimes to obtain the benefit of a more favorable plea.  This included his physical manipulation of the crime scene to stage the appearance of an ATV accident.  Any expectation of finality is not objectively reasonable where the defendant enters into a plea agreement in bad faith, intending to deceive the State into offering a more lenient bargain.

The prosecution's knowledge at the time of the plea is also "critical."  *Zima*, ¶ 12. *Carpenter* only applies where, at the time of the plea, "the prosecutor has knowledge of and jurisdiction over all [the] offenses[.]"  *Id.*, ¶ 13, quoting *State v. Lordan*, 116 N.H. 479, 482, 363 A.2d 201 (1976).  In *Carpenter*, "the state was aware that the defendant's victim was likely to die of the injuries inflicted by the defendant[.]"  *Harrison*, ¶ 40.  Absent that knowledge, State would not be on an equal footing with the defendant to reach an agreement to resolve all of the charges.  The defendant in that circumstance could not reasonably expect that his plea would do so.

It was only because "the prosecutor and the court had jurisdiction over all the charges, both actual and potential," that "the defendant's expectation that his guilty plea would terminate the incident was inherently justified[.]"  *Zima*, ¶ 12.  The State did not have that knowledge in this case, and did not have it because Soto manipulated evidence by staging the ATV accident and lying to authorities.

A defendant should not be allowed to benefit from the wrongfulness of his own acts; from his deceit of law enforcement authorities; and from his own bad faith in plea negotiations.  In this case, the defendant entered into a plea agreement with the fingers of

9

one hand crossed behind his back.  This Court should not countenance these tactics, which will have a subversive and chilling effect on the willingness of prosecutors to enter into plea bargains to anything less than the indictment.  "[F]or where fraud or collusion is practiced on a court, the court ceases to function as a court and its judgment becomes an official stamp lent to the subversive intentions of the abusing parties." *Van DeRyt v. Van DeRyt*, 6 Ohio St.2d 31, 36, 215 N.E.2d 698 (1966).

The trial court rightly refused to allow Soto to take advantage of his own misconduct and deception.  The Third District erred by reversing that decision and by misapplying double jeopardy law to do so.  This Court should accept jurisdiction over this case and hold that a defendant does not have an objectively reasonable expectation of finality in a plea agreement under *State v. Carpenter* where the State was unaware of the factual basis for additional charges at the time of the plea solely as a result of the defendant's wrongdoing.

## **CONCLUSION**

Amicus Curiae the Cuyahoga County Prosecutor's Office therefore submits that this case is worthy of Supreme Court review and respectfully asks this Honorable Court to accept jurisdiction and reverse the Third District's decision.

Respectfully submitted,
MICHAEL C. O'MALLEY
CUYAHOGA COUNTY PROSECUTOR

 */s/ Christopher D. Schroeder*
CHRISTOPHER D. SCHROEDER (0089855)
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113
(216) 443-7733
cschroeder@prosecutor.cuyahogacounty.us

10

## **CERTIFICATE OF SERVICE**

A copy of the foregoing *Memorandum in Support of Jurisdiction of Amicus Curiae the Cuyahoga County Prosecutor's Office* was served by email this 21st day of March, 2018 to Joseph Benavidez (joebenavidez138@gmail.com), counsel for Defendant-Appellee Travis Soto.

　　　　　　　　　　　　　　　 */s/ Christopher D. Schroeder*
　　　　　　　　　　　　　　　Christopher D. Schroeder (0089855)
　　　　　　　　　　　　　　　Assistant Prosecuting Attorney

11



**The Supreme Court of Ohio**

FILED

MAY 23 2018

CLERK OF COURT
SUPREME COURT OF OHIO

State of Ohio                    Case No. 2018-0416

    v.                    E N T R Y

Travis Soto


      Upon consideration of the jurisdictional memoranda filed in this case, the court accepts the appeal. The clerk shall issue an order for the transmittal of the record from the Court of Appeals for Putnam County, and the parties shall brief this case in accordance with the Rules of Practice of the Supreme Court of Ohio.

    (Putnam County Court of Appeals; No. 12-17-05)


Maureen O'Connor
Chief Justice


**The Official Case Announcement can be found at http://www.supremecourt.ohio.gov/ROD/docs/**

Supreme Court of Ohio Clerk of Court - Filed July 03, 2018 - Case No. 2018-0416

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. 2018-0416 |
| APPELLANT | : | ON APPEAL FROM PUTNAM COUNTY COURT OF APPEALS, |
| v. | : | THIRD APPELLATE DISTRICT |
| TRAVIS SOTO | : | COURT OF APPEALS CASE NO. 12-17-05 |
| APPELLEE. | : | |

## MERIT BRIEF OF APPELLANT STATE OF OHIO

Gary L. Lammers (#0042040) (Counsel of Record)
Putnam County Prosecuting Attorney
336 East Main Street
Ottawa, Ohio 45875
Phone: (419) 523-3600
Fax: (419) 523-4519
gary.lammers@putnamcountyohio.gov

COUNSEL FOR APPELLANT
STATE OF OHIO

Carly M. Edelstein (#0095950)
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215
614-752-70339
Fax No. 614-752-5167
carly.edelstein@opd.ohio.gov

COUNSEL FOR APPELLEE
TRAVIS SOTO

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE AND FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Proposition of Law No. 1:  Involuntary Manslaughter with a
    child endangering predicate in violation of ORC 2903.04(A)
    is not the same offense for double jeopardy purposes as
    Aggravated Murder in violation of ORC 2901.01(C) or Murder
    with a felonious assault predicate in violation of ORC 2903.02 (B)
    under the *Blockburger* "same offense" test . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Proposition of Law No. 2:  Additional facts necessary to sustain
    a new charge that have not been discovered despite the exercise of
    due diligence acts as an exception to *Blockburger* to allow
    subsequent prosecution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    Proposition of Law No. 3: A negotiated plea does not bar
    successive prosecutions where the defendant would not reasonably
    believe that his or her plea would bar further prosecutions for any
    greater offense related to the same factual scenario . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

ii

APPENDIX                                                                    Appx. Page

Notice of Appeal to the Ohio Supreme Court
(March 19, 2018)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-1

Judgment Entry of the Third District Court of Appeals
(February 5, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-3

Opinion of the Third District Court of Appeals
(February 5, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-4

Judgment Entry of the Putnam County Common Pleas Court
(April 13, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-24

CONSTITUTIONAL PROVISIONS, STATUTES:

5th Amendment of the U.S. Constitution . . . . . . . . . . . . . . . . . . . . . . . . . .   A-30

R.C. 2903.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-31

R.C. 2903.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-32

R.C. 2903.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-33

R.C. 2919.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   A-34

iii

TABLE OF AUTHORITIES

Page

CASES:

*Ashe v Swenson* (1970), 397 U.S. 436, 90 S. Ct. 1189, 25 L Ed. 2d 469 . . . . . . . . . 4,13

*Benton v. Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969) . . . . . . 5

*Blockburger v. United States* (1932), 284 U.S. 299, 52 S. Ct. 180, 76 L Ed 306. . . . 6

*Brown v. Ohio* (1977), 432 U.S. 161, 97 S. Ct. 2221, 53 L. Ed. 2d 187 . . . . . . . . . . 13

*Carmody* v. *Seventh Judicial District* (1965), 81 Nev. 83, 398 P. 2d 706 . . . . . . . . 13

*Castlebrook, Ltd. v Dayton Properties Ltd. Partnership*, 78 Ohio App. 3d 340, 604 N.E. 2d 808 (2nd Dist. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Centers* v. *Commonwealth* (Ky. 1958), 318 S.W. 2d 57 . . . . . . . . . . . . . . . . . . . . 13

*Commonwealth, ex rel. Papy*, v.. *Maroney* (1965), 417 Pa. 368, 207 A. 2d 814 . . . 13

*Diaz v. United States* (1912), 223 U.S. 442, 32 S. Ct. 250, 56 L. Ed. 500 . . . . . . . . 4

*Grady v. Corbin*, (1990), 10 S. Ct. 2084, 110 S. Ct. 2084, 109 L. Ed. 2d 548. . . . . . 4,13

*In re M.C.H.*, 5th Dist. Delaware No. 12-CA-131, 2013-Ohio-2649 . . . . . . . . . . . . . 9

*North Carolina v. Pearce* (1969), 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L.Ed. 2d 656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Southworth* v. *State* (1929), 98 Fla. 1184, 125 So. 345 . . . . . . . . . . . . . . . . . . . . . . 13

*State v. Bridges*, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480 . . . . . . . . . . . . 14

*State v. Brown*, 119 Ohio St. 3d 447, 2008–Ohio–4569, 895 N.E. 2d 149 . . . . . . . . 5

*State v. Carpenter*, 68 Ohio St. 3d 59, 1992-Ohio-226 . . . . . . . . . . . . . . . . . . . . . . . 4,14

*State v. Crago*, 53 Ohio St. 3d 243, 559 N. E. 2d 1353 (1990) . . . . . . . . . . . . . . . . 7

*State v. Davis* (1983), 6 Ohio St. 3d 91,95, 6 Ohio B. 131, 451 N.E.2d 772 . . . . . 11,12

*State v. Deem* (1988), 40 Ohio St. 3d 205, 533 N. E. 2d 294 . . . . . . . . . . . . . . . . . . . 12

iv

*State v. Delfino*, 22 Ohio St. 3d 270, 273, 2 Ohio B. 443, 490 N.E. 2d 884 (1986) . . 6

*State v. Dye*, 127 Ohio St. 3d 357, 2010-Ohio-578, 939 N. E. 2d 1217 . . . . . . . . . . 15

*State v. Evans*, 122 Ohio St. 3d 381, 2009 Ohio 2974, 911 N.E. 2d 889 . . . . . . . . . . 11

*State v. Frost*, 8th Dist. Cuyahoga No. 45561, 1983 Ohio App. LEXIS 13860
(June 23, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Kidder* (1987), 32 Ohio St. 3d 279, 281, 513 N.E. 2d 311 . . . . . . . . . . . . . . 11,12

*State v. Larabee*, 69 Ohio St.3d 357, 359, 632 N.E.2d 511 (1994) . . . . . . . . . . . . . . 9

*State v. Lynch*, 98 Ohio St. 3d 514, 2003- Ohio-2284 . . . . . . . . . . . . . . . . . . . . . . . . 11

*State v. Liberatore*, 4 Ohio St. 3d 13, 14, 4 Ohio B. 11, 445 N.E. 1116 (1983) . . . . . 5

*State v. Martello*, 97 Ohio St. 3d 398, 2002–Ohio–6661, 780 N. E. 2d 250 . . . . . . . . 6

*State v. Gustafson*, 76 Ohio St. 3d 425, 432, 1996 Ohio 299, 668 N.E. 2d 435 (1996) 11

*State v. Mills* (Nov. 1, 1990), 3d Dist. No. 1-89-45, 1990 Ohio App. LEXIS 4797 . . . 11

*State v. Moore* (1996), 110 Ohio App.3d 649,  675 N.E. 2d 13, 1996 Ohio App.
LEXIS 1599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State v. Morris,* 132 Ohio St. 3d 337, 2012-Ohio-2407, 972 N.E.2d 528 . . . . . . . . . . 5

*State v. Resor*, 2010 Ohio 397, 2010 Ohio App. LEXIS 310, 2010 WL 415414. . . . . . 4,10

*State v. Richey* (1992), 64 Ohio St.3d 353, 369, 595 N.E.2d 915 . . . . . . . . . . . . . . . . . . 8

*State v. Thomas* (1980), 61 Ohio St.2d 254, 400 N. E. 2d 897, 1980 LEXIS 647 . . . . 4,12

*State v. Tolbert* (1991), 60 Ohio St.3d 89, 593 N.E. 2d 614, 1991 Ohio App.
LEXIS 1255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State v. Wilkins* (1980), 64 Ohio St. 2d 382, 387, 415 N. E. 2d 303 . . . . . . . . . . . . . . 12

*State v. Zima* (2004), 102 Ohio St. 3d 61,2004-Ohio-1807, 806 N.E. 2d 542, 2004
Ohio LEXIS 876 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,14,15

*United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556, (1993) 7

*United States v. Jorn, 400 U.S.470, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971)* . . . . . . . . . . 5

*United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 97 S. Ct. 1349, 51 L.Ed.2d 642 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

STATUTES:

R.C. 2919.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,6,7,8

R.C. 2903.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7,8

R.C. 2903.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,7

R.C. 2903.04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

R.C. 2903.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

R.C. 2905.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

R.C. 2921.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

### STATEMENT OF THE CASE AND FACTS

On or about the 23rd day of January 2006 at 5:38 pm, a 911 call was made to the Putnam County Sheriff's office in reference to a code situation involving a two year old boy after being run over by a 4 wheeler. The child, Julio Baldazo, was taken by Continental EMS to the Putnam County Ambulatory Care Center where the child was pronounced dead. The child's death was investigated by the Putnam County Sheriff's Office. The Appellee through interviews stated that he was at home with his 2 year old son throughout the morning and that everything was fine.  At noon, the child's mother, Lucy Baldazo, came home from work to have lunch and she left at 12:50 to go back to work. The mother stated her son was fine when she left.  The Appellee told authorities after Ms Baldazo left, he got on the computer and at around 2 pm, messaged the child's maternal grandmother that Julio wanted to go outside and play.  The Appellee first stated he was riding a 4 wheeler and accidentally ran over the child as he came around a corner of an outbuilding.   The Appellee later changed his account stating that he was giving Julio a ride on the 4 wheeler on the railroad bed adjoining the property and that Julio fell off the 4 wheeler and he ran over him striking him with the 4 wheeler.

After striking him with the 4 wheeler, Appellee stated he picked Julio up off the ground, carried him inside the house, cleaned him up, changed his clothes and rocked Julio until he stopped crying whereupon he put Julio to bed.  After putting the 4 wheeler away, Appellee checked on Julio and discovered that Julio was not breathing.  It wasn't until 2 to 3 hours later when Julio's mother, Lucy Baldazo, came home that Appellee advised her that Julio wasn't with them anymore. Lucy Baldazo immediately went to check on Julio, found him unresponsive and called 911.

1

On January 24, 2006, an autopsy was done by Dr. Cynthia Bisser of the Lucas County Coroner's office. Dr. Bisser concluded that the injuries were consistent with the history given of it, that the child died from internal injuries and that the time of death was not at the moment of impact but rather 1 to 2 hours thereafter.

Appellee was indicted on March 31, 2006, for Child Endangering by creating a substantial risk of harm to his son which resulted in actual serious physical harm in violation of R.C. 2919.22(A) (E) (1) (c), a felony of the 3rd degree, and Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering, in violation of R.C. 2903.04(A), a felony of the 1st degree.

The factual basis of both counts relied heavily on Appellee's representations to law enforcement as the sole witness describing the cause of death by way of an ATV accident wherein Appellee was the driver and struck his son and the conclusion of the Lucas County Coroner's office who conducted the autopsy given Appellee's version of the events, and concluded the child died of multiple blunt force trauma caused by an ATV accident.

On August 31, 2006, Appellee entered into a negotiated plea whereby he pled guilty to Child Endangering, the Involuntary Manslaughter charge was dismissed, and he was sentenced to five (5) years incarceration. The Appellee served and completed his sentence thereafter.

On July 25, 2016, Appellee voluntarily appeared at the Putnam County Sheriff's Office, indicated he wanted to provide the truthful account of what occurred regarding his son , Julio, and proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, and

2

reports from 2006 and present, were reviewed by Dr. Randall Schlievert, a pediatric abuse specialist qualified as an expert multiple times by the Putnam County Common Pleas Court. Dr. Schlievert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son, and importantly concluded that Defendant's 2006 misrepresentations led to the reasonable yet faulty conclusions of the Lucas County Coroner.

Appellee was then indicted on August 12, 2016 for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C).

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

On October 11, 2016, the Appellee filed a Motion to Dismiss based on the grounds of double jeopardy. On April 13, 2017, the Trial Court overruled the Appellee's Motion to Dismiss finding that, in applying the *Blockburger* test, the 2016 Aggravated Murder charge requires proof of two different elements from Involuntary Manslaughter and that the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault

3

predicate. *See State v. Resor, 2010 Ohio 397.* The Trial Court also found that an exception to *Blockburger* existed in this case, stating that the facts necessary to support the 2016 indictment could not have been discovered despite the exercise of due diligence until additional evidence was uncovered such as the Appellee's appearance and confession and the new medical examiner's report. See *Grady v. Corbin,* [1990], 10 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161,169; *Ashe v Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

On May 2, 2017, the Appellee appealed the Trial Court's ruling to the Third District Court of Appeals. On February 5, 2018, the Third District Court of Appeals issued their opinion reversing the trial court's decision based on the United States Supreme Court's holding in *Blockburger* and the Ohio Supreme Court's ruling in *Thomas*, finding that Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder and would prevent a subsequent prosecution for Aggravated Murder and Murder in these circumstances. The Appellate Court also ruled that the exception to *Blockburger* allowing a subsequent prosecution if additional facts necessary to sustain a charge have not occurred or have not been discovered despite the exercise of due diligence did not apply in this case. The Appellate Court also concluded that because the state did not reserve the right to bring additional charges regarding the child's death at the time of the plea, the state was foreclosed from doing so based on the holding of *State v. Carpenter,* 68 Ohio St. 3d 59, 1992-Ohio-226.

On March 19, 2018, the Appellant, State of Ohio, filed their Notice of Appeal and on May 23, 2018, this Court accepted the within appeal.

4

## ARGUMENT IN SUPPORT OF PROPOSITION OF LAW

**Proposition of Law No. 1**:  Involuntary Manslaughter with a
child endangering predicate in violation of ORC 2903.04(A)
is not the same offense for double jeopardy purposes as
Aggravated Murder in violation of ORC 2901.01(C) or Murder
with a felonious assault predicate in violation of ORC 2903.02 (B)
under the *Blockburger* "same offense" test.

Appellate courts review de novo the denial of a motion to dismiss an indictment
on the grounds of double jeopardy, because it is a pure question of law. *See State v.
Morris*, 132 Ohio St. 3d 337, 2012- Ohio-2407. 972 N.E. 2d 528, *paragraph 16*, citing
*Castlebrook, Ltd. v Dayton Properties Ltd. Partnership*, 78 Ohio App. 3d 340, 346, 604
N.E. 2d 808 ( 2nd Dist. 1992).

Where successive prosecutions are at stake, the double jeopardy guarantee serves
a "a constitutional policy of finality for the defendants benefit." *State v. Liberatore*, 4
Ohio St. 3d 13, 14, 4 Ohio B. 11, 445 N.E. 1116 (1983), quoting *United States v. Jorn*,
400 U. S. 470, 479, 91 S.Ct. 547, 27 L.Ed. 2d 543 (1971).

The double jeopardy clause of the Fifth Amendment of the United States
Constitution provides that no person shall "be subject for the same offense to be twice put
in jeopardy of life or limb." Through the 14th amendment to the United States
Constitution, this protection applies to individuals prosecuted by the state of Ohio. *State
v. Brown*, 119 Ohio St. 3d 447, 2008 – Ohio – 4569, 890 5N. E.2d 149, ¶ 10, citing
*Benton v. Maryland*, 395 U.S. 784, 786, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). The
Ohio Constitution provides "no person shall be twice put in jeopardy for the same
offense." Ohio Constitution, article 1, section 10. The protections afforded by the Ohio
and United States constitutions Double Jeopardy Clause are coextensive. *State v.*

5

*Martello*, 97 Ohio St. 3d 398, 2002 – Ohio – 6661, 780 N. E. 2d 250 ¶ 7, citing *State v. Gustafson*, 76 Ohio St. 3d 425, 432, 1996 Ohio 299, 668N. E. 2d 435 (1996).

The Double Jeopardy Clause establishes three separate constitutional protections: (1) "against a second prosecution for the same offense after acquittal[,]" (2) "against a second prosecution for the same offense after conviction[,]" and (3) "against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969); *State v. Moore* (1996), 110 Ohio App.3d 649.

In the within case, the first and third protections are not applicable as there was no acquittal nor multiple punishments for the same offense. The only protection at issue in this case is the protection against a second prosecution after conviction, specifically, prosecution for aggravated murder and murder after conviction for the offense of Child Endangering in violation of Ohio Revise Code Section 2919.22 (A)/(E)(1)(c).

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61: See also *State v. Delfino*, 22 Ohio St. 3d 270, 273, 2 Ohio B. 443, 490 N.E. 2d 884 (1986). Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas*

6

(1980), 61 Ohio St.2d 254, 259, overruled on other grounds, *State v. Crago*, 53 Ohio St. 3d 243, 559 N. E. 2d 1353 (1990), syllabus.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*. The United States Supreme Court has summarized the *Blockburger* test as an inquiry that asks "whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double Jeopardy bars additional punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556, (1993).

In this case, Appellee was originally indicted on March 31, 2006 on a charge of Involuntary Manslaughter with a child endangering predicate in violation of 2919.22 (A) & (E)(1)(c) in violation of Ohio Revised Code Section 2903.04 (A), a felony of the first degree and a separate charge of child endangering in violation of 2919.22 (A) & (E)(1)(c), a felony of the third degree.

As a result of a negotiated plea, Appellee pled to the child endangering charge and the involuntary manslaughter was dismissed. Appellee received and completed a five year sentence and, several years after his release and completion of post release control, Appellee gave a voluntary confession stating he intentionally punched and killed his son.

Appellee was indicted on new charges including, but not limited to, Aggravated Murder in violation of Ohio Revised Code Section 2903.01(C), an unclassified felony and Murder in violation of Ohio Revised Code Section 2903.02(B), Murder, an unclassified felony.

7

After completing the Blockburger analysis and comparing the elements of child endangering under ORC 2919.22 (A) & (E)(1)(c) to that of aggravated murder under ORC 2903.01(C), it is clear that each offense requires proof of an element not contained in the other. Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the victim being under the age of thirteen years which are elements not required or included in the original prosecution of Child Endangering. Meanwhile, child endangering requires different elements in that the offender has to be a parent, guardian or custodian, person having custody or control or a person in loco parentis and has to violate a duty of care, protection or support. *See State v. Richey*, 64 Ohio St.3d 353, 369, 595 N.E.2d 915 (1992) ("The elements of child endangering are the defendant's custody or control of a child under eighteen and his creation of a substantial risk to the health or safety of the child by violating a duty of care or protection. Aggravated murder is a purposeful killing in the course of one of nine specified felonies, none of which is child endangering. These offenses have entirely different elements"). Hence, Double Jeopardy does not prohibit the prosecution of this new charge of aggravated murder.

The same result is true when comparing the elements of child endangering and murder. Murder requires the proof of an offense of violence while child endangering requires different elements in that the offender has to be a parent, guardian or custodian, person having custody or control or a person in loco parentis and has to violate a duty of care, protection or support.

This *Blockburger* analysis should have been the end of the court of appeal's double jeopardy review as the Involuntary Manslaughter was dismissed by the state prior to jeopardy attaching. The Third District could not, as it purported to do, apply a double jeopardy analysis to the involuntary manslaughter count that the State dismissed as part of

8

Soto's 2006 plea agreement. "The protections afforded by the [Double Jeopardy] clause are implicated only when the accused has actually been placed in jeopardy. This state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 97 S. Ct. 1349, 51 L.Ed.2d 642 (1977). Jeopardy does not attach to charges dismissed as part of a plea agreement before the jury is sworn. The Third District could not, as it purported to do, apply a double jeopardy analysis to the involuntary manslaughter count that the State dismissed as part of Soto's 2006 plea agreement. "The protections afforded by the [Double Jeopardy] clause are implicated only when the accused has actually been placed in jeopardy. This state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 97 S. Ct. 1349, 51 L.Ed.2d 642 (1977). Jeopardy does not attach to charges dismissed as part of a plea agreement before the jury is sworn.

"It is unnecessary to determine whether the charges against the defendant in Cleveland Municipal Court in the present case were lesser included offenses of the charges contained in the felony indictment. For those charges were nolled in accordance with the terms of the plea bargain. The entry of a *nolle prosequi* restores an accused to the status of a person against whom charges have never been filed[.] * * * [N]o jeopardy attaches where a *nolle prosequi* is entered before a jury is sworn."

*State v. Frost*, 8th Dist. Cuyahoga No. 45561, 1983 Ohio App. LEXIS 13860, *3-4 (June 23, 1983). "Because jeopardy had not attached to the pretrial procedure, the defendant was precluded from asserting a double jeopardy defense." *State v. Larabee*, 69 Ohio St.3d 357, 359, 632 N.E.2d 511 (1994).

A dismissal of charges as part of a plea agreement is *not* equivalent to an acquittal on those charges. *See Frost*, *4 ("Further, the acceptance of a guilty plea on some counts and the nolle of others, is not functionally equivalent to a verdict of not guilty on the dismissed charges"); *In re M.C.H.*, 5th Dist. Delaware No. 12-CA-131, 2013-Ohio-2649, ¶ 20 ("As

9

jeopardy has not attached and the accused can be re-prosecuted for the same offense, a dismissal or nolle is not the functional equivalent of an acquittal").

The Third District erred by treating the State's nolle of the involuntary manslaughter count as part of Soto's 2006 plea as the functional equivalent of an acquittal.

Nevertheless, even if the *Blockburger* test is applied to the dismissed involuntary manslaughter charge and the elements of that offense are compared to the aggravated murder and murder, the B*lockburger* analysis shows each offense contains an element not contained in the other and, as a result, Double Jeopardy will not bar prosecution of the charge of these charges.

*State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to involuntary manslaughter and murder. In that case, the court found:

> Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:
>
> "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."
>
> The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).
>
> Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:
>
> "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."
>
> The felony alleged is child endangering[.]
>
> * * *
>
> With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an

10

offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate.

Appellant does recognize that this Court has held that Involuntary Manslaughter is a lesser included offense of both Aggravated Murder and Murder. *State v. Lynch*, 98 Ohio St. 3d 514, 2003- Ohio-2284. However, it is important to note and to distinguish those cases from the within case as those cases involved a Defendant charged with aggravated murder and/or murder and the Defendant wanted the Court to provide an instruction on Involuntary manslaughter as a lesser included offense.

To determine whether a criminal defendant was entitled to a jury instruction (charge) on a lesser included offense requires a two-step analysis. *State v. Davis* (1983), 6 Ohio St. 3d 91,95, 6 Ohio B. 131, 451 N.E. 2d 772: *State v. Kidder* (1987), 32 Ohio St. 3d 279, 281, 513 N.E. 2d 311. See, also, *State v. Mills* (Nov. 1, 1990), 3d Dist. No. 1-89-45, 1990 Ohio App. LEXIS 4797. First, the reviewing court must determine whether the one offense is, in fact, a lesser included offense of the other offense. An offense is a lesser included offense if: (1) one offense carries a greater penalty than the other; (2) some element of the greater offense is not required to prove commission of the lesser offense; and (3) the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed. *State v. Evans*, 122 Ohio St. 3d 381, 2009 Ohio 2974, 911 N.E. 2d 889, P26 (clarifying the three-part test set forth

11

in *State v. Deem* (1988), 40 Ohio St. 3d 205, 533 N. E. 2d 294). Second, the reviewing court must determine whether the trial court was obligated to give a jury instruction on the lesser included offense under the specific facts of the case. *Davis*, 6 Ohio St. 2d at 95-96, citing *State v. Wilkins* (1980), 64 Ohio St. 2d 382, 387, 415 N. E. 2d 303. "[A] charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser included offense." *State v. Thomas* (1988), 40 Ohio St. 3d 213, 216, 533 N. E. 2d 286, citing *Kidder*, 32 Ohio St. 3d at 281; *Davis*, 6 Ohio St. 3d 91, 6 Ohio B. 131, 451 N.E.2d 772; *Wilkins*, 64 Ohio St. 2d 382, 415 N.E. 2d 303.

In those circumstances, rather than analyzing the charges under the "same elements" test under *Blockburger* for double jeopardy purposes, the Court correctly focused on applying the lesser included test in determining whether or not to give a lesser included offense instruction. Id.   The tests and the analysis required in these circumstances are different and do not automatically result in the same outcome as demonstrated in the *Resor* case noted above. The fact that one can conclude involuntary manslaughter is a lesser included offense under the lesser included test but not be same offense under *Blockburger* is clear when correctly applying the applicable test.

As a result of these facts and principles in law, it is clear that the appellate court erred in finding that the new charges of aggravated murder and murder were barred by double jeopardy.

> **Proposition of Law No. 2**:  **Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to *Blockburger* to allow subsequent prosecution.**

12

An exception to the *Blockburger* test exists where the state is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus. The courts have long held that where a fact necessary to the commission of one offense occurs after the defendant has been convicted of another offense, multiple prosecutions are not barred by the Double Jeopardy Clause. The cases seem to be unanimous on this point. See, *e.g., Carmody* v.. *Seventh Judicial District* (1965), 81 Nev. 83, 398 P. 2d 706; *Commonwealth, ex rel. Papy,* v.. *Maroney* (1965), 417 Pa. 368, 207 A. 2d 814; *Centers* v.. *Commonwealth* (Ky. 1958), 318 S.W. 2d 57; *Southworth* v.. *State* (1929), 98 Fla. 1184, 125 So. 345.

In this case, the facts necessary to support the 2016 Grand Jury Indictment could not have been discovered despite the exercise of due diligence until Defendant appeared and confessed to the actual details of his son's death. The 2006 investigation relied heavily on Defendant's assertions of what occurred since Defendant was the only person present when the facts giving rise to his son's death occurred. The Appellee's account was fully vetted by Appellant and Appellant's due diligence is further evidenced by the Lucas County Coroner's findings that Julio's death was caused by the trauma suffered by being struck by a 4 wheeler.  Thereafter, Dr. Schlievert's report dated September 30, 2016, highlights the reasonableness of the investigative conclusions in 2006 as follows:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their

13

children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures **are the** most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

… What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

Hence, the false narrative led to a false medical diagnosis. As such, the facts necessary to support this subsequent prosecution could not have been discovered until July 2016 despite the exercise of due diligence.

**Proposition of Law No. 3**: **A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario.**

In *State v. Carpenter*, 68 Ohio St.3d 59, 623 N.E.2d 66 (1993), this Court held that the State cannot indict a defendant for murder after the defendant has entered a negotiated guilty plea to a lesser offense unless the State expressly reserves the right to bring further charges at the time of the plea. It was further determined that the *Carpenter* ruling only applies where, at the time of the plea, "the prosecutor has knowledge of and jurisdiction over all [the] offenses[.]" *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 13. Similarly, it has been held that a negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480. It is clear that *Carpenter* and these related holdings are essentially a synthesis of contract and criminal law in a particular setting. *State v Zima*,

14

102 Ohio St 3d 61, 2004-Ohio-1807. 806 N. E. 2d 542,¶11; see also *State v. Dye*, 127 Ohio St . 3d 357, 2010-ohio-5728, 939 N.E. 2d 1217, ¶30 (Lundberg Stratton, J., dissenting) ("At the outset, the holding in *Carpenter* is not compelled by the Double Jeopardy Clause").

The Appellee cannot have an objectively reasonable expectation of finality in his plea where Appellee obtains that agreement through fraud unbeknownst to the Appellant. Any expectation of finality is not objectively reasonable where the Appellee enters in to a plea agreement in bad faith, intending to deceive the State into offering a more lenient bargain.

It is clear that the knowledge of the facts the parties had at the time of the plea negotiations and the negotiated plea are crucial in the analysis of these types of cases and in this case in particular. The prosecution did not have that knowledge in this case, and did not have it because Soto intentionally and fraudulently concealed it. Appellee staged the ATV accident and lied to authorities.

In light of these facts, Appellee could not have a reasonable expectation that his plea would terminate prosecution of all pending or future crimes arising from the incident. The Appellee could not have reasonably believed that his 2006 negotiated plea to a charge based on his false narrative of the events which was fully vetted by Appellant in the exercise of due diligence would bar prosecution of subsequent charges based on a truthful narrative of the events, and which further transformed the case from one of an accidental death to a purposeful homicide. The 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge simply does not prohibit a successive prosecution on the greater offenses of Aggravated Murder and/or Murder under the circumstances of this case.

15

<u>CONCLUSION</u>

For the reasons discussed above, this Honorable Court should reverse the decision

of the Third District Court of Appeals and remand the matter back to the Trial Court.

Respectfully submitted,

Gary L. Lammers (#0042040)
Putnam County Prosecuting Attorney
(COUNSEL OF RECORD)

COUNSEL FOR APPELLANT
STATE OF OHIO

336 E. Main Street
Ottawa, Ohio 45875
(419) 523-3600
(419) 523-4519 - Fax
email: gary.lammers@putnamcountyohio.gov

16

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Merit Brief of Appellant State of

Ohio was served by ordinary U. S. Mail on this 2nd day of July, 2018 upon the following

counsel of record:

Carly M. Edelstein (#0095950)
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215
614-752-70339
Fax No. 614-752-5167
carly.edelstein@opd.ohio.gov

COUNSEL FOR APPELLEE
TRAVIS SOTO

Gary L. Lammers (#0042040)

17

**APPENDIX**

Supreme Court of Ohio Clerk of Court - Filed March 19, 2018 - Case No. 2018-0416

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | ON APPEAL FROM PUTNAM COUNTY COURT OF APPEALS, |
| APPELLANT | : | THIRD APPELLATE DISTRICT |
| v. | : | COURT OF APPEALS CASE NO. 12-17-05 |
| TRAVIS SOTO | : | |
| APPELLEE. | : | |

## NOTICE OF APPEAL OF APPELLANT STATE OF OHIO

Gary L. Lammers (#0042040) (Counsel of Record)
Putnam County Prosecuting Attorney
336 East Main Street
Ottawa, Ohio 45875
Phone: (419) 523-3600
Fax: (419) 523-4519
gary.lammers@putnamcountyohio.gov

COUNSEL FOR APPELLANT
STATE OF OHIO

Joseph Benavidez
212 N. Elizabeth Street #322
Lima, Ohio 45801
419-228-0189
Fax No. 419-228-3367

COUNSEL FOR APPELLEE
TRAVIS SOTO

A-1

**NOTICE OF APPEAL OF APPELLANT STATE OF OHIO**

Appellant, State of Ohio, hereby gives notice of appeal to the Supreme Court of Ohio from the judgment of the Putnam County Court of Appeals, Third Appellate District, entered in Court of Appeals Case No. 12-17-05

This case raises a substantial constitutional question and is one of public or great general interest.

Respectfully Submitted,

Gary L. Lammers (#0042040)
COUNSEL FOR APPELLANT
STATE OF OHIO

**CERTIFICATE OF SERVICE**

I certify that a copy of this Notice of Appeal was sent by ordinary mail to counsel for Appellee, Joseph Benavidez, 212 N. Elizabeth Street, #322, Lima, Ohio 45801, on the 19th day of March, 2018.

Gary L. Lammers (#0042040)
COUNSEL FOR APPELLANT
STATE OF OHIO

ii
A-2

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,        CASE NO. 12-17-05

    v.

TRAVIS SOTO,               J U D G M E N T
                              E N T R Y

    DEFENDANT-APPELLANT.

For the reasons stated in the opinion of this Court, the assignment of error is sustained and it is the judgment and order of this Court that the judgment of the trial court is reversed with costs assessed to Appellee for which judgment is hereby rendered. The cause is hereby remanded to the trial court for further proceedings and for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27, and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

                                    JUDGE

                                    JUDGE

                       ZIMMERMAN, J., DISSENTS
                       JUDGE

DATED:   February 5, 2018

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### PUTNAM COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO. 12-17-05

    v.

TRAVIS SOTO,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 2016 CR 57

Judgment Reversed and Cause Remanded

Date of Decision: February 5, 2018

APPEARANCES:

    *Michael J. Short* for Appellant

    *Lillian R. Shun* for Appellee

A-4

Case No. 12-17-05

**SHAW, J.**

{¶1} Defendant-appellant, Travis Soto ("Soto"), brings this appeal from the April 13, 2017, judgment of the Putnam County Common Pleas Court denying Soto's motion to dismiss on the grounds of double jeopardy.

*Relevant Facts and Procedural History*

{¶2} On or about January 23, 2006, Soto's toddler son was killed.  Soto represented to law enforcement and the Lucas County Coroner that his son was struck while Soto was driving an all-terrain vehicle ("ATV") and that his son died as a result.  Consistent with Soto's representations to law enforcement, the coroner concluded that the child died of blunt force trauma caused by an ATV accident.

{¶3} On March 31, 2006, Soto was charged with Child Endangering in violation of R.C. 2919.22(A)/(E)(1)(c), a felony of the third degree, and Involuntary Manslaughter in violation of R.C. 2903.04(A), a felony of the first degree.  It was alleged that Soto committed Involuntary Manslaughter by causing the death of his son while committing the predicate felony offense of Child Endangering.

{¶4} Subsequently, Soto entered into a negotiated plea agreement wherein he agreed to plead guilty to Child Endangering and in exchange the Involuntary Manslaughter charge was dismissed.  As a result of Soto's conviction, the record indicates that Soto was sentenced to serve 5 years in prison.

-2-
A–5

Case No. 12-17-05

{¶5} On or about July 25, 2016, Soto voluntarily appeared at the Putnam County Sheriff's Office and allegedly indicated that he wanted to provide a "truthful" account of what happened to his son. Soto told the police that he had actually beat his son to death back in 2006 and that he had staged the ATV accident scene.

{¶6} The Lucas County Coroner's original 2006 report was then reviewed by a pediatric abuse specialist who concluded that the toddler had actually died of multiple blunt force trauma due to Soto's violent actions. The expert concluded that Soto's original 2006 misrepresentations "led to the reasonably yet faulty conclusions of the Lucas County Coroner." (Doc. No. 29).

{¶7} On August 15, 2016, Soto was indicted by the Putnam County Grand Jury for Aggravated Murder in violation of R.C. 2903.01(C), an unclassified felony, Murder in violation of R.C. 2903.02(B), an unclassified felony, Felonious Assault in violation of R.C. 2903.11(A)(1), a felony of the first degree, Kidnapping in violation of R.C. 2905.01, a felony of the first degree, and Tampering with Evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree.

{¶8} On October 11, 2016, Soto filed a "Motion to Dismiss on the Grounds of Double Jeopardy." In the motion, Soto argued that in his original 2006 prosecution, a charge of Involuntary Manslaughter was dismissed when he pled guilty to Child Endangering. Soto contended that the judgment entries and

-3-
A-6

Case No. 12-17-05

transcripts from that case did not address whether the matter would be dismissed with or without prejudice, but the "entries in the record makes one think that a change of pleas [sic] to child endangering also disposed of the involuntary manslaughter charge." (Doc. No. 28). Soto contended that Involuntary Manslaughter was a lesser included offense of both Murder and Aggravated Murder, which he argued would bar a subsequent prosecution of Soto on those charges.

{¶9} On October 18, 2016, the State filed a response. The State contended that pursuant to the United States Supreme Court's decision in *Blockburger v. United States*, 284 U.S. 299 (1932), Aggravated Murder contained different elements than Involuntary Manslaughter, which would allow multiple prosecutions. As to the Murder charge, the State argued that pursuant to *State v. Bridges*, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480, ¶ 11, a negotiated guilty plea only barred successive prosecutions where the defendant would " ' "reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." ' " *Bridges citing State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, ¶8, quoting *State v. Edwards*, 8th Dist. Cuyahoga No. 94568, 2011-Ohio-95, ¶ 23.

{¶10} The State contended that because of his prior false narrative Soto could not have reasonably believed that his negotiated plea to Child Endangering would bar prosecution of subsequent homicide charges based on the truth. Further, the

-4-
A-7

Case No. 12-17-05

State argued that subsequent prosecution on a more serious crime was not barred in a situation where the State was unable to proceed on a more serious charge because the additional facts necessary to sustain the charge had not yet occurred or had not yet been discovered despite the exercise of due diligence. *See Brown v. Ohio*, 432 U.S. 161, 169, fn. 7, 97 S.Ct. 2221, 2227 (1977).

{¶11} On April 13, 2017, the trial court filed its judgment entry determining Soto's motion to dismiss.  The trial court found that pursuant to *Blockburger*, Felonious Assault, Kidnapping, Tampering with Evidence, and Aggravated Murder all required proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter, which would permit multiple prosecutions.  As to the Murder charge, the trial court determined that Soto could not have reasonably believed that his 2006 negotiated plea based on his prior false narrative of events would bar prosecution of a purposeful homicide.  Further, the trial court indicated that Involuntary Manslaughter with a Child Endangering predicate was not the same offense as Murder with a Felonious Assault predicate. Finally, the trial court determined that the facts to support the 2016 indictment could not have been discovered in the exercise of due diligence until the additional evidence was uncovered.  Thus the trial court overruled Soto's motion to dismiss.

Case No. 12-17-05

{¶12} It is from this judgment that Soto appeals, asserting the following assignment of error for our review.[1]

## Assignment of Error
**The trial court erred [in] overrul[ing] Defendant's Motion to Dismiss on Double Jeopardy Grounds.**

{¶13} In Soto's assignment of error, he contends that the trial court erred by overruling his motion to dismiss on double jeopardy grounds.  Specifically, Soto argues that his 2006 plea that resulted in the dismissal of the Involuntary Manslaughter charge should bar the current prosecution because Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder. Further, Soto argues that the trial court did not support its finding that Soto could not have reasonably believed that the earlier dismissal would bar future prosecution for the death of Soto's son.  Finally, Soto argues that the State did not reserve any right to bring additional charges in the original dismissal of his Involuntary Manslaughter charge.

### Standard of Review

{¶14} Appellate courts review the denial of a motion to dismiss an indictment on the grounds of double jeopardy de novo, "because it is a pure question of law." *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, ¶ 13, citing *State v.*

---

[1] The Supreme Court of Ohio has determined that the denial of a motion to dismiss on double jeopardy grounds is a final appealable order. *State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, ¶ 61 ("We hold that an order denying a motion to dismiss on double-jeopardy grounds is a final, appealable order.")

Case No. 12-17-05

*Morris,* 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 16, citing *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership,* 78 Ohio App.3d 340, 346 (2d Dist.1992).

*Relevant Authority and Analysis*

{¶15} "Where successive prosecutions are at stake, the double jeopardy guarantee serves 'a constitutional policy of finality for the defendant's benefit.' " *State v. Liberatore,* 4 Ohio St.3d 13, 14 (1983), quoting *United States v. Jorn,* 400 U.S. 470, 479, 91 S.Ct. 547 (1971). The question in this case is whether the State would violate that guarantee if it prosecuted Soto for Aggravated Murder and Murder after a charge of Involuntary Manslaughter was dismissed pursuant to a 2006 plea agreement with Soto for actions resulting in the death of his son.[2]

{¶16} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Through the Fourteenth Amendment to the United States Constitution, this protection applies to individuals prosecuted by the State of Ohio. *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 10, citing *Benton v. Maryland,* 395 U.S. 784, 786, 86 S.Ct. 2056 (1969). Similarly, the Ohio

_____

[2] All of Soto's arguments on appeal pertain to the charges of Aggravated Murder and Murder. He does not appear to contend that the remaining charges against him are barred by Double Jeopardy. In fact, in his summary of the issue presented for review in his brief, Soto states the issue as "Whether the Defendant's earlier guilty plea to involuntary manslaughter barred prosecution for murder and aggravated murder 11 years later." Notably the prior guilty plea was not to involuntary manslaughter, making that an incorrect statement; however, this summary is consistent with the position that Soto raises no challenges regarding the remaining counts against him.

-7-
A-1C

Case No. 12-17-05

Constitution provides, "No person shall be twice put in jeopardy for the same offense." Ohio Constitution, Article I, Section 10. The Supreme Court of Ohio has described the protections afforded by the Ohio and United States Constitutions' Double Jeopardy Clauses as "coextensive." *Mutter, supra* at ¶ 15, citing *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, ¶ 7, citing *State v. Gustafson*, 76 Ohio St.3d 425, 432 (1996).

{¶17} Principally, "The Double Jeopardy Clauses [of both Constitutions] protect against three abuses: (1) 'a second prosecution for the same offense after acquittal,' (2) 'a second prosecution for the same offense after conviction,' and (3) 'multiple punishments for the same offense.' " *Mutter* at ¶ 15 quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072 (1969), *overruled on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201 (1989).

{¶18} "In determining whether an accused is being successively prosecuted for the 'same offense,' the [Supreme Court of Ohio] * * * adopted the 'same elements' test articulated [by the Supreme Court of the United States] in *Blockburger v. United States* (1932), 284 U.S. 299, 304, 52 S.Ct. 180[.]' " *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, ¶ 18. The *Blockburger* test applies "where the same act or transaction constitutes a violation of two distinct statutory provisions" and requires the reviewing court to evaluate the elements of each statutory provision to determine "whether *each* provision requires proof of a fact

-8-
A-11

Case No. 12-17-05

which the other does not." (Emphasis added.) *Blockburger* at 304. " 'This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case.' " *Zima* at ¶ 20, quoting *State v. Thomas*, 61 Ohio St.2d 254, 259 (1980), *overruled on other grounds*, *State v. Crago*, 53 Ohio St.3d 243 (1990), syllabus. The United States Supreme Court has summarized the *Blockburger* test as an inquiry that asks "whether *each* offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." (Emphasis added.) *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849 (1993).

{¶19} In this case, Soto argues that he should not be able to be prosecuted for Aggravated Murder and Murder due to the fact that his prior 2006 plea agreement disposed of a count of Involuntary Manslaughter against him. In support of his position, Soto cites multiple cases wherein the Supreme Court of Ohio has stated that Involuntary Manslaughter is a lesser included offense of both Aggravated Murder and Murder. *See State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 79 ("Involuntary manslaughter, R.C. 2903.04, is a lesser included offense of aggravated murder with prior calculation and design * * * and murder, R.C. 2903.02 * * * because the only distinguishing factor is the mental state involved in the act."); *State v. Thomas*, 40 Ohio St.3d 213, 216 (1988). Soto argues that because

-9-
A-12

Case No. 12-17-05

Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder, a subsequent prosecution on these offenses now violates double jeopardy.

{¶20} Both the Supreme Court of the United States and the Supreme Court of Ohio have addressed situations where government entities attempted to prosecute an individual for a greater offense after a defendant had been convicted of a lesser included offense. In *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221 (1977), the State of Ohio attempted to prosecute a defendant for the greater offense of Auto Theft after the defendant had pleaded guilty to the lesser included offense of Joyriding. *Brown* at 168. In *Brown*, the Supreme Court of the United States concluded that "[w]hatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense." *Id.* at 169.

{¶21} More recently, the Supreme Court of Ohio considered a situation where a defendant was prosecuted for a "misdemeanor offense that was a lesser included offense of the felony for which [he was] originally indicted." *Mutter*, *supra*, at ¶ 22. The Supreme Court of Ohio determined that "a misdemeanor conviction for a lesser included offense bars the state from indicting the same defendant for a felony that by definition included the misdemeanor offense within it as a lesser included offense, arising from the same facts." *Id.*

-10-
A-13

Case No. 12-17-05

{¶22} Here, Soto was never *convicted* of Involuntary Manslaughter; however, he was charged with Involuntary Manslaughter in 2006 and that charge was dismissed pursuant to a plea agreement wherein Soto agreed to plead guilty to Child Endangering, the predicate offense of the Involuntary Manslaughter. Notably, the new charges against Soto, which include Aggravated Murder and Murder, were also filed after Soto served his 5-year prison sentence on the Child Endangering conviction related to the death of his son. Thus while Soto was not convicted of Involuntary Manslaughter, he was in jeopardy of being tried and convicted of Involuntary Manslaughter but-for the plea agreement, resulting in his conviction and sentence for the predicate offense of Child Endangering. Involuntary Manslaughter is a lesser included offense of Aggravated Murder and Murder, as the Supreme Court of Ohio has stated, thus it would seem that a subsequent prosecution would be barred in these circumstances.

{¶23} The dissent argues that because the Involuntary Manslaughter count in the original prosecution was dismissed pursuant to a plea agreement Double Jeopardy should not be implicated here. In support, the dissent cites language from *State v. Bonarrigo*, 62 Ohio St.2d 7, 12 (1980), related to a State's dismissal of charges *prior to there ever being a trial or conviction on any operative offense*. Such authority has no relevance here, where the sole basis for dismissal of the Involuntary Manslaughter was the conviction and served sentence on the predicate

-11-

A−14

Case No. 12-17-05

offense to the Involuntary Manslaughter--Child Endangering.  It is our view that the double jeopardy implication of a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal.  Under any other interpretation, and barring any special exception or reservation in the record, the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense.  There would be no finality under such a system and it would render plea agreements largely meaningless.  Notably, neither of the parties raise the same argument as the dissent, and the trial court did not make a ruling on this issue either.

{¶24} Moreover, while the trial court found that under the *Blockburger* test Aggravated Murder and Murder contained additional elements that Involuntary Manslaughter did not have, *Blockburger* actually requires that *each* offense contain an element that the other does not in order for a subsequent prosecution to be permissible.  The Supreme Court of Ohio has determined that when comparing elements the

> **test is not a word game to be performed by rote by matching the words chosen by the legislature to define criminal offenses.  Some offenses, such as aggravated murder and murder, lend themselves to such a simple matching test; others do not. [Citations omitted] * * * The proper overall focus is on the nature and circumstances**

-12-
A–15

Case No. 12-17-05

**of the offenses as defined, rather than on the precise words used
to define them.**

*State v. Thomas*, 40 Ohio St.3d 213, 216-217.

{¶25} Turning then to the actual elements of the crimes involved with the
Supreme Court of Ohio's standards in mind, the original 2006 charge of Involuntary
Manslaughter was alleged to be a violation of R.C. 2903.04(A), which reads, "No
person shall cause the death of another or the unlawful termination of another's
pregnancy as a proximate result of the offender's committing or attempting to
commit a felony." R.C. 2903.04(A).[3]

{¶26} The 2016 indictment alleges one count of Aggravated Murder, which
requires proof that, "No person shall purposely, and with prior calculation and
design, cause the death of another or the unlawful termination of another's
pregnancy." R.C. 2903.01.  The 2016 indictment also alleges one count of Murder
in violation of R.C. 2903.02(B), which reads, "No person shall cause the death of
another as a proximate result of the offender's committing or attempting to commit
an offense of violence that is a felony of the first or second degree and that is not a
violation of section 2903.03 or 2903.04 of the Revised Code."  The offense of
violence alleged in the 2016 indictment is Felonious Assault in violation of R.C.

---

[3] The felony allegedly committed was Child Endangering in violation of R.C. 2919.22(A)/(E)(1)(c), which
reads, "No person, who is the parent * * * of a child * * * shall create a substantial risk to the health or safety
of the child, by violating a duty of care, protection, or support. * * * If the violation * * * results in serious
physical harm to the child involved, [it is] a felony of the third degree[.]"

-13-
A-16

Case No. 12-17-05

2903.11(A)(1), which reads, "No person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn."

{¶27} Based on the guidance of the Supreme Court of Ohio that an elements' test is not a "rote" matching test, we cannot agree with the trial court that *both* Aggravated Murder and Involuntary Manslaughter contain elements that the other does not. While Aggravated Murder does contain the language of "prior calculation and design," which Involuntary Manslaughter does not have, the Supreme Court of Ohio has held that "[A]ggravated [M]urder with prior calculation and design, * * * is defined as [M]urder with an enhanced mental state. Thus the only distinguishing factor between R.C. 2903.01(A) [Aggravated Murder] and [I]nvoluntary [M]anslaughter is, as in the case of murder, the mental state involved." *Thomas*, 40 Ohio St.3d at 216. The Supreme Court of Ohio reasoned that "one cannot criminally cause another's death without committing an underlying felony or misdemeanor." *Id*. at 216. Put another way, under the Supreme Court of Ohio's construction that prior calculation and design is not an additional element but only an "enhancement" of the state of mind required for both homicide offenses, an Aggravated Murder could not be committed without at least committing an Involuntary Manslaughter. As a result, under this construction, Involuntary Manslaughter does not contain an "element" of the offense that is not subsumed within Aggravated Murder, even if a rote matching test of language of the statute might differ.

-14-
A-17

Case No. 12-17-05

{¶28} Alternatively, the State argues that even if the offenses are considered the same under *Blockburger*, there is an exception to *Blockburger* that would allow a subsequent prosecution if the additional facts necessary to sustain a charge have not yet occurred or have not been discovered despite the exercise of due diligence. *Brown v. Ohio*, 432 U.S. 161, 169, at fn. 7. Although the trial court found this argument persuasive, we do not. Key to this exception is the "exercise of due diligence." While the State may contend that it could not have known that Soto purposely killed his son until he purportedly admitted as much in 2016, this seems to place an unlikely constitutional burden on a criminal defendant to assist the prosecution in every respect despite his right to remain silent. It also implies that the State is constitutionally entitled to rely exclusively upon a defendant's explanation or narrative in investigating a criminal offense or in determining the appropriate criminal charges in any given case.

{¶29} We do not believe either of these assumptions are constitutionally tenable in making a double jeopardy determination. On the contrary, regardless of a criminal defendant's narrative, it is the State's responsibility to properly and thoroughly investigate the matter in regard to making an accurate assessment of what happened, determining the appropriate charges based on those facts, and determining what, if any, plea negotiations to accept once charges have been brought.

-15-
A-18

Case No. 12-17-05

{¶30} Notably, there is no evidence in the record before us, nor has the State presented any, to indicate that at the time of the original plea agreement the State reserved the right to bring additional charges related to the death of Soto's child. *See State v. Carpenter*, 68 Ohio St.3d 59, 1993-Ohio-226 ("Accordingly, we hold that the state cannot indict a defendant for murder after the court has accepted a negotiated guilty plea to a lesser offense and the victim later dies of injuries sustained in the crime, unless the state expressly reserves the right to file additional charges on the record at the time of the defendant's plea.")

{¶31} Regardless of the status of the record as to any reservation of rights by the State at the original plea, the trial court determined that because Soto was not forthright in confessing his true culpability in his original statement to law enforcement, he could not have reasonably believed that his 2006 negotiated plea would have barred prosecution of the subsequent charges, citing a case from the Tenth District Court of Appeals in support. *See State v. Bridges*, 10th Dist. Franklin No. 14AP-602, 2015-Ohio-4480, ¶ 11. *Bridges* is readily distinguishable from this case as the defendant in that case essentially noted on the record that he was pleading guilty to a case in municipal court specifically to avoid charges in a felony indictment that was expected to be filed any day.  Moreover, the indictment in *Bridges* for the more serious charge was filed the day after the defendant's guilty

-16-
A–19

Case No. 12-17-05

plea on the lesser charge, and the Tenth District found the timing component important.

{¶32} Furthermore, in *Bridges*, the Tenth District actually distinguished its own case in *State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, which is slightly more similar to the case *sub judice* than *Bridges*. In *Church*, the Tenth District Court of Appeals found that a defendant who pled guilty to a charge of failure to use a crosswalk in exchange for the dismissal of a possession of a controlled substance charge had a reasonable expectation, based upon his negotiated plea agreement, that he would not be subject to more serious drug charges (trafficking in marijuana) arising out of the same incident. The case *sub judice* is more similar to *Church* than *Bridges*, though both contain different factual scenarios than the case before us.

{¶33} Finally, while we may be somewhat sympathetic to the notion that Soto's conduct, which may even constitute a separate crime, should not in any way be rewarded or might even be construed as a waiver of a defendant's constitutional rights in some circumstances, as noted earlier we are not convinced that this conduct supersedes either the duty of the State to independently investigate and prosecute crime, or the Double Jeopardy rights of the defendant where, as here, he has been convicted and served his sentenced for the offense pled to in exchange for dismissing the Involuntary Manslaughter.

-17-
A-20

Case No. 12-17-05

{¶34} Based on these circumstances and the holding of the United States Supreme Court in *Blockburger* and the Supreme Court of Ohio in *Thomas*, we find that because Involuntary Manslaughter constitutes a lesser included offense of Aggravated Murder and Murder, the principles of Double Jeopardy would prevent a subsequent prosecution of Soto for Aggravated Murder and Murder in this instance.

{¶35} In sum, it is our conclusion that it was the responsibility of the State to thoroughly and forensically investigate the matter at the outset, and to thoroughly vet Soto's story when his son first died. The State did so to the extent it was satisfied back in 2006 and brought the original charges regarding the death of Soto's child. The State then negotiated a plea agreement based on those conclusions and dismissed the homicide charge without any indication in the record as to further reservation regarding future developments. Finally, Soto then served his entire sentence emanating from that negotiated plea agreement. Under these circumstances we are compelled to find that Soto cannot now be prosecuted, convicted, and sentenced again for the death of the same child. Accordingly, for all of these reasons Soto's assignment of error is sustained.

*Conclusion*

{¶36} For the foregoing reasons the assignment of error is sustained and the judgment of the Putnam County Common Pleas Court is reversed. This cause is

-18-

A−21

Case No. 12-17-05

remanded to the trial court for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**WILLAMOWSKI, P.J., concurs.**

**ZIMMERMAN, J., dissents.**

{¶36} I start my dissent noting that our record does not contain *any* facts surrounding the defendant-appellant's original plea.  Soto's underlying plea to the charge of Child Endangering and the State's voluntary dismissal of the Involuntary Manslaughter charge have relevance to the proceedings before us.  Specifically, did Soto plead no contest; did the State *nolle* the charge of Involuntary Manslaughter; did the negotiated plea between Soto and the State occur after commencement of a trial?  These questions are unanswered.

{¶37} However, for purposes of my dissent, I must presume that the underlying proceedings were "regular" since a "presumption of regularity" attaches to all judicial proceedings.  *See generally, State v. Richardson*, 3d Dist. Seneca No. 13-13-54, 13-13-55, 2014-Ohio-3541.  Therefore, I will presume that Soto pled guilty to Child Endangering and the State *nolled* the Involuntary Manslaughter charge *before jeopardy attached* (i.e. prior to swearing a jury or swearing in the first witness).

-19-
A–22

Case No. 12-17-05

{¶38} Herein, the *nolle* of the Involuntary Manslaughter count by the State neither operated as an acquittal nor prevented further prosecution of the offense. *See Bucolo v. Adkins*, 424 U.S. 641, 642, 96 S.Ct. 1086 (1976). Further, "a *nolle prosequi* dismisses the charges *without prejudice* to reindictment". *State v. Bonarrigo*, 62 Ohio St.2d 7, 12 (1980). Thus, the majority's logic (that double jeopardy applies because Soto was merely charged with Involuntary Manslaughter) is misplaced because he was not punished or convicted of that offense. Double Jeopardy "applies to both successive punishments and to successive prosecutions for the same criminal offense". *United States v. Dixon*, 509 U.S. 688, 696 (1993). Here, Soto was only punished for endangering his son, *not* for his murder. As such, and under the facts presented, jeopardy never attached in this case.

{¶39} Accordingly, I agree with the trial court's denial of Soto's motion to dismiss for different reasons, and contend that double jeopardy does not apply in this case because Soto was not convicted or punished for any offense that is a lesser included offense of the charges set forth in the new 2017 indictment.

{¶40} The *only* possible valid legal issue in this case is whether or not Soto's speedy trial rights were violated after his indictment for murder and aggravated murder charges. However, that issue is not before us.

{¶41} I therefore dissent.

/jlr

-20-

A-23

J.268 P.460

## IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
## OTTAWA, OHIO

| STATE OF OHIO | : | CASE NO. 2016 CR 57 |
|---|---|---|
| Plaintiff | : | |
| -vs- | : | JUDGMENT ENTRY |
| TRAVIS SOTO | : | |
| Defendant | : | |

This matter came on for consideration of Defendant's previously filed **Motion to Dismiss** on the grounds of double jeopardy. The Court has reviewed Defendant's Motion and the response of the State of Ohio.

### FACTS

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of R.C. 2903.04(A), a felony of the 1st degree.

As charged, Defendant was alleged to have committed Child Endangering by creating a substantial risk of harm, and actually causing serious physical harm to his child, and was alleged to have committed Involuntary Manslaughter by causing the death of his son while committing the predicate offense of felony Child Endangering.

The factual basis of the 2006 prosecution relied, in part, on Defendant's representations to law enforcement indicating he was the driver of an All Terrain Vehicle that struck his son. The Lucas County Coroner conducted an autopsy and was given Defendant's version of the

1

A-24

S.268  P.401

events.  The coroner concluded that the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, the Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering.  The Involuntary Manslaughter charge was dismissed.  He was sentenced to five (5) years incarceration.

The State represents the following as a basis for a subsequent 2016 indictment:  On July 25, 2016, the Defendant voluntarily appeared at the Putnam County Sheriff's Office and indicated that he wanted to provide the truthful account of what occurred in 2006.  He proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, as well as reports from 2006 to the present were reviewed by a pediatric abuse specialist previously qualified as an expert by this Court. The expert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son.  He also concluded that Defendant's 2006 misrepresentations led to the reasonable, yet faulty, prior conclusions of the Lucas County Coroner.

Defendant was then indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C);

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

2

A–25

Ō.2o8   P.4o2

### DECISION

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense*." *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. The test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*. Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.

0268  P.A03

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore, Double Jeopardy does not bar prosecution of this offense.

Furthermore, the 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

The Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his previous narrative of events would bar prosecution of subsequent charges based on newly discovered evidence which would transform the case from one of an accidental death to a purposeful homicide

Involuntary Manslaughter with a felony Child Endangering predicate is not the *same offense* as Murder with a Felonious Assault predicate. *State v. Resor*, 2010 Ohio 397, reviewed the *Blockburger* same offense test with respect to these two charges:

Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(1).

Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

4

A-27

O.268  P.40A

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate. Therefore, a resolution of the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. Also, a further exception to the *Blockburger* test exists where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been previously discovered despite the exercise of due diligence until additional evidence was

5

A-28

S.26B   P.405

uncovered, such as Defendant's appearance and confession to the actual details of his son's

death. The coroner's report stated in part:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> ... What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

The Court finds that the exception under *Grady vs. Corbin* also applies to the within case.

For reasons as stated, Defendant's **Motion to Dismiss** on the grounds of double jeopardy

is **hereby overruled**.

JUDGE RANDALL BASINGER

cc:
Prosecuting Attorney – faxed
Joseph Benavidez – faxed to 419-228-3367

6

A-29

26          CONSTITUTION OF THE UNITED STATES

peaceably to assemble, and to petition the Government for a redress of grievances.

### AMENDMENT [II.]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

### AMENDMENT [III.]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

### AMENDMENT [IV.]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### AMENDMENT [V.]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## 2903.01 Aggravated murder.

(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

(C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.

(D) No person who is under detention as a result of having been found guilty of or having pleaded guilty to a felony or who breaks that detention shall purposely cause the death of another.

(E) No person shall purposely cause the death of a law enforcement officer whom the offender knows or has reasonable cause to know is a law enforcement officer when either of the following applies:

(1) The victim, at the time of the commission of the offense, is engaged in the victim's duties.

(2) It is the offender's specific purpose to kill a law enforcement officer.

(F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

(G) As used in this section:

(1) "Detention" has the same meaning as in section 2921.01 of the Revised Code.

(2) "Law enforcement officer" has the same meaning as in section 2911.01 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Effective Date: 05-15-2002 .

A-31

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 343

## 2903.02 Murder.

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

(C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.

(D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

Effective Date: 06-30-1998.

A–32

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 344

## 2903.04 Involuntary manslaughter.

(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.

(B) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree, a regulatory offense, or a minor misdemeanor other than a violation of any section contained in Title XLV of the Revised Code that is a minor misdemeanor and other than a violation of an ordinance of a municipal corporation that, regardless of the penalty set by ordinance for the violation, is substantially equivalent to any section contained in Title XLV of the Revised Code that is a minor misdemeanor.

(C) Whoever violates this section is guilty of involuntary manslaughter. Violation of division (A) of this section is a felony of the first degree. Violation of division (B) of this section is a felony of the third degree.

(D) If an offender is convicted of or pleads guilty to a violation of division (A) or (B) of this section and if the felony, misdemeanor, or regulatory offense that the offender committed or attempted to commit, that proximately resulted in the death of the other person or the unlawful termination of another's pregnancy, and that is the basis of the offender's violation of division (A) or (B) of this section was a violation of division (A) or (B) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance or included, as an element of that felony, misdemeanor, or regulatory offense, the offender's operation or participation in the operation of a snowmobile, locomotive, watercraft, or aircraft while the offender was under the influence of alcohol, a drug of abuse, or alcohol and a drug of abuse, both of the following apply:

(1) The court shall impose a class one suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege as specified in division (A)(1) of section 4510.02 of the Revised Code.

(2) The court shall impose a mandatory prison term for the violation of division (A) or (B) of this section from the range of prison terms authorized for the level of the offense under section 2929.14 of the Revised Code.

Effective Date: 01-01-2004.

A−33

## 2919.22 Endangering children.

**(A)** No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

**(B)** No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

**(1)** Abuse the child;

**(2)** Torture or cruelly abuse the child;

**(3)** Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child;

**(4)** Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development;

**(5)** Entice, coerce, permit, encourage, compel, hire, employ, use, or allow the child to act, model, or in any other way participate in, or be photographed for, the production, presentation, dissemination, or advertisement of any material or performance that the offender knows or reasonably should know is obscene, is sexually oriented matter, or is nudity-oriented matter;

**(6)** Allow the child to be on the same parcel of real property and within one hundred feet of, or, in the case of more than one housing unit on the same parcel of real property, in the same housing unit and within one hundred feet of, any act in violation of section 2925.04 or 2925.041 of the Revised Code when the person knows that the act is occurring, whether or not any person is prosecuted for or convicted of the violation of section 2925.04 or 2925.041 of the Revised Code that is the basis of the violation of this division.

**(C)**

**(1)** No person shall operate a vehicle, streetcar, or trackless trolley within this state in violation of division (A) of section 4511.19 of the Revised Code when one or more children under eighteen years of age are in the vehicle, streetcar, or trackless trolley. Notwithstanding any other provision of law, a person may be convicted at the same trial or proceeding of a violation of this division and a violation of division (A) of section 4511.19 of the Revised Code that constitutes the basis of the charge of the violation of this division. For purposes of sections 4511.191 to 4511.197 of the Revised Code and all related provisions of law, a person arrested for a violation of this division shall be considered to be under arrest for operating a vehicle while under the influence of alcohol, a drug of abuse, or a combination of them or for operating a vehicle with a prohibited concentration of alcohol, a controlled substance, or a metabolite of a controlled substance in the whole blood, blood serum or plasma, breath, or urine.

A-34

(2) As used in division (C)(1) of this section:

(a) "Controlled substance" has the same meaning as in section **3719.01** of the Revised Code.

(b) "Vehicle," "streetcar," and "trackless trolley" have the same meanings as in section **4511.01** of the Revised Code.

(D)

(1) Division (B)(5) of this section does not apply to any material or performance that is produced, presented, or disseminated for a bona fide medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, member of the clergy, prosecutor, judge, or other person having a proper interest in the material or performance.

(2) Mistake of age is not a defense to a charge under division (B)(5) of this section.

(3) In a prosecution under division (B)(5) of this section, the trier of fact may infer that an actor, model, or participant in the material or performance involved is a juvenile if the material or performance, through its title, text, visual representation, or otherwise, represents or depicts the actor, model, or participant as a juvenile.

(4) As used in this division and division (B)(5) of this section:

(a) "Material," "performance," "obscene," and "sexual activity" have the same meanings as in section **2907.01** of the Revised Code.

(b) "Nudity-oriented matter" means any material or performance that shows a minor in a state of nudity and that, taken as a whole by the average person applying contemporary community standards, appeals to prurient interest.

(c) "Sexually oriented matter" means any material or performance that shows a minor participating or engaging in sexual activity, masturbation, or bestiality.

(E)

(1) Whoever violates this section is guilty of endangering children.

(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:

(a) Except as otherwise provided in division (E)(2)(b), (c), or (d) of this section, a misdemeanor of the first degree;

(b) If the offender previously has been convicted of an offense under this section or of any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, except as otherwise provided in division (E)(2)(c) or (d) of this section, a felony of the fourth degree;

(c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree;

(d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

A-35

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 347

(e) If the violation is a felony violation of division (B)(1) of this section and the offender also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section 2929.14 of the Revised Code and shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code.

(3) If the offender violates division (B)(2), (3), (4), or (6) of this section, except as otherwise provided in this division, endangering children is a felony of the third degree. If the violation results in serious physical harm to the child involved, or if the offender previously has been convicted of an offense under this section or of any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, endangering children is a felony of the second degree. If the offender violates division (B)(2), (3), or (4) of this section and the offender also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section 2929.14 of the Revised Code and shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code. If the offender violates division (B)(6) of this section and the drug involved is methamphetamine, the court shall impose a mandatory prison term on the offender as follows:

(a) If the violation is a violation of division (B)(6) of this section that is a felony of the third degree under division (E)(3) of this section and the drug involved is methamphetamine, except as otherwise provided in this division, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree that is not less than two years. If the violation is a violation of division (B)(6) of this section that is a felony of the third degree under division (E)(3) of this section, if the drug involved is methamphetamine, and if the offender previously has been convicted of or pleaded guilty to a violation of division (B)(6) of this section, a violation of division (A) of section 2925.04 of the Revised Code, or a violation of division (A) of section 2925.041 of the Revised Code, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the third degree that is not less than five years.

(b) If the violation is a violation of division (B)(6) of this section that is a felony of the second degree under division (E)(3) of this section and the drug involved is methamphetamine, except as otherwise provided in this division, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree that is not less than three years. If the violation is a violation of division (B)(6) of this section that is a felony of the second degree under division (E)(3) of this section, if the drug involved is methamphetamine, and if the offender previously has been convicted of or pleaded guilty to a violation of division (B)(6) of this section, a violation of division (A) of section 2925.04 of the Revised Code, or a violation of division (A) of section 2925.041 of the Revised Code, the court shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the second degree that is not less than five years.

(4) If the offender violates division (B)(5) of this section, endangering children is a felony of the second degree. If the offender also is convicted of or pleads guilty to a specification as described in section 2941.1422 of the Revised Code that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term as provided in division (B)(7) of section 2929.14 of the Revised Code and shall order the offender to make restitution as provided in division (B)(8) of section 2929.18 of the Revised Code.

A–36

(5) If the offender violates division (C) of this section, the offender shall be punished as follows:

(a) Except as otherwise provided in division (E)(5)(b) or (c) of this section, endangering children in violation of division (C) of this section is a misdemeanor of the first degree.

(b) If the violation results in serious physical harm to the child involved or the offender previously has been convicted of an offense under this section or any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, except as otherwise provided in division (E)(5)(c) of this section, endangering children in violation of division (C) of this section is a felony of the fifth degree.

(c) If the violation results in serious physical harm to the child involved and if the offender previously has been convicted of a violation of division (C) of this section, section 2903.06 or 2903.08 of the Revised Code, section 2903.07 of the Revised Code as it existed prior to March 23, 2000, or section 2903.04 of the Revised Code in a case in which the offender was subject to the sanctions described in division (D) of that section, endangering children in violation of division (C) of this section is a felony of the fourth degree.

(d) In addition to any term of imprisonment, fine, or other sentence, penalty, or sanction it imposes upon the offender pursuant to division (E)(5)(a), (b), or (c) of this section or pursuant to any other provision of law and in addition to any suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege under Chapter 4506., 4509., 4510., or 4511. of the Revised Code or under any other provision of law, the court also may impose upon the offender a class seven suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege from the range specified in division (A)(7) of section 4510.02 of the Revised Code.

(e) In addition to any term of imprisonment, fine, or other sentence, penalty, or sanction imposed upon the offender pursuant to division (E)(5)(a), (b), (c), or (d) of this section or pursuant to any other provision of law for the violation of division (C) of this section, if as part of the same trial or proceeding the offender also is convicted of or pleads guilty to a separate charge charging the violation of division (A) of section 4511.19 of the Revised Code that was the basis of the charge of the violation of division (C) of this section, the offender also shall be sentenced in accordance with section 4511.19 of the Revised Code for that violation of division (A) of section 4511.19 of the Revised Code.

(F)

(1)

(a) A court may require an offender to perform not more than two hundred hours of supervised community service work under the authority of an agency, subdivision, or charitable organization. The requirement shall be part of the community control sanction or sentence of the offender, and the court shall impose the community service in accordance with and subject to divisions (F)(1)(a) and (b) of this section. The court may require an offender whom it requires to perform supervised community service work as part of the offender's community control sanction or sentence to pay the court a reasonable fee to cover the costs of the offender's participation in the work, including, but not limited to, the costs of procuring a policy or policies of liability insurance to cover the period during which the offender will perform the work. If the court requires the offender to perform supervised community service work as part of the offender's community control sanction or sentence, the court shall do so in accordance with the following limitations and criteria:

A-37

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 349

(i) The court shall require that the community service work be performed after completion of the term of imprisonment or jail term imposed upon the offender for the violation of division (C) of this section, if applicable.

(ii) The supervised community service work shall be subject to the limitations set forth in divisions (B) (1), (2), and (3) of section 2951.02 of the Revised Code.

(iii) The community service work shall be supervised in the manner described in division (B)(4) of section 2951.02 of the Revised Code by an official or person with the qualifications described in that division. The official or person periodically shall report in writing to the court concerning the conduct of the offender in performing the work.

(iv) The court shall inform the offender in writing that if the offender does not adequately perform, as determined by the court, all of the required community service work, the court may order that the offender be committed to a jail or workhouse for a period of time that does not exceed the term of imprisonment that the court could have imposed upon the offender for the violation of division (C) of this section, reduced by the total amount of time that the offender actually was imprisoned under the sentence or term that was imposed upon the offender for that violation and by the total amount of time that the offender was confined for any reason arising out of the offense for which the offender was convicted and sentenced as described in sections 2949.08 and 2967.191 of the Revised Code, and that, if the court orders that the offender be so committed, the court is authorized, but not required, to grant the offender credit upon the period of the commitment for the community service work that the offender adequately performed.

(b) If a court, pursuant to division (F)(1)(a) of this section, orders an offender to perform community service work as part of the offender's community control sanction or sentence and if the offender does not adequately perform all of the required community service work, as determined by the court, the court may order that the offender be committed to a jail or workhouse for a period of time that does not exceed the term of imprisonment that the court could have imposed upon the offender for the violation of division (C) of this section, reduced by the total amount of time that the offender actually was imprisoned under the sentence or term that was imposed upon the offender for that violation and by the total amount of time that the offender was confined for any reason arising out of the offense for which the offender was convicted and sentenced as described in sections 2949.08 and 2967.191 of the Revised Code. The court may order that a person committed pursuant to this division shall receive hour-for-hour credit upon the period of the commitment for the community service work that the offender adequately performed. No commitment pursuant to this division shall exceed the period of the term of imprisonment that the sentencing court could have imposed upon the offender for the violation of division (C) of this section, reduced by the total amount of time that the offender actually was imprisoned under that sentence or term and by the total amount of time that the offender was confined for any reason arising out of the offense for which the offender was convicted and sentenced as described in sections 2949.08 and 2967.191 of the Revised Code.

(2) Division (F)(1) of this section does not limit or affect the authority of the court to suspend the sentence imposed upon a misdemeanor offender and place the offender under a community control sanction pursuant to section 2929.25 of the Revised Code, to require a misdemeanor or felony offender to perform supervised community service work in accordance with division (B) of section 2951.02 of the Revised Code, or to place a felony offender under a community control sanction.

(G)

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 350

Case: 3:21-cv-00167-DCN  Doc #: 12-1  Filed: 05/07/21  351 of 576.  PageID #: 421

Lawriter - ORC - 2919.22 Endangering children.                                    Page 6 of 7

(1) If a court suspends an offender's driver's or commercial driver's license or permit or nonresident operating privilege under division (E)(5)(d) of this section, the period of the suspension shall be consecutive to, and commence after, the period of suspension of the offender's driver's or commercial driver's license or permit or nonresident operating privilege that is imposed under Chapter 4506., 4509., 4510., or 4511. of the Revised Code or under any other provision of law in relation to the violation of division (C) of this section that is the basis of the suspension under division (E)(5)(d) of this section or in relation to the violation of division (A) of section 4511.19 of the Revised Code that is the basis for that violation of division (C) of this section.

(2) An offender is not entitled to request, and the court shall not grant to the offender, limited driving privileges if the offender's license, permit, or privilege has been suspended under division (E)(5)(d) of this section and the offender, within the preceding six years, has been convicted of or pleaded guilty to three or more violations of one or more of the following:

(a) Division (C) of this section;

(b) Any equivalent offense, as defined in section 4511.181 of the Revised Code.

(H)

(1) If a person violates division (C) of this section and if, at the time of the violation, there were two or more children under eighteen years of age in the motor vehicle involved in the violation, the offender may be convicted of a violation of division (C) of this section for each of the children, but the court may sentence the offender for only one of the violations.

(2)

(a) If a person is convicted of or pleads guilty to a violation of division (C) of this section but the person is not also convicted of and does not also plead guilty to a separate charge charging the violation of division (A) of section 4511.19 of the Revised Code that was the basis of the charge of the violation of division (C) of this section, both of the following apply:

(i) For purposes of the provisions of section 4511.19 of the Revised Code that set forth the penalties and sanctions for a violation of division (A) of section 4511.19 of the Revised Code, the conviction of or plea of guilty to the violation of division (C) of this section shall not constitute a violation of division (A) of section 4511.19 of the Revised Code;

(ii) For purposes of any provision of law that refers to a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code and that is not described in division (H)(2)(a)(i) of this section, the conviction of or plea of guilty to the violation of division (C) of this section shall constitute a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code.

(b) If a person is convicted of or pleads guilty to a violation of division (C) of this section and the person also is convicted of or pleads guilty to a separate charge charging the violation of division (A) of section 4511.19 of the Revised Code that was the basis of the charge of the violation of division (C) of this section, the conviction of or plea of guilty to the violation of division (C) of this section shall not constitute, for purposes of any provision of law that refers to a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code, a conviction of or plea of guilty to a violation of division (A) of section 4511.19 of the Revised Code.

A-39

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 351

(I) As used in this section:

(1) "Community control sanction" has the same meaning as in section 2929.01 of the Revised Code;

(2) "Limited driving privileges" has the same meaning as in section 4501.01 of the Revised Code;

(3) "Methamphetamine" has the same meaning as in section 2925.01 of the Revised Code.

Amended by 129th General AssemblyFile No.29, HB 86, §1, eff. 9/30/2011.

Effective Date: 01-01-2004; 08-11-2004; 05-17-2006; 08-17-2006; 2008 HB280 04-07-2009.

A-40

Supreme Court of Ohio Clerk of Court - Filed July 16, 2018 - Case No. 2018-0416

# IN THE SUPREME COURT OF OHIO

| | |
|---|---|
| STATE OF OHIO, | Case No. 2018-0416 |
| Plaintiff-Appellant, | On Appeal from the Putnam County Court of Appeals, Third Appellate District |
| v. | |
| TRAVIS SOTO, | Court of Appeals Case No. 12-07-05 |
| Defendant-Appellee. | |

### BRIEF OF AMICUS CURIAE THE CUYAHOGA COUNTY PROSECUTOR'S OFFICE ON BEHALF OF APPELLANT THE STATE OF OHIO

**GARY L. LAMMERS (0042040)**
Putnam County Prosecutor
336 East Main Street
Ottawa, Ohio 45875
(419) 523-3600
gary.lammers@putnamcountyohio.gov

Counsel for Appellant
 State of Ohio

**CARLY M. EDELSTEIN (0095950)**
Assistant State Public Defender
250 East Broad Street, Suite 1400
(614) 752-7033
Carly.Edelstein@opd.ohio.gov

Counsel for Appellee
 Travis Soto

**MICHAEL C. O'MALLEY (0059592)**
Cuyahoga County Prosecutor

CHRISTOPHER D. SCHROEDER (0089855)
Assistant Prosecuting Attorney
 *Counsel of Record*
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113
(216) 443-7733
cschroeder@prosecutor.cuyahogacounty.us

Counsel for *Amicus Curiae*
 The Cuyahoga County Prosecutor's Office

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

INTRODUCTION AND STATEMENT OF AMICUS INTEREST ............................................ 2

STATEMENT OF THE CASE AND RELEVANT FACTS ....................................................... 3

PROPOSITION OF LAW NO. 1: Involuntary manslaughter with a child endangering predicate in violation of ORC 2903.04(A) is not the same offense for double jeopardy purposes as aggravated murder in violation of ORC 2903.01(C) or murder with a felonious assault predicate in violation of ORC 2903.02(B). ............................................................................... 3

    1.    Double jeopardy bars successive prosecutions for the same offense following an acquittal.  The dismissal of a count as part of a plea agreement is not an acquittal of that count.............................................................................................................................................. 4

    2.    Under Ohio v. Johnson, a defendant's plea to a lesser included offense does not bar the State from prosecuting the defendant for the greater offense. ...................................................... 6

    3.    Jeopardy does not attach to charges terminated by plea agreement before the jury is empaneled and sworn. ..................................................................................................................... 7

    4.    The involuntary manslaughter count was not dismissed "with prejudice" in part of the 2006 plea agreement. ...................................................................................................................... 8

    5.    Double jeopardy did not bar the 2016 prosecution because child endangering is not the same offense as aggravated murder.............................................................................................. 8

    6.    Conclusion. ........................................................................................................................ 9

PROPOSITION OF LAW No. 2:  Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to Blockburger to allow subsequent prosecution........................................................................................................ 10

PROPOSITION OF LAW No. 3:  A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario. .............................. 10

ii

1.    State v. Carpenter only bars the State from prosecuting a defendant for additional offenses arising out of the same transaction where a defendant has an objectively reasonable expectation of finality in his plea..................................................................... 10

2.    Jeffers v. United States recognized that double jeopardy does not bar successive prosecutions where the defendant caused the successive prosecutions through his own actions......................................................................................................................................... 13

3.    The State exercised due diligence in this case, relying on the coroner's conclusion in an autopsy report that the victim died in an ATV accident. ........................................................ 14

4.    Soto's plea agreement, which he entered into in bad faith and by deception, constituted a fraud on the court that deprived Soto of any objectively reasonable expectation of finality................................................................................................................... 15

5.    The trial court's denial of Soto's motion to dismiss should not have been a final, appealable order.................................................................................................................................. 16

CONCLUSION ........................................................................................................................ 17

CERTIFICATE OF SERVICE ............................................................................................... 18

iii

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Arizona v. Washington*,
434 U.S. 497, 98 S. Ct. 824, 54 L.Ed.2d 717 (1978) ...................................................................5

*Ashe v. Swenson*,
397 U.S. 436, 90 S. Ct. 1189, 25 L.Ed.2d 469 (1970) ...............................................................14

*Blockburger v. United States*,
284 U.S. 299, 52 S. Ct. 180, 76 L.Ed.2d 306 (1932)...............................1, 3-4, 9-10

*City of Cleveland v. Evans*,
8th Dist. Cuyahoga No. 100721, 2014-Ohio-4567 .................................................11

*City of Cleveland v. Primm*,
8th Dist. Cuyahoga No. 104963, 2017-Ohio-7242 ...................................................8

*Episcopal Retirement Homes v. Ohio Dept. of Indus. Relations*,
61 Ohio St.3d 366, 575 N.E.2d 134 (1991) ..........................................................6

*Evans v. Michigan*,
568 U.S. 313, 133 S. Ct. 1069, 185 L.Ed.2d 124 (2013)..........................................5

*In re M.C.H.*,
5th Dist. Delaware No. 12-CA-131, 2013-Ohio-2649..............................................8

*Jeffers v. United States*,
432 U.S. 137, 97 S. Ct. 2207, 53 L.Ed.2d 168 (1977) .......................................13-14

*North Carolina v. Pearce*,
395 U.S. 711, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969) ........................................6, 8-9

*Ohio v. Johnson*,
467 U.S. 493, 104 S. Ct. 2536, 81 L.Ed.2d 425 (1984)..........................................6-7

*State v. Anderson*,
138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23.................................................16

*State v. Carpenter*,
68 Ohio St.3d 59, 623 N.E.2d 66 (1993)......................................................... passim

*State v. Dye*,
127 Ohio St.3d 357, 2010-Ohio-5728, 939 N.E.2d 1217 ..........................................11

iv

*State v. Frost*,
    8th Dist. Cuyahoga No. 45561, 1983 Ohio App. LEXIS 13860 (June 23, 1983) ....................8

*State v. Harrison*,
    122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ...................................... 11-12

*State v. Larabee*,
    69 Ohio St.3d 357, 632 N.E.2d 511 (1994) ..................................................................8

*State v. Lordan*,
    116 N.H. 479, 363 A.2d 201 (1976) ........................................................................ 12

*State v. Mutter*,
    150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141 ........................................... 7, 9

*State v. Richey*,
    64 Ohio St.3d 353, 595 N.E.2d 915 (1992) .................................................................9

*State v. Sherman Anderson*,
    8th Dist. Cuyahoga No. 106304 .......................................................................... 16-17

*State v. Soto*,
    3d Dist. Putnam No. 12-17-05, 2018-Ohio-459 ............................................... passim

*State v. Zima*,
    102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542.................................... 2, 11-13

*United States v. Martin Linen*,
    430 U.S. 564, 97 S. Ct. 1349, 51 L.Ed.2d 642 (1977) ............................................ 5, 7

*United States v. Schuster*,
    769 F.2d 337 (6th Cir.1985)......................................................................................7

*United States v. Scott*,
    437 U.S. 82, 98 S. Ct. 2187, 57 L.Ed.2d 65 (1978) .................................................5

*Van DeRyt v. Van DeRyt*,
    6 Ohio St.2d 31, 215 N.E.2d 698 (1966)................................................................ 16

## **Statutes**                    **Page(s)**

ORC 2903.01(C) ...........................................................................................................3
ORC 2903.02(B) ...........................................................................................................3
ORC 2903.04(A)...........................................................................................................3

v

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendant Travis Soto murdered his two-year-old son Julio in 2006.  He then concocted a story in which he claimed that he accidentally struck and killed the boy while driving an ATV.  Based on that story – and given that Soto was the only surviving witness to the incident – the State offered Soto a plea to child endangering, a felony of the third degree, and a dismissal of another count of involuntary manslaughter.  Soto pleaded guilty to child endangering and served five years in prison.  After his release, Soto apparently had a crisis of conscience, and in 2016, confessed that he in fact beat his son to death and staged the ATV accident to cover up the crime.  Based on Soto's confession, the State indicted Soto for aggravated murder, murder, and other offenses.  Soto then moved to dismiss his 2016 indictment on double jeopardy grounds.

In reversing the trial court's decision to deny Soto's motion to dismiss by a 2-1 majority, the Third District committed two crucial errors.  First, the lower court held that the dismissal of the involuntary manslaughter count as part of the plea agreement was the functional equivalent of an acquittal for purposes of double jeopardy.  The court then applied the elemental-comparison test of *Blockburger* between involuntary manslaughter and aggravated murder.  A dismissal as part of a plea agreement, however, is not an acquittal.  It represents no ruling on any element of the offense, nor a finding as to guilt or innocence.  Jeopardy does not attach to a count that the court dismisses as part of a plea agreement before trial.  The Third District therefore should never have applied any *Blockburger* analysis to the dismissed count of involuntary manslaughter at all.  The lower court's decision to do so extended the Double Jeopardy Clause to cover, for the first time, charges dismissed without prejudice prior to the attachment of jeopardy.

1

Second, the lower court missed completely this Court's decision in *State v. Carpenter*, 68 Ohio St.3d 59, 623 N.E.2d 66 (1993).  In *Carpenter*, this Court held that the State could not indict a defendant for murder after the defendant entered into a negotiated guilty plea to a lesser offense unless the State expressly reserved the right to bring further charges at the time of the plea.  The State did not do so in this case.  What the State did have was a compelling argument that *Carpenter* only applied where, at the time of the plea, "the prosecutor has knowledge of and jurisdiction over all [the] offenses[.]"  *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 13.  The prosecution did not have that knowledge in this case, and did not have it because Soto concealed it.  The Third District should have analyzed Soto's case using a *Carpenter* analysis, asking whether Soto had a reasonable expectation of finality in his plea where Soto induced that plea through fraud. The court did none of that analysis.

In addition to being wrong on several fronts as a matter of law, the Third District's decision will result in an egregious miscarriage of justice.  Travis Soto, who beat his own son to death, staged the scene to make it look like an accident, lied to authorities, and only admitted his guilt years later after his release from prison, will serve only five years for a plea to child endangering that he obtained through fraud.  This Court cannot allow this decision to stand.  Accordingly, Amicus Curiae the Cuyahoga County Prosecutor's Office asks this Honorable Court to reverse the Third District's decision.

## INTRODUCTION AND STATEMENT OF AMICUS INTEREST

The Cuyahoga County Prosecutor's Office is responsible for all felony prosecutions in common pleas court in Cuyahoga County, Ohio.  The Cuyahoga County Prosecutor's Office has a special interest in this case and its outcome because the Third District's decision to

2

expand the Double Jeopardy Clause to include counts dismissed without prejudice as part of a plea agreement will have, and is already having, significant repercussions in Cuyahoga County.  That decision risks chilling the State's willingness to enter into plea agreements out of concern that the State will be unable to resurrect any charges dismissed as part of those agreements in the event that either (1) the defendant's plea is later vacated for any reason, or (2) the State learns of additional evidence that would justify the bringing of further charges.  The Cuyahoga County Prosecutor's Office also has an interest in ensuring the uniform application of Ohio law to ensure consistency and to promote confidence in the justice system.

### STATEMENT OF THE CASE AND RELEVANT FACTS

Amicus Curiae the Cuyahoga County Prosecutor's Office hereby adopts and incorporates by reference the Statement of the Case and Statement of Facts as set forth by the Appellant, the State of Ohio, in its merit brief.  Amicus Curiae hereby submits the following additional arguments in support of the Appellant's three propositions of law.

### LAW AND ARGUMENT

***PROPOSITION OF LAW NO. 1: Involuntary manslaughter with a child endangering predicate in violation of ORC 2903.04(A) is not the same offense for double jeopardy purposes as aggravated murder in violation of ORC 2903.01(C) or murder with a felonious assault predicate in violation of ORC 2903.02(B).***

Appellant the State of Ohio demonstrates in its merit brief that the involuntary manslaughter count for which the grand jury indicted Soto in 2006 was not the same offense for purposes of *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L.Ed.2d 306 (1932) as the aggravated murder count for which the grand jury indicted Soto in 2016.  Amicus Curiae further submits that the Third District erred by applying a *Blockburger* elemental-

3

comparison analysis to the charge of involuntary manslaughter in the first place.  Soto was not acquitted of involuntary manslaughter.  Rather, the State dismissed the involuntary manslaughter count as part of a plea agreement.  Jeopardy neither attached nor ever terminated with respect to the charge of involuntary manslaughter.  As such, the Third District should not have applied any double jeopardy analysis to that count at all.

   1. **Double jeopardy bars successive prosecutions for the same offense following an acquittal.  The dismissal of a count as part of a plea agreement is not an acquittal on that count.**

   The Double Jeopardy Clause establishes three separate constitutional protections: (1) "against a second prosecution for the same offense after acquittal[,]" (2) "against a second prosecution for the same offense after conviction[,]" and (3) "against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969).  None of these three things were at issue in this case.  Soto was never "acquitted" of anything.  There was no issue of allied offenses ("multiple punishments"), given that this case proceeded as an interlocutory appeal prior to trial.  And the only offense of which Soto was convicted – child endangering – was not the same offense as aggravated murder using a *Blockburger* analysis.  There should thus have been no double jeopardy issue in this case.

   The Third District erred by treating the State's nolle of the involuntary manslaughter count as part of Soto's 2006 plea as the functional equivalent of an acquittal.  *See State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 23 ("It is our view that the double jeopardy implication of a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal").  The dismissal of charges as part of a plea agreement is *not* an acquittal, express or implied, on those charges.

4

An acquittal is "any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Evans v. Michigan*, 568 U.S. 313, 318, 133 S. Ct. 1069, 185 L.Ed.2d 124 (2013), citing *United States v. Scott*, 437 U.S. 82, 98 S. Ct. 2187, 57 L.Ed.2d 65 (1978).  For purposes of double jeopardy, "a defendant is acquitted only when 'the ruling of the judge, whatever its label, actually represents a resolution [in the defendant's favor], correct or not, of some or all of the factual elements of the offense charged." *Scott* at 97, quoting *United States v. Martin Linen*, 430 U.S. 564, 571, 97 S. Ct. 1349, 51 L.Ed.2d 642 (1977).  An "acquittal" therefore includes "a ruling by the court that the evidence is insufficient to convict," a "factual finding [that] necessarily establish[es] the criminal defendant's lack of criminal culpability," and any other "rulin[g] which relate[s] to the ultimate question of guilt or innocence." *Scott* at 91.

The Supreme Court has distinguished "[t]hese sorts of substantive rulings" from "procedural rulings that may also terminate a case midtrial, which we generally refer to as dismissals or mistrials." *Evans* at 319.  Such "[p]rocedural dismissals include rulings on questions that 'are unrelated to factual guilt or innocence,' but 'which serve other purposes[.]'" *Id.*, quoting *Scott* at 98, n. 11.  The Court in *Scott* explained that double jeopardy is not implicated where the trial court does not render a factual determination in terminating the case.  The defendant in that case "has not been 'deprived' of his valued right to go to the first jury; only the public has been deprived of its valued right to 'one complete opportunity to convict those who have violated its laws.'" *Scott* at 100, quoting *Arizona v. Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L.Ed.2d 717 (1978).

The State's dismissal of a count as part of a plea agreement is not an acquittal of that count.  In that circumstance, the trial court does not resolve any factual element of the charge

in the defendant's favor. There is no ruling that relates to the ultimate question of guilt or innocence of the dismissed count. It is, rather, a procedural dismissal unrelated to factual guilt or innocence that serves another purpose – namely, the facilitation of a plea agreement. The parties' agreement to dismiss that count prevents the trier-of-fact from ever considering or rendering a verdict on that count, including a verdict of acquittal.

2. **Under *Ohio v. Johnson*, a defendant's plea to a lesser included offense does not bar the State from prosecuting the defendant for the greater offense.**

The Supreme Court has already held in this very context that the dismissal of one count in the indictment at the time of a defendant's plea is not an "implied acquittal" on the dismissed offense. *Ohio v. Johnson*, 467 U.S. 493, 104 S. Ct. 2536, 81 L.Ed.2d 425 (1984). In *Johnson*, the defendant pleaded guilty at his arraignment to involuntary manslaughter and grand theft, which were lesser-included offenses of murder and aggravated robbery charges also contained in the indictment. *Id.* at 496. The trial court accepted the pleas, over the objection of the State, and then dismissed the remaining charges. *Id.* The Supreme Court held that double jeopardy did not prohibit the State from continuing to prosecute Johnson for aggravated murder and aggravated robbery:

> "The acceptance of a guilty plea to lesser included offenses while charges on the greater offenses remain pending, moreover, has none of the implications of an 'implied acquittal' which results from a verdict convicting a defendant on lesser included offenses rendered by a jury charged to consider both greater and lesser included offenses."

*Johnson* at 502. The Court stressed that "the taking of a guilty plea is not the same as an adjudication on the merits after full trial[.]" *Id.* at 500, n. 9. Collateral estoppel therefore could not bar prosecution on the remaining charges – regardless of whether the count to which the defendant pleaded guilty was a lesser-included offense of the dismissed count. *Id.*

6

It is true that the defendant in *Johnson* entered his plea over the objection of the State, whereas the defendant in this case entered into a plea agreement with the State (albeit in bad faith).  But the Sixth Circuit found that fact not dispositive in *United States v. Schuster*, 769 F.2d 337, 340-343 (6th Cir.1985):

> "Appellant argues that *Johnson* is not dispositive here because in *Johnson* the guilty pleas were entered * * * over the objection of the prosecution.  We find no basis for distinguishing *Johnson* on that theory.  The discussion in *Johnson* does not emphasize the prosecution's opposition to the plea, but the lack of a final adjudication on the merits.  Acceptance of the guilty pleas in the present case did not operate as a final adjudication that would bar continued prosecution on the remaining counts."

This Court has long held that "[t]he protections afforded by the Ohio and United States Constitutions' Double Jeopardy Clauses are coextensive."  *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 15.  If this Court follows the Supreme Court's lead in *Johnson*, this Court must hold that the dismissal of a count as part of a plea agreement is not an "acquittal" on that count.

### 3. Jeopardy does not attach to charges terminated by plea agreement before the jury is empaneled and sworn.

The Third District could not apply a double jeopardy analysis to the involuntary manslaughter count that the State dismissed as part of Soto's 2006 plea agreement because jeopardy never attached to that count.  "The protections afforded by the [Double Jeopardy] clause are implicated only when the accused has actually been placed in jeopardy.  This state of jeopardy attaches when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence."  *United States v. Martin Linen Supply Co.*, 430 U.S. at 569, 97 S. Ct. 1349, 51 L.Ed.2d 642.  Where the court dismisses a charge before the jury is empaneled and sworn, or before the court begins to hear evidence, jeopardy does not attach.

7

"It is unnecessary to determine whether the charges against the defendant in Cleveland Municipal Court in the present case were lesser included offenses of the charges contained in the felony indictment. For those charges were nolled in accordance with the terms of the plea bargain. The entry of a *nolle prosequi* restores an accused to the status of a person against whom charges have never been filed[.] * * * [N]o jeopardy attaches where a *nolle prosequi* is entered before a jury is sworn."

*State v. Frost*, 8th Dist. Cuyahoga No. 45561, 1983 Ohio App. LEXIS 13860, *3-4 (June 23, 1983). "Because jeopardy had not attached to the pretrial procedure, the defendant was precluded from asserting a double jeopardy defense." *State v. Larabee*, 69 Ohio St.3d 357, 359, 632 N.E.2d 511 (1994). *See also In re M.C.H.*, 5th Dist. Delaware No. 12-CA-131, 2013-Ohio-2649, ¶ 20 ("As jeopardy has not attached and the accused can be re-prosecuted for the same offense, a dismissal or nolle is not the functional equivalent of an acquittal").

**4. The involuntary manslaughter count was not dismissed "with prejudice" in part of the 2006 plea agreement.**

The Third District's decision to treat the State's nolle of the involuntary manslaughter count as an "implied acquittal" was even more egregious in this case given that the State did not dismiss that count with prejudice. Soto acknowledged in the appellate court that "the judgment entries and transcripts from that case did not address whether the matter would be dismissed with or without prejudice[.]" *State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 8. "When an indictment or citation is dismissed without any indication of whether the dismissal is with or without prejudice, we presume the dismissal to be without prejudice." *City of Cleveland v. Primm*, 8th Dist. Cuyahoga No. 104963, 2017-Ohio-7242, ¶ 8.

**5. Double jeopardy did not bar the 2016 prosecution because child endangering is not the same offense as aggravated murder.**

This left Soto with only the second type of protection afforded by the Double Jeopardy Clause: protection "against a second prosecution for the same offense after conviction."

8

*North Carolina v. Pearce*, 395 U.S. at 717, 89 S. Ct. 2072, 23 L.Ed.2d 656. The only offense of which Soto was convicted was child endangering. The Third District should have applied a *Blockburger* analysis only to the child endangering count determine whether the 2016 prosecution involved that same offense for purposes of double jeopardy. *See State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 17 (*Blockburger* applies to a successive prosecutions double jeopardy claim).

Using that *Blockburger* analysis, both child endangering and aggravated murder each contain an element not contained in the other offense. *See State v. Richey*, 64 Ohio St.3d 353, 369, 595 N.E.2d 915 (1992) ("The elements of child endangering are the defendant's custody or control of a child under eighteen and his creation of a substantial risk to the health or safety of the child by violating a duty of care or protection. Aggravated murder is a purposeful killing in the course of one of nine specified felonies, none of which is child endangering. These offenses have entirely different elements"). Accordingly, the only count of which Soto was ever convicted – child endangering – was not an allied offense to aggravated murder under *Blockburger*. This should have been the end of the lower court's double jeopardy analysis.

### 6. Conclusion.

To hold, as the Third District did in this case, that double jeopardy bars successive prosecutions of counts dismissed as part of a plea agreement, with or without prejudice, and without any adjudication on the merits, would be a dramatic expansion of the Double Jeopardy Clause. It would create a new, fourth category of double jeopardy protections never contemplated by the Supreme Court or by any authority of which Amicus Curiae is aware. It will prevent prosecutions and deter the State's willingness to enter into plea bargains. This

9

Court must reverse this case and hold that the dismissal of a count in an indictment as part of a plea agreement is not an acquittal of that count for purposes of double jeopardy.

> **PROPOSITION OF LAW NO. 2**:  *Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to Blockburger to allow subsequent prosecution.*

> **PROPOSITION OF LAW NO. 3**:  *A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario.*

It is clear from the Third District's opinion that what the lower court was truly troubled by was the prospect of the State re-indicting a defendant for additional offenses arising from the same incident following a plea:

> "Under any other interpretation, and barring any special exception or reservation in the record, the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense. There would be no finality under such a system and it would render plea agreements largely meaningless."

*State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 23.  This may be a valid concern, but the Third District did not need to stretch double jeopardy to cover this situation. The scenario that the Third District described is exactly the fact pattern that this Court addressed in *Carpenter*.  The Third District should therefore have simply applied *Carpenter* to this case.  Had the court done so, its analysis would have been completely different.

1. ***State v. Carpenter* only bars the State from prosecuting a defendant for additional offenses arising out of the same transaction where a defendant has an objectively reasonable expectation of finality in his plea.**

In *Carpenter*, at syllabus, this Court held the following:

> "The state cannot indict a defendant for murder after the court has accepted a negotiated guilty plea to a lesser offense and the victim later dies of injuries

10

sustained in the crime, unless the state expressly reserves the right to file additional charges on the record at the time of the defendant's plea."

The Third District noted that the State did not reserve the right to bring additional charges at the time of Soto's 2006 plea.  *See Soto*, ¶ 30, citing *Carpenter*.  The court should therefore have applied *Carpenter* in its decision.  No sooner did the lower court raise the *Carpenter* issue, however, than the court seemed to declare it irrelevant.  *Id.*, ¶ 31 ("Regardless of the status of the record as to any reservation of rights by the State at the original plea * * *").  The Third District did not discuss *Carpenter* any further in its opinion.

*Carpenter* "is not based on the Double Jeopardy Clause of the Constitution, but on contract law." *City of Cleveland v. Evans*, 8th Dist. Cuyahoga No. 100721, 2014-Ohio-4567, ¶ 32.  "The holding in *Carpenter* is essentially a synthesis of contract and criminal law in a particular factual setting." *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 11; *see also State v. Dye*, 127 Ohio St.3d 357, 2010-Ohio-5728, 939 N.E.2d 1217, ¶ 30 (Lundberg Stratton, J., dissenting) ("At the outset, the holding in *Carpenter* is not compelled by the Double Jeopardy Clause").   Contract law generally requires a meeting of the minds. "In order to declare the existence of a contract, both parties must consent to its terms, there must be a meeting of the minds of both parties; and the contract must be definite and certain." *Episcopal Retirement Homes v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991) (internal citations omitted).

This Court premised its decision in *Carpenter* on its finding that "under the circumstances of that case, the defendant reasonably 'anticipated that by pleading guilty to attempted felonious assault, and giving up rights which may have resulted in his acquittal, he was terminating the incident and could not be called on to account further on any charges regarding this incident.'" *Zima*, ¶ 11, quoting *Carpenter* at 61-62.  "The key to the continued

11

validity of the plea agreement in *Carpenter* was the reasonableness of the defendant's expectation that the prosecution would end[.]"  *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 43.

The crucial inquiries in any *Carpenter* claim are thus (1) whether the defendant expected that his plea would terminate all charges arising from the incident, and (2) whether that expectation was objectively reasonable.  If the answer to both questions is yes, *Carpenter* requires dismissal of any subsequent charges.  By contrast, if the State reserves the right to bring additional charges at the time of the plea, any expectation of finality by the defendant is irrelevant, and the court need not consider those questions.

A defendant cannot have an objectively reasonable expectation of finality in a plea agreement obtained through fraud.  In that circumstance, there can be no meeting of the minds.  It is undisputed in this case that Soto lied to authorities and concealed evidence of his crimes to obtain the benefit of a more favorable plea.  The Third District acknowledged this in its opinion, writing that "Soto told the police [in 2016] that he had actually beat his son to death back in 2006 and that he had staged the ATV accident scene."  *State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 5.  Any expectation of finality by a defendant is not objectively reasonable where the defendant enters into a plea agreement in bad faith, intending to deceive the State into offering a more lenient bargain.

The prosecution's knowledge at the time of the plea is "critical."  *Zima*, ¶ 12.  *Carpenter* only applies where, at the time of the plea, "the prosecutor has knowledge of and jurisdiction over all [the] offenses[.]"  *Id.*, ¶ 13, quoting *State v. Lordan*, 116 N.H. 479, 482, 363 A.2d 201 (1976).  In *Carpenter*, "the state was aware that the defendant's victim was likely to die of the injuries inflicted by the defendant[.]"  *Harrison*, ¶ 40.  Absent that knowledge, State would

12

not be on an equal footing with the defendant to reach an agreement to resolve all of the charges.  The defendant could not reasonably expect that his plea would do so.

In *Carpenter*, it was only because "the prosecutor and the court had jurisdiction over all the charges, both actual and potential," that "the defendant's expectation that his guilty plea would terminate the incident was inherently justified[.]"  *Zima*, ¶ 12.  The State did not have that knowledge in this case, and did not have it because Soto manipulated evidence by staging the ATV accident and lying to authorities.  This Court should hold in this case that *Carpenter* does not preclude the State from bringing additional charges against a defendant following a negotiated plea where the State was unaware of the factual basis for the additional charges at the time of the plea as a result of fraud or deception by the defendant.

### 2. *Jeffers v. United States* recognized that double jeopardy does not bar successive prosecutions where the defendant caused the successive prosecutions through his own actions.

This principle is in harmony with the Supreme Court's own double jeopardy jurisprudence.  In *Jeffers v. United States*, 432 U.S. 137, 97 S. Ct. 2207, 53 L.Ed.2d 168 (1977), the Supreme Court recognized what was essentially an "invited error" exception to the double jeopardy bar against successive prosecutions.  In *Jeffers*, the defendant was indicted in two separate cases – one for conspiracy, and one for conducting a continuing criminal enterprise.  *Id.* at 141-142.  The conspiracy charge was a lesser included offense of the continuing criminal enterprise charge.  *Id.* at 144.  The government sought to consolidate the two indictments together for a single trial.  *Id.* at 142.  The defendant objected.  *Id.*  The trial court sided with the defendant and ordered the cases tried separately.  *Id.* at 143.

The Supreme Court held that the defendant's action in opposing the government's motion to consolidate the indictments acted as an exception to the double jeopardy

13

prohibition against successive prosecutions for the same offense. The defendant was "solely responsible for the successive prosecutions[.]" *Id.* at 154. The defendant's own actions "deprived him of any right that he might have had against consecutive trials." *Id.* The Supreme Court thus held that the government could prosecute the defendant for the greater offense, "and the only issue remaining is that of cumulative punishments upon such prosecution and conviction." *Id.*

Significantly, the Supreme Court in *Jeffers* also strongly implied that double jeopardy would not bar successive prosecutions where the State was unaware of the facts necessary to support a conviction on the greater offense at the time of the conviction on the first offense, despite the exercise of due diligence. The Court noted that "[o]ne commonly recognized exception" to the bar against successive prosecutions exists "when all the events necessary to the greater crime have not taken place at the time the prosecution for the lesser is begun." *Id.* at 151. The Court continued: "This exception may also apply when the facts necessary to the greater were not discovered despite the exercise of due diligence before the first trial." *Id.* at 152, citing *Ashe v. Swenson*, 397 U.S. 436, 453 n. 7, 90 S. Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring) ("For example, where a crime is not completed or not discovered, despite diligence on the part of the police, until after the commencement of a prosecution for other crimes arising from the same transaction, an exception to the 'same transaction' rule should be made"). This case presents this Court with the opportunity to recognize and define the "due diligence" exception to double jeopardy.

### 3. The State exercised due diligence in this case, relying on the coroner's conclusion in an autopsy report that the victim died in an ATV accident.

The Third District acknowledged the existence of the "due diligence" exception, yet found that the State did not exercise such diligence in this case by "rely[ing] exclusively upon

[the] defendant's explanation or narrative[.]"  *State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 28.  But the State did not rely exclusively upon Soto's explanation for his son's death.  The Lucas County Coroner's Office "concluded that the child died of blunt force trauma caused by an ATV accident."  *Id.*, ¶ 2.  Even if the State was not justified in relying on Soto's explanation, it was surely justified in relying on that of a forensic pathologist. Moreover, in the 2016 prosecution, the State obtained the expert opinion of a pediatric abuse specialist, Dr. Randall Schlievert, who reviewed the Lucas County Coroner's 2006 autopsy report.  Dr. Schlievert concluded that the pathologist's original finding that the child died as the result of an ATV accident was "reasonabl[e] yet faulty[.]"  *Id.*, ¶ 6.

The Third District also refused to hold Soto accountable for his lies to law enforcement, writing that "this seems to place an unlikely constitutional burden on a criminal defendant to assist the prosecution in every respect despite his right to remain silent."  *Id.*, ¶ 28.  Soto, however, did not remain silent.  Soto waived his right to remain silent and chose to give a statement to police and to the coroner that was false.  If Soto simply did nothing, the question of whether there was bad faith sufficient to preclude him from having a reasonable expectation of finality in his plea might be a closer one.  But that is not this case. Soto chose to inject false information into the police investigation to conceal the extent of his involvement in his son's death and to thereby obtain a more favorable plea deal.  He could not have had an objectively reasonable expectation of finality in his plea under these facts.

**4. Soto's plea agreement, which he entered into in bad faith and by deception, constituted a fraud on the court that deprived Soto of any objectively reasonable expectation of finality.**

The trial court rightly refused to allow Soto to take advantage of his own misconduct and deception.  The Third District erred by reversing that decision and by misapplying

double jeopardy law to do so.  A defendant should not be allowed to benefit from the wrongfulness of his own acts; from his deceit of law enforcement authorities; and from his own bad faith in plea negotiations.

Soto entered into a plea agreement with the fingers of one hand crossed behind his back.  This Court should not countenance these tactics, which will have a subversive and chilling effect on the willingness of prosecutors to enter into plea bargains to anything less than the indictment.  "[F]or where fraud or collusion is practiced on a court, the court ceases to function as a court and its judgment becomes an official stamp lent to the subversive intentions of the abusing parties."  *Van DeRyt v. Van DeRyt*, 6 Ohio St.2d 31, 36, 215 N.E.2d 698 (1966).  This Court should reverse the Third District's decision in this case and hold that a defendant does not have an objectively reasonable expectation of finality in a plea agreement under *State v. Carpenter* where the State was unaware of the factual basis for additional charges at the time of the plea solely as a result of the defendant's wrongdoing.

**5. The trial court's denial of Soto's motion to dismiss should not have been a final, appealable order.**

Finally, Amicus Curiae notes that there is no precedent in Ohio that allows a defendant to bring a pretrial, interlocutory appeal of the denial of a motion to dismiss based on *Carpenter*.  The Third District allowed Soto's appeal to proceed only by accepting Soto's invitation to frame his argument as a double jeopardy claim, rather than as a *Carpenter* claim. This Court has recognized that the denial of a motion to dismiss on double jeopardy grounds is a final, appealable order.  *See State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23, ¶ 61.  Had Soto correctly framed his motion to dismiss as a *Carpenter* claim, or had the Third District framed it that way, no authority (presently) exists for the proposition that the denial of such a motion is a final, appealable order.  *But see State v. Sherman Anderson*,

16

8th Dist. Cuyahoga No. 106304 (appeal pending on the question of whether the denial of a *Carpenter* motion to dismiss is a final, appealable order; oral argument held May 22, 2018).

Given that Soto did not frame his motion to dismiss as a *Carpenter* claim, and that the parties did not raise this issue in the lower court, this is not the right case to decide whether the denial of a motion to dismiss based on *Carpenter* is a final, appealable order.  But Amicus Curiae suspects that this Court will see this issue again soon.

## CONCLUSION

Amicus Curiae the Cuyahoga County Prosecutor's Office therefore respectfully asks this Honorable Court reverse the Third District's decision and hold that (1) the dismissal of a count in an indictment as part of a plea agreement is not an "implied acquittal" of that count for purposes of double jeopardy, and (2) a defendant does not have an objectively reasonable expectation of finality in a plea agreement under *State v. Carpenter* where the State was unaware of the factual basis for additional charges at the time of the plea, and did not reserve the right to bring those charges in the future, solely as a result of the defendant's wrongdoing.

Respectfully submitted,
MICHAEL C. O'MALLEY
CUYAHOGA COUNTY PROSECUTOR

 _/s/ Christopher D. Schroeder_
CHRISTOPHER D. SCHROEDER (0089855)
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113
(216) 443-7733
cschroeder@prosecutor.cuyahogacounty.us

17

**CERTIFICATE OF SERVICE**

A copy of the foregoing *Brief of Amicus Curiae the Cuyahoga County Prosecutor's Office on Behalf of Appellant* was served by email this 16th day of July, 2018 to Carly M. Edelstein (carly.edelstein@opd.ohio.gov), counsel for Defendant-Appellee Travis Soto.

　*/s/ Christopher D. Schroeder*
Christopher D. Schroeder (0089855)
Assistant Prosecuting Attorney

18

Supreme Court of Ohio Clerk of Court - Filed August 22, 2018 - Case No. 2018-0416

IN THE SUPREME COURT OF OHIO

STATE OF OHIO,                          :
                                        :      Case No. 2018-0416
            Plaintiff-Appellant,        :
                                        :      On Appeal from the
vs.                                     :      Putnam County Court of Appeals,
                                        :      Third Appellate District
TRAVIS SOTO,                            :
                                        :      C.A. Case No. 12-17-05
            Defendant-Appellee.         :
                                        :
_____

## MERIT BRIEF OF TRAVIS SOTO
_____

PUTNAM COUNTY                           OFFICE OF THE OHIO PUBLIC DEFENDER
PROSECUTOR'S OFFICE

GARY L. LAMMERS (0042040)               CARLY M. EDELSTEIN (0095950)
Putnam County Prosecuting Attorney      Assistant State Public Defender
(Counsel of Record)                     (Counsel of Record)

336 East Main Street                    250 East Broad Street, Suite 1400
Ottawa, Ohio 45875                      Columbus, Ohio 43215
(419) 523-3600                          (614) 752-7033
(419) 523-4519 – Fax                    (614) 752-5167 – Fax
gary.lammers@putnamcountyohio.gov       carly.edelstein@opd.ohio.gov

COUNSEL FOR STATE OF OHIO               COUNSEL FOR TRAVIS SOTO

## TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF THE CASE .................................................................................................. 2

STATEMENT OF THE FACTS ................................................................................................ 4

ARGUMENT ........................................................................................................................ 6

State's Proposition of Law No. 3:

 A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario. ................................................ 6

 Response to the State's Proposition of Law No. 3 ................................................... 6

State's Proposition of Law No. 1:

 Involuntary Manslaughter with a child endangering predicate in violation of ORC 2903.04(A) is not the same offense for double jeopardy purposes as Aggravated Murder in violation of ORC 2903.01(C) or Murder with a felonious assault predicate in violation of ORC 2903.02(B) under the *Blockburger* "same offense" test. ................................................................................................................. 15

 Response to the State's Proposition of Law No. 1 ................................................. 15

State's Proposition of Law No. 2:

 Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to *Blockburger* to allow subsequent prosecution. ....................................................................................... 21

 Response to the State's Proposition of Law No. 2 ................................................. 21

CONCLUSION .................................................................................................................... 26

CERTIFICATE OF SERVICE ................................................................................................ 27

i

**APPENDIX:**

*State of Ohio v. Travis Soto*, Case No. 2016 CR 57, Putnam County Court of Common
  Pleas, Motion to Dismiss on the Grounds of Double Jeopardy ..................................... A-1

*State of Ohio v. Travis Soto*, Case No. 2016 CR 57, Putnam County Court of Common
  Pleas, Response to Defendant's Motion to Dismiss ....................................................... A-4

Article I, Section 10, Ohio Constitution ............................................................................. A-11

R.C. 2903.11 ....................................................................................................................... A-12

R.C. 2905.01 ....................................................................................................................... A-14

R.C. 2921.12 ....................................................................................................................... A-16

ii

# TABLE OF AUTHORITIES

**Page No.**

**CASES:**

*Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) ................................21

*Baughman v. State Farm Mut. Auto Ins. Co.*, 88 Ohio St.3d 480, 727 N.E.2d 1265 (2000)...........................................................................................................................................1

*Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)............ *passim*

*Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) ............................ *passim*

*Carmody v. Seventh Judicial District*, 81 Nev. 83, 398 P.2d 706 (1965).........................22, 23

*City of Cleveland v. Evans*, 8th Dist. Cuyahoga No. 100721, 2014-Ohio-4567 ....................11

*Centers v. Commonwealth*, 318 S.W.2d 57 (Ky. 1958).......................................................22, 23

*Commonwealth, ex rel. Papy v. Maroney*, 417 Pa. 368, 207 A.2d 814 (1965) ................22, 23

*Daniel v. State*, 2008 WY 87, 189 P.3d 859 (2008) ................................................................24

*Diaz v. United States*, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912) ...................21, 22, 23

*In re J.A.P.*, 2d Dist. Montgomery No. 20058, 2004-Ohio-3918 ............................................10

*Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977)................13, 14

*North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)..................16

*Ohio v. Johnson*, 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984)...............................18

*People v. Davis*, 36 Cal.4th 510, 31 Cal.Rptr.3d 96, 115 P.3d 417 (2005) ............................24

*People v. Wilson*, 454 Mich. 421, 563 N.W.2d 44 (1997)......................................................24

*Rashad v. Burt*, 108 F.3d 677 (6th Cir.1997).........................................................................23

*Reeves v. Campbell*, 708 F. App'x 230 (6th Cir.2017)...........................................................20

*Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) .........................6

*Southworth v. State*, 98 Fla. 1184, 125 So. 345 (1929) .....................................................22, 23

*State v. Anderson*, 8th Dist. Cuyahoga No. 106304, 2018-Ohio-3051 .....................................10

*State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150 ...................................6

*State v. Carpenter*, 68 Ohio St.3d 59, 623 N.E.2d 66 (1993) ......................................... *passim*

*State v. Chappell*, 127 Ohio St.3d 376, 2010-Ohio-5991, 939 N.E.2d 1234.........................16

*State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663 ................................9, 11

*State v. Dye*, 127 Ohio St.3d 357, 2010-Ohio-5728, 939 N.E.2d 1217 ................................7, 8

*State v. Edwards*, 8th Dist. Cuyahoga Nos. 94568 and 94929, 2011-Ohio-95...................9, 23

*State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889.................................19

*State v. Fairbanks*, 117 Ohio St.3d 543, 2008-Ohio-1470, 885 N.E.2d 888 ..........................17

*State v. Gonzales*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903 (1st Dist.)........22

*State v. Goodman*, 9th Dist. Medina No. 3220-M, 2002-Ohio-818 .......................................22

*State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106..................7, 8, 14

*State v. Johnson*, 6 Ohio St.3d 420, 453 N.E.2d 595 (1983) ...................................................17

*State v. Kidder*, 32 Ohio St.3d 279, 513 N.E.2d 311 (1987) ............................................18, 19

*State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890 ........................................16

*State v. Lordan*, 116 N.H. 479, 363 A.2d 201 (1976).................................................................7

*State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185...............17, 18, 20, 21

*State v. McCullough*, 8th Dist. Cuyahoga No. 105959, 2018-Ohio-1967 ..............................10

*State v. Mullins*, 5th Dist. Fairfield No. 12 CA 17, 2013-Ohio-1826...............................10, 11

*State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141...............................17

*State v. Resor*, 6th Dist. Huron No. H-08-028, 2010-Ohio-397 .............................................20

*State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459................................3, 12, 24, 26

*State v. Thomas*, 61 N.J. 314, 294 A.2d 57 (1972) ...................................................................6

iv

*State v. Thomas*, 61 Ohio St.2d 254, 400 N.E.2d 897 (1980)..............................................7, 22

*State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988).....................................17, 18, 21

*State v. Tolbert*, 60 Ohio St.3d 89, 573 N.E.2d 617 (1991)............................................. *passim*

*State v. Vargas*, 279 Mont. 357, 928 P.2d 165 (1996).......................................................24, 25

*State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542 ............................7, 9, 10

*United States v. Aguilar*, 849 F.2d 92 (3d Cir.1988) .......................................................24, 25

*United States v. Anderson*, 514 F.2d 583 (7th Cir.1975) .........................................................7

*United States v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)...................17

*United States v. Hallam*, 472 F.2d 168 (9th Cir.1973) ............................................................7

*United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) ...........................17

*United States v. Robison*, 924 F.2d 612 (6th Cir.1991) ............................................................6

*United States v. Rosenberg*, 888 F.2d 1406 (D.C. Cir.1989)............................................24, 25

## CONSTITUTIONAL PROVISIONS:

Article I, Section 10, Ohio Constitution ...................................................................................16

Fifth Amendment, United States Constitution.........................................................................16

## STATUTES:

R.C. 2903.01 ...................................................................................................................... *passim*

R.C. 2903.02 .....................................................................................................2, 15, 19, 20

R.C. 2903.04 .........................................................................................................2, 15, 20

R.C. 2903.11 ...............................................................................................................................2

R.C. 2905.01 ...............................................................................................................................2

R.C. 2919.22 ...............................................................................................................................2

R.C. 2921.12 ...............................................................................................................................2

v

**INTRODUCTION**

This case should be dismissed as improvidently granted. The Third District Court of Appeals correctly applied the test set forth in *Blockburger v. United* States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed.3d 306 (1932) to Mr. Travis Soto's charges and properly considered the due diligence exception articulated by this Court in *State v. Tolbert*, 60 Ohio St.3d 89, 573 N.E.2d 617 (1991). The State does not like the outcome below, so it has asked this Court to engage in error correction. *Baughman v. State Farm Mut. Auto Ins. Co.*, 88 Ohio St.3d 480, 492, 727 N.E.2d 1265 (2000) (Cook, J., and Stratton, J., concurring) (explaining that this Court "sits to settle the law, not to settle cases," and its function is not to engage in "'error correction' regarding the application of settled law" to the facts of a particular case). The State asks this Court to find that the court of appeals improperly applied the *Blockburger* test, that the court improperly concluded that the State failed to exercise due diligence in its investigation and indictment of Mr. Soto, and that Mr. Soto did not reasonably believe his negotiated plea would bar further prosecutions for any greater offenses related to the death of his child. Each of the State's propositions of law seeks error correction. Whether or not Mr. Soto's offenses are the same for purposes of Double Jeopardy, whether the State exercised due diligence in this case, and whether Mr. Soto could have reasonably believed his plea would bar further prosecution are all questions of fact that are specific to this case. This Court should therefore dismiss this appeal as improvidently granted.

### STATEMENT OF THE CASE

On March 31, 2006, the State indicted Mr. Travis Soto for causing the death of his two-year-old son. The State charged him with involuntary manslaughter, in violation of R.C. 2903.04(A), for causing the death of another as a proximate result of committing or attempting to commit a felony, and child endangering, in violation of R.C. 2919.22(A) and (E)(1)(c). On August 31, 2006, the State entered into a negotiated plea agreement with Mr. Soto whereby he pleaded guilty to child endangering and the State dismissed the involuntary manslaughter charge. The trial court sentenced Mr. Soto to five years in prison.

Years after Mr. Soto completed his prison term, on August 15, 2016, the State again indicted Mr. Soto for causing the death of his son. This time, the State charged Mr. Soto with aggravated murder, in violation of R.C. 2903.01(C), for purposely causing the death of another under the age of thirteen; murder, in violation of R.C. 2903.02(B), for causing the death of another as a proximate result of committing or attempting to commit a felony of the first or second degree that is an offense of violence; felonious assault, in violation of R.C. 2903.11(A)(1); kidnapping, in violation of R.C. 2905.01; and tampering with evidence, in violation of R.C. 2921.12(A)(1).

Before trial, on October 11, 2016, Mr. Soto filed a "Motion to Dismiss on the Grounds of Double Jeopardy," arguing that involuntary manslaughter (dismissed by agreement in 2006) is a lesser included offense of both murder and aggravated murder (charged in 2016), and therefore the 2006 plea agreement precludes subsequent prosecution for these greater charges. The State responded by asserting that the involuntary manslaughter charge was not the same offense as murder and aggravated murder for purposes of a Double Jeopardy analysis, that a due diligence exception applied, and that Mr. Soto could not have reasonably believed his negotiated plea based

2

on his 2006 narrative of events would bar subsequent prosecution on greater charges. 10/18/2016 Response to Defendant's Motion to Dismiss, p. 4-6.

On April 13, 2017, the trial court denied Mr. Soto's motion. The court concluded that involuntary manslaughter was not the same offense as murder and aggravated murder for Double Jeopardy purposes; that even if they were the same offenses under the *Blockburger* test, the information necessary to support the later charges could not have been discovered despite the State's exercise of due diligence; and that Mr. Soto "could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his previous narrative of events would bar prosecution of subsequent charges based on newly discovered evidence which would transform the case from one of an accidental death to a purposeful homicide." 4/13/2017 Judgment Entry, 2016-CR-00057, p. 4.

Mr. Soto filed an interlocutory appeal, and the Third District Court of Appeals reversed the lower court's decision. The Third District concluded that involuntary manslaughter, murder, and aggravated murder are the same offenses under the Double Jeopardy Clause; that the due diligence exception does not apply because the State failed to conduct a full and complete investigation and instead relied on Mr. Soto's purported confession; and that this Court's decision in *State v. Carpenter*, 68 Ohio St.3d 59, 623 N.E.2d 66 (1993), precludes a subsequent indictment for aggravated murder and murder because the State failed to reserve the right to bring additional charges against Mr. Soto. *State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459.

On March 19, 2018, the State filed its notice of appeal and memorandum in support of jurisdiction. Mr. Soto's then-attorney waived the right to file a memorandum in opposition, and on May 23, 2018, this Court accepted the appeal.

## STATEMENT OF THE FACTS

The procedural history above stems from the January 23, 2006, death of Mr. Soto's two-year-old son, J.B. That day, Mr. Soto was at home with J.B. while the child's mother was at work. When she returned from work, Mr. Soto informed her that J.B. was no longer with them, she called 911, and J.B. was pronounced dead soon thereafter.

The Putnam County Sheriff's Office immediately began investigating J.B.'s death. Through interviews, Mr. Soto indicated to investigators that he accidentally ran over J.B. with his all-terrain vehicle (ATV). But Mr. Soto's story changed. At first, Mr. Soto told investigators that he was riding the ATV alone and accidentally ran over J.B. as he came around the corner of a building on the property. Later, Mr. Soto gave a different story, telling investigators that he was riding the ATV with J.B. along the railroad tracks next to the property when J.B. fell off and was struck by the vehicle. Mr. Soto told the detectives that he picked up J.B., carried him inside the house, cleaned him up, changed his clothes, rocked him until he stopped crying, and put him to bed. Mr. Soto told the police he later checked on the boy and learned that he was not breathing. He did not call 911 or attempt to get any medical care for J.B. Two to three hours later, when J.B.'s mother returned home, Mr. Soto informed her that J.B. was no longer with them.

The next day, on January 24, 2006, Dr. Cynthia Bisser of the Lucas County Coroner's Office conducted an autopsy of J.B. and concluded that his injuries were consistent with the history provided to her: that the child died from internal injuries sustained from an ATV accident.

The State charged Mr. Soto with child endangering and involuntary manslaughter. As part of a negotiated plea agreement, Mr. Soto pleaded guilty to child endangering, and the State dismissed the involuntary manslaughter charge. Mr. Soto was sentenced to five years in prison, and he served all of that time. Years after completing his full prison sentence, Mr. Soto returned

4

to the Putnam County Sheriff's Office and provided a new statement concerning the 2006 death of J.B. Mr. Soto claimed that J.B. had not died from an ATV accident, that he had staged the accident scene, and that J.B. died because he had beat him.[1]

Based on this new version of events, a pediatric abuse specialist, Dr. Randall Schlievert, reviewed the autopsy report from 2006 and the new information provided to him by the State, and concluded as follows:

> It is understandable that Dr. Beisser [sic] certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lungs, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> …What I can say is that [J.B.]'s injuries are entirely consistent with [Mr. Soto]'s confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that [J.B.] died from the abuse that [Mr. Soto] inflicted on that day in 2006.

4/13/2017 Judgment Entry, 2016-CR-00057, p. 6.

Thereafter, the State indicted Mr. Soto with the charges at issue in this case.

---

[1] Amicus asserts that it is undisputed that Mr. Soto lied to authorities and concealed evidence of his crimes to obtain the benefit of a more favorable plea. Brief of Amicus Curiae, p. 12. This is not undisputed. At this point, Mr. Soto has told three different stories: two concerning an ATV accident and one concerning a beating and cover-up. Each time a medical examiner reviewed the evidence, the report supported the theory at the time. Mr. Soto has not been found guilty by a jury of these new charges. Therefore, we do not know which is the true story.

## ARGUMENT

For clarity, this brief addresses the State's propositions of law out of order.

**State's Proposition of Law No. 3:**

> **A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario.**

**Response to the State's Proposition of Law No. 3**

The State's third proposition of law concerns contract law and its application to plea agreements, but the "contract" at issue in this case—the plea agreement—is not part of the record. The State seeks error correction without allowing the Court to review the plea agreement, the judgment entry, or even the sentencing hearing transcript.

**I.    A plea agreement is a contract between the defendant and the State, and it is governed by contract law principles.**

A plea agreement represents the conclusion of an important negotiating process between the State and the defendant and his or her attorney. It is "contractual in nature" and it is interpreted using "traditional principles of contract law." *United States v. Robison*, 924 F.2d 612, 613 (6th Cir.1991). *See also State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 50. These contracts between the State and the defendant are "an essential and necessary part of the administration of justice." *State v. Carpenter*, 68 Ohio St.3d 59, 61, 623 N.E.2d 66 (1993). *See also Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). They are critical to the criminal justice system because they reduce the overall number of cases going to trial, which would otherwise flood and overwhelm the courts. *Santobello* at 261. And only "if it is generally believed that performance on the part of the State will not disappoint a defendant's reasonable expectations will plea bargaining become and remain a truly effective device in criminal administration." *State v. Thomas*, 61 N.J. 314, 322, 294 A.2d 57 (1972). For that reason,

6

a prosecutor may not "dissolve an executed bargain or [] vacate a guilty plea when he discovers that the bargain is unexpectedly advantageous to the defendant." *State v. Lordan*, 116 N.H. 479, 482, 363 A.2d 201 (1976), citing *United States v. Hallam*, 472 F.2d 168 (9th Cir.1973), and *United States v. Anderson*, 514 F.2d 583 (7th Cir.1975).

When interpreting a plea agreement, "effect must be given to the intention of the state and the defendant in their plea bargain * * *." *State v. Dye*, 127 Ohio St.3d 357, 2010-Ohio-5728, 939 N.E.2d 1217, ¶ 22. Consequently, when the parties reach an agreement that resolves all criminal conduct surrounding a particular incident, double-jeopardy-like protection ensures that the parties' understanding of the agreement is enforced. *See generally Carpenter* at syllabus; *State v. Tolbert*, 60 Ohio St.3d 89, 91, 573 N.E.2d 617 (1991); *State v. Thomas*, 61 Ohio St.2d 254, 261-262, 400 N.E.2d 897 (1980); *Brown v. Ohio*, 432 U.S. 161, 166-167, fn. 6, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

In other words, a negotiated plea bars successive prosecutions where the defendant reasonably believes that the plea would preclude further prosecutions for any offense arising from the same factual scenario. *See Dye* at ¶ 20-28. *See also Lordan* at 203. And the focus should be "on the reasonableness of the defendant's belief that the plea agreement would terminate any future charges based upon the same incident." *State v. Harrison*, 122 Ohio St.3d 512, 2009-Ohio-3547, 912 N.E.2d 1106, ¶ 45.[2]

---

[2] Amicus asserts that "[t]he prosecution's knowledge at the time of the plea is 'critical,'" allegedly quoting *State v. Zima* for that proposition. Brief of Amicus Curiae, p. 12, quoting *Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 12. Not so. In *Zima*, the State brought charges arising out of the same incident in both municipal and common pleas courts. The defendant's plea agreement resolved only the municipal court charges. The *Zima* Court's holding turned on the "defendant's belief that no further charges will be brought or prosecuted." *Id*. The defendant did not have a reasonable expectation because "'[a] defendant should be aware that a plea taken before a municipal judge with limited criminal jurisdiction might not dispose of the matter fully.'" *Id*. at

7

II.     *State v. Carpenter* **and its progeny.**

In *State v. Carpenter*, this Court held that separate and apart from Double Jeopardy considerations, "the state cannot indict a defendant for murder after the court has accepted a negotiated guilty plea to a lesser offense and the victim later dies of injuries sustained in the crime, unless the state expressly reserves the right to file additional charges on the record at the time of the defendant's plea." 68 Ohio St.3d 59, 62, 623 N.E.2d 66 (1993). In reaching that conclusion, this Court considered the equities involved in plea bargaining:

> By accepting a plea to a lesser included charge, the state obtained a definite prison term for the defendant and avoided the uncertainties of trial. In exchange, the appellant anticipated that by pleading guilty to attempted felonious assault, and giving up rights which may have resulted in his acquittal, he was terminating the incident and could not be called on to account further on any charges regarding this incident.

*Id.* at 61-62. Years later, this Court reaffirmed its commitment to that principle stating that a negotiated guilty plea carries with it a "defendant's reasonable expectation that pleading guilty would end the criminal proceedings arising out of the incident * * *." *Dye* at ¶ 26.

This Court and others have applied the *Carpenter* holding in contexts other than where a victim dies after the defendant and the State enter into a negotiated plea agreement. For example, in *Harrison*, this Court applied *Carpenter* to a case concerning child pornography charges. The State attempted to prosecute the defendant a second time for charges arising out of the same incident, and this Court concluded that "Harrison had a reasonable expectation that he could not be called on to account further on any charges arising out of the investigation that led to the original

---

¶ 14, quoting *State v. Zima*, 8th Dist. Cuyahoga No. 80824, 2002-Ohio-6327, ¶ 44 (Kilbane, J., concurring in part and dissenting in part).

8

prosecution. As in *Carpenter*, this expectation was entirely reasonable and justified, and the prosecutor was aware of this expectation at the time of the plea agreement." *Id*. at ¶ 60.

The Tenth and Eighth Districts have similarly applied *Carpenter* in settings outside the context of subsequent death and homicide charges. *State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, concerned traffic and drug-related offenses. The Tenth District's holding relied on the appellant's "reasonable expectation, based upon the negotiated plea agreement * * * that he would not be subject to more serious drug charges arising out of the incident." *Id*. at ¶ 17. And in *State v. Edwards*, the Eighth District applied *Carpenter* to conclude that a second prosecution for drugs stemming from the same course of conduct was not permissible because the State failed to reserve the right to file additional charges. 8th Dist. Cuyahoga Nos. 94568 and 94929, 2011-Ohio-95, ¶ 23-25.

Under *Carpenter* and its progeny, therefore, the State is barred from bringing subsequent charges after a negotiated plea agreement where the defendant had a reasonable expectation that his guilty plea would terminate all proceedings stemming from the same incident.

### III.   A defendant's reasonable expectation that his guilty plea will terminate all proceedings from the incident.

In *Carpenter*, "the defendant's expectation that his guilty plea would terminate the incident was inherently justified because the prosecutor and the court had jurisdiction over all the charges, both actual and potential, and because the negotiated guilty plea included the dismissal of all pending charges." *State v. Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, ¶ 12. "In the absence of th[o]se or equivalent circumstances, * * * it would be exceedingly difficult to sustain a defendant's belief that no further charges will be brought or prosecuted." *Id*. In *Carpenter*, the State had actual knowledge of the alleged victim's condition at the time of the plea agreement and knew that death was a possible outcome. Despite this knowledge, the State entered into a

9

negotiated plea agreement accepting a plea to a lesser included offense without reserving the right to bring additional charges. In doing so, the State secured a conviction and definite prison term, and the defendant reasonably expected that he would not have "to account further on any charges regarding [that] incident." *Carpenter*, 68 Ohio St.3d 59, 61-62, 623 N.E.2d 66 (1993).

Appellate courts throughout Ohio have shed additional light on when a defendant can have a reasonable expectation of finality in his proceedings. The Second District Court of Appeals has concluded that a juvenile defendant had a reasonable expectation of finality where the police had access to all of the relevant information at the time of the original plea, including the fact that the victim was in critical condition after the shooting at issue in the case. *In re J.A.P.*, 2d Dist. Montgomery No. 20058, 2004-Ohio-3918, ¶ 9. In *State v. McCullough*, 8th Dist. Cuyahoga No. 105959, 2018-Ohio-1967, the Eighth District held that a defendant had a reasonable expectation that no additional charges would be brought in common pleas court once he pleaded in municipal court. In that case, the State had tried to inform the defendant about a new indictment before he was sentenced, but the State sent notice to the wrong address. The Court concluded that because the defendant was unaware that new charges arising out of the same criminal conduct would be filed (and in fact were filed), he had a reasonable expectation that he would not be subjected to additional charges. *Id*. at ¶ 16. And more recently, the same court concluded that a "guilty plea itself creates the expectation that it will terminate criminal proceedings and that the defendant '[cannot] be called on to account further on any charges regarding th[e] incident.'" *State v. Anderson*, 8th Dist. Cuyahoga No. 106304, 2018-Ohio-3051, ¶ 11, quoting *Carpenter* at 62.

Not all courts find a defendant's expectation of finality reasonable under the circumstances. In *Zima*, 102 Ohio St.3d 61, 2004-Ohio-1807, 806 N.E.2d 542, this Court concluded that a defendant who pleaded guilty in municipal court but already had charges pending in common pleas

10

court could not rely on such an argument to escape the second set of charges. *Id.* at ¶ 14. In *State v. Mullins*, 5th Dist. Fairfield No. 12 CA 17, 2013-Ohio-1826, ¶ 24, the Fifth District concluded that a defendant did not have a reasonable expectation of final disposition by his plea agreement because he had engaged in separate conduct in separate counties that could clearly be charged separately. And the Eighth District, in *City of Cleveland v. Evans*, 8th Dist. Cuyahoga No. 100721, 2014-Ohio-4567, ¶ 35, concluded that a defendant did not have a reasonable expectation that his plea agreement would dispose of all charges arising from a traffic stop that led to discovery of drugs, traffic violations, and intoxication because his level of intoxication was clearly illegal, his plea agreement did not consider any O.V.I. charges, and proceedings before the grand jury with a separate case number were pending at the time of his plea.

The above cases, viewed together, provide a road map for determining whether a defendant had a reasonable expectation that his guilty plea would terminate all proceedings stemming from the same incident. First, the defendant's charges have to arise out of the same incident, and the defendant's actions must have occurred in the same jurisdiction. Additional charges cannot already be pending against the defendant at the time of the plea agreement. The court and the State must have had jurisdiction over all of the charges. And, finally, the negotiated plea agreement must have resolved all of the indicted charges, and the State must have failed to reserve the right to bring additional charges arising out of the incident.

IV.     **Mr. Soto entered into a negotiated plea agreement with the State and had a reasonable expectation that he would not be subjected to additional charges arising out of J.B.'s death.**

The Third District Court of Appeals below concluded that, like the defendant in *State v. Church*, 10th Dist. Franklin No. 12AP-34, 2012-Ohio-5663, Mr. Soto "had a reasonable expectation, based upon his negotiated plea agreement, that he would not be subject to more

11

serious * * * charges * * * arising out of the same incident." *Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 32. The Court did not err.

Mr. Soto's charges arose from the same incident, and his actions occurred in the same jurisdiction. No additional charges were pending at the time he entered into the negotiated plea agreement that resolved all of the charges in his 2006 case. And just like in *Carpenter*, where the State was aware of the seriousness of the victim's injuries at the time of the indictment, the State had access to all of the relevant facts when it indicted Mr. Soto and when it entered into a negotiated plea agreement with him. The State knew that J.B. had died. The State knew that Mr. Soto told two different stories concerning the manner in which he died: one in which he and J.B. were riding on an ATV together when J.B. fell off and was struck by the vehicle, and the other in which he struck J.B. after the child ran around the corner of a building on the property. The State was also aware that Mr. Soto's actions following the supposed accident were irrational. According to his statements, relied on by the State in bringing charges, he discovered that his child was no longer breathing but failed to call 911 or bring him to a doctor. Instead, J.B.'s mother returned home two to three hours later to learn that her son had died and no actions had been taken to save him. The State had access to all of this information. Moreover, as the State's pediatric abuse specialist suggested in 2016, the State's coroner should have observed that J.B.'s overall injuries were not fully consistent with an ATV accident. *See* 4/13/2017 Judgment Entry, 2016-CR-00057, p. 6 (the specialist was "struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident").

Many times the police won't have "access" to a defendant's statement—because the defendant has the right to silence. So the State can't say here that Mr. Soto's 2016 statement is something the police needed to have access to, or else they could renege on a plea deal. If that

12

were the case, the State could renege on any plea deal in which the defendant didn't give a full, complete, truthful statement. And that's not how plea deals work, or should work.

Instead, the State indicted Mr. Soto on charges they knew they could prove, and entered into a plea agreement and obtained a certain prison sentence. *See Carpenter*, 68 Ohio St.3d 59, 61-62, 623 N.E.2d 66 (1993). Because all of the charges at issue in this case arise out of the same incident, the State and the court had jurisdiction over all of the charges, the plea agreement resolved all of the 2006 charges, and the police had access to all of the relevant information at the time of the first case, Mr. Soto had a reasonable expectation of finality when he entered into his negotiated plea. Now, unhappy with their original deal, the State is trying to break it by bringing additional charges. *Carpenter* and its progeny prevent that from happening.

### V.    Amicus' arguments are meritless.

First, Amicus argues that the U.S. Supreme Court's decision in *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), tells us that Double Jeopardy and *Carpenter* should not bar successive prosecutions when the defendant caused the successive prosecutions through his own actions. Brief of Amicus Curiae, p. 13-14. *Jeffers* stands for no such thing.

In *Jeffers*, the defendant was charged in two separate indictments at the same time. After the indictments were filed, the State attempted to join the two cases, but the defendant objected and the cases remained separate. When the defendant was convicted in the first case, he filed a motion to dismiss the second case because he had already been placed in jeopardy and the two indictments arose out of the same event. The Supreme Court concluded that this was not a situation where the policy behind the Double Jeopardy Clause required prohibition of the second trial. The defendant was on notice of the second set of charges from the very beginning and could not possibly have had a reasonable expectation that the conclusion of the first trial would put an end

13

to all proceedings arising out of the incident. The Court concluded that "although a defendant is normally entitled to have charges on a greater and a lesser offense resolved in one proceeding, there is no violation of the Double Jeopardy Clause when he elects to have the two offenses tried separately and persuades the trial court to honor his election." *Jeffers* at 152.

    *Jeffers* and similar cases are entirely distinguishable from this case. First, these cases do not concern negotiated plea agreements, which are governed by contract law and focus on the reasonable expectations of the defendant. Second, like in *Carpenter*, *Harrison*, and others, the prosecutor indicted Mr. Soto, he pleaded guilty, and he was sentenced. And he served all of his prison time. The State *then* brought additional charges—not because Mr. Soto elected to have offenses charged and tried separately, but because the State was unhappy with the initial deal it made with Mr. Soto. Mr. Soto did not make a procedural decision that prevented the State from bringing these charges together, and he was not aware that those charges would be brought at a later time.

    Second, Amicus mistakenly asserts that if this Court were to affirm the lower court decision, it will "have a subversive and chilling effect on the willingness of prosecutors to enter into plea bargains to anything less than the indictment." Brief of Amicus Curiae, p. 16. Had Mr. Soto pleaded to both charges in the indictment, the outcome would have been the same. The State's failure to exercise due diligence and fully investigate the inconsistencies in Mr. Soto's 2006 statements led to an indictment on two counts that the State now believes were insufficient to hold Mr. Soto fully accountable for his actions. The parties subsequently negotiated based on those charges. Had Mr. Soto pleaded guilty to both involuntary manslaughter and child endangering, the same problems would have resulted, and there would still be an open question as to whether the State can bring subsequent charges for the greater homicide offenses. Finding that *Carpenter*

14

applies to prohibit the subsequent prosecutions in this case should not have any chilling effect with respect to the willingness of prosecutors to engage in meaningful plea bargaining.

**VI.    Conclusion.**

Defendants lie. Witnesses lie. The State knows this. What if a witness had lied in this case? Is that another instance in which a defendant cannot have a reasonable expectation of finality in his plea agreement? And a final plea agreement cannot be subject to reversal every time a defendant believes the State has not uncovered the whole truth. There were holes in its investigation, yet the State proceeded on its charges. Mr. Soto had a reasonable expectation that pleading guilty would bring an end to proceedings arising out of J.B.'s death, and he served his time. Because of this reasonable expectation, the State was required to reserve the right to bring additional charges stemming from J.B.'s death. The State failed to do so. For this reason, this Court should affirm the Third District Court of Appeals' dismissal of Mr. Soto's aggravated murder and murder charges.

**State's Proposition of Law No. 1:**

> **Involuntary Manslaughter with a child endangering predicate in violation of ORC 2903.04(A) is not the same offense for double jeopardy purposes as Aggravated Murder in violation of ORC 2903.01(C) or Murder with a felonious assault predicate in violation of ORC 2903.02(B) under the *Blockburger* "same offense" test.**

**Response to the State's Proposition of Law No. 1**

**I.     The State has waived any argument as to the attachment of jeopardy to the involuntary manslaughter charge that was dismissed in 2006 pursuant to a negotiated plea agreement.**

For the first time in the two years this case has been winding its way through the courts, the State is arguing that jeopardy did not attach to the involuntary manslaughter charge dismissed

15

in 2006 as part of Mr. Soto's plea agreement. The lower courts presumed that jeopardy attached because the issue was never raised before them, and this Court should do the same.

An issue is not properly before this Court when an appellant failed to raise the issue in the court of appeals or in its jurisdictional memorandum to this Court. *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, 8 N.E.3d 890, ¶ 9, citing *State v. Chappell*, 127 Ohio St.3d 376, 2010-Ohio-5991, 939 N.E.2d 1234, ¶ 26 (because the appellant "did not raise this issue in the court of appeals or argue it in his memorandum seeking jurisdiction in this court, we will not consider this issue, as it is not properly before the court.") (Footnote omitted.)

Here, the State did not argue in the trial court, the court of appeals, or its jurisdictional memorandum that jeopardy did not attach to Mr. Soto's involuntary manslaughter charge. Accordingly, the only issue properly before this Court is whether, under the *Blockburger* test, involuntary manslaughter is the "same offense" as murder and aggravated murder under the Double Jeopardy Clause.

## II.     The Double Jeopardy Clause prohibits prosecution for the same offense after acquittal or conviction.

The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Ohio Constitution similarly instructs that "[n]o person shall be twice put in jeopardy for the same offense." Ohio Constitution, Article I, Section 10. These clauses provide critical protections against "a second prosecution for the same offense after acquittal," "a second prosecution for the same offense after conviction," and "multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). "Where successive prosecutions are at stake, the guarantee serves 'a constitutional policy of finality for the defendant's benefit.'" *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977),

16

quoting *United States v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (Plurality opinion).

In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court articulated the seminal test for determining whether offenses qualify for this Double Jeopardy protection. *Brown* at 166. The test requires reviewing courts "to evaluate the elements of each statutory provision to determine 'whether each provision requires proof of a fact which the other does not.'" *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 17, quoting *Blockburger* at 304. The tests asks "whether each offense contains an element not contained in the other." *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). If not, Double Jeopardy bars additional prosecution and punishment. *Id*. The test forbids cumulative punishments and subsequent prosecution for both a greater- and lesser-included offense. *State v. Johnson*, 6 Ohio St.3d 420, 422, 453 N.E.2d 595 (1983), citing *Brown* at 164-166. *See also Tolbert*, 60 Ohio St.3d 89, 573 N.E.2d 617 (1991), paragraph one of the syllabus ("If application of [the *Blockburger*] test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, the subsequent prosecution is barred."); *State v. Fairbanks*, 117 Ohio St.3d 543, 2008-Ohio-1470, 885 N.E.2d 888, ¶ 7 ("Because the statutory elements of reckless operation and failure to comply are not identical, the only inquiry is whether either is a lesser included offense of the other.")

### III. Involuntary manslaughter is the "same offense" as aggravated murder and murder for double jeopardy purposes.

This Court has been clear: involuntary manslaughter is a lesser-included offense of felony murder and of aggravated murder. *See State v. Thomas*, 40 Ohio St.3d 213, 215-216, 533 N.E.2d

17

286 (1988); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 78-79.[3] One commits involuntary manslaughter when committing murder or aggravated murder, because the elements of involuntary manslaughter are subsumed within these two greater homicide offenses. *Ohio v. Kidder*, 32 Ohio St.3d 279, 315, 513 N.E.2d 311 (1987). In *State v. Lynch*, this Court reviewed a trial court's decision to instruct the jury on involuntary manslaughter as a lesser included offense of felony murder and its refusal to instruct on involuntary manslaughter as a lesser included offense of aggravated murder, in violation of R.C. 2903.01(C). This Court concluded that involuntary manslaughter is not only a lesser included offense of felony murder, but other forms of murder as well, including aggravated murder of a child under thirteen years of age. *Id*. at ¶ 79. This is so because the only factor distinguishing murder and involuntary manslaughter is the mental state required for commission of the crime. *Id. See also Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988) ("Murder and involuntary manslaughter are statutorily defined in such a way that the elements of involuntary manslaughter, aside from the mental state, are always met whenever a murder has been committed."). And the only additional distinguishing factor between aggravated murder of a child under thirteen and involuntary manslaughter is the age of the victim. *Lynch* at ¶ 79.

---

[3] *Ohio v. Johnson*, 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984), does not resolve this case. Critical to that case was its procedural posture and the manner in which the charges were brought. In *Johnson*, the defendant was charged with four counts, all at the same time. At arraignment, he pleaded guilty to two and asked the court to dismiss the others on double jeopardy grounds. The U.S. Supreme Court concluded that such dismissal was not appropriate because "[t]he State is not prohibited by the Double Jeopardy Clause from charging respondent with greater and lesser included offenses and prosecuting those offenses in a single trial." *Id*. at 500. In *Johnson*, "no more than one trial of the offenses charged was ever contemplated," and it was the defendant's procedural choices, not the State's actions, that caused the charges to be separated. *Id*. at 502. In the instant case, the State's failures caused the separate disposition of counts.

18

Though *Lynch* concerned greater- and lesser-included offenses in the context of jury instructions and not Double Jeopardy, the substance of those tests is the same. An offense is a lesser-included offense if "one offense carries a greater penalty than the other, [if] some element of the greater offense is not required to prove commission of the lesser offense, and [if] the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 26. And this Court has already concluded that involuntary manslaughter is a lesser-included offense of both murder and aggravated murder. That means that involuntary manslaughter carries a lesser penalty than murder and aggravated murder, neither murder nor aggravated murder can ever be committed without involuntary manslaughter having also been committed (despite the difference in mens rea), and some element of murder and aggravated murder is not required to prove the commission of involuntary manslaughter. For murder in violation of R.C. 2903.02(B), the additional element is that the felony must be a first or second degree felony of violence. For aggravated murder in violation of R.C. 2903.01(C), there must be purpose and the victim must be under the age of thirteen at the time of the offense.

The *Blockburger* test yields the same result. Involuntary manslaughter does not require any elements that felony murder does not also require. Each offense requires that a death be caused as a proximate result of committing or attempting to commit a felony. Felony murder requires a first or second degree felony of violence, while involuntary manslaughter only requires a felony of any kind. Similarly, because no murder offense can ever be committed without the commission of either a felony or a misdemeanor, *Kidder* at 292, involuntary manslaughter does not contain an element that aggravated murder under R.C. 2903.01 does not also contain.

**Table 1: *Blockburger* analysis of involuntary manslaughter and felony murder**

| Involuntary Manslaughter, R.C. 2903.04(A) | Felony Murder, R.C. 2903.02(B) |
|---|---|
| (1) Cause the death of another | (1) Cause the death of another |
| (2) As a proximate result of | (2) As a proximate result of |
| (3) Committing or attempting to commit a felony | (3) Committing or attempting to commit a first or second degree felony of violence |

**Table 2: *Blockburger* analysis of involuntary manslaughter and aggravated murder**

| Involuntary Manslaughter, R.C. 2903.04(A) | Aggravated Murder, R.C. 2903.01(C) |
|---|---|
| (1) Cause the death of another | (1) Purposely |
| (2) As a proximate result of | (2) Cause the death of another |
| (3) Committing or attempting to commit a felony | (3) Who is under thirteen years of age at time of offense |

The two tests result in the same outcome, which is why the U.S. Supreme Court has concluded that a greater offense is, by definition, "the 'same' for purposes of double jeopardy as any lesser offense included in it." *Brown*, 432 U.S. 161, 168, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). *See also Reeves v. Campbell*, 708 F. App'x 230, 239 (6th Cir.2017).

The State asserts that the Sixth District's decision in *State v. Resor*, 6th Dist. Huron No. H-08-028, 2010-Ohio-397, resolves this proposition of law. It does not. First, this Court is not bound by a lower court decision, especially when it is at odds with this Court's own case law regarding involuntary manslaughter as a lesser included offense of murder and aggravated murder. *Compare Resor* at ¶ 24 (explaining that different mental states constitute different elements) *with Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 79 (finding that different mental states are not different elements distinguishing greater- and lesser-included offenses). Second, the *Resor* court's consideration of *Blockburger* as applied to the charges in that case was mere dicta. *Resor* is a case about relitigating a fact previously determined by the jury, not whether double jeopardy bars successive prosecutions. The case involved acquittal on the greater homicide count and a hung jury on the lower involuntary manslaughter count. The court concluded that the fact that the jury

20

acquitted on the murder charge, having found that the defendant did not act knowingly, did not mean that the involuntary manslaughter charge could not have been proved. An analysis under *Blockburger* was irrelevant to that holding.

### IV.    Conclusion.

The Double Jeopardy Clause prohibits the State from charging a defendant with a greater offense after he or she has already pleaded to a lesser offense. *Brown* at 166. This Court has made clear that involuntary manslaughter is a lesser included offense of felony murder and of aggravated murder. *Thomas*, 40 Ohio St.3d 213, 215-216, 533 N.E.2d 286 (1988); *Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 78-79. The State and its amicus ignore this clarity and ask this Court to correct a decision below that they simply disagree with. This Court should affirm the Third District Court of Appeals.

**State's Proposition of Law No. 2:**

> **Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to *Blockburger* to allow subsequent prosecution.**

**Response to the State's Proposition of Law No. 2**

### I.    The due diligence exception.

In *Brown v. Ohio*, the U.S. Supreme Court acknowledged a potential exception to the Double Jeopardy protection when "the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence." 432 U.S. 161, 169, fn. 7, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), citing *Diaz v. United States*, 223 U.S. 442, 448-449, 32 S.Ct. 250, 56 L.Ed. 500 (1912), *Ashe v. Swenson*, 397 U.S. 436, 453, fn. 7, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). A number of courts have articulated an exception whereby a subsequent

prosecution is not barred by the Double Jeopardy Clause when "a fact necessary to the commission of one offense occurs after the defendant has been convicted of another [offense.]" *State v. Thomas*, 61 Ohio St.2d 254, 262, 400 N.E.2d 897 (1980), citing *Carmody v. Seventh Judicial District*, 81 Nev. 83, 398 P.2d 706 (1965), *Commonwealth, ex rel. Papy v. Maroney*, 417 Pa. 368, 207 A.2d 814 (1965), *Centers v. Commonwealth*, 318 S.W.2d 57 (Ky. 1958), *Southworth v. State*, 98 Fla. 1184, 125 So. 345 (1929). In each of those out-of-state cases, the defendant pleaded guilty to a lesser charge, the victim later died, and the State subsequently brought homicide charges. In each of those cases, a fact necessary to the commission of the offense had not yet occurred. *See also Diaz* at 449.

This Court adopted the U.S Supreme Court's dicta in *State v. Tolbert*, holding that a constitutional exception to the double jeopardy protection applies "where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence." *Tolbert,* 60 Ohio St.3d 89, 573 N.E.2d 617 (1991), paragraph two of the syllabus. To determine whether such an exception applies, a court must consider the "'circumstances which exist at the time of the first trial and when all actionable facts became available to the prosecution.'" *State v. State v. Gonzales*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903, ¶ 29 (1st Dist.), quoting *State v. Goodman*, 9th Dist. Medina No. 3220-M, 2002-Ohio-818, ¶ 19. In *Tolbert*, the State rushed to charge a defendant with misdemeanor assault before gathering all of the facts necessary to shed light on the extent of the crime. The defendant pleaded guilty to the charge, and later that day the police learned that the victim's injuries were worse than originally believed. The State subsequently charged the defendant with felonious assault. He claimed that the Double Jeopardy Clause prohibited the second prosecution. A majority of this Court concluded that

22

although misdemeanor assault is a lesser-included offense of felonious assault and therefore the two offenses were the same for purposes of the Double Jeopardy analysis, the State was permitted to proceed on the second case. "[E]ven though the facts necessary to sustain the charge of felonious assault occurred prior to Tolbert's plea, these facts were not discoverable despite the exercise of due diligence." *Tolbert* at 92.

The *Tolbert* due diligence exception differs from *Diaz*, *Carmody*, *Maroney*, *Centers*, and *Southworth*. In each of those cases, the facts necessary to support the subsequent charge had not yet occurred. A due diligence exception, on the other hand, if applied incorrectly, could potentially give police a pass on doing their jobs. Due diligence "in a criminal investigation requires that the police and the prosecution ascertain the facts of the crime, *as they currently exist*, before proceeding with charges against the accused." *Tolbert* at 93 (Brown, J., dissenting). While it is perhaps important to allow an exception in cases where no stone went unturned during an investigation, it is also critical that courts not "encourage[] the state to prematurely file slapdash charges against an accused without ascertaining the full extent of the crime." *Id*.

In *Rashad v. Burt*, 108 F.3d 677 (6th Cir.1997), the State conducted an insufficient vehicle search, failed to discover additional drugs, and only later found them during a second, more thorough search. The State attempted to bring additional charges based on their new discovery, but the Sixth Circuit held that the Double Jeopardy Clause prohibited a subsequent prosecution. The Court was disturbed by the State's failure to conduct a "proper and thorough" investigation. *Id*. at 681. Critically, the Court noted that if the case were to come out differently, "we would, in effect, be rewarding the State for its failure to discover evidence in a timely manner * * *." *Id*. at 682. And similarly, in *State v. Edwards*, 8th Dist. Cuyahoga Nos. 94568 and 94929, 2011-Ohio-

95, the Court expressed concerns about inadequate police investigations and their impact on application of the due diligence exception.

Whether the due diligence exception applies in a particular case will be a fact-based determination considering the information available and the efforts put forth by the State at the time of the initial prosecution. *People v. Davis*, 36 Cal.4th 510, 558, 31 Cal.Rptr.3d 96, 115 P.3d 417 (2005); *Daniel v. State*, 2008 WY 87, 189 P.3d 859, ¶ 14 (2008). And "the burden of proving the due diligence exception falls certainly upon the government." *United States v. Aguilar*, 849 F.2d 92, 100 (3d Cir.1988). *See also United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir.1989); *People v. Wilson*, 454 Mich. 421, 435, 563 N.W.2d 44 (1997); *State v. Vargas*, 279 Mont. 357, 361-362, 928 P.2d 165 (1996).

### II.     The State did not exercise due diligence and should not now be permitted to redo its case based on that failure.

With the minimal facts available to it in the record, the Third District below concluded that the State failed to exercise due diligence in this case and therefore the exception to the Double Jeopardy Clause did not apply. The Court explained that it was "not convinced that [Mr. Soto's] conduct supersedes either the duty of the state to independently investigate and prosecute crime, or the Double Jeopardy rights of the defendant where, as here, he has been convicted and served his sentence[] for the offense pled to in exchange for dismissing the Involuntary Manslaughter." *State v. Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 33.

The State has not met its burden to prove that the police exercised due diligence, or that a necessary fact could not have been discovered had the police exercised due diligence. Whether the due diligence exception applies is a question of fact, and the record is slim on the facts. The State did not provide sufficient information on the record to establish that it exercised due diligence in

24

its 2006 investigation and prosecution of Mr. Soto. *See Aguilar* at 100; *Rosenberg* at 1415; *Wilson* at 435; *Vargas* at 361-362.

Indeed, the record shows the opposite: the State failed to exercise due diligence. The State's investigation began and ended with Mr. Soto's two different stories regarding an ATV accident and his irrational conduct when he learned his son, J.B., was no longer breathing. Had the State done its due diligence, it would not have relied on these conflicting and irrational statements and would have conducted a further-searching investigation. Had the State exercised due diligence, here is what they could have done:

- Further interview J.B.'s mother about Mr. Soto's relationship with his son and whether he had ever given him rides on the ATV in the past.

- Interview other family members about Mr. Soto's relationship with J.B. and J.B.'s mother.

- Interview Mr. Soto's neighbors to better understand his relationship with J.B. and J.B.'s mother and to corroborate Mr. Soto's story about the ATV accident.

- Conduct forensic analysis of the ATV tire tracks on the property to determine whether they matched either of Mr. Soto's stories regarding the ATV accident.

- Examine the ATV to find possible clothing fibers on the vehicle.

- Search Mr. Soto's house to find the clothing J.B. was allegedly wearing during the ATV accident.

- Check Mr. Soto's phone records to determine whether he had called anyone in the aftermath of the accident.

- Conduct a more searching autopsy to determine why J.B. had no broken bones or tire tracks on his body.

The list shows the State did not exercise due diligence. If they had done these things—if they had exercised due diligence—they could have discovered the facts necessary to bring the additional charges or confirm the accidental nature of J.B.'s death. Instead, the State relied entirely on Mr. Soto's inconsistent statements to formulate its theory of the case, shared that theory with the coroner, and received a report from her concluding that "the child died of multiple blunt force trauma caused by an ATV accident." Merit Brief of Appellant, p. 2. In 2016, the State's pediatric abuse specialist revealed how sloppy the 2006 investigation truly was, stating that he would have noticed the inconsistencies between J.B.'s injuries and the State's theory of the case. *See* 4/13/2017 Judgment Entry, 2016-CR-00057, p. 6.

In Mr. Soto's case, the State simply failed to scrutinize the evidence to determine what had actually occurred. That is the State's job. And as the Third District observed below, "it was the responsibility of the State to thoroughly and forensically investigate the matter at the outset, and to thoroughly vet [Mr.] Soto's story when his son first died. The State did so to the extent it was satisfied back in 2006 and brought the original charges regarding the death of [his] child." *Soto*, 3d Dist. Putnam No. 12-17-05, 2018-Ohio-459, ¶ 35. Due diligence in a criminal investigation, especially one where the stakes are so high, requires more.

## CONCLUSION

This Court should dismiss this case as improvidently granted. In the alternative, this Court should affirm the court of appeals' decision and remand to the trial court for a trial on the charges not challenged through this appeal.

26

Respectfully submitted,

Office of the Ohio Public Defender

/s/ *Carly M. Edelstein*
Carly M. Edelstein (0095950)
Assistant State Public Defender
(Counsel of Record)

250 East Broad Street, Suite 1400
Columbus, Ohio 43215
(614) 752-7033
(614) 752-5167 – Fax
carly.edelstein@opd.ohio.gov

COUNSEL FOR TRAVIS SOTO

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing **MERIT BRIEF OF TRAVIS SOTO** was

forwarded via electronic mail to Gary L. Lammers, Putnam County Prosecuting Attorney, at

gary.lammers@putnamcountyohio.gov, on this 22nd day of August, 2018.

/s/ *Carly M. Edelstein*
Carly M. Edelstein (0095950)
Assistant State Public Defender

COUNSEL FOR TRAVIS SOTO

27

IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 2018-0416 |
| Plaintiff-Appellant, | : | |
| | : | On Discretionary Appeal from the |
| vs. | : | Putnam County Court of Appeals, |
| | : | Third Appellate District |
| TRAVIS SOTO, | : | |
| | : | C.A. Case No. 12-17-05 |
| Defendant-Appellee. | : | |
| | : | |

_____

## APPENDIX TO

## MERIT BRIEF OF TRAVIS SOTO

_____

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | * | CASE NO. 2016 CR 00057 |
| Plaintiff | * | |
| vs | * | |
| TRAVIS SOTO | * | MOTION TO DISMISS ON |
| | | THE GROUNDS OF DOUBLE |
| Defendant | * | JEOPARDY |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The defendant was brought before this court upon an indictment citing violations of involuntary man slaughter (a felony of the 1st degree, ORC 2903.04 (A) and child endangering ( a felony if the 3rd degree, ORC 2919.22) (A) and (E)(1)(C) dated March 31, 2006. The defendant appeared back in front of this court on July 7, 2006, after initially entering pleas of not guilty, and submitted a negotiated plea of guilty to endangering children (court II of the original indictment). The defendant was sentenced by this court in August 31, 2006, to five years of actual incarceration with the Ohio Department of Rehabilitation and Correction and a monetary fine of $ 10,000, the maximum alterable penalties for a felony of the third degree.

The defendant served his ordered time with the Ohio Department of Rehabilitation and Corrections and was released in 2012 and he obtained employment at Campbell's Soup in Napoleon Ohio. On August 15, 2016 a five count indictment was filed with the clerk of this court alleging violations of: Aggravated Murder, and unclassified felony ORC 2903.01(c); Murder, an unclassified felony, O.R.C. 2903.02 (B); Felonious Assault, a felony of the first degree. O.R.C. 2903.11 (A) (1); Kidnapping, a felony of the 1st degree, O.R.C 2905.01; and Tampering with Evidence, a felony of the 3rd degree, O.R.C. 2921.12 (A)(i). All six counts in the indictment allege to the date of January 23, 2006.

The defendant has tendered not guilty pleas to all of the charges and the case is pending awaiting Final resolution.

The defendant is now claiming that the prosecution of him pursuant to the pending indictment violates the double jeopardy clause of the United States

A-1

Constitutions, Specifically the Fifth Amendment, nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb". In Brown v Ohio, 432 U.S. 161 cites that "whatever the sequence maybe, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense.

Earlier the defendant, as previously stated, entered a plea of guilty to child endangering, and the disposition of count 1, involuntary manslaughter was dismissed. Neither the judgment entries or transcripts of the proceeding address how the matters would be disposed, with or without prejudice. The entries in the record makes one think that a change of pleas to child endangering also disposed of the involuntary manslaughter charge. There is no debate that involuntary manslaughter is a lesser included offense of murder and aggravated murder thereby barring the persecution of defendant on these charges.

Therefore the admission of child endangering charge at the August, 2006 hearing and subsequent dismissal of the involuntary manslaughter charge would bar the further prosecution of any charged involving murder of the deceased.

Respectfully Submitted,

Joseph Benavidez #0042447
Attorney for Defendant
212 North Elizabeth St Ste 322
Lima, Ohio 45801
(419) 228-0189

**Proof of Service**

I hereby certify that a copy of the foregoing was hand delivered to the Putnam County Prosecutor's Office this 11t$^{h}$ day of October, 2016.

Joseph Benavidez
Attorney for Defendant

A-2

10/08/2016  06:12  4192283367     DUGAN AND ASSOC     PAGE  01/03

# JOSEPH A BENAVIDEZ

ATTORNEY AT LAW
212 N Elizabeth
3rd Floor, Suite 322
Lima, Ohio 45801

Phone: 419-228-0189     Email: joebenavidez138@gmail.com     Fax: 419-228-3367

## FACSIMILE TRANSMITTAL SHEET

Date: _10/11/16_     Pages (Including Cover): _3_
To:
Attention: _Jill_
Phone Number: _____
Fax Number: _419-523-5284_
Regarding: _Travis Soto_
Remarks: _____

_____ URGENT          _____ FOR YOUR REVIEW

_____ REPLY ASAP      _____ ORIGINAL WILL FOLLOW BY
                                 REGULAR U.S. MAIL
_____ PLEASE REPLY

A-3

IN THE COMMON PLEAS COURT OF PUTNAM COUNTY, OHIO
OTTAWA, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO | : | CASE NO. | 2016 CR 57 |
| Plaintiff | : | | |
| -vs- | : | | |
| TRAVIS SOTO | : | RESPONSE TO DEFENDANT'S | |
| | | MOTION TO DISMISS | |
| Defendant | : | | |

_____

Now comes the Putnam County Assistant Prosecuting Attorney, Todd C. Schroeder, and

hereby submits to this Honorable Court his reply to Defendant's Motion to Dismiss on Double

Jeopardy grounds.

**The 2006 Prosecution**

Defendant was Indicted on March 31, 2006, for Child Endangering, in violation of R.C.

2919.22(A)(E)(1)(c), a felony of the 3rd degree, and Involuntary Manslaughter, in violation of

R.C. 2903.04(A), a felony of the 1st degree. Critically important are the elements and factual

basis of each count.

As charged, Defendant was alleged to have committed Child Endangering by creating a

substantial risk of harm, and actually causing serious physical harm to his child, and was alleged

to have committed Involuntary Manslaughter by causing the death of his son while committing

the predicate offense of felony Child Endangering.

The factual basis of both counts relied heavily on Defendant's representations to law

enforcement, which varied each time he recounted the details, but were always premised on

describing the cause of death by way of an ATV accident wherein Defendant was the driver and

struck his son. The Lucas County Coroner conducted an autopsy, was given Defendant's version



of the events, and concluded the child died of multiple blunt force trauma caused by an ATV accident.

Ultimately, Defendant entered into a negotiated plea whereby he pled guilty to Child Endangering, the Involuntary Manslaughter charge was dismissed, and he was sentenced to five (5) years incarceration.

On July 25, 2016, Defendant voluntarily appeared at the Putnam County Sheriff's Office, indicated he wanted to provide the truthful account of what occurred, and proceeded to describe that he had in fact beat his child to death and staged the ATV accident scene. The Lucas County Coroner's Office report, photographs, and reports from 2006 and present, were reviewed by Dr. Randall Schlievert, a pediatric abuse specialist qualified as an expert multiple times by this Court. Dr. Schlievert concluded that the child died of multiple blunt force trauma due to Defendant's violent actions towards his son, and importantly concluded that Defendant's 2006 misrepresentations led to the reasonable yet faulty conclusions of the Lucas County Coroner.

Defendant was then Indicted for:

**Aggravated Murder**, an unclassified felony, for purposely causing the death of another under age thirteen, in violation of Ohio Revised Code Section 2903.01(C).

**Murder**, an unclassified felony, for causing the death of another while committing the predicate offense of felonious assault, in violation of Ohio Revised Code Section 2903.02(B),

**Felonious Assault**, a second degree felony, for knowingly causing serious physical harm to his son, in violation of Ohio Revised Code Section 2903.11(A)(1).

**Kidnapping**, a first degree felony, for restraining the liberty of his son and causing serious physical harm, in violation of Ohio Revised Code Section 2905.01.

**Tampering with Evidence**, a third degree felony, for altering, concealing or destroying evidence relating to an investigation being conducted by the Putnam County Sheriff's Office, in violation of Ohio Revised Code Section 2921.12(A)(1).

**Double Jeopardy Test**

A-5

"The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect the accused from being put in jeopardy twice for the same offense. These provisions protect an individual against successive punishments as well as successive prosecutions for the *same offense*." *State v. Moore* (1996), 110 Ohio App.3d 649.

In determining whether an accused is being successively prosecuted for the "same offense," the Ohio Supreme Court has adopted the so called "same elements" test articulated in *Blockburger v. United States* (1932), 284 U.S. 299; *State v. Zima* (2004), 102 Ohio St. 3d 61. Under *Blockburger*, "the Double Jeopardy Clause * * * prohibits successive prosecutions for the same criminal act or transaction under two criminal statutes unless each statute 'requires proof of a fact which the other does not.'" *State v. Tolbert* (1991), 60 Ohio St.3d 89, 90. This test focuses upon the elements of the two statutory provisions, not upon the evidence proffered in a given case. *State v. Thomas* (1980), 61 Ohio St.2d 254, 259, overruled on other grounds.

**ARGUMENT – PART I**

Double Jeopardy does not prohibit successive prosecutions, only successive prosecutions for the *same offense*. The *Blockburger* test requires a comparison of elements when determining if two offenses are the *same offense*.

Here, Felonious Assault, Kidnapping, and Tampering with Evidence each requires proof of an element not required or included in the original prosecution of Child Endangering and Involuntary Manslaughter. Hence, Double Jeopardy does not prohibit the prosecution of these new charges.[1]

---

[1] The State asserts that the six (6) year Statute of Limitations does not bar prosecution for Felonious Assault and Tampering with Evidence since these crimes were not discovered until Defendant's confession; nonetheless judicial review of this issue would be prudent.

A-6

Likewise, Aggravated Murder requires proof of two different elements, the *mens rea* of purposely as well as the age of the victim being under thirteen. Therefore Double Jeopardy does not bar prosecution of this offense.

It thus appears that the charge of Murder and Involuntary Manslaughter, both of which involve causing the death of another through the commission of a felony, requires more careful scrutiny. However, as described below, Double Jeopardy will not bar prosecution of the charge of Murder.

**ARGUMENT – PART II**

A.   The 2006 negotiated plea resulting in the dismissal of the Involuntary Manslaughter charge does not prohibit a successive prosecution on the greater offense of Murder. A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State v. Bridges*, 2015 Ohio 4480.

Clearly the Defendant could not have reasonably believed that his 2006 negotiated plea to, and dismissal of, charges of Child Endangering and Involuntary Manslaughter based on his false narrative of the events would bar prosecution of subsequent charges based on a truthful narrative of the events, and which further transformed the case from one about an accidental death to one involving excessive violence committed purposefully.

B.   Involuntary Manslaughter with a felony Child Endangering predicate is **not** the *same offense* as Murder with a Felonious Assault predicate.   Therefore, a resolution on the Involuntary Manslaughter charge on any basis does not bar this subsequent prosecution.

*State v. Resor*, 2010 Ohio 397 reviewed the *Blockburger* same offense test with respect to these two charges:

A-7

Count I of the indictment alleges felony murder in violation of R.C. 2903.02(B). In material part that statute provides:

"No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

The offense of violence specified is felonious assault, "* * * by knowingly causing serious physical harm to another * * *." The language tracks that found in R.C. 2903.11(A)(i).

Count II alleges involuntary manslaughter in violation of R.C. 2903.04(A), which provides:

"No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

The felony alleged is child endangering[.]

* * *

With respect to Counts I and II, it is apparent that the mental state necessary for the commission of each offense differs from the other. Felonious assault, which underlies the felony murder count, requires an offender to knowingly inflict serious harm on another. Child endangering, the predicate to the involuntary manslaughter charge, requires only that the offender act recklessly. Moreover, child endangering requires that the victim be under age 18, while felonious assault contains no such element. Thus, each provision requires proof of a fact which the other does not and the *Blockburger* test is satisfied.

Hence, the 2006 Involuntary Manslaughter charge with a felony Child Endangerment predicate is not the same offense as the 2016 Murder charge with a Felonious Assault predicate.

C.      Even if Murder and Involuntary Manslaughter constitute the same offense, an exception applies.

To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment, a court must first apply the *Blockburger* test. If application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, the subsequent prosecution is barred. *Grady v. Corbin* [1990], 110 S. Ct. 2084,

A-8

2090; *Brown v. Ohio* [1977], 432 U.S. 161, 166, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, 261.

An exception to the *Blockburger* test exists where the state is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. *Grady v. Corbin* [1990], 110 S. Ct. 2084, 2090; *Brown v. Ohio* [1977], 432 U.S. 161, 169; *Ashe v. Swenson* [1970], 397 U.S. 436, 453; *Diaz v. United States* [1912], 223 U.S. 442, 448-449, applied and followed; *State v. Thomas* [1980], 61 Ohio St. 2d 254, paragraph five of the syllabus.

Here, the facts necessary to support the 2016 Grand Jury Indictment could not have been discovered despite the exercise of due diligence until Defendant appeared and confessed to the actual details of his son's death. The 2006 investigation relied heavily on Defendant's assertions of what occurred since Defendant was the only person present when the facts giving rise to his son's death occurred. Dr. Schlievert's report dated September 30, 2016, highlights the reasonableness of the investigative conclusions in 2006 as follows:

> It is understandable that Dr. Beisser certified this as an accident from the ATV at the time. After all, doctors rely heavily on parent reports of their children's injuries/problems to make proper diagnosis. When the history is false, the diagnosis can often be wrong. Some of his injuries were compatible with the reported ATV accident (liver injury, contusions of lung, hemothorax). I am struck by the lack of fractures (skull, extremity, ribs), as fractures are the most likely injuries from an ATV accident. Hence, while I could have also been fooled into thinking this was an accident (had I been involved in 2006), the lack of fractures and other items are odd.

> … What I can say is that Julio's injuries are entirely consistent with Travis' confession in July 2016. They match very well. Overall, I can state to a reasonable degree of medical certainty that Julio died from the abuse that Travis inflicted on that day in 2006.

A-9

From:                                    10/18/2016 11:26    #836 P.007/007

Hence, the false narrative led to a false medical diagnosis. As such, the fact necessary to support

this subsequent prosecution could not have been discovered until July 2016 despite the exercise

of due diligence.

WHEREFORE, the State of Ohio respectfully requests that this Honorable Court overrule

Defendant's Motion to Dismiss on Double Jeopardy grounds.

Respectfully submitted,

Todd C. Schroeder, #0075265
Putnam County Assistant Prosecuting Attorney
336 E. Main Street, Suite B
Ottawa, Ohio 45875
Phone: 419-523-3600
Fax: 419-523-4519

## CERTIFICATE

I hereby certify that a copy of the foregoing has been served to Attorney At Law, Joseph
Benavidez, 212 North Elizabeth Street, 3rd Floor, Suite 322, Lima, Ohio 45801, via US Mail,
postage prepaid, on this 18th day of October 2016.

Todd C. Schroeder, #0075265

A-10

## CONSTITUTION OF THE STATE OF OHIO

### ARTICLE I:   BILL OF RIGHTS

§ 10       [Trial of accused persons and their rights; depositions by state and comment on failure to testify in criminal cases.]

Except in cases of impeachment, cases arising in the army and navy, or in the militia when in actual service in time of war or public danger, and cases involving offenses for which the penalty provided is less than imprisonment in the penitentiary, no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury; and the number of persons necessary to constitute such grand jury and the number thereof necessary to concur in finding such indictment shall be determined by law.  In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court.   No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be made the subject of comment by counsel.  No person shall be twice put in jeopardy for the same offense.  (As amended September 3, 1912.)

A-11

### ORC Ann. 2903.11, Part 1 of 2

Current with Legislation passed by the 132nd General Assembly and filed with the Secretary of State through file 95 (SB 1).

**Page's Ohio Revised Code Annotated > Title 29: Crimes — Procedure (Chs. 2901 — 2981) > Chapter 2903: Homicide and Assault (§§ 2903.01 — 2903.37) > Assault (§§ 2903.11 — 2903.16)**

## § 2903.11 Felonious assault.

**(A)**No person shall knowingly do either of the following:

**(1)**Cause serious physical harm to another or to another's unborn;

**(2)**Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

**(B)**No person, with knowledge that the person has tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome, shall knowingly do any of the following:

**(1)**Engage in sexual conduct with another person without disclosing that knowledge to the other person prior to engaging in the sexual conduct;

**(2)**Engage in sexual conduct with a person whom the offender knows or has reasonable cause to believe lacks the mental capacity to appreciate the significance of the knowledge that the offender has tested positive as a carrier of a virus that causes acquired immunodeficiency syndrome;

**(3)**Engage in sexual conduct with a person under eighteen years of age who is not the spouse of the offender.

**(C)**The prosecution of a person under this section does not preclude prosecution of that person under *section 2907.02 of the Revised Code*.

**(D)**

   **(1)**

      **(a)**Whoever violates this section is guilty of felonious assault. Except as otherwise provided in this division or division (D)(1)(b) of this section, felonious assault is a felony of the second degree. If the victim of a violation of division (A) of this section is a peace officer or an investigator of the bureau of criminal identification and investigation, felonious assault is a felony of the first degree.

      **(b)**Regardless of whether the felonious assault is a felony of the first or second degree under division (D)(1)(a) of this section, if the offender also is convicted of or pleads guilty to a specification as described in *section 2941.1423 of the Revised Code* that was included in the indictment, count in the indictment, or information charging the offense, except as otherwise provided in this division or unless a longer prison term is required under any other provision of law, the court shall sentence the offender to a mandatory prison term as provided in division (B)(8) of *section 2929.14 of the Revised Code*. If the victim of the offense is a peace officer or an investigator of the bureau of criminal identification and investigation, and if the victim suffered serious physical harm as a result of the commission of the offense, felonious assault is a felony of the first degree, and the court, pursuant to division (F) of *section 2929.13 of the Revised Code*, shall impose as a mandatory prison term one of the prison terms prescribed for a felony of the first degree.

   **(2)**In addition to any other sanctions imposed pursuant to division (D)(1) of this section for felonious assault committed in violation of division (A)(1) or (2) of this section, if the offender also is convicted of

A-12

or pleads guilty to a specification of the type described in *section 2941.1425 of the Revised Code* that was included in the indictment, count in the indictment, or information charging the offense, the court shall sentence the offender to a mandatory prison term under division (B)(9) of *section 2929.14 of the Revised Code.*

**(3)**In addition to any other sanctions imposed pursuant to division (D)(1) of this section for felonious assault committed in violation of division (A)(2) of this section, if the deadly weapon used in the commission of the violation is a motor vehicle, the court shall impose upon the offender a class two suspension of the offender's driver's license, commercial driver's license, temporary instruction permit, probationary license, or nonresident operating privilege as specified in division (A)(2) of *section 4510.02 of the Revised Code*.

**(E)**As used in this section:

**(1)**"Deadly weapon" and "dangerous ordnance" have the same meanings as in *section 2923.11 of the Revised Code*.

**(2)**"Motor vehicle" has the same meaning as in *section 4501.01 of the Revised Code*.

**(3)**"Peace officer" has the same meaning as in *section 2935.01 of the Revised Code*.

**(4)**"Sexual conduct" has the same meaning as in *section 2907.01 of the Revised Code*, except that, as used in this section, it does not include the insertion of an instrument, apparatus, or other object that is not a part of the body into the vaginal or anal opening of another, unless the offender knew at the time of the insertion that the instrument, apparatus, or other object carried the offender's bodily fluid.

**(5)**"Investigator of the bureau of criminal identification and investigation" means an investigator of the bureau of criminal identification and investigation who is commissioned by the superintendent of the bureau as a special agent for the purpose of assisting law enforcement officers or providing emergency assistance to peace officers pursuant to authority granted under *section 109.541 of the Revised Code*.

**(6)**"Investigator" has the same meaning as in *section 109.541 of the Revised Code*.

**(F)**The provisions of division (D)(2) of this section and of division (F)(20) of *section 2929.13*, divisions (B)(9) and (C)(6) of *section 2929.14*, and *section 2941.1425 of the Revised Code* shall be known as "Judy's Law."

## History

134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 7-1-83); 139 v H 269 (Eff 7-1-83); 140 v S 210 (Eff 7-1-83); *146 v S 2* (Eff 7-1-96); *146 v S 239* (Eff 9-6-96); *148 v S 142* (Eff 2-3-2000); *148 v H 100*. Eff 3-23-2000; *151 v H 95*, § 1, eff. 8-3-06; *151 v H 347*, § 1, eff. 3-14-07; *151 v H 461*, § 1, eff. 4-4-07; *152 v H 280*, § 1, eff. 4-7-09; *2011 HB 86*, § 1, eff. Sept. 30, 2011; *2017 HB 63*, § 1, effective Oct 17, 2017.

Page's Ohio Revised Code Annotated
Copyright © 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

*End of Document*

## *ORC Ann. 2905.01*

Current with Legislation passed by the 132nd General Assembly and filed with the Secretary of State through file 95 (SB 1).

*Page's Ohio Revised Code Annotated > Title 29: Crimes — Procedure (Chs. 2901 — 2981) > Chapter 2905: Kidnapping and Extortion (§§ 2905.01 — 2905.44) > Kidnapping and Related Offenses (§§ 2905.01 — 2905.10)*

# § 2905.01 Kidnapping.

**(A)**No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

**(1)**To hold for ransom, or as a shield or hostage;

**(2)**To facilitate the commission of any felony or flight thereafter;

**(3)**To terrorize, or to inflict serious physical harm on the victim or another;

**(4)**To engage in sexual activity, as defined in *section 2907.01 of the Revised Code*, with the victim against the victim's will;

**(5)**To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority;

**(6)**To hold in a condition of involuntary servitude.

**(B)**No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:

**(1)**Remove another from the place where the other person is found;

**(2)**Restrain another of the other person's liberty.

**(C)**

**(1)**Whoever violates this section is guilty of kidnapping. Except as otherwise provided in this division or division (C)(2) or (3) of this section, kidnapping is a felony of the first degree. Except as otherwise provided in this division or division (C)(2) or (3) of this section, if an offender who violates division (A)(1) to (5), (B)(1), or (B)(2) of this section releases the victim in a safe place unharmed, kidnapping is a felony of the second degree.

**(2)**If the offender in any case also is convicted of or pleads guilty to a specification as described in *section 2941.1422 of the Revised Code* that was included in the indictment, count in the indictment, or information charging the offense, the court shall order the offender to make restitution as provided in division (B)(8) of *section 2929.18 of the Revised Code* and, except as otherwise provided in division (C)(3) of this section, shall sentence the offender to a mandatory prison term as provided in division (B)(7) of *section 2929.14 of the Revised Code.*

**(3)**If the victim of the offense is less than thirteen years of age and if the offender also is convicted of or pleads guilty to a sexual motivation specification that was included in the indictment, count in the indictment, or information charging the offense, kidnapping is a felony of the first degree, and,

A-14

ORC Ann. 2905.01

notwithstanding the definite sentence provided for a felony of the first degree in *section 2929.14 of the Revised Code*, the offender shall be sentenced pursuant to *section 2971.03 of the Revised Code* as follows:

> **(a)**Except as otherwise provided in division (C)(3)(b) of this section, the offender shall be sentenced pursuant to that section to an indefinite prison term consisting of a minimum term of fifteen years and a maximum term of life imprisonment.

> **(b)**If the offender releases the victim in a safe place unharmed, the offender shall be sentenced pursuant to that section to an indefinite term consisting of a minimum term of ten years and a maximum term of life imprisonment.

**(D)**As used in this section:

> **(1)**"Involuntary servitude" has the same meaning as in *section 2905.31 of the Revised Code*.

> **(2)**"Sexual motivation specification" has the same meaning as in *section 2971.01 of the Revised Code*.

## History

134 v H 511 (Eff 1-1-74); 139 v S 199 (Eff 1-5-83); *146 v S 2*. Eff 7-1-96; *152 v S 10*, § 1, eff. 1-1-08; *152 v H 280*, § 1, eff. 4-7-09; *153 v S 235*, § 1, eff. 3-24-11; *2011 HB 86*, § 1, eff. Sept. 30, 2011.

Page's Ohio Revised Code Annotated
Copyright © 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

End of Document

### *ORC Ann. 2921.12*

Current with Legislation passed by the 132nd General Assembly and filed with the Secretary of State through file 95 (SB 1).

*Page's Ohio Revised Code Annotated  >  Title 29: Crimes — Procedure (Chs. 2901 — 2981)  >  Chapter 2921: Offenses Against Justice and Public Administration (§§ 2921.01 — 2921.52)  >  Perjury (§§ 2921.11 — 2921.18)*

## § 2921.12 Tampering with evidence.

**(A)**No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

**(1)**Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;

**(2)**Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation.

**(B)**Whoever violates this section is guilty of tampering with evidence, a felony of the third degree.

## History

134 v H 511. Eff 1-1-74.

Page's Ohio Revised Code Annotated
Copyright © 2018 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

End of Document

Supreme Court of Ohio Clerk of Court - Filed September 24, 2018 - Case No. 2018-0416

## IN THE SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | CASE NO.    2018-0416 |
| APPELLLEE | : | ON APPEAL FROM THE PUTNAM COUNT COURT OF |
| | : | APPEALS, THIRD APPELLATE DISTRICT |
| v. | : | |
| TRAVIS SOTO | : | COURT OF APPEALS CASE NO. 12-17-05 |
| APPELLANT | : | |

### REPLY BRIEF OF APPELLANT STATE OF OHIO

**TODD C. SCHROEDER, #0075265**
**Assistant Prosecuting Attorney**
**Putnam County, Ohio**
**336 East Main Street, Suite B**
**Ottawa, Ohio 45875**
**Phone: (419) 523-3600**
**Fax: (419) 523-4519**
**Todd.schroeder@putnamcountyohio.gov**

**AND**

**GARY L. LAMMERS, #0042040**
**Counsel of Record**
**Putnam County Prosecuting Attorney**
**336 East Main Street, Suite B**
**Ottawa, Ohio 45875**
**Phone: (419) 523-3600**
**Fax: (419) 523-4519**
**Gary.lammers@putnamcountyohio.gov**

**COUNSEL FOR APPELLANT**
**STATE OF OHIO**

**CARLY M. EDELSTEIN, #0095950**
**Assistant State Public Defender**
**Attorney for Defendant**
**250 East Broad Street, Suite 1400**
**Columbus, Ohio 43215**
**Phone: (614) 752-7033**
**Fax: (614) 752-5167**
**carly.edelstein@opd.ohio.gov**

**ATTORNEY FOR APPELLANT**

TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………ii

INTRODUCTION TO APPELLANT'S REPLY……………………………………………………1

ARGUMENT IN SUPPORT OF PROPOSITION OF LAW…………………………………………..…3

    A.  PROPOSITION OF LAW NO. 1……………………………………………….….3

    B.  PROPOSITION OF LAW NO. 2……………………………………………….....6

    C.  PROPOSITION OF LAW NO. 3…………………………………………….…...10

CONCLUSION……………………………………………………………………….......12

CERTIFICATE OF SERVICE…………………………………………………………….....13

i

## TABLE OF AUTHORITIES

*CASES*

*Blockburger v. United States*, 284 U.S. 299 (1932)……………..……………………..…3,4,5,6

*Iannelli v. United States*, 420 U.S. 770, 785……………………………………………..……3

*Illinois v. Vitale*, 447 U.S. 410 419-420 (1980) ……………...……………………………….5

*Snyder v Massachusetts*, 291 U.S.97, 122 (1934)…………………………………………....1

*State v. Bridges*, Ohio 4480 (2015)…………………………………………………………10

*State v. Carpenter*, 68 Ohio St. 3d 59, 61 (1993)…………………………………………11,12

*State v. Dye*, 127 Ohio St. 3d 357 (2010)…………………………………………………...10

*State v. Gonzales*, 151 Ohio App. 3d 160 (2002)…………………………………………….6

*State v. Resor*, 2010 WL 415414 (2010)……………………………………………………..5

*State v Thomas*, 40 Ohio St.3d 213 (1998)………………………………………….……..3,4

*State v. Tolbert*, 60 Ohio St. 3d 89 (1991)…………………………………………………..6

*State v. Zima*, 102 Ohio St.3d 61, 67 (2004)…………………………………………….4,5,11

*United States v. Walker*, 546 F. Supp. 805, 811 (1982)……………………………………..6

*Whalen v. United States* (1980) …………………………………………………………….5

*WEBSITES:*

EN.OXFORDDICTIONARIES.COM…………….…………………………………...………10, 11

ii

## INTRODUCTION TO APPELLANT'S REPLY

*Justice, though due the accused, is due the accuser also.*
*The concept of fairness must not be strained till it is*
*narrowed to a filament. We are to keep the balance true."*

This case seeks to answer Justice Cardoza's call "to keep the balance true." *Snyder v. Massachusetts* (1934), 291 U.S. 97, 122. While Double Jeopardy offers important constitutional protections for an accused facing multiple prosecutions, it must be used as a shield and not a sword. Our justice system cannot sustain the conduct of an accused who proactively manipulates the evidence and engages in fraud and deceit to secure a less serious charge. If it does, then calls "to keep the balance true" are rendered meaningless.

Defendant/Appellee, Travis Soto, was indicted for Tampering with Evidence by the Putnam County Grand Jury on August 12, 2016, finding that Soto, on January 23, 2006, "**did while knowing that an official proceeding or investigation was in progress or was about to be or likely to be instituted, alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.**"

January 23, 2006, was the day Soto beat his two year old child to death, then staged the ATV scene to support his fictional version of events. Law enforcement began its investigation into two-year-old J.B.'s death that day, but Soto was not indicted with Involuntary Manslaughter and Child Endangering until March 31, 2006. Thus, law enforcement investigated this case for more than two months before presenting its findings to a grand jury.

1

While Soto enjoyed the constitutional protection against self-incrimination, he presumably elected against remaining silent believing he had sufficiently tampered with the evidence in the case and could escape more serious charges. His fraud and deceit during the two-plus month investigation and subsequent prosecution was successful despite the exercise of due diligence by law enforcement.

Soto's evidence tampering and falsification came to light on July 25, 2016, when he appeared at the Putnam County Sheriff's Office and acknowledged that he beat his son to death, then staged the ATV accident scene and maintained a fictional version of events to law enforcement, family, and friends. He further stated his belief that his confession would result in another prosecution. He was then Indicted for Murder and Tampering with Evidence, along with other charges.

The facts of this case should be distinguished from a case in which an accused exercises his or her right to remain silent, or where an accused makes a statement simply denying responsibility. In those situations law enforcement is clearly responsible for the results of its investigation. However, that is not what occurred in this case. Here, Soto proactively manipulated the evidence and staged an accident scene in order to escape responsibility for his murderous conduct. As such he intentionally influenced the investigation so as to make the real crime undiscoverable despite the due diligence of law enforcement. Accordingly he could not have held the reasonable expectation that his plea in 2006 would prevent additional charges should his true crime be discovered.

2

## ARGUMENT IN SUPPORT OF PROPOSITION OF LAW

**Proposition of Law No. 1**: Involuntary Manslaughter with a
child endangering predicate in violation of ORC 2903.04(A)
is not the same offense for double jeopardy purposes as
Aggravated Murder in violation of ORC 2901.01(C) or Murder
with a felonious assault predicate in violation of ORC 2903.02 (B)
under the *Blockburger* "same offense" test.

Appellant herein incorporates its previous statements of law and argument
contained within its Merit Brief.

*Blockburger v. United States* held that "[t]he applicable rule is that where the
same act or transaction constitutes a violation of two distinct statutory provisions, the test
to be applied to determine whether there are two offenses or only one, is whether each
provision requires proof of an additional fact which the other does not..." While the test
emphasizes the elements of two crimes, it does so by focusing on whether each crime
"requires proof of a fact that the other does not." *Iannelli v. United States*, 420 U.S. 770,
785.

Ordinarily, but not always, the *Blockburger* test will be met when analyzing if a
lesser offense is the same as its greater offense for purposes of Double Jeopardy. This is
because ordinarily, but not always, the lesser offense will *not* require proof of an
additional fact from that needed to sustain a conviction on the greater offense. For
example, the *Blockburger* test is met when the greater offense and lesser offense relies on
the same predicate offense. This has been the case in each instance in which this Court,
and lower courts, have found that involuntary manslaughter is a lesser offense of
aggravated murder and murder. See, *State v. Thomas* (1998), 40 Ohio St.3d 213.

However, "[t]his test is not a word game to be performed by rote by matching the
words chosen by the legislature to define criminal offenses... [t]he proper overall focus is

3

on the nature and circumstances of the offenses as defined, rather than on the precise words used to define them." *Thomas* at 217. Thus, when determining whether two offenses are the same by analyzing whether one offense requires proof of a fact that the other does not, it is proper to go beyond the rote matching of words and to consider the nature and circumstances of the offenses as defined. This can only be accomplished by considering the predicate offenses that are contained within the criminal statutes at issue.

In 2006 Soto was prosecuted for Involuntary Manslaughter with a Child Endangering predicate. That charge was dismissed. Soto now faces prosecution for Murder with a Felonious Assault predicate. When considering if Involuntary Manslaughter with a Child Endangering predicate is the same offense as Murder with a Felonious Assault predicate, *Blockburger* requires a determination whether one offense requires proof of an additional fact which the other does not. This Court has previously determined that when answering that question it is necessary to consider predicate offenses. *State v. Zima* (2004), 102 Ohio St.3d 61, 67.

In *Zima*, the defendant had been convicted of O.V.I., a lesser offense of Aggravated Vehicular Assault with an O.V.I. predicate. Zima argued that she could not be prosecuted for Aggravated Vehicular Assault since O.V.I. is the same offense under *Blockburger*. This Court disagreed and found that when a statute allows for different predicate offenses, then *Blockburger* requires a comparison using the elements of the predicate offense that the State is seeking to prove. *Zima* at 67-68. As a result, Aggravated Vehicular Assault with an O.V.I. predicate was construed as constituting a separate offense from Aggravated Vehicular Assault with a Reckless Operation predicate.

4

As stated in *Zima*, "there is nothing in the record to indicate that the state will have to reply on the components of the lesser offenses that were charged in the [prior] proceedings…" Here, the components of the lesser offense of Involuntary Manslaughter with a Child Endangering predicate will not be relied upon when proving the conduct of Aggravated Murder or Murder with a Felonious Assault predicate. "[T]he mere possibility that the state may seek to rely on the ingredients of the lesser offenses… is not sufficient to bar a latter prosecution." *Zima* citing *Illinois v. Vitale* (1980), 447 U.S. 410, 419-420. Here, it can be argued that even the ingredients of the lesser offense of Involuntary Manslaughter with a Child Endangering predicate will not be relied upon.

A statute which allows for different predicate offenses should be viewed as allowing for separate offenses. "In *Whalen v. United States* (1980), the Supreme Court… determined that when the *Blockburger* test is applied to a statute containing alternative elements, each statutory alternative should be construed as constituting a separate offense and analyzed accordingly." *Zima* at 68.

This is exactly the approach taken in *State v. Resor* (2010), 2010 WL 415414, in which the Sixth District Court of Appeals determined that Murder with a Felonious Assault predicate is not the "same offense" as Involuntary Manslaughter with a Child Endangering predicate.

Although precedent exists for the proposition that Involuntary Manslaughter is a lesser offense of Aggravated Murder and Murder, that precedent seemingly involves cases in which the predicate offenses were the same. Appellant/State of Ohio urges this Court to follow the rationale in *Zima, Whalen,* and *Resor* to find that when the

5

*Blockburger* test is applied to a statute that allows for alternative predicate offenses, that each alternative be construed as constituting a separate offense and analyzed accordingly.

If that is done in this case, then the conclusion must be that Involuntary Manslaughter with a Child Endangering predicate is not the "same offense" as Murder with a Felonious Assault predicate.

> **Proposition of Law No. 2**: **Additional facts necessary to sustain a new charge that have not been discovered despite the exercise of due diligence acts as an exception to *Blockburger* to allow subsequent prosecution.**

Appellant herein incorporates its previous statements of law and argument contained within its Merit Brief.

Even when facts necessary to sustain a charge occurs prior to a plea, if the facts were not discoverable despite the exercise of due diligence then a successive prosecution is not barred by double jeopardy. *State v. Tolbert* (1991), 60 Ohio St.3d 89. "In a due-diligence situation, 'due diligence' means 'ordinary, rather than extraordinary diligence.'" *State v. Gonzales* (2002), 151 Ohio App.3d 160, citing *United States v. Walker* (1982), 546 F. Supp. 805, 811. It is within the discretion of the trial judge to determine the diligence required under the circumstances.[1] *Walker* at 811.

> It would strain reason and common sense, however, to read *Brown* as foreclosing later prosecution for a greater offense any time facts initially available raise a mere suspicion that the greater offense had been committed. Such an interpretation would in fact render the due diligence prong of the exception largely meaningless. The exception, by its terms, assumes a reason for an investigation in the first place. Surely suspicion that a greater offense had been committed cannot be excluded as such a reason.

*Walker* at 811.

---

[1] The Third Appellate District reviewed the trial court's finding that law enforcement exercised due diligence *de nova*. However, such review should have been whether the trial court abused its discretion. The trial court had the necessary record to review that issue. The Appellate Court did not.

6

Thus, due diligence in investigating a child's death requires ordinary diligence, not extraordinary, and the mere suspicion that a greater offense may have been committed does not exclude the due diligence exception from applying when law enforcement originally concludes, based on the results of a diligent investigation, that the lesser offense was committed.

This is especially true when an accused proactively engages in conduct designed to undermine the results of the investigation and lead law enforcement to conclude that the lesser, and not the greater, offense had been committed.

Here, law enforcement did exercise due diligence, and Soto agrees. In his Merit Brief, Soto outlines his view of how the due diligence standard could be met in this case. Soto's ideal investigation (followed by the State's response in bold) would include the following:

• Further interview J.B.'s mother about Mr. Soto's relationship with his son and whether he had ever given him rides on the ATV in the past.

*The State interviewed J.B.'s mother on multiple occasions concerning Soto's relationship with his son and history of giving J.B. rides. In addition, the State interviewed additional witnesses with knowledge of Soto's history of giving J.B. rides. In addition, the State interviewed others who received statements from Soto concerning the ATV accident.*

• Interview other family members about Mr. Soto's relationship with J.B. and J.B.'s mother.

*The State conducted interviews concerning Soto's relationship with J.B. and J.B.'s mother. In addition, the State reviewed all available prior reports concerning*

7

*those relationships. In addition, the State interviewed Soto's brother to corroborate statements made by Soto.*

• Interview Mr. Soto's neighbors to better understand his relationship with J.B. and J.B.'s mother and to corroborate Mr. Soto's story about the ATV accident.

*The State conducted interviews with Soto's neighbor relative to Soto's version of events involving an ATV accident.*

• Conduct forensic analysis of the ATV tire tracks on the property to determine whether they matched either of Mr. Soto's stories regarding the ATV accident.

*The State did confirm that Soto's ATV was driven on the property. In addition, the State received a sketch from Soto purporting to depict the location of the ATV accident.*

• Examine the ATV to find possible clothing fibers on the vehicle.

*The State did confiscate the ATV, forensically examined it, and did find red fibers believed to match the red shirt Soto claimed was worn by J.B. at the time of his death.*

• Search Mr. Soto's house to find the clothing J.B. was allegedly wearing during the ATV accident.

*The State did search Soto's home and was provided the subject clothing by Soto and J.B.'s mother. In addition, the State confiscated J.B.'s blankets, pillows, and covers from J.B.'s bed to be forensically examined.*

• Check Mr. Soto's phone records to determine whether he had called anyone in the aftermath of the accident.

8

*The State did receive Soto's phone records to determine who he contacted and when. In addition, the State confiscated and analyzed Soto's computer to corroborate his statement that he had been on the computer the afternoon of J.B.'s death.*

• Conduct a more searching autopsy to determine why J.B. had no broken bones or tire tracks on his body.

*The State appropriately relied on the skill and expertise of the Lucas County Coroner's Office and the opinions expressed by the physician that conducted the autopsy. In addition, the State provided the coroner measurements associated with the ATV, who in turn compared those with the bruises on J.B.*

See Merit Brief of Travis Soto, p. 25.

Thus, the State not only exercised due diligence according to Soto's view, but exceeded the same. The State's investigation further exceeded what is outlined above in response to Soto's Merit Brief.

The trial court, with the entire record of this case and the 2006 investigation, determined that law enforcement exercised due diligence. Law enforcement did not rush to charge Soto, but instead investigated this matter for more than two months before presenting its findings to a grand jury.

Unfortunately, the facts of this case were not discoverable despite the exercise of due diligence. Here, Soto proactively manipulated the evidence and staged an accident scene in order to escape responsibility for his murderous conduct. As such he intentionally influenced the investigation so as to make the real crime undiscoverable despite the due diligence of law enforcement. Under these circumstances, a criminal

9

defendant should not enjoy the protection of double jeopardy or benefit from his cover-up.

> **Proposition of Law No. 3**: **A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario.**

Appellant herein incorporates its previous statements of law and argument contained within its Merit Brief.

A negotiated plea "bars successive prosecutions where the defendant *would reasonably believe* that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario." *State. v. Bridges*, 2015 Ohio 4480. The question, then, is whether Soto's guilty plea carried with it "defendant's reasonable expectation that pleading guilty would end the criminal proceedings arising out of the incident." *State v. Dye* (2010), 127 Ohio St.3d 357.

"Reasonable" means "having sound judgement; fair and sensible" while "expectation" means "a strong belief that something will happen or be the case." https://en.oxforddictionaries.com. At the outset, we know Soto did not expect that his 2006 plea would bar future prosecutions because during his July 25, 2016 confession to law enforcement he indicated his belief that his confession would lead to another prosecution. Nevertheless, even if Soto expected that his 2006 plea would bar a future prosecution, such a belief cannot be found to be reasonable. Such a belief is not based in "sound judgment," nor is "fair and sensible."

As stated above, Soto proactively manipulated the evidence in order to escape prosecution for Murder. Objectively, it is not reasonable to conclude that such conduct, if

10

discovered, would be consequence-free and that one could avoid a subsequent prosecution by entering a plea before such conduct was discovered.

*Carpenter* and its progeny includes cases wherein the defendant was found to have held a reasonable expectation that the guilty plea would terminate the incident. The common thread connecting those cases was that the State had actual knowledge of the underlying facts prior to the guilty plea, yet chose to allow a plea without reserving the right to file additional charges. In *Carpenter*, "the defendant's expectation that his guilty plea would terminate the incident was inherently justified because the prosecutor and the court had jurisdiction over all the charges, both actual and <u>potential</u>, and because the negotiated guilty plea included a dismissal of all pending charges." *State v. Zima* (2004), 102 Ohio St.3d 61. "In the absence of th[o]se or equivalent circumstances, … it would be exceedingly difficult to sustain a defendant's belief that no further charges will be brought or prosecuted." *Id.*

Here, Soto understood at the time of his plea that the charges of Aggravated Murder and Murder were not potential charges, and that neither the court nor prosecutor contemplated such charges. "Potential" means "having or showing the capacity to develop into something in the future." https://en.oxforddictionaries.com. Soto proactively concealed the facts such that he was fully aware (and the only one with such awareness) at the time of his plea that the true nature of his crime had not been discovered. As such, the charges of Aggravated Murder and Murder seemingly did not have or show the capacity to develop in the future. "It would be exceedingly difficult to sustain [Soto's] belief that no further charges [would] be brought or prosecuted." See, *Zima*.

11

Such circumstances, if found to bar Soto's subsequent prosecution, would undermine the traditional principles of contract law which legitimizes the plea negotiation process. As stated in *Carpenter*, these contracts between the State and defendants are "an essential and necessary part of the administration of justice." *State v. Carpenter* (1993), 68 Ohio St.3d 59, 61.

A defendant has a right to remain silent and need not assist a criminal investigation against him, but nor should he benefit when he chooses to tamper with evidence in an effort to disguise and avoid prosecution for the greater offense. "Justice, though due the accused, is due the accuser also." Justice Cardoza.

<u>CONCLUSION</u>

For the reasons discussed above, this Honorable Court should reverse the decision of the Third District Court of Appeals and remand the matter back to the Trial Court.

Respectfully submitted,

Todd C. Schroeder (#0075265)
Putnam County Assistant Prosecuting Attorney
Gary L. Lammers (#0042040)
Putnam County Prosecuting Attorney
(COUNSEL OF RECORD)

COUNSEL FOR APPELLANT
STATE OF OHIO

336 E. Main Street
Ottawa, Ohio 45875
(419) 523-3600
(419) 523-4519 - Fax
email: gary.lammers@putnamcountyohio.gov
        todd.schroeder@putnamcountyohio.gov



12

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing Merit Brief of Appellant State of

Ohio was served by ordinary U. S. Mail on this 24th day of September, 2018 upon the

following counsel of record:

Carly M. Edelstein (#0095950)
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215
614-752-70339
Fax No. 614-752-5167
carly.edelstein@opd.ohio.gov

COUNSEL FOR APPELLEE
TRAVIS SOTO

Todd C. Schroeder (#0075265)

13

 Neutral
As of: May 3, 2021 7:30 PM Z

## *State v. Soto*

Supreme Court of Ohio

March 6, 2019, Submitted; October 31, 2019, Decided

No. 2018-0416

**Reporter**

158 Ohio St. 3d 44 *; 2019-Ohio-4430 **; 139 N.E.3d 889 ***; 2019 Ohio LEXIS 2264 ****

THE STATE OF OHIO, APPELLANT, v. SOTO, APPELLEE.

**Subsequent History:** US Supreme Court certiorari denied by *Soto v. Ohio, 2020 U.S. LEXIS 3293 (U.S., June 22, 2020)*

**Prior History:** APPEAL from the *Court of Appeals for Putnam County, No. 12-17-05, 2018-Ohio-459, 94 N.E.3d 618* [****1] .

*State v. Soto, 2018-Ohio-459, 2018 Ohio App. LEXIS 467, 94 N.E.3d 618 (Ohio Ct. App., Putnam County, Feb. 5, 2018)*

**Disposition:** Judgment reversed and cause remanded.

## Core Terms

murder, jeopardy, involuntary manslaughter, plea agreement, aggravated, charges, involuntary-manslaughter, guilty plea, child endangerment, same offense, attaches, double-jeopardy, trial court, prosecuting, indictment, double jeopardy, convicted, negotiated plea, lesser included offense, subsequent prosecution, murder charges, authorities, offenses, constitutional prohibition, court of appeals, empaneled, sentence, bargain, twice, cause death

## Case Summary

### Overview

HOLDINGS: [1]-The appellate court erred by finding that double jeopardy barred prosecution of defendant for murder or aggravated murder because, since the involuntary-manslaughter charge was dismissed prior to the empaneling of a jury, jeopardy never attached to that charge and the double-jeopardy prohibition did not prevent the State from prosecuting defendant for murder or aggravated murder. Because the involuntary-manslaughter charge was dismissed under his plea agreement, defendant was never tried for involuntary manslaughter nor was he convicted of or punished for that crime and, in treating the dismissal of the involuntary-manslaughter charge as an acquittal, the court of appeals ignored the principle that a dismissal entered before jeopardy attaches did not function as an acquittal and did not prevent further prosecution for the offense.

### Outcome

Appellate court judgment reversed and remanded to the trial court.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental

State v. Soto

Rights > Procedural Due Process > Double Jeopardy

*HN1*[⬇️]  **Procedural Due Process, Double Jeopardy**

The *Fifth Amendment to the United States Constitution* guarantees that no person shall be subject for the same offence to be twice put in jeopardy of life or limb. The Ohio Constitution contains a similarly worded guarantee and provides that no person shall be twice put in jeopardy for the same offense. *Ohio Const. art. I, § 10*. These provisions have been read to protect against three distinct wrongs: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Double Jeopardy

Criminal Law & Procedure > ... > Double Jeopardy > Double Jeopardy Protection > Acquittals

*HN2*[⬇️]  **Procedural Due Process, Double Jeopardy**

A dismissal is not equivalent to an acquittal. By their plain terms, the Double Jeopardy Clauses apply only when someone would be "twice put in jeopardy."

Criminal Law & Procedure > Commencement of Criminal Proceedings > Double Jeopardy > Attachment Jeopardy

*HN3*[⬇️]  **Double Jeopardy, Attachment Jeopardy**

It is axiomatic that when a charge is dismissed before jeopardy attaches, the double-jeopardy protections do not prevent subsequent prosecution for the dismissed charge. For charges to which the defendant did not plead guilty, jeopardy does not attach until a jury is empaneled or, in a bench trial, when the judge starts taking evidence.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Double Jeopardy > Double Jeopardy Protection

Criminal Law & Procedure > Preliminary Proceedings > Plea Bargaining Process > Enforcement of Plea Agreements

*HN4*[⬇️]  **Double Jeopardy, Double Jeopardy Protection**

Separate and apart from the constitutional protections provided by the double-jeopardy provisions, a plea agreement may bar further charges based on principles of contract law. The underlying premise is that when a plea rests on a promise made by the prosecutor, that promise must be fulfilled. The rule is based on contract-law principles, not the *Double Jeopardy Clause of the Fifth Amendment to the United States Constitution*.

## Headnotes/Summary

**Headnotes**

*Criminal law—Double jeopardy—Double Jeopardy Clauses do not bar murder prosecution of defendant whose prior involuntary-manslaughter charge was dismissed under plea agreement—Court of appeals' judgment reversing trial court's denial of defendant's motion to dismiss reversed and cause remanded.*

**Counsel:** Gary L. Lammers, Putnam County Prosecuting Attorney, for appellant.

Timothy Young, Ohio Public Defender, and Carly M. Edelstein, Assistant Public Defender, for appellee.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christopher D. Schroeder, Assistant Prosecuting Attorney, urging reversal for amicus curiae, Cuyahoga County Prosecutor's Office.

**Judges:** DEWINE, J. O'CONNOR, C.J., and KENNEDY, FRENCH, and FISCHER, JJ., concur. STEWART, J., concurs in judgment only. DONNELLY, J., dissents, with an opinion.

**Opinion by:** DEWINE

## Opinion

State v. Soto

[***891] [*44]   DEWINE, J.

[**P1]   In 2006, a two-year-old boy was killed. At the time, his father, *Travis Soto*, told police that he had accidentally caused the boy's death while driving an ATV. Soto was charged with child endangering and involuntary manslaughter. He entered into a plea agreement whereby he pleaded guilty to child endangering and the other charge was dismissed. [****2] He served his time in prison. That might have been the end of the story.

[**P2]   But several years after his release, Soto told authorities that his previous account was a lie. The truth, he said, was that he had beaten his son to death. The state then charged Soto with murder and aggravated murder, among other offenses. We now must decide whether the constitutional prohibition against double jeopardy bars the murder charges.

[**P3]   We hold that because the involuntary-manslaughter charge was dismissed prior to the empaneling of a jury, jeopardy never attached to that charge. Because of this, the double-jeopardy prohibition does not prevent the state from prosecuting Soto for murder or aggravated murder. For that reason, we reverse the judgment of the Third District Court of Appeals.

## I. BACKGROUND

[**P4]   As recounted by both parties, the relevant facts are as follows. In January 2006, Soto's son, Julio, was killed. Based on Soto's statements at the time, authorities believed that the child had died in a tragic ATV accident.

[**P5] [*45]   In 2006, Soto gave authorities two different stories about what had happened. Initially, Soto told investigators that he had accidentally run over Julio with an ATV after turning a corner [****3] around a building on his property. Later, Soto told authorities that Julio had been riding with Soto on the vehicle and was struck after he fell off. The Lucas County Coroner's Office conducted an autopsy and concluded that Julio's injuries were consistent with an ATV accident.

[**P6]   After being charged with child endangering under *R.C. 2919.22(A)* and involuntary manslaughter under *R.C. 2903.04(A)*, Soto negotiated a plea agreement. He pleaded guilty to child endangering, and the involuntary-manslaughter charge was dismissed. Soto was sentenced to five years in prison, which he served.

[**P7]   But it turns out that Julio's death may not have been accidental. In July 2016, Soto went to the Putnam County Sheriff's Office and confessed that he had beaten the child to death and fabricated the ATV accident. A doctor specializing in pediatric abuse reviewed the 2006 autopsy report and photographs taken at the time and concluded that the child's injuries were consistent with Soto's more recent story. Specifically, the doctor pointed to [***892] the fact that there were no bone fractures, which would normally be expected in an ATV accident. Authorities then indicted Soto for aggravated murder, murder, felonious assault, kidnapping, and tampering [****4] with evidence.

[**P8]   In October 2016, Soto filed a motion to dismiss the murder charges. The motion argued that the charges were barred by the *Fifth Amendment's* prohibition against a person being "twice put in jeopardy of life or limb." *Fifth Amendment to the U.S. Constitution.* He asserted that involuntary manslaughter is a lesser included offense of murder and aggravated murder and that the state is therefore barred from prosecuting those charges.

[**P9]   The trial court denied the motion, concluding that the double-jeopardy protection does not bar Soto's prosecution for murder and aggravated murder. The court reasoned that under the test set forth in *Blockburger v. United States*, involuntary manslaughter with a child-endangering predicate is not the same offense as murder with a felonious-assault predicate. *See 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).*

[**P10]   Soto filed an interlocutory appeal of the trial court's denial of his motion to dismiss—a procedural step that was appropriate based on this court's decision in *State v. Anderson*, which allowed an interlocutory appeal of a denial of a motion to dismiss on double-jeopardy grounds. *138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23, ¶ 26; see also Abney v. United States, 431 U.S. 651, 659, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).* Soto asserted a single assignment of error in his appeal: "The trial court erred [in] over[ruling] Defendant's Motion to Dismiss on Double Jeopardy Grounds." [****5]

[**P11] [*46]   In a two-to-one decision, the court of appeals reversed the trial court's denial of Soto's motion to dismiss. The majority concluded that "because Involuntary Manslaughter constitutes a lesser included offense of Aggravated Murder and Murder, the principles of Double Jeopardy would prevent a subsequent prosecution of Soto for Aggravated Murder and Murder in this instance." *2018-Ohio-459, 94 N.E.3d 618, ¶ 34.* The majority noted that although Soto was not convicted of involuntary manslaughter, "he was in jeopardy of being tried and convicted of Involuntary Manslaughter but-for the plea agreement." *Id. at ¶ 22.* Writing in dissent, Judge Zimmerman argued that because the

State v. Soto

involuntary-manslaughter charge had been dismissed, jeopardy had not attached to that charge. *Id., at ¶ 38* (Zimmerman, J., dissenting). The dissenting opinion therefore concluded that double-jeopardy principles do not bar Soto's prosecution for murder and aggravated murder. As explained below, Judge Zimmerman was right.

## II. ANALYSIS

### A. Double-Jeopardy Principles Do Not Bar Soto's Prosecution

**[\*\*P12]** *HN1*[⬆] The *Fifth Amendment to the United States Constitution* guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Ohio Constitution contains a similarly worded **[\*\*\*\*6]** guarantee: "No person shall be twice put in jeopardy for the same offence." *Ohio Constitution, Article I, Section 10.*[1] We have read these provisions to protect against three distinct wrongs: "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, **[\*\*\*893]** and (3) multiple punishments for the same offense." *State v. Gustafson, 76 Ohio St.3d 425, 432, 1996- Ohio 299, 668 N.E.2d 435 (1996)*, citing *United States v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).*

**[\*\*P13]** The court of appeals determined that the first protection—preventing a second prosecution for the same offense following an acquittal—was violated here because Soto had been indicted for involuntary manslaughter in 2006 and was now facing prosecution for murder and aggravated murder. Treating the dismissal of the involuntary-manslaughter charge as an acquittal, the court concluded that further prosecution of Soto violated the *Double Jeopardy Clauses* because under the test set forth in *Blockburger*, murder and aggravated murder constitute the same offense as involuntary manslaughter. But *HN2*[⬆] a dismissal is not equivalent to an acquittal. By their plain terms, the *Double Jeopardy Clauses* **[\*47]** apply only when someone would be "twice put in jeopardy." Because Soto was never put in jeopardy for the dismissed 2006 involuntary-manslaughter charge, the *Double Jeopardy* Clauses do not bar his

subsequent prosecution for murder and aggravated **[\*\*\*\*7]** murder.

**[\*\*P14]** Because the involuntary-manslaughter charge was dismissed under his plea agreement, Soto was never tried for involuntary manslaughter nor was he convicted of or punished for that crime. In treating the dismissal of the involuntary-manslaughter charge as an acquittal, the court of appeals ignored the principle that a dismissal entered before jeopardy attaches does not function as an acquittal and does not prevent further prosecution for the offense. *See C.K. v. State, 145 Ohio St.3d 322, 2015-Ohio-3421, 49 N.E.3d 1218, ¶ 15; Bucolo v. Adkins, 424 U.S. 641, 642, 96 S.Ct. 1086, 47 L.Ed.2d 301 (1976).*

**[\*\*P15]** The dissent advances the novel proposition that double jeopardy attaches to a charge dismissed under a plea agreement—here, the involuntary-manslaughter charge. In support of this view, the dissent points to cases holding that jeopardy attaches when a court accepts a guilty plea. Dissenting opinion at ¶ 37-38. Of course, that's true. But what the dissent neglects to mention is that the principle applies only to the charges to which a defendant pleads guilty. *See, e.g., United States v. Soto-Alvarez, 958 F.2d 473, 482 (1st Cir.1992), fn. 7* ("jeopardy ordinarily does not attach to counts which are dismissed and on which no finding of guilty is made"); *United States v. Dionisio, 503 F.3d 78, 89 (2d Cir.2007)* (holding that jeopardy did not attach to charges that were dismissed with prejudice under a plea agreement, when the dismissal did not entail **[\*\*\*\*8]** a "resolution of any factual elements that went to the merits of the charges"). Tellingly, the dissent does not cite a single case adopting its view that double jeopardy applies to a charge, like the one at issue here, that was dismissed under a plea agreement before being put to a trier of fact.[2]

**[\*\*P16]** *HN3*[⬆] It is axiomatic that when a charge is dismissed before jeopardy attaches, the double-jeopardy protections do not prevent subsequent prosecution for the dismissed charge. *See C.K. at ¶ 15; State v. Grillo, 2015-Ohio-308, 27 N.E.3d 951, ¶ 25 (5th Dist.).* For charges to which the defendant did not plead guilty, jeopardy does not attach until a jury is empaneled or, in a bench trial, when the judge starts taking evidence. *Gustafson, 76 Ohio St.3d at 435, 668 N.E.2d 435.* Because Soto entered his guilty plea prior to the empaneling of a jury or the taking of evidence, jeopardy **[\*\*\*894]** attached—but only as to the child-endangering charge to which he pleaded guilty and not as to the dismissed involuntary-manslaughter charge.

---

[1] In the past, we have treated the two guarantees as "coextensive." *State v. Gustafson, 76 Ohio St.3d 425, 432, 1996- Ohio 299, 668 N.E.2d 435 (1996).* Because neither party has presented a contrary argument, we have no opportunity to revisit that determination today.

[2] The dissent attempts to enlist *Dionisio* in support of its novel view, but in *Dionisio*, the court held that jeopardy did not attach to charges dismissed under a plea agreement.

State v. Soto

[**P17] [*48]   Soto has not argued that child endangering constitutes the same offense as murder and aggravated murder. And for good reason—under the *Blockburger* test, it is plain that the child-endangering charge does not constitute the same offense as the murder charges, because each of the [****9]   murder offenses contains an element not found in child endangering and child endangering contains an element not found in the murder offenses. As a result, the *Double Jeopardy* *Clauses* do not bar Soto's prosecution for murder and aggravated murder.

**B. We Dismiss as Improvidently Accepted the Proposition of Law Relating to Soto's Plea Agreement**

[**P18]   We accepted three propositions of law in this case. The first two challenge the court of appeals' conclusion that Soto's prosecution is barred by the constitutional double-jeopardy protections. The third asserts: "A negotiated plea does not bar successive prosecutions where the defendant would not reasonably believe that his or her plea would bar further prosecutions for any greater offense related to the same factual scenario."

[**P19]   This third proposition of law relates not to the constitutional double-jeopardy protection but, rather, to a claim for relief based on the contents of Soto's plea agreement. *See, e.g., State v. Dye, 127 Ohio St.3d 357, 2010-Ohio-5728, 939 N.E.2d 1217, ¶ 22. HN4*[⬆]  Separate and apart from the constitutional protections provided by the double-jeopardy provisions, a plea agreement may bar further charges based on principles of contract law. *Id. at ¶ 21.* The underlying premise is that when a plea rests on a promise made by [****10]   the prosecutor, that promise must be fulfilled. *Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); see also State v. Bethel, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150,* ¶ 50. The rule is "based on contract-law principles, not the *Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.*" *Dye at ¶ 20, fn. 2.*

[**P20]   Upon reflection, we dismiss the third proposition of law as having been improvidently accepted. In doing so, we note that Soto did not raise a claim related to the content of his plea agreement in the trial court—rather, he sought relief there based solely on the constitutional prohibition against double jeopardy. Further, Soto did not raise an assignment of error identifying the plea agreement as a basis for relief in the court of appeals. And while the court of appeals did discuss the negotiated plea generally, it did so in the context of the constitutional double-jeopardy prohibition and did not consider the plea agreement as a separate basis for relief.

Thus, the issue is not properly before us.[3]

[**P21] [*49]   The dissent conflates the contractual-plea-agreement argument with the separate double-jeopardy argument and is eager to hold that the agreement bars the present charges against Soto. Dissenting opinion at ¶ 54. The dissent also asserts [***895]   that under our analysis, "no plea bargain is necessarily conclusive and any plea agreement can be negated." [****11]   *Id.* at ¶ 53. But this misconstrues our holding. We take no view about whether Soto's plea agreement might serve as a bar to the murder charges. Soto did not present a plea-agreement claim to the trial court, and the agreement was never put into the record. Nor did he raise an assignment of error relating to the plea agreement in the court of appeals. It would be improper for us to reach that issue under the present procedural posture of the case. Further, to do so would require us to speculate about the contents of a plea agreement that is found nowhere in the record before us.

**III. CONCLUSION**

[**P22]   We reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

Judgment reversed and cause remanded.

O'CONNOR, C.J., and KENNEDY, FRENCH, and FISCHER, JJ., concur.

STEWART, J., concurs in judgment only.

DONNELLY, J., dissents, with an opinion.

**Dissent by:** DONNELLY

# Dissent

---

[3] We further note that this court has never addressed whether an interlocutory appeal may be brought based on the denial of a motion to dismiss on the basis of a plea agreement (as opposed to the constitutional double-jeopardy prohibition). *Compare State v. Anderson, 8th Dist. Cuyahoga No. 106304, 2018-Ohio-3051* (allowing interlocutory appeal) *with State v. Ammons, 9th Dist. Summit No. 28675, 2019-Ohio-286* (concluding that that issue was not ripe for review in an interlocutory appeal). We have no occasion to do so today, because Soto never sought an interlocutory appeal on that basis.

State v. Soto

**DONNELLY, J., dissenting**.

[**P23]  The constitutional prohibition against double jeopardy bars appellee **_Travis Soto_**'s prosecution for murder and aggravated murder; because the majority concludes otherwise, I respectfully dissent. I would affirm the judgment of the court of appeals.

## BACKGROUND[4]

[**P24]  On January [****12]  23, 2006, **_Travis Soto_**'s two-year-old son, Julio, was found dead. Julio was in Soto's care that day. When questioned by the police, Soto told [*50]  two separate versions of how Julio had died. First, Soto explained that he had accidently run over Julio with his all-terrain vehicle ("ATV") after turning a corner around a building on his property. Later, Soto told authorities that Julio had been riding on the ATV and was struck by the ATV after he fell off it. Soto told the detectives that he had carried Julio inside the house, cleaned him, rocked him until he stopped crying, and put him to bed. Soto did not call 9-1-1 or attempt to get any medical care for Julio. Two or three hours later, when Julio's mother returned home, Soto informed her that Julio had died.

[**P25]  Based on Soto's explanations, an autopsy was conducted, and it was concluded that Julio's injuries were consistent with an ATV accident.

[**P26]  On March 31, 2006, a grand jury returned a two-count indictment against Soto for causing the death of his son. Count one charged a violation of _R.C.   2903.04(A)_, involuntary manslaughter, for causing the death of another as a proximate result of committing or attempting to commit a felony, and count two charged a [****13]  violation of _R.C. 2919.22(A)_ and _(E)(1)(c)_, child endangering. On August 31, 2006, the trial court accepted a negotiated plea agreement between the state and Soto whereby in exchange for his guilty plea to child endangering, the state dismissed the involuntary-manslaughter charge. The court sentenced Soto to five years in prison.

[**P27]  On July 25, 2016, several years after he was released from prison, Soto went to the authorities and gave a third version of Julio's death.[5] In this account, [***896]  Soto

said that he had beaten Julio to death and fabricated the ATV accident. A pediatric-abuse specialist reviewed the 2006 autopsy report and photographs taken at the time and concluded that Julio's injuries were consistent with Soto's new version of the facts. Armed with this new version, the state quickly went back to the grand jury.

[**P28]  On August 15, 2016, the state again indicted Soto for causing the death of his son. This time, the state charged Soto with aggravated murder, in violation of _R.C. 2903.01(C)_, for purposely causing the death of another under the age of 13; murder, in violation of _R.C. 2903.02(B)_, for causing the death of another as a proximate result of committing or attempting to commit a felony of the first or second degree that is an offense [****14]  of violence; felonious assault, in violation of _R.C. 2903.11(A)(1)_; kidnapping in violation of _R.C. 2905.01_; and tampering with evidence in violation of _R.C. 2921.12(A)(1)_.

[**P29]  [*51]  On October 11, 2016, Soto filed a motion to dismiss the murder and aggravated-murder charges based on the constitutional prohibition against double jeopardy. Soto argued that involuntary manslaughter (which was the charge dismissed by agreement in 2006 when he pleaded guilty to child endangering) is a lesser included offense of both murder and aggravated murder (which were charged in 2016) and that the plea agreement therefore precludes his subsequent prosecution on these greater charges. The state responded by arguing that the involuntary-manslaughter charge was not the same offense as murder and aggravated murder for purposes of a double-jeopardy analysis, that despite the state's due-diligence, the information necessary to charge Soto with the later charges could not have been discovered, and that Soto could not have reasonably believed that his negotiated plea based on his 2006 accounts of Julio's death would bar Soto's subsequent prosecution on greater charges.

[**P30]  On April 13, 2017, the trial court denied Soto's motion to dismiss, concluding that involuntary [****15]  manslaughter is not the same offense as murder and aggravated murder for double-jeopardy purposes; that even if they were the same offenses under _Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)_, the information necessary to support the later charges could not have been discovered despite the state's exercise of due diligence; and that Soto could not have reasonably believed that his 2006 negotiated plea to child endangering and the 2006 dismissal of the involuntary-manslaughter charge based on his initial accounts of Julio's death would bar Soto's subsequent prosecution on the greater charges based on newly discovered evidence that would transform the case from one of an accidental death to a purposeful homicide.

---

[4] The facts are taken from the representations made by the parties in their respective briefs.

[5] At a competency hearing, a psychiatrist and a psychologist each testified that Soto had indicated he had begun experiencing auditory hallucinations, that these voices were telling him that he had killed his son, and that Soto had gone to the police and given this third account because of these voices.

State v. Soto

**[\*\*P31]** Soto filed an interlocutory appeal, and the Third District Court of Appeals reversed the trial court's judgment. In a two-to-one decision, the Third District determined that involuntary manslaughter, murder, and aggravated murder are the same offenses under the *Double Jeopardy Clauses*; that the due-diligence exception does not apply, because the state had failed to conduct a full and complete investigation and instead relied on Soto's purported confession; and that *State v. Carpenter, 68 Ohio St.3d 59, 1993- Ohio 226, 623 N.E.2d 66 (1993)*, bars Soto's subsequent indictment for aggravated **[\*\*\*897]** murder and murder because **[\*\*\*\*16]** at the time of the plea agreement, the state failed to reserve the right to bring additional charges against Soto. The dissenting opinion made the assumption that the state nolled the involuntary-manslaughter charge before jeopardy attached (i.e., prior to swearing in a jury or the first witness) and that the nolle of the involuntary-manslaughter charge therefore neither operated as an acquittal nor prevented Soto's further prosecution for that offense. Accordingly, the dissent concluded that Soto could be tried on the murder and aggravated-murder charges.

**[\*52] ANALYSIS**

**Majority opinion**

**[\*\*P32]** The majority determines that the issue before this court is "whether the constitutional prohibition against double jeopardy bars the murder charges." Majority opinion at ¶ 2. In resolving that issue, the majority holds that because the involuntary-manslaughter charge was dismissed prior to empanelment of a jury, jeopardy never attached to the charge and therefore, the double-jeopardy prohibition does not prevent the state from prosecuting Soto for murder or aggravated murder.

**[\*\*P33]** In framing the issue, the majority ignores the procedural nature of the case and stops short of answering the actual question before **[\*\*\*\*17]** us. The issue to be addressed is whether the constitutional prohibition against double jeopardy bars murder charges *when the lesser included offense of involuntary manslaughter has been dismissed as a result of a negotiated plea agreement*. Given the actual question before us, I believe that the majority's determination that double jeopardy did not attach because the lesser included offense was dismissed before a jury was empaneled is irrelevant, as explained below.

*Double Jeopardy Clauses*[6]

**[\*\*P34]** The *Double Jeopardy Clause of the Fifth Amendment to the United States Constitution* provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Ohio Constitution conveys a similar guarantee: "No person shall be twice put in jeopardy for the same offense." *Ohio Constitution, Article I, Section 10*.

**[\*\*P35]** The *Double Jeopardy Clause* serves the fundamental policy of protecting a defendant's finality interest so that a defendant will not be subject to the state's attempts to relitigate the facts or secure additional punishment after a conviction and sentence. *United States v. Dinitz, 424 U.S. 600, 606, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)*. "What lies at the heart of the *Double Jeopardy Clause* is the prohibition against multiple prosecutions for 'the same offense.' " *Jeffers v. United States, 432 U.S. 137, 150, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977)* (plurality opinion), quoting the *Fifth Amendment*. The clause provides critical protections against (1) "a second prosecution for the same offense after acquittal," (2) "a **[\*\*\*\*18]** second prosecution for the same offense after conviction," and (3) "multiple punishments for the same offense." *North Carolina v. Pearce, 395 U.S. 711, 717, **[\*53]** 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), overruled on other grounds, Alabama **[\*\*\*898]** v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989)*. "Where successive prosecutions are at stake, the guarantee serves 'a constitutional policy of finality for the defendant's benefit.' " *Brown v. Ohio, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)*, quoting *United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)* (plurality opinion).

**[\*\*P36]** The majority says that jeopardy did not attach to the lesser included offense of involuntary manslaughter, based on the facts that a jury was not sworn in and evidence was not taken by the trial court. Those facts are true—and beside the point. Here, Soto's fate was not decided by a jury or bench trial. Instead, Soto's criminal case was resolved by a guilty plea. And that is what a guilty plea does: it waives a jury trial and eliminates the taking of evidence at a bench trial. *Crim.R. 11(B)* and *(C)*.

**[\*\*P37]** In *State v. Gustafson*, a case cited by the majority, this court recognized that jeopardy attaches, so as to preclude

---

[6] The state's third proposition of law presents a separate theory for reversal based on contract-law principles, asserting that Soto could not have reasonably expected based on his plea agreement that he would not face future prosecution for greater offenses relating to the death of his son. My disagreement with the majority centers instead on its interpretation of the *Double Jeopardy Clauses* as applied to a conviction entered by way of a guilty plea.

State v. Soto

subsequent criminal proceedings, at different points in time depending on the nature of the proceeding in question. *76 Ohio St.3d 425, 435, 1996- Ohio 299, 668 N.E.2d 435 (1996)*. And although jeopardy attaches when a jury is empaneled and sworn in or the court begins to hear evidence at a bench trial, a different rule applies when the defendant [****19] has elected not to proceed to trial. *See United States v. McIntosh, 580 F.3d 1222, 1224 (11th Cir.2009)*. In that situation, jeopardy attaches when the court unconditionally accepts a guilty plea. *Id.; United States v. Sanchez, 609 F.2d 761, 762 (5th Cir.1980)*.[7]

[**P38] As explained in *McIntosh*, "[t]he acceptance of an unconditional plea 'is itself a conviction. More is not required; the court has nothing to do but give judgment and sentence.' " *Id. at 1228*, quoting *Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 71 L.Ed. 1009 (1927)*; *see also United States v. Cambindo Valencia, 609 F.2d 603, 637 (2d Cir.1979)* ("The Government makes the rather remarkable argument that, because a jury was not impaneled in respect to the earlier indictment, jeopardy did not attach. Of course, however, it is axiomatic once the *double jeopardy clause* that jeopardy attached once [the defendant's] guilty plea was accepted"); *United States v. Ursery, 59 F.3d 568, 572 (6th Cir.1995)*, *rev'd on other grounds, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996)*; *Peiffer v. State, 88 S.W.3d 439, 444 (Mo.2002)*; *State v. McAlear, 519 N.W.2d 596, 599 (S.D.1994)*.

[**P39] [*54] The majority cites *United States v. Soto-Alvarez, 958 F.2d 473 (1st Cir.1992)*, and *United States v. Dionisio, 503 F.3d 78 (2d Cir.2007)*, for the proposition that jeopardy attaches only to the charges to which a defendant pleads guilty. Majority opinion at ¶ 15. However, a closer reading of these decisions is warranted.

[**P40] First, *Soto-Alvarez* offers no analysis to support the proposition for which the majority cites that decision. The proposition was summarily mentioned in a footnote in which the court stated that it was concerned only "with the two charges to which the defendant pled guilty since jeopardy [****20] ordinarily does not attach to [***899] counts which are dismissed and on which no finding of guilty

is made." *Soto-Alvarez at 482, fn. 7*. The absence of analysis in *Soto-Alvarez* undermines its persuasive value here.

[**P41] *Dionisio* actually supports the conclusion that jeopardy attached in this case. In that case, the Second Circuit rejected the district court's categorical ruling that a pretrial dismissal with prejudice cannot trigger the attachment of jeopardy. *Dionisio at 82*. The appellate court recognized that it is not necessary to have an actual acquittal or conviction to trigger double jeopardy, noting that "[w]hat is crucial, instead, is whether the defendant faced the risk of a determination of guilt, and this may well include exposure to risk of conviction in a pretrial plea proceeding." *Id. at 83*.

[**P42] Here, Soto faced exposure to the risk of convictions for both involuntary manslaughter and child endangering as charged in the indictment. In exchange for an agreement to plead guilty to child endangering, the state agreed to drop the involuntary-manslaughter charge. But for the state's agreement to drop the involuntary-manslaughter charge, Soto unquestionably faced the risk of a determination of guilt on the involuntary-manslaughter charge. [****21] Accepting Soto's plea, the trial court conclusively determined his criminal culpability for purposes of double jeopardy.

[**P43] The majority cites *C.K. v. State, 145 Ohio St.3d 322, 2015-Ohio-3421, 49 N.E.3d 1218*, and *Bucolo v. Adkins, 424 U.S. 641, 96 S.Ct. 1086, 47 L.Ed.2d 301 (1976)*, for the principle that a dismissal entered before jeopardy attaches does not function as an acquittal and does not prevent further prosecution for the offense. Although these cases may support that principle, they are easily distinguishable from this case.

[**P44] In *C.K.*, the defendant was seeking to be declared a wrongfully imprisoned individual as defined in *R.C. 2743.48* because his murder conviction had been reversed as against the manifest weight of the evidence and the state had dismissed the indictment without prejudice. In determining that C.K. could not establish he was a wrongfully imprisoned individual pursuant to the statute, [*55] this court recognized that a reversal of a conviction as against the manifest weight of the evidence does not bar retrial on the same charge.

[**P45] Therefore, *C.K.* simply stands for the proposition that the state has discretion to dismiss charges without prejudice to allow further investigation of the underlying crimes and to avoid putting a defendant in jeopardy on evidence of uncertain credibility. *Id. at ¶ 17*. That proposition [****22] has no relevance here, however, because the state and trial court accepted the dismissal in simultaneous exchange for Soto's pleading guilty to child endangering.

[**P46] Similarly, *Bucolo* has no application to the facts of

---

[7] Other courts have held there must be a judgment or sentence before a guilty plea may qualify as a conviction for purposes of double jeopardy. *See, e.g., State v. Stone, 2017 MT 189, 388 Mont. 239, 400 P.3d 692, ¶ 25 (Mt.2017)*. Although the United States Supreme Court has yet to decide when jeopardy attaches in a guilty-plea case, it has assumed that jeopardy attaches at least by the time of sentencing on the plea. *Ricketts v. Adamson, 483 U.S. 1, 8, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987)*.

this case. In *Bucolo*, the petitioners were convicted of publishing certain comic strips and pictures in violation of a state obscenity statute. The convictions were affirmed on appeal. The United States Supreme Court summarily reversed. The state then nolle prossed the charges, but on remand, the Supreme Court of Florida sent the case back to the trial court " 'for further proceedings.' " *424 U.S. at 641, 96 S.Ct. 1086, 47 L.Ed.2d 301*, quoting *Bucolo v. State, 316 So.2d 551 (Fla.1975)*. The petitioners then petitioned the United States Supreme Court for a writ of mandamus to prevent the state from reprosecuting them. It was in this context that the court noted that recharging the petitioners with violations of the state obscenity statute was clearly foreclosed and that the state's failure to give **[***900]** effect to the United States Supreme Court's prior judgment was not cured by the intervening exercise of prosecutorial discretion. Therefore, the court's statement in *Bucolo* that nolle prosequi, if entered before jeopardy attaches, neither operates as an acquittal **[****23]** nor prevents further prosecution of the offense, *id. at 642*, offers no better understanding of the issue before us.

**Soto's guilty plea**

**[**P47]** When this case was initially investigated, Soto told two different versions of the cause of his son's death. This should have raised immediate concerns about Soto's credibility. After the child's death was investigated, the state assessed what it believed the truth to be and presented charges to the grand jury. A true bill was returned, and Soto was indicted on two counts: involuntary manslaughter with a child-endangering predicate offense and child endangering. At his arraignment, Soto pleaded not guilty to both counts.

**[**P48]** At that point, the state had accused Soto of committing involuntary manslaughter and child endangering and the judge assigned to hear the case and resolve this criminal dispute was operating under the assumption that the state was prepared to prove the truth of these allegations beyond a reasonable doubt.

**[**P49]** Soto had a constitutional right to hold the state to its burden and have a fact-finder (jury or court) decide whether he was guilty beyond a reasonable doubt of involuntary manslaughter and child endangering. Scott, *Plea Bargaining* **[*56]** *as Contract* **[****24]** , *101 Yale L.J. 1909, 1914 (1992)*. Instead, Soto and the state chose to enter into a negotiated plea agreement.[8] Under that agreement, the state

gave up the chance to prosecute Soto for involuntary manslaughter or any other type of murder charge with the same elements in exchange for Soto's guilty plea. *Id.* When Soto's plea was unconditionally accepted, a record was thereby created that then became the "truth" regarding the crime Soto committed resulting in the death of his son. *See* Johnson, *Fictional Pleas*, *94 Ind.L.J. 855, 897 (2019)* (a "fictional" guilty plea creates a record that then becomes "truth" and serves as a permanent record of conviction).

**[**P50]** In a negotiated plea agreement, the parties trade various risks and entitlements. *Scott at 1914*. When a defendant enters into a plea agreement with the state, both sides intend that it fully resolve the matter. Chinn, *A Deal Is a Deal: Plea Bargains and Double Jeopardy after* Ohio v. Johnson, *37 Seattle U.L.Rev. 285, 301 (2013)*. The defendant forgoes fundamental constitutional rights (such as the right to a jury, the presumption of innocence, and the right to be convicted by proof beyond a reasonable doubt)[9] in exchange for the dismissal of some charges, the hope of a lesser sentence, or both. *Scott at 1920*; *Johnson at 868*. The state gives up prosecuting the defendant **[****25]** for all the charged offenses in exchange for a quicker, less costly resolution and a sure conviction. *Johnson at 868*.

**[**P51]** Here, in entering into the plea agreement, the state did not have to rely solely on Soto's questionable versions of the facts. In fact, a prosecutor is presumed **[***901]** to have done due diligence in conducting an investigation to ensure that a plea bargain is appropriate. *Chinn at 297*. Every other litigant in our justice system is expected to exercise due diligence before taking actions having conclusive judicial effect. Should the state, with its vast resources, be uniquely relieved of this responsibility?

**[**P52]** A plea determines a defendant's fate with respect to the offenses arising out of the criminal episode (here, the death of Soto's son). In this case, the state obtained a conviction without having to prove beyond a reasonable doubt that Soto committed the offenses as charged in the 2006 indictment. Soto received the benefit of having the involuntary-manslaughter charge dropped. The state did not reserve any right to bring new charges. *See Carpenter, 68 Ohio St.3d 59, 1993- Ohio 226, 623 N.E.2d 66*. Although the bargain reached in a plea agreement may not (and often **[*57]** does not) reflect a defendant's actual culpability, it

---

[8] Although it is true that the record does not contain a transcript of the plea or sentencing hearings in the 2006 case, the parties do not deny, and in fact, agree that they entered into a negotiated plea

agreement.

---

[9] *See Duncan v. Louisiana, 391 U.S. 145, 157-158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)*; *Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)*; *In re Winship, 397 U.S. 358, 363, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)*.

State v. Soto

does reflect a mutually agreed resolution. **[****26]**

**[**P53]** Under the majority's conclusion, no plea bargain is necessarily conclusive and any plea agreement can be negated with new information. To accept this position is to declare that a plea agreement is not worth the paper it is journalized on.

**[**P54]** I believe that the court of appeals' majority opinion got it right. Soto was charged with involuntary manslaughter in 2006, and that charge was dismissed pursuant to a plea agreement in which Soto agreed to plead guilty to child endangering, the predicate offense of the involuntary-manslaughter charge. Thus, while Soto was not convicted of involuntary manslaughter, he would have been in jeopardy of being tried and convicted of involuntary manslaughter but for the plea agreement resulting in his conviction and sentence for the predicate offense of child endangering. Because involuntary manslaughter is a lesser included offense of aggravated murder and murder, *see State v. Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 79; State v. Thomas, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988),* Soto's subsequent prosecution for these offenses is barred.

**CONCLUSION**

**[**P55]** I would hold that Soto may not be prosecuted for aggravated murder or murder, because his 2006 plea agreement disposed of the involuntary-manslaughter charge against him. Accordingly, I would affirm the judgment of **[****27]** the court of appeals.

---

**End of Document**

| | Search documents in this case: | Search |
| --- | --- | --- |

## No. 19-7834

| Title: | **Travis Soto, Petitioner** |
| --- | --- |
| | **v.** |
| | **Ohio** |
| Docketed: | March 2, 2020 |
| Linked with 19A797 | |
| Lower Ct: | Supreme Court of Ohio |
|   Case Numbers: | (2018-0416) |
|   Decision Date: | October 31, 2019 |

| DATE | PROCEEDINGS AND ORDERS |
| --- | --- |
| Jan 13 2020 | Application (19A797) to extend the time to file a petition for a writ of certiorari from January 29, 2020 to February 28, 2020, submitted to Justice Sotomayor. **Proof of Service**     **Main Document**     **Lower Court Orders/Opinions** |
| Jan 17 2020 | Application (19A797) granted by Justice Sotomayor extending the time to file until February 28, 2020. |
| Feb 27 2020 | Petition for a writ of certiorari and motion for leave to proceed in forma pauperis filed. (Response due April 1, 2020) **Petition**     **Appendix**     **Motion for Leave to Proceed in Forma Pauperis**     **Proof of Service** |
| Mar 26 2020 | Waiver of right of respondent State of Ohio to respond filed. **Main Document** |
| Mar 31 2020 | Brief amici curiae of The Public Defender Association, Ohio Justice & Policy Center, et al. filed. |

5/3/2021                                           Search - Supreme Court of the United States

| | Main Document | Proof of Service | Certificate of Word Count |
|---|---|---|---|
| Apr 02 2020 | DISTRIBUTED for Conference of 4/17/2020. | | |
| Apr 07 2020 | Response Requested. (Due May 7, 2020) | | |
| Apr 07 2020 | Motion to extend the time to file a response from May 7, 2020 to June 8, 2020, submitted to The Clerk. **Main Document** | | |
| Apr 09 2020 | Motion to extend the time to file a response is granted and the time is extended to and including June 8, 2020 | | |
| May 26 2020 | Brief of respondent State of Ohio in opposition filed. **Main Document**  **Proof of Service** | | |
| Jun 02 2020 | Reply of petitioner Travis Soto filed. (Distributed) **Main Document**  **Proof of Service** | | |
| Jun 03 2020 | DISTRIBUTED for Conference of 6/18/2020. | | |
| Jun 22 2020 | Petition DENIED. | | |

| NAME | ADDRESS | PHONE |
|---|---|---|
| Attorneys for Petitioner | | |
| Louis Everett Grube Counsel of Record | Paul W. Flowers Co., L.P.A. 50 Public Square, Suite 1910 Cleveland, OH 44113  leg@pwfco.com | (216) 344-9393 |
| Party name: Travis Soto | | |
| Attorneys for Respondent | | |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 453

| | | |
|---|---|---|
| Benjamin Michael Flowers<br>    Counsel of Record | Ohio Attorney General Dave Yost<br>30 E. Broad St.<br>Columbus, OH 43215<br><br>benjamin.flowers@ohioattorneygeneral.gov | 6144668980 |
| Party name: State of Ohio | | |
| Other | | |
| Jeffrey Jude Pokorak<br>    Counsel of Record | Suffolk University Law School<br>Supreme Court Clinic<br>120 Tremont Street<br>Boston, MA 02108-4977<br><br>jpokorak@suffolk.edu | 617-305-1645 |
| Party name: The Public Defender Association, Ohio Justice & Policy Center, et al. | | |

TRAVIS SOTO v. SIEFKER, SHERIFF
CASE NO. 3:21-cv-167
APPENDIX - Page 454

No. _____

---

IN THE
SUPREME COURT OF THE UNITED STATES
_____

Travis Soto, Petitioner

v.

The State of Ohio, Respondent

---

On petition for a writ of certiorari to the Supreme Court of Ohio

---

**PETITION FOR A WRIT OF CERTIORARI**

---

Louis E. Grube, Esq.
*Counsel of Record*
Paul W. Flowers, Esq.
**Paul W. Flowers Co., L.P.A.**
50 Public Square, Suite 1910
Cleveland, Ohio 44113
(216) 344-9393
leg@pwfco.com

*Attorneys for Petitioner,
Travis Soto*

Carly M. Edelstein, Esq.
Assistant State Public Defender
**Office of the Ohio Public Defender**

## QUESTIONS PRESENTED

This Court has yet to resolve the question lying at the core of this appeal, which has produced a split amongst this country's federal and state judiciary: whether the rights preserved by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution attach to charges dismissed during execution of a negotiated plea agreement that avoids a jury trial, or may the defendant be re-indicted later for charges constituting the same offense. The absence of a clear answer has resulted in three discrete doctrines applied by the lower courts.

Petitioner Travis Soto ("Soto") claimed in 2006 that he had accidentally killed his young child in an all-terrain vehicle ("ATV") accident. He was indicted for involuntary manslaughter predicated on a separate felony charge of child endangering. Soto and Respondent, the State of Ohio, negotiated an agreement providing for entry of a guilty plea to child endangering in return for dismissal of the involuntary manslaughter charge. Soto served his five-year sentence, was released, and resumed a normal life.

Well after Soto completed the sentence for his crime, he proceeded to the Putnam County Sheriff's Office to state that he had beaten his child to death and staged the purportedly fatal ATV accident to hide the crime.

Despite the earlier plea arrangement and the sentence he had fully served, Soto was charged with aggravated murder and murder predicated on a separate charge of felonious assault. He moved to dismiss these charges, claiming that any further prosecution would be barred by the Double Jeopardy Clause.

i

The Supreme Court of Ohio held that the rights preserved by the Double Jeopardy Clause had not attached to the involuntary manslaughter charge before it was dismissed in 2006 and concluded that the motion to dismiss the new murder charges was properly denied. *App. 7-8.* If this is the rule, of what value is dismissal of a charge to a defendant who in return bargains away and waives the fundamental right to a trial by a jury of his or her peers? If jeopardy does not attach under such circumstances, vital finality interests protected by the Double Jeopardy Clause will be undermined. In a criminal justice system in which nearly all criminal cases are resolved by plea agreement, this Court's answer to the question presented would have enormous national impact. The Ohio Court's opinion thus raises an important question of federal law that has not been, but should be, settled by this Court.

## PARTIES TO THE PROCEEDING

Petitioner is Travis Soto, a citizen of the United States of America. Respondent is the State of Ohio.

## DIRECTLY RELATED PROCEEDINGS

*State v. Soto*, No. 2018-0416, Supreme Court of Ohio. Judgment entered Oct. 31, 2019.

*State v. Soto*, No. 12-17-05, Court of Appeals of Ohio for the Third Appellate District. Judgment entered Feb. 5, 2018.

ii

*State v. Soto*, No. 2016 CR 00057, Court of Common Pleas for Putnam County, Ohio. Judgment entered Apr. 13, 2017.

*State v. Soto*, No. 2006 AP 00017, Court of Appeals of Ohio for the Third Appellate District. Judgment entered Nov. 3, 2006.

*State v. Soto*, No. 2006 CR 00019, Court of Common Pleas for Putnam County, Ohio. Judgment entered Sept. 5, 2006.

iii

# TABLE OF CONTENTS

QUESTIONS PRESENTED........................................................................i

PARTIES TO THE PROCEEDING..........................................................ii

DIRECTLY RELATED PROCEEDINGS ..................................................ii

TABLE OF CONTENTS........................................................................iv

TABLE OF AUTHORITIES .....................................................................v

OPINIONS BELOW.................................................................................1

STATEMENT OF JURISDICTION ..........................................................1

CONSTITUTIONAL AND STATUTORY AUTHORITY INVOLVED ......................1

STATEMENT OF THE CASE ..................................................................5

REASONS FOR GRANTING THE PETITION..........................................9

I.      INTRODUCTION ........................................................................9

II.     THE ORIGIN AND PROTECTIONS OF THE DOUBLE JEOPARDY
        CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES
        CONSTITUTION ......................................................................10

III.    THE OPINION OF THE OHIO SUPREME COURT DECIDED AN
        IMPORTANT FEDERAL QUESTION IN A WAY THAT CONFLICTS
        WITH THE DECISION OF A UNITED STATES COURT OF APPEALS
        ..............................................................................................13

IV.     THIS DISPUTE PRESENTS AN IMPORTANT QUESTION OF
        FEDERAL LAW THAT HAS NOT BEEN, BUT SHOULD BE,
        SETTLED BY THIS COURT .....................................................19

        A.   THIS COURT HAS NOT SETTLED WHETHER JEOPARDY
             ATTACHES TO CHARGES DISMISSED DURING EXECUTION
             OF A PLEA DEAL ............................................................19

        B.   AN ANSWER TO THE QUESTION PRESENTED WILL HAVE
             ENORMOUS NATIONAL IMPACT .....................................28

iv

V.      THIS DISPUTE PRESENTS A LIVE CASE AND CONTROVERSY...........32

CONCLUSION..........................................................................................................33

## APPENDIX

Supreme Court of Ohio, Judgment Entry,
    dated Oct. 31, 2019...........................................................................................App. 1

Supreme Court of Ohio, Slip Opinion No. 2019-Ohio-4430,
    dated Oct. 31, 2019...........................................................................................App. 2

Ohio Court of Appeals for the Third Judicial District, Judgment Entry,
    dated Feb. 5, 2018...........................................................................................App. 26

Ohio Court of Appeals for the Third Judicial District Slip Opinion No. 2018-
    Ohio-459,
    dated Feb. 5, 2018...........................................................................................App. 28

Ohio Court of Common Pleas for Putnam County, Judgment Entry,
    dated Apr. 13, 2017 .........................................................................................App. 47

## TABLE OF AUTHORITIES

CASES

*Allen v. Wright*,
    468 U.S. 737 (1984) ................................................................................... 32

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ..................................................................................... 32

*Benton v. Maryland*,
    395 U.S. 784 (1969) ............................................................................. 10, 11

*Blockburger v. United States*,
    284 U.S. 299 (1932) ................................................................................. 7, 8

*Boykin v. Alabama*,
    395 U.S. 238 (1969) ............................................................................. 26, 27

*Brady v. United States*,
    397 U.S. 742 (1970) ................................................................................... 29

v

*Brown v. Ohio,*
    432 U.S. 161 (1977) ................................................................... 11, 13, 27

*Burks v. United States,*
    437 U.S. 1 (1978) ............................................................................ 12

*Crist v. Bretz,*
    437 U.S. 28 (1978) .......................................................................... 12

*Florida v. Nixon,*
    543 U.S. 175 (2004) ........................................................................ 26

*Green v. United States,*
    355 U.S. 184 (1957) ........................................................ 11, 12, 19, 28

*Illinois v. Somerville,*
    410 U.S. 458 (1973) ........................................................................ 20

*Martinez v. Illinois,*
    572 U.S. 833 (2014) ............................................................ 20, 21, 22

*McCarthy v. United States,*
    394 U.S. 459 (1969) ........................................................................ 27

*Mullreed v. Kropp,*
    425 F.2d 1095 (6th Cir. 1970) ......................................................... 27

*North Carolina v. Pearce,*
    395 U.S. 711 (1969) ........................................................................ 11

*Ohio v. Johnson,*
    467 U.S. 493 (1984) ................................................................... 22, 23

*People v. Deems,*
    81 Ill. 2d 384, 43 Ill. Dec. 8, 410 N.E.2d 8 (1980) ....................... 22

*People v. Martinez,*
    2011 Il. App. 2d 100498, 969 N.E.2d 840 .................................... 21

*People v. Martinez,*
    2013 IL 113475, 371 Ill. Dec. 315, 990 N.E.2d 215 .................... 22

*Santobello v. New York,*
    404 U.S. 257 (1971) ........................................................................ 30

*Serfass v. United States,*
    420 U.S. 377 (1975) ................................................................. *passim*

vi

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ............................................................................... 32

*United States v. Angilau,*
    717 F.3d 781 (10th Cir. 2013) ............................................................... 15

*United States v. Baggett,*
    901 F.2d 1546 (11th Cir. 1990) .............................................................. 17

*United States v. Covington,*
    395 U.S. 57 (1969) ................................................................................. 26

*United States v. Dionisio,*
    415 F. Supp. 2d 191 (E.D.N.Y. 2006) .................................................... 16

*United States v. Dionisio,*
    503 F.3d 78 (2d Cir. 2007) .............................................................*passim*

*United States v. Faulkner,*
    793 F.3d 752 (7th Cir. 2015) ....................................................... 9, 13, 14

*United States v. Hecht,*
    638 F.2d 651 (3d Cir. 1981) ................................................................... 13

*United States v. Holland,*
    956 F.2d 990 (10th Cir. 1992) ............................................................... 14

*United States v. Jorn,*
    400 U.S. 470 (1971) .......................................................................... 11, 12

*United States v. King,*
    581 F.2d 800 (10th Cir. 1978) ............................................................... 15

*United States v. Marchese,*
    46 F.3d 1020 (10th Cir. 1995) ............................................................... 15

*United States v. Martin Linen Supply Co.,*
    430 U.S. 564 (1977) .......................................................................... 12, 20

*United States v. Mintz,*
    16 F.3d 1101 (10th Cir. 1994) .......................................................... 14, 15

*United States v. Nyhuis,*
    8 F.3d 731 (11th Cir. 1993) .............................................................. 17, 24

*United States v. Soto-Alvarez,*
    958 F.2d 473 (1st Cir. 1992) ................................................................. 18

vii

*United States v. Vaughan,*
715 F.2d 1373 (9th Cir. 1983) ................................................................................. 24


CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ...................................................................................*passim*

U.S. Const. art. III ................................................................................................ 32


STATUTE

28 U.S.C. § 1257(a) ................................................................................................ 1

Ohio Revised Code § 2903.01 ........................................................................... 2, 6

Ohio Revised Code § 2903.02 ........................................................................... 2, 6

Ohio Revised Code § 2903.03 .............................................................................. 2

Ohio Revised Code § 2903.04 ........................................................................ 2, 3, 5

Ohio Revised Code § 2903.11 ........................................................................... 2, 6

Ohio Revised Code § 2919.22 .............................................................................. 3, 5

Ohio Revised Code § 2929.02 .............................................................................. 2


RULE

Fed. R. Crim. P. 11 .......................................................................................... 26, 27

Fed. R. Crim. P. 12 ............................................................................................. 25

Ohio Crim. R. 11 ..................................................................................... 4, 26, 27, 31

Sup. Ct. R. 10 ..................................................................................... 13, 19, 20


OTHER AUTHORITIES

Albert W. Alschuler, *Plea Bargaining and its History,*
79 Colum. L. Rev. 1 (1979) ........................................................................... 28, 29

viii

Comment, *Official Inducement to Plead Guilty: Suggested Morals for a Marketplace*,
   32 U. Chi. L. Rev. 167 (1964) .................................................................................. 30

David S. Rudstein, *A Brief History of the Fifth Amendment Guarantee Against
   Double Jeopardy*,
   14 Wm. & Mary Bill Rts. J. 193 (2005) .................................................................. 10

Donald J. Newman, *Conviction, The Determination of Guilt or Innocence Without
   Trial*
   76 Yale L.J. 612 (1966) ............................................................................................ 29

John Gramlich, *Only 2% of federal criminal defendants go to trial, and most who do
   are found guilty*,
   Pew Research Center (June 11, 2019), https://www.pewresearch.org/fact-
   tank/2019/06/11/only-2-of-federal-criminal-defendants-go-to-trial-and-most-who-
   do-are-found-guilty/ ................................................................................................... 29

Lucian E. Dervan, *Bargained Justice: The History and Psychology of Plea
   Bargaining and the Trial Penalty*,
   31 Federal Sentencing Reporter 4-5 (April 2019/June 2019) ............................ 28, 29

Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*,
   101 Yale L.J. 1909 (1992) .................................................................................. 20, 29

Task Force on Administration of Justice, The President's Commission on Law
   Enforcement and Administration of Justice, *Task Force Report: The Courts* (1967)
   ................................................................................................................................... 30

*United States Attorneys' Annual Statistical Report Fiscal Year 2010*,
   United States Department of Justice (2010),
   https://www.justice.gov/sites/default/files/usao/legacy/2011/09/01/10statrpt.pdf . 30

*United States Attorneys Statistical Report Fiscal Year 1960*,
   United States Department of Justice, 1 (October 1960),
   https://www.justice.gov/sites/default/files/usao/legacy/2009/07/31/STATISTICAL_
   REPORT_FISCAL_YEAR_1960.pdf .......................................................................... 30

## OPINIONS BELOW

The opinion of the Supreme Court of Ohio in docket number 2018-0416 was issued on October 31, 2019, and it is published.  *State v. Soto*, __ Ohio St.3d __, 2019-Ohio-4430, __ N.E.3d __, 2019 WL 5606913.  The opinion of the Court of Appeals of Ohio for the Third Appellate District in docket number 12-17-05 was issued on February 5, 2018, and it is published.  *State v. Soto*, 2018-Ohio-459, 94 N.E.3d 618.  The judgment entry and decision of the Court of Common Pleas for Putnam County, Ohio, was entered Apr. 13, 2017, and it is not published.

## STATEMENT OF JURISDICTION

This Court's jurisdiction is drawn from 28 U.S.C. § 1257(a).  On January 17, 2020, Justice Sotomayor granted an application to extend the time to file a petition for a writ of certiorari from January 29, 2020, to February 28, 2020.  *Soto v. Ohio*, United States Supreme Court No. 19A797.

## STATUTORY AND CONSTITUTIONAL AUTHORITY INVOLVED

The Fifth Amendment to the United States Constitution states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

1

On the date that Soto was indicted under this section, Ohio Revised Code § 2903.01

stated in pertinent part:

> (C) No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense.
>
> . . .
>
> (F) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

On the date that Soto was indicted under this section, Ohio Revised Code § 2903.02

stated in pertinent part:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
>
> . . .
>
> (D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.

On the date that Soto was indicted under this section, Ohio Revised Code § 2903.11

stated in pertinent part:

> (A) No person shall knowingly do either of the following:
>
> > (1) Cause serious physical harm to another or to another's unborn[.]
>
> . . .
>
> (D)
>
> > (1)

2

> (a) Whoever violates this section is guilty of felonious assault.

On the date that Soto was indicted under this section, Ohio Revised Code § 2903.04

stated in pertinent part:

> (A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony.
>
> . . .
>
> (C) Whoever violates this section is guilty of involuntary manslaughter.

On the date that Soto was indicted under this section, Ohio Revised Code § 2919.22

stated in pertinent part:

> (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.
>
> . . .
>
> (E)
>
> > (1) Whoever violates this section is guilty of endangering children.
> >
> > (2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following:

3

. . .

>> (c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree[.]

Rule 11 of the Ohio Rules of Criminal Procedure states:

> (C) Pleas of guilty and no contest in felony cases.

. . .

>> (2) In felony cases the court may refuse to accept a plea of guilty or a plea of no contest, and shall not accept a plea of guilty or no contest without first addressing the defendant personally and doing all of the following:

. . .

>>> (c) Informing the defendant and determining that the defendant understands that by the plea the defendant is waiving the rights to jury trial, to confront witnesses against him or her, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself.

4

## STATEMENT OF THE CASE

Early in 2006, Soto was investigated regarding the death of his young son. *App. 47-48.* He made varying admissions to law enforcement, but in every story his son was accidentally killed after being struck by an ATV that Soto operated. *App. 4.* After hearing this, and after conducting an autopsy, the Lucas County Coroner "concluded that the child died of multiple blunt force trauma caused by an ATV accident." *App. 48.*[1] Soto was indicted on March 31, 2006 ("2006 Indictment"), for involuntary manslaughter, which was predicated on a separate charge of child endangering. *App. 29, 47-48.* Involuntary manslaughter is defined under Ohio Revised Code § 2903.04(A) as causing "the death of another . . . as a proximate result of the offender's committing or attempting to commit a felony." *App. 39.* Under the version of Ohio Revised Code § 2919.22(A) and (E)(2)(c) in effect at the time, the child endangering charge was elevated to a third-degree felony by virtue of the "serious physical harm" that Soto had caused. *Id.*

The State of Ohio negotiated an agreement with Soto providing that he would enter a guilty plea to child endangering and the involuntary manslaughter charge

_____

[1] The parties did not disagree at any earlier phase regarding the facts of the prior litigation, and the record in this matter does not include the record of Soto's 2006 prosecution. *App. 3.* This statement of the facts has relied upon the judgment entry and decision of the Court of Common Pleas for Putnam County, Ohio, which does not differ from the representations of the State of Ohio before that court.

5

would be dismissed. *App. 48.* The trial court accepted Soto's plea and sentenced him to a five-year term in prison, which he served. *App. 3, 48.*

Several years after his release from prison, Soto arrived at the Putnam County Sheriff's Office on July 25, 2016. *App. 48.* He announced that he had killed his son and fabricated the ATV accident. *Id.* Using this statement, and after reviewing photographs and the 2006 coroner's report, an expert "pediatric abuse specialist . . . concluded that the child died of multiple blunt force trauma" caused by Soto. *Id.*

The State of Ohio acquired a new indictment ("2016 Indictment"), which charged aggravated murder and murder predicated on a separate charge of felonious assault. *App. 48-49.* The aggravated murder count specifically alleged under Ohio Revised Code § 2903.01(C) that Soto had caused "the death of another who is under thirteen years of age." *Id.* The 2016 Indictment charged murder, alleging that he had caused "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." *Ohio Revised Code § 2903.02(B); see App. 49.* The underlying charge was felonious assault under Ohio Revised Code § 2903.11(A)(1), a first-degree felony, alleging that he had "knowingly" caused "serious physical harm" to another. *See App. 49.*

On October 11, 2016, Soto filed his Motion to Dismiss on the Grounds of Double Jeopardy ("Motion"), which sought dismissal of the 2016 Indictment under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. *App. 4, 47.* After the State of Ohio opposed the Motion, the trial court denied it. *App. 53.*

6

The trial court held that under this Court's decision in *Blockburger v. United States*, 284 U.S. 299 (1932), Soto had not been charged in the 2016 Indictment with the "same offense" as he had been in the 2006 Indictment. *App. 49-50*.

Soto filed a lawful interlocutory appeal to the Court of Appeals of Ohio for the Third Appellate District and assigned as error that the Motion should not have been overruled. *App. 32-34*. He argued that under *Blockburger* the charge of involuntary manslaughter in the 2006 Indictment was a lesser included offense of the murder and aggravated murder charges in the 2016 Indictment. *App. 33-36*. The Third District Court of Appeals reversed the trial court's order overruling the Motion and remanded the matter for further proceedings. *App. 44*. The appellate court held that although Soto "was not convicted of Involuntary Manslaughter, he was in jeopardy of being tried and convicted of Involuntary Manslaughter but-for the plea agreement, resulting in his conviction and sentence for the predicate offense of Child Endangering." *App. 37*. The court determined that involuntary manslaughter was a lesser included offense of murder and aggravated murder—the trial court had misapplied *Blockburger*, finding only that murder and aggravated murder had elements not found in involuntary manslaughter. *App. 38*. And it was observed that "a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal." *App. 38*.

The State of Ohio sought and was granted discretionary review in the Supreme Court of Ohio. *See App. 2*. The state's High Court reversed the judgment of the court

7

of appeals and remanded the matter to the trial court for further proceedings. *App. 3, 11.* The Court first held that jeopardy had not attached to the involuntary manslaughter charge because "[f]or charges to which the defendant did not plead guilty, jeopardy does not attach until a jury is empaneled or, in a bench trial, when the judge starts taking evidence." *App. 8.* In the absence of these triggering events, jeopardy had attached "only as to the child-endangering charge to which [Soto] pleaded guilty" according to the Court's majority. *Id.* Because Soto had never "argued that child endangering constitutes the same offense as murder and aggravated murder," and because the majority was convinced that each of these crimes had an element that the other did not, the Court held that Soto could be prosecuted for murder and aggravated murder. *App. 9.*

Justice Michael P. Donnelly dissented, highlighting that the parties on each side of a negotiated plea agreement receive benefits and expect finality. *App. 16-17, 23.* Justice Donnelly also registered agreement with the appellate court's decision, observing that "while Soto was not convicted of involuntary manslaughter, he would have been in jeopardy of being tried and convicted of involuntary manslaughter but for the plea agreement resulting in his conviction and sentence for the predicate offense of child endangering." *App. 24.*

8

## REASONS FOR GRANTING THE PETITION

Petitioner Soto now seeks further review in this Court and offers the following reasons why a writ of certiorari is warranted.

## I.     INTRODUCTION

In the history of this Court's jurisprudence regarding the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, there has never been a definitive answer to the determinative question in these proceedings: whether the rights preserved by the Double Jeopardy Clause attach to charges that are dismissed as a condition of and during execution of a plea agreement. The nature of the fundamental protection against successive prosecutions and its history both weigh in favor of taking up this appeal and answering the question presented in the affirmative.

The issue should be settled nationally because a split between the decisions of federal courts of appeals has developed and the Supreme Court of Ohio has now taken a side. *See United States v. Faulkner*, 793 F.3d 752, 758 (7th Cir. 2015). Moreover, the rule adopted by the State of Ohio thwarts any finality to judgments reached through a plea agreement, which is the most pervasive manner by which criminal prosecutions are resolved in our nation. The rule that jeopardy does not attach to charges dismissed during execution of a plea deal risks eroding the common expectation among the public that when one agrees to enter a guilty plea to some charges in an indictment in return for dismissal of other charges, one will not later

9

be prosecuted for the dismissed portions of the indictment.  Accordingly, the question in this appeal has taken on national significance, and this Court should therefore issue a writ of certiorari to the Supreme Court of Ohio.

## II.  THE ORIGIN AND PROTECTIONS OF THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution directs that "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb."  This provision was ratified and incorporated into the text of the United States Constitution along with the rest of the Bill of Rights on December 15, 1791.  But it has been recognized that the protections preserved by the Double Jeopardy Clause have far older roots in the common law of England, the Judeo-Christian legal tradition, and even the law of the Greco-Roman period.  *Benton v. Maryland*, 395 U.S. 784, 795 (1969); David S. Rudstein, *A Brief History of the Fifth Amendment Guarantee Against Double Jeopardy*, 14 Wm. & Mary Bill Rts. J. 193, 196-221 (2005).  Protections against being twice put in jeopardy of criminal punishment made their way into the codified laws of some of the British colonies and several of the early state constitutions, which served as a model for the Double Jeopardy Clause of the United States Constitution.  Rudstein at 221-26.  The right is now regarded as fundamental, and the Double Jeopardy Clause has been incorporated through the Fourteenth Amendment to the United States Constitution

10

and rendered applicable against the states.  *Benton* at 795-96.  The constitutional provision finds several applications:

> The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense."

*Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

This Court has explained the longstanding conceptual underpinning of the protections preserved by the Double Jeopardy Clause:

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187-88 (1957).  The rule "represents a constitutional policy of finality for the defendant's benefit." *United States v. Jorn*, 400 U.S. 470, 479 (1971).  The "heavy personal strain which a criminal trial represents for the individual defendant" has justified defining "jeopardy" with significant breadth:  "These considerations have led this Court to conclude that a defendant is placed in jeopardy in a criminal proceeding once the defendant is put to trial before the trier of the facts, whether the trier be a jury or a judge." *Id.*

11

To the end of securing the finality of a prosecution, "courts have found it useful to define a point in criminal proceedings at which the constitutional purposes and policies are implicated by resort to the concept of 'attachment of jeopardy.' " *Serfass v. United States*, 420 U.S. 377, 388 (1975) (quoting *Jorn* at 480).  This Court has decided that for "a jury trial, jeopardy attaches when a jury is empaneled and sworn," and for "a nonjury trial, jeopardy attaches when the court begins to hear evidence." *Id.*  This rule "prevents a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict." *Green* at 188.  But this Court has not yet considered whether attachment occurs during execution of a negotiated plea agreement and acceptance of a guilty plea.  The principle of attachment "is an integral part" of the federal constitutional doctrine that cannot be altered by state laws. *Crist v. Bretz*, 437 U.S. 28, 38 (1978).

This Court has given "absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision." *Burks v. United States*, 437 U.S. 1, 16 (1978).  But court action may also be given the effect of an acquittal.  Much like a judgment of acquittal by a trial court on the basis of insufficient evidence, a reversal of a conviction for lack of sufficient evidence on appeal bars retrial under the Double Jeopardy Clause. *Id.* at 17-18.  This Court has "emphasized that what constitutes an 'acquittal' is not to be controlled by the form of the judge's action," but rather the determinative factor is "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977).

12

Convictions after a guilty plea have been given the same effect as convictions by a jury's verdict—both bar a second prosecution for the same offense. *E.g., Brown*, 432 U.S. 161.  "Undeniably, a defendant is considered to be convicted by the entry of his plea of guilty just as if a jury had found a verdict of guilty against him, and jeopardy therefore attaches with acceptance of his guilty plea." *United States v. Hecht*, 638 F.2d 651, 657 (3d Cir. 1981).

## III.   THE OPINION OF THE OHIO SUPREME COURT DECIDED AN IMPORTANT FEDERAL QUESTION IN A WAY THAT CONFLICTS WITH THE DECISION OF A UNITED STATES COURT OF APPEALS

Whether the rights preserved by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution attach to charges that are dismissed as a condition of and during execution of a plea agreement is an unsettled question that has engendered disagreement between the United States courts of appeals. Having taken a position in this conflict, the Supreme Court of Ohio "has decided an important federal question in a way that conflicts with the decision of . . . a United States court of appeals." *Sup. Ct. R. 10(b).*

In *Faulkner*, 793 F.3d 752, the United States Court of Appeals for the Seventh Circuit highlighted the conflict.  The court observed that the United States Court of Appeals for the Second Circuit, on the one hand, has held that jeopardy does not attach to a charge dismissed with prejudice pursuant to a plea agreement, while the Tenth Circuit had applied double jeopardy protections to a charge that was dismissed

13

with prejudice as part of a plea agreement prior to trial. *Id.* at 758. *Compare United States v. Dionisio*, 503 F.3d 78 (2d Cir. 2007), *with United States v. Mintz*, 16 F.3d 1101 (10th Cir. 1994), *and United States v. Holland*, 956 F.2d 990 (10th Cir. 1992). The *Faulkner* panel concluded that it did not need to "wade into this debate" given that an answer would not determine the outcome in that case. *Faulkner* at 758.

In *Mintz*, defendants were charged in the United States District Court for the Southern District of Florida with three charges in a multi-count indictment: "conspiracy to import marijuana," "importation of marijuana," and "conspiracy to possess marijuana with intent to distribute." *Mintz* at 1102. The defendants pled guilty to the first count, and the court dismissed the other charges with prejudice. *Id.* at 1102-03. On the same day that they were sentenced to 121 months in prison by the federal court in Florida, the defendants were charged in a separate indictment in the United States District Court for the District of Kansas with conspiracy to possess marijuana with intent to distribute and possession with intent to distribute. *Id.* at 1103. They moved to dismiss the charges on double jeopardy grounds, asserting that the conspiracies charged in the two cases "were part of one continuing conspiracy." *Id.* The federal court in Kansas dismissed the conspiracy count but denied the motion as to the possession count. *Id.*

The defendants appealed the denial of their motion, and the United States cross-appealed to challenge the court's dismissal of the conspiracy charge. *Mintz* at 1103. The United States Court of Appeals for the Tenth Circuit affirmed the district court's order dismissing the conspiracy count, holding that jeopardy attaches to a

14

charge dismissed with prejudice at the time of a guilty plea in an earlier proceeding. *Id.* at 1103, 1106. The *Mintz* decision remains good law in the Tenth Circuit—another panel of the same court later acknowledged that "*Mintz* appears to be in tension with other decisions of th[e] court," including *United States v. King*, 581 F.2d 800, 801 (10th Cir. 1978), and *United States v. Marchese*, 46 F.3d 1020, 1022-23 (10th Cir. 1995), but it was not necessary to address the merits of the issue and the holding from *Mintz* was left undisturbed. *United States v. Angilau*, 717 F.3d 781, 787 n.1 (10th Cir. 2013).

Neither of the cases cited in the *Angilau* decision answer the question raised in this appeal. In *King*, the court considered the double jeopardy implications of a dismissal entered over the objection of the United States and before a plea or trial. *King*, 581 F.2d at 801-02. In *Marchese*, the court considered whether jeopardy had attached to mail-fraud and money laundering charges that were dismissed before a plea or trial where the court had considered some evidence regarding whether funds could be traced in support of the motion to dismiss. *Marchese*, 46 F.3d at 1022-23. The court held that because "tracing is not a requisite to establishing a case of mail fraud, the evidence surrounding this issue would not constitute a defense on the merits" and "the court's dismissal did not act as the functional equivalent of an acquittal." *Id.* at 1023.

In *Dionisio*, on the other hand, the United States Court of Appeals for the Second Circuit adopted a fact-based analysis but held that jeopardy did not attach to counts that were dismissed with prejudice as part of the plea agreement. *Dionisio*,

15

503 F.3d at 85-89.  The defendant was charged in the United States District Court for the Eastern District of New York with multiple counts arising out of a racketeering conspiracy with the La Cosa Nostra crime family occurring from 1993 to 2001.  *Id.* at 79-80.  Pursuant to a plea agreement, he pled guilty to one count of substantive racketeering, and the government moved to dismiss all the other counts charged in the indictment with prejudice.  *Id.* at 80.  The New York federal court accepted the plea and sentenced the defendant to prison.  *Id.*  Years later, the defendant was again indicted in the same district court on a racketeering charge for conduct that allegedly took place from 1991 to 1999.  *Id.*  He moved to dismiss this second indictment on double jeopardy grounds, asserting that it "was based on the same conduct as that which formed the predicate of [his earlier] indictment."  *Id.*  The trial court denied the motion and held "that 'jeopardy did not attach when the racketeering conspiracy charge was dismissed with prejudice from the 2001 indictment pursuant to defendant's plea agreement.' "  *Id.* at 81 (quoting *United States v. Dionisio*, 415 F. Supp. 2d 191, 199 (E.D.N.Y. 2006)).

The defendant appealed, and the Second Circuit panel affirmed the district court's order.  *Dionisio*, 503 F.3d at 81, 89.  After agreeing with the trial court that no authorities from this Court answer " 'whether jeopardy attaches when a charge is dismissed with prejudice pursuant to a plea agreement,' " the court of appeals detailed the way that this Court described the mechanism of attachment in *Serfass* and *Martin Linen Supply Co.*  *Id.* at 82-84.  Synthesizing a "framework" from those cases, the Second Circuit held that "the key issue, even in a pretrial context, is

16

whether the disposition of an individual's indictment entailed findings of facts on the merits such that the defendant was placed in genuine jeopardy by the making of such findings." *Id.* at 83.  By way of example, the court suggested that "a plea agreement in which the court was directly involved in a defendant's decision to plead guilty to two counts, in exchange for an agreement to drop with prejudice a third count, all on the basis of findings of certain facts which support that agreement, might perhaps constitute a pretrial fact-finding that implicated jeopardy in its proper sense of risk of exposure." *Id.* at 84 (footnote omitted).  Yet in light of the limited record in *Dionisio*, the court of appeals held that there was no reason to believe that the dismissal operated as "a resolution of any factual elements that went to the merits of the charges." *Id.* at 89.

Still other federal courts of appeals have held that jeopardy does not attach to charges dismissed as a condition of and during execution of a plea agreement.  *See, e.g., United States v. Baggett*, 901 F.2d 1546, 1548 (11th Cir. 1990) (emphasis added) (concluding without analysis that "[i]n the case of a plea bargain, *with respect to the offense pleaded to*, jeopardy normally attaches when the court unconditionally accepts a guilty plea").  Under this convictions-only regime, courts have permitted jeopardy to attach to a defendant's previous convictions pursuant to a plea but have summarily declined to even consider whether later charges were the same as those that had been dismissed as a part of the plea agreement. *United States v. Nyhuis*, 8 F.3d 731, 735 n.2 (11th Cir. 1993) (citing *Baggett* at 1550) ("We may disregard the . . . conspiracy charge in the Michigan indictment which was dismissed pursuant to [defendant's]

17

plea agreement because jeopardy did not attach to that dismissed charge."); *United States v. Soto-Alvarez*, 958 F.2d 473, 482 n.7 (1st Cir. 1992) (emphasis added) ("jeopardy ordinarily does not attach to counts which are dismissed *and on which no finding of guilty is made*.").  The result is that after having accepted a plea that spares the prosecution of the time, expense, and uncertainty of a trial and potential appeals, the defendant loses any benefit of the bargain once the dismissed charges are revived or a greater version of the same offense is charged.

The Supreme Court of Ohio embraced this troubling "heads I win tails you lose" approach when weighing in on the conflict.  The majority observed in conclusory fashion that "because the involuntary-manslaughter charge was dismissed prior to the empaneling of a jury, jeopardy never attached to that charge."  *App. 3*.  The view of dissenting Justice Donnelly was rejected:

> The dissent advances the novel proposition that double jeopardy attaches to a charge dismissed under a plea agreement—here, the involuntary-manslaughter charge. In support of this view, the dissent points to cases holding that jeopardy attaches when a court accepts a guilty plea. Dissenting opinion at ¶ 37-38.  Of course, that's true.  But what the dissent neglects to mention is that the principle applies only to the charges to which a defendant pleads guilty.

*App. 7-8.*  The majority appeared to be unaware that Justice Donnelly's position was far from "novel," as it had been adopted more than twenty years ago in *Mintz*.

There are now at least three approaches reflected in the decisions of the United States courts of appeals for answering the question raised in Soto's appeal to this Court.  Only the rule adopted by the Third District Court of Appeals below and in

18

*Mintz*—that jeopardy does attach to those charges dismissed during execution of a negotiated plea agreement—adequately protects the finality interests at play during such proceedings.  The fact-based analysis utilized in *Dionisio* will find uneven application and invite re-litigation of the circumstances of a plea colloquy without adequately affording finality to the agreement of the parties to forego fact-finding in light of the proof available.  And the convictions-only regime exemplified by *Baggett*, *Nyhuis*, *Soto-Alvarez*, and the decision of the Supreme Court of Ohio is entirely untethered from the conceptual underpinnings of the Double Jeopardy Clause.  *See, e.g., Green*, 355 U.S. at 187 ("the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity").  Further review is appropriate in order to settle the issue nationally.  *Sup. Ct. R. 10(b)*.

## IV. THIS DISPUTE PRESENTS AN IMPORTANT QUESTION OF FEDERAL LAW THAT HAS NOT BEEN, BUT SHOULD BE, SETTLED BY THIS COURT

### A. THIS COURT HAS NOT SETTLED WHETHER JEOPARDY ATTACHES TO CHARGES DISMISSED DURING EXECUTION OF A PLEA DEAL

The confusion below and between the various courts that have struggled to achieve uniformity stems from the fact that this Court has not yet resolved the

19

question presented. Cases decided by this Court have set forth clear rules for determining when jeopardy attaches to charges resolved by trial and when cases are dismissed pretrial with no factual findings or consequences for a defendant. But this Court has not yet spoken about the interplay between the Double Jeopardy Clause and plea bargains, which are pervasive in the criminal justice system. *See* Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 Yale L.J. 1909, 1912 (1992) ("[plea bargaining] is not some adjunct to the criminal justice system; it *is* the criminal justice system"). Because an answer will inform the import of dismissed charges in almost every criminal case that has recently been or will be decided, this Court should take up whether charges dismissed as part of a plea agreement should be accorded the same degree of finality as charges resolved after a trial begins. *Sup. Ct. R. 10(c)*.

Nearly one half-century ago, this Court held that the critical protections embodied in the Double Jeopardy Clause attach "when a jury is empaneled and sworn, or, in a bench trial, when the judge begins to receive evidence." *Martin Linen Supply Co.*, 430 U.S. at 569 (citing *Illinois v. Somerville*, 410 U.S. 458, 471 (1973) (White, J., dissenting)). As recently as 2014, and recognizing confusion in the lower courts, this Court reaffirmed that principle. *See Martinez v. Illinois*, 572 U.S. 833 (2014).

In *Martinez v. Illinois*, the defendant was charged with aggravated battery and mob action and was brought to trial nearly four years after the indictment. *Martinez v. Illinois* at 834. Prior to trial, the Illinois court granted numerous continuances to

20

allow the government adequate time to locate the complaining witnesses. *Id*. at 835. However, on the morning of trial, the complaining witnesses "were again nowhere to be found." *Id*. at 835. The parties moved forward with jury selection, hoping the complaining witnesses would arrive during that time. *Id*. Once the jurors were selected and the government was still not prepared to move forward, the court delayed swearing the jurors and instead called the other cases on the docket to allow some additional time for the complaining witnesses to arrive. *Id*. Eventually, when there were no more options for delay, the government filed a motion for continuance asserting that it could not proceed without the complaining witnesses. *Id*. The court denied the motion and the jury was sworn. *Id*. at 836-37. When trial began, the government declined to present its case and the defense moved for a judgment of acquittal. *Id*. at 837. The court granted the defendant's motion and the government appealed, arguing that "the trial court should have granted a continuance." *Id*.

On appeal, the defendant argued that the appeal itself was improper under the Double Jeopardy Clause because he had been acquitted by the trial court's directed verdict of not guilty. *Id*. Relying, in part, on this Court's holding in *Serfass*, 420 U.S. at 391, the Illinois appellate court permitted the appeal, concluding that "because no witnesses were sworn and the state presented no evidence, jeopardy never attached and, therefore, the trial court's action was an appealable dismissal of the charges rather than a nonappealable acquittal." *People v. Martinez*, 2011 Il. App. 2d 100498, 969 N.E.2d 840, 846. The Illinois Supreme Court affirmed, finding:

> Because defendant was not placed in jeopardy, the circuit
> court's entry of directed verdicts of not guilty did not

21

> constitute true acquittals.  In fact, we note that, in
> directing findings of not guilty in favor of defendant, the
> circuit court itself repeatedly referred to its action as a
> "dismissal" rather than an acquittal: it informed the jury
> that the "case is dismissed" against the defendant and
> stated in its written order that the "matter is dismissed."
> Under these facts, the interests protected by the double
> jeopardy clause "simply are not threatened in this case."

*People v. Martinez*, 2013 IL 113475, 371 Ill. Dec. 315, 990 N.E.2d 215, 225 (quoting

*People v. Deems*, 81 Ill. 2d 384, 389, 43 Ill. Dec. 8, 410 N.E.2d 8 (1980)).

This Court reversed the Illinois Supreme Court, concluding that it "misread

[the Court's] precedents in suggesting that the swearing of the jury is anything other

than a bright line at which jeopardy attaches." *Martinez*, 572 U.S. at 839.  The rule

was applied, and this Court concluded that the defendant had been placed in jeopardy

when the jury was sworn.  *Id*. at 842.  The directed verdict constituted an acquittal

for purposes of the Double Jeopardy analysis.  *Id*. ("the trial court's action was an

acquittal because the court 'acted on its view that the prosecution had failed to prove

its case' ").

This Court has also confronted the issue of whether jeopardy attaches to

pretrial dismissals without factual findings or agreement by the parties.  *See, e.g.*,

*Ohio v. Johnson*, 467 U.S. 493 (1984).  In *Johnson*, the defendant was charged with

four separate counts in a single indictment—grand theft, aggravated robbery,

involuntary manslaughter, and murder—all arising out of the same incident.  *Id*. at

494.  At arraignment, and over the government's objection, he pled guilty to the two

lesser offenses of grand theft and involuntary manslaughter and not guilty to the

greater charges.  *Id*.  He then moved to dismiss the aggravated robbery and murder

22

charges on double jeopardy grounds.  *Id*.  The trial court granted the motion over the state's objection.  *Id*.  The Ohio Court of Appeals and the Supreme Court of Ohio affirmed that decision.  *Id*.

This Court granted a writ of certiorari and reversed, concluding that "acceptance of a guilty plea to lesser included offenses while charges on the greater offenses remain pending . . . has none of the implications of an 'implied acquittal' which results from a verdict convicting a defendant on lesser included offenses rendered by a jury charged to consider both greater and lesser included offenses."  *Id*. at 501-02.  Therefore, this Court said, "the principles of finality and prevention of prosecutorial overreaching" that the Double Jeopardy Clause is concerned with were not implicated.  *Id*. at 501.

Neither *Johnson* nor the *Martin Linen Supply Co.* line of cases answers the critical question in this case regarding the effect of executing a plea agreement between the government and a defendant that resolves all of the charges in an indictment.  Although *Johnson* addresses pretrial dismissal, it is not applicable.  In *Johnson*, all four counts in the indictment were brought for trial at the same time.  *Id*. at 496.  "[N]o more than one trial of the offenses charged was ever contemplated," and the defendant's procedural choices, not the State's actions, caused the charges to be separated.  *Id*. at 502.  In the context of a plea agreement on the other hand, the State's choices also cause the disparate resolution of counts.

The lower courts' confusion regarding pretrial attachment also stems from this Court's decision in *Serfass*, 420 U.S. 377.  Federal courts of appeals have relied on

23

that case in determining that jeopardy does not attach to charges dismissed prior to trial.  *E.g.*, *United States v. Vaughan*, 715 F.2d 1373 (9th Cir. 1983); *Dionisio*, 503 F.3d 78.

In *Serfass*, the Court decided the narrow question of "whether a Court of Appeals has jurisdiction of an appeal by the United States from a pretrial order dismissing an indictment based on a legal ruling made by the District Court after an examination of records and an affidavit setting forth evidence to be adduced at trial." *Serfass* at 378-79.  The petitioner in *Serfass* had refused to be inducted into the armed forces after his attempt to register as a conscientious objector was rejected.  *Id*. at 379.  He sought an order dismissing the ensuing indictment for "willfully failing to report for and submit to induction into the Armed Forces," asserting that the local board of the Selective Service had not adequately considered the merits of his request. *Id*.  After briefing and oral argument to the district court, and after the petitioner's Selective Service file was submitted for review, the indictment was dismissed.  *Id*. at 380-81.  The trial court held that the "petitioner was 'entitled to full consideration of his claim prior to assignment to combatant training and service,' " but that the local board's order could be " 'reasonably construed as a rejection on the merits, thereby prejudicing his right to in-service review.' " *Id*.

The United States appealed the dismissal order, but the petitioner contended that "the Court of Appeals lacked jurisdiction because further prosecution was prohibited by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution." *Serfass* at 381.  The Court of Appeals determined that it did

24

have jurisdiction to entertain the appeal because it was authorized by statute: "since petitioner had not waived his right to a jury trial, and no jury had been empaneled and sworn at the time the District Court ruled on his motion to dismiss the indictment, jeopardy had not attached and the dismissal was an appealable order." *Id.* at 381-82.

This Court recognized a conflict among the courts of appeals on whether the Double Jeopardy Clause would permit an appeal under the Criminal Appeals Act "from a pretrial order dismissing an indictment in these circumstances" and granted a writ of certiorari. *Serfass, 420 U.S.* at 383. Answering the statutory question, it was held that "Congress intended to authorize an appeal to a court of appeals in this kind of case so long as further prosecution would not be barred by the Double Jeopardy Clause." *Id.* at 387. And turning to the constitutional question, it was held:

> Under our cases jeopardy had not yet attached when the District Court granted petitioner's motion to dismiss the indictment. Petitioner was not then, nor has he ever been, 'put to trial before the trier of facts.' The proceedings were initiated by his motion to dismiss the indictment. Petitioner had not waived his right to a jury trial, and, of course, a jury trial could not be waived by him without the consent of the Government and of the court.

*Id.* at 389. In reaching this conclusion, it was observed that the District Court never had any "power to make any determination regarding petitioner's guilt or innocence." *Id.* Indeed, the trial court was only empowered to enter the order dismissing the indictment upon a pretrial motion because it could be determined "without a trial on the merits." *Fed. R. Crim. P. 12(b)(1). See also Serfass* at 389 ("Petitioner's defense was raised before trial precisely because 'trial of the facts surrounding the

25

commission of the alleged offense would be of no assistance in determining' its validity.") (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

The decision in *Serfass* is not helpful to answer whether the rights preserved by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution attach to charges that are dismissed as a condition of and during execution of a plea agreement. Unlike the petitioner in *Serfass*, Soto and every other individual who enters a plea of guilty, nolo contendere, or "no contest" as it is called in Ohio, to any part of an indictment *does waive* the right to a jury trial. *Florida v. Nixon*, 543 U.S. 175, 187-88 (2004) ("By entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury, the protection against self-incrimination, and the right to confront one's accusers."); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *Fed. R. Crim. P. 11(b)(1)(C) and (F)*; *Ohio Crim. R. 11(C)(2)(c)*. In both the federal and Ohio courts, it is the act of entering the plea that actually effects the waiver. *Fed. R. Crim. P. 11(b)(1)(C) and (F)* ("the court must inform the defendant of, and determine that the defendant understands, the following: . . . (C) the right to a jury trial; . . . (F) the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere"); *Ohio Crim. R. 11(C)(2)(c)* ("by the plea the defendant is waiving the rights to jury trial").

This mechanism of waiver is precisely why jeopardy should attach at the moment that a plea is given and accepted. It was observed in *Boykin* that a "plea of guilty is more than a confession which admits that the accused did various acts; it is

26

itself a conviction; nothing remains but to give judgment and determine punishment."
*Boykin,* 395 U.S. at 242.  In the federal system, trial courts are required at that time
to assess the factual basis of a guilty plea. *Fed. R. Crim. P. 11(b)(3).*  "The judge must
determine 'that the conduct which the defendant admits constitutes the offense
charged in the indictment or information or an offense included therein to which the
defendant has pleaded guilty.' " *McCarthy v. United States*, 394 U.S. 459, 467 (1969)
(quoting *Fed. R. Crim. P. 11*, Notes of Advisory Committee on Criminal Rules.).  This
rule aids the same finality interests underpinning the Double Jeopardy Clause by
creating proof in the record of "a guilty plea's voluntariness . . . in any subsequent
post-conviction proceeding based upon a claim that the plea was involuntary." *Id.*

In a state like Ohio, "the court need not take testimony upon a plea of guilty or
no contest." *Ohio Crim. R. 11(C)(4).*  But after the right to a jury trial is waived in
such proceedings, execution of a plea agreement still has the effect of determining the
facts that support a judgment of conviction. *See Boykin,* 395 U.S. at 242.  Moreover,
the lack of an assessment of the factual basis of a guilty plea has not been seen as a
barrier to placing a conviction by plea on the same footing as a conviction by a jury
trial for the purpose of determining whether jeopardy would bar a second prosecution.
*See Brown*, 432 U.S. 161.  If jeopardy attaches to *a conviction* entered without any
sort of factual findings, the difference between an acquittal by jury and a dismissal
during execution of a plea agreement is arguably semantic—the same rule should
apply to both.  *See also Mullreed v. Kropp*, 425 F.2d 1095, 1099-102 (6th Cir. 1970)
(likening the jury's decision to acquit a defendant to the government's "refusal" to

27

seek a conviction on one criminal charge after a guilty plea to a lesser included charge).  Most of the same interests undergirding the Double Jeopardy Clause justify such a holding.  The likelihood of "embarrassment, expense and ordeal" and a "continuing state of anxiety and insecurity" resulting from the possibility of "repeated attempts to convict an individual for an alleged offense" are uniquely high if, after entering a guilty plea to some charges in return for dismissal of others, a person may still be re-indicted.  *Green*, 355 U.S. at 187.  Because the plea waives the right to a jury trial and forecloses submission of those same facts to a jury or the bench, jeopardy should attach to all charges resolved at the time of a plea.

### B.   AN ANSWER TO THE QUESTION PRESENTED WILL HAVE ENORMOUS NATIONAL IMPACT

At the time the Constitution was drafted, criminal cases were not resolved by guilty pleas.  In fact, courts actively discouraged resolution of cases by guilty plea until the latter half of the nineteenth century.  Albert W. Alschuler, *Plea Bargaining and its History*, 79 Colum. L. Rev. 1, 5, 8 (1979).  *See also* Lucian E. Dervan, *Bargained Justice: The History and Psychology of Plea Bargaining and the Trial Penalty*, 31 Federal Sentencing Reporter 4-5, 239 (April 2019/June 2019) ("Plea bargaining as it is known today is actually a relatively recent American invention that appeared first around the time of the American civil war, later became a tool of corruption during the early twentieth century, and eventually gained widespread use and legitimacy as a response to the burdens of overcriminalization.").

28

However, once adopted at the end of the nineteenth century, "plea bargaining became a dominant method of resolving criminal cases." Alschuler at 6.  For example, just "[b]etween the early twentieth century and 1925, . . . pleas of guilty in the federal criminal justice system rose from 50 percent to 90 percent of convictions."  Dervan, 31 Federal Sentencing Reporter at 240.  These numbers remained steady into the second half of the twentieth century.  *See, e.g.*, Scott & Stuntz, 101 Yale L.J. at 1909 n.1, 2.  In 1964, guilty pleas accounted for approximately 90 percent of all misdemeanor and felony convictions.  Dervan at 240.  *See also Brady v. United States*, 397 U.S. 742, 752 n.10 (1970) ("It has been estimated that about 90%, and perhaps 95%, of all criminal convictions are by pleas of guilty; between 70% and 85% of all felony convictions are estimated to be by guilty plea.  D. Newman, Conviction, The Determination of Guilt or Innocence Without Trial 3 and n.1 (1966).").

That number has only increased in recent years.  In 2019, "almost 98 percent of criminal convictions in the federal system and 94 percent of criminal convictions in the state systems result from a plea of guilty."  Dervan at 239.  According to the Pew Research Center, there were nearly 80,000 defendants in federal criminal cases in 2018.  Only 2% of them went to trial, while 90% pled guilty.  John Gramlich, *Only 2% of federal criminal defendants go to trial, and most who do are found guilty*, Pew Research Center (June 11, 2019), https://www.pewresearch.org/fact-tank/2019/06/11/only-2-of-federal-criminal-defendants-go-to-trial-and-most-who-do-are-found-guilty/.

29

As the number of both federal and state criminal prosecutions have ballooned in recent decades, the plea agreement has become even more imperative to the function of the criminal justice system.  *Compare United States Attorneys Statistical Report Fiscal Year 1960*, United States Department of Justice, 1 (October 1960), https://www.justice.gov/sites/default/files/usao/legacy/2009/07/31/STATISTICAL_RE PORT_FISCAL_YEAR_1960.pdf (showing 30,617 criminal cases were filed in federal courts in 1960), *with United States Attorneys' Annual Statistical Report Fiscal Year 2010*, United States Department of Justice (2010), https://www.justice.gov/sites/default/files/usao/legacy/2011/09/01/10statrpt.pdf (showing that 68,591 criminal cases were filed in federal courts in 2010 against 91,047 defendants).  Because of these numbers, it became clear as early as the mid-1960s that "[o]ur system of criminal justice has come to depend upon a steady flow of guilty pleas.  There are simply not enough judges, prosecutors, or defense counsel to operate a system in which most defendants go to trial."  Task Force on Administration of Justice, The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Courts* 10 (1967) (citing Comment, *Official Inducement to Plead Guilty: Suggested Morals for a Marketplace*, 32 U. Chi. L. Rev. 167 (1964)).  This Court acknowledged that reality in *Santobello v. New York*, 404 U.S. 257, 261 (1971): "Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons."

Without guilty pleas, the criminal justice system could not function.  But it has never been a part of this Court's jurisprudence that protections as carefully guarded

30

as those enshrined in the Double Jeopardy Clause should lose force simply because the justice system has expanded in the latter part of this century and embraced efficiency.  The people still have a collective sense that justice means being put at risk of conviction a single time, and the rule adopted by the lower court shreds that expectation.  Perhaps best stated by the majority of the Third District Court of Appeals panel:

> It is our view that the double jeopardy implication of a dismissal of the Involuntary Manslaughter in the context of such a plea agreement is akin to the double jeopardy protection and finality afforded to an acquittal.  Under any other interpretation, and barring any special exception or reservation in the record, the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense.  There would be no finality under such a system and it would render plea agreements largely meaningless.

*App. 38.*

The harsh rule adopted by the Supreme Court of Ohio certainly runs this risk.  Under the convictions-only regime that now governs in this state and elsewhere, there is no legal principle preventing reindictment of every crime ever dismissed during the execution of a plea agreement save for perhaps the statute of limitations.  The number of such charges is flatly innumerable.  And it is questionable how knowingly a plea could be entered when no court has ever been required in this state to inform a criminal defendant of the prospect for reindictment upon the dismissed charges.  *Ohio Crim. R. 11.*  Who would be willing to enter such a one-sided arrangement when jeopardy will attach and accord finality to a resolution of the

31

entire indictment simply by proceeding to trial?  Under these nationally significant circumstances, this Court's review is warranted.

## V.    THIS DISPUTE PRESENTS A LIVE CASE AND CONTROVERSY

The present dispute remains a live one.  "Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.' "  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013).  Generally, "those who invoke the power of a federal court" must "demonstrate standing—a 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' "  *Id.*, quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984).  "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974).

Petitioner Soto has been incarcerated in the Putnam County Jail during the pendency of these proceedings, and his prosecution is ongoing.  On December 19, 2019, the Court of Common Pleas for Putnam County directed Soto to file "an appropriate motion for stay" after the filing of this petition.  *Journal Entry filed December 19, 2019.*  All pre-trial proceedings have been continued until after the due date for this petition.  Because Soto maintains through these proceedings that his prosecution is barred by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, there is a live case and controversy.

32

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully Submitted,

Louis E. Grube, Esq.
*Counsel of Record*
Paul W. Flowers, Esq.
**PAUL W. FLOWERS CO., L.P.A.**
50 Public Square, Suite 1910
Cleveland, Ohio 44113
(216) 344-9393
leg@pwfco.com

*Attorneys for Petitioner,*
*Travis Soto*

Carly M. Edelstein, Esq.
Assistant State Public Defender
**OFFICE OF THE OHIO PUBLIC DEFENDER**

33

No. 19-7834

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

# IN THE SUPREME COURT
# OF THE UNITED STATES

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

TRAVIS SOTO,

*Petitioner,*

v.

THE STATE OF OHIO,

*Respondent.*

_____

On Petition for Writ of Certiorari to the
Supreme Court of Ohio
_____

BRIEF FOR THE PUBLIC DEFENDER ASSOCIATION,
OHIO JUSTICE & POLICY CENTER, ET AL.,
AS AMICI CURIAE IN SUPPORT OF
PETITIONER'S WRIT OF CERTIORARI

_____

**Jeffrey Jude Pokorak***
*Counsel of Record, for*
*Amici Curiae*
Supreme Court Clinic
Suffolk University
 Law School
120 Tremont Street
Boston, MA  02108-4977
(p) 617.305.1645
jpokorak@suffolk.edu

**Courtney A. Dunn**
*Attorney at Law*
CPCS Mental Health,
 Litigation Division
7 Palmer St., Suite 302
Roxbury, MA 02119
(p) 617.516.5835
clogan@publiccounsel.net

***Member, Supreme Court Bar*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................ii

INTEREST OF *AMICI CURIAE* ....................................1

SUMMARY OF ARGUMENT AND RESTATEMENT OF QUESTIONS PRESENTED ................................2

ARGUMENT ...............................................................4

I.  THIS COURT SHOULD GRANT CERTIORARI TO DETERMINE WHETHER THE DOUBLE JEOPARDY CLAUSE OUGHT TO APPLY TO ALL COUNTS IN A SINGLE INDICTMENT AFTER A NEGOTIATED PLEA AGREEMENT ............................................4

   A.  Negotiated Pleas are now a Fundamental Procedural Aspect of the Criminal Justice System in the United States ........…..............5

   B.  The Value and Necessity of Finality in Negotiated Pleas ......................................7

II.  THIS COURT SHOULD GRANT CERTIORARI TO DETERMINE WHETHER THE CRIMINAL LAW DOCTRINE OF "MERGER OF OFFENSES" IS A PROTECTED ANCILLARY TO THE DOUBLE JEOPARDY CLAUSE ….......................…..........13

   A.  Mr. Soto's Past and Present Charges .............14

   B.  Double Jeopardy and Lesser Included Offenses ……...............................…..........16

ii

CONCLUSION ...................................................19

APPENDICES:

    APPENDIX A
    (List of *Amicus* Organizations) ...................APP. 1

    APPENDIX B
    (Mr. Soto's 2006 Indictment) .....................APP. 3

    APPENDIX C
    (Mr. Soto's 2006 Plea and Judgment) .........APP. 5

iii

# Table of Authorities

**CASES**

*Ashe v. Swenson,*
397 U.S. 436 (1970)................................................ 13

*Benton v. Maryland,*
395 U.S. 784 (1969).............................................. 16

*Blackledge v. Allison,*
431 U.S. 63 (1971)....................................7, 10, 12, 13

*Blockburger v. United States,*
284 US 299 (1932)................................................ 16

*Brady v. United States,*
397 U.S. 742 (1970).............................................7, 9

*Lafler v. Cooper,*
566 U.S. 156 (2012).............................................. 11

*Lee v. United States,*
582 U.S. ___, 137 S.Ct. 1958 (2017) ...................11, 12

*Missouri v. Frye,*
566 U.S. 134 (2012)..........................................*passim*

*Padilla v. Kentucky,*
599 U.S. 356 (2010)...........................................10, 11

*Santobello v. New York,*
404 U.S. 257 (1971)....................................7, 8, 10, 12

*State v. Lucas,*
243 Kan. 462, 759 P.2d 90 (1988)......................17, 18

*State v. Soto,*
2018-Ohio-459, 94 N.E.3d 618 (2018) ..................... 15

*State v. Thomas,*
40 Ohio St.3d 213 (1988) ......................................... 15

iv

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V..........................................*passim*
U.S. Const. amend. VI .........................................10, 11
U.S. Const. amend. XIV....................................*passim*
U.S. Const. amend. XXI............................................. 6

## STATUTES

Ohio Rev. Code § 2903.04 .......................................... 14
Ohio Rev. Code § 2919.22 ...............................3, 14, 18
National Prohibition Act of 1919, Pub. L.66-85,
    41 Stat. 305-323 ...................................................... 5

## RULES

Fed. R. Crim. P. ......................................................... 8
Sup. Ct. R. 37.6.......................................................... 2
Unif. R. Crim. P. 433 ................................................. 8
Unif. R. Crim. P. 434 ................................................. 8

## OTHER AUTHORITIES

Albert W. Alschuler, *Plea Bargaining and
    its History*, 79 Colum. L. Rev. 1 (1979) .................5, 7
American Bar Association, *Criminal
    Justice Standards on Guilty Pleas*, (3d. 1999) .......6, 9

v

American Bar Association Project on Standards
  for Criminal Justice, *Standards Relating to
  Pleas of Guilty 2* (1968)............................................6, 8
American Legal Institute, *Model Code of
  Pre-Arraignment Procedure*, (1966)........................... 8
Cynthia Alkon, *What's Law Got To Do With
  It? Plea Bargaining Reform After Lafler and
  Frye*, 7 Y.B. On Arb. & Mediation 1 (2015) ...........7, 8
Guyora Binder, *Making the Best of Felony
  Murder*, 91 B.U. L. Rev. 403 (2011) ....................... 17
Lucian E. Dervan*, Bargained Justice: The
  History and Psychology of Plea Bargaining
  and the Trial Penalty*, 31 Federal Sentencing
  Reporter 4-5, 239 (April 2019/June 2019).......5, 6, 12
Lucian E. Dervan & Vanessa E. Edkins, *The
  Innocent Defendant's Dilemma: An Innovative
  Empirical Study of Plea Bargaining's
  Innocence Problem*, 103 J. Crim. L. &
  Criminology 1 (2013). .............................................. 5
Office of the United States Courts, *Statistical
  Tables for the Federal Judiciary 2001:*
    https://www.uscourts.gov/statistics/table/d-
    4/statistical-tables-federal-judiciary/2001/12/31..... 6
Office of the United States Courts, *Statistical
  Tables for the Federal Judiciary 2019:*
    https://www.uscourts.gov/statistics/table/d-
    4/statistical-tables-federal-judiciary/2019/12/31..... 7
Robert E. Scott & William J. Stuntz,
  *Plea Bargaining as Contract,* 101 Yale L. J.
  1909 (1992)............................................................. 4

1

## INTEREST OF *AMICI CURIAE*[1]

Justice Kennedy, writing for the Court, stated what is now the obvious reality of all criminal justice systems in the United States:

> "To a large extent . . . horse trading [between prosecutor and defense counsel] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system." ... In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant.

*Missouri v. Frye*, 566 U.S. 134, 143-144 (2012) (internal citations omitted). In the instant case, the Ohio Supreme Court embraced a concept of double jeopardy in the negotiated plea context that may easily undo the decades of this Court's jurisprudence regarding our guilty plea-dominant adjudicatory systems. By allowing claims negotiated away to be re-charged in future prosecutions, the court below has undermined one of the most important promises

---

[1] In accordance with Supreme Court Rule 37.6 undersigned counsel certifies that no counsel for any party authored, in whole or in part, any aspect of this brief. Further, no person or entity, other than *amici curiae*, made a monetary contribution to the preparation or submission of this brief. All parties were given timely notice regarding the intent to file this brief. Written notice of consent to file this brief of *amici* was given by the counsel of record for each party in the case.

2

of the negotiated plea infrastructure – the finality of that agreement.

Each *Amicus* joining this brief believes that the issues presented regarding negotiated pleas and the scope of the double jeopardy protections afforded defendants in that process is critical to the administration of justice throughout all criminal law jurisdictions, state and federal. *Amici* are a collection of National, State-wide and local Criminal Justice advocates and Public Defender Organizations. *Amici* urge this Court to grant the Petition for Writ of Certiorari in order to thoughtfully address the issues presented. A list of the *amici curiae* are attached at Appendix A.

## SUMMARY OF ARGUMENT AND RESTATEMENT OF QUESTIONS PRESENTED

This case offers the Court an opportunity to consider two issues that are of utmost importance to the administration of criminal justice, both in state courts and throughout the federal system. First, the case presents a question of first impression:

**Whether the double jeopardy clause ought to apply to all counts in a single indictment resolved by plea agreement under the Fifth and Fourteenth Amendment to the United States Constitution**.

In the instant case, Petitioner Soto was charged in a single indictment with two counts. He pleaded guilty to the second count for which he received both

3

a dismissal of the first count of the single indictment and a five-year prison sentence which he served. The State now seeks to try Mr. Soto for a crime which all parties below agree would be barred if jeopardy attached to the abandoned count.

Second, this case offers the Court an opportunity to craft a rule on another issue that the Court has yet to address:

**Whether the doctrine of "merger of offenses," precludes the subsequent trial of a felony murder charge to which the state has already secured a negotiated conviction on the predicate felony as a violation of the Fifth and Fourteenth Amendments to the United States Constitution.**

In Mr. Soto's case, the state negotiated a plea to an underlying felony of "Endangering Children"[2] in return for dismissing a felony murder count of "Involuntary Manslaughter" which relied on the Endangering Children charge as the predicate felony. After Mr. Soto's negotiated plea was accepted for which he served his full sentence, the State is now seeking to charge Mr. Soto with homicide charges that rely on either the actual felony pleaded to or the factual basis for that plea's acceptance by the trial court. Soto Plea Agreement, at App. 8 ("By pleading guilty I admit to committing the offense and

---

[2] Although Mr. Soto's 2006 Indictment and plea agreement refer to "Child Endangering, the actual statutory title is "Endangering Children." Ohio Rev. Code § 2919.22 (c.f. Appendix B at App. 3; C at App. 5)

4

will tell the Court the facts and circumstances of my guilt") This Court is therefore presented with the opportunity to settle law surrounding the issues of merger of offenses and to clarify the doctrine's application in all criminal law jurisdictions.

Regardless of outcome, both these issues are serious and implicate the charging, prosecution, adjudication and punishment of individuals throughout the jurisdictions supervised by this Court. Failing to address these issues at this time leaves prosecutors, defense attorneys, courts, and those charged with crimes in the position of not being able to make intelligent or knowing waivers in any plea agreement in which one charge is abandoned by the prosecution in return for a guilty plea on another count in the same indictment. Considering the fundamental role and reliance on the finality of negotiated settlements in all criminal cases resolved short of trial, this Court ought to grant the Writ in order to fully consider these important issues.

## ARGUMENT

**I. THIS COURT SHOULD GRANT CERTIORARI TO DETERMINE WHETHER THE DOUBLE JEOPARDY CLAUSE OUGHT TO APPLY TO ALL COUNTS IN A SINGLE INDICTMENT AFTER A NEGOTIATED PLEA AGREEMENT**

As Justice Kennedy pointedly observed: "To a large extent … horse trading [between prosecutor and defense] determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it is the

5

criminal justice system." *Missouri v. Frye*, 566 U.S. 134, 143-144 (2012) (quoting Scott & Stuntz, Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992)).

A plea is the exchange of official concessions by the government for the defendant's act of self-conviction. In all criminal courts under this Court's jurisdiction, the plea agreement is the dominant and therefore most critical aspect of criminal case resolution.  This Court should grant certiorari in this case to determine whether double jeopardy attaches to the whole of an indictment at the time of a court's acceptance of a negotiated plea agreement.

In the instant case, Petitioner Soto exchanged his plea of guilty to Count II of a single indictment for a significant prison sentence and the end of prosecution on the more serious charge contained in Count I of the same indictment.

Two types of plea agreements dominate the process in today's criminal justice system: charge pleas and sentence pleas.  Charge pleas allow a defendant to plead guilty to a lesser charge than originally arraigned/indicted on and sentencing pleas enable a defendant to try and minimize the sentence he/she faces.  In the current case, the plea entered by Mr. Soto was a combination of both types – charge and sentence pleas – as he received the maximum allowable sentence (five years in prison) for acceptance of responsibility on the lesser charge.

6

A. <u>Negotiated Pleas are now a Fundamental Procedural Aspect of the Criminal Justice System in the United States.</u>

Despite negotiated plea agreement's dominant place in the modern-day criminal justice system, it is a procedure developed primarily in the last century to adapt to other significant changes within the system. Albert W. Alschuler, *Plea Bargaining and its History*, 79 Colum. L. Rev. 1, 6 (1979). The first cases of plea agreements appeared in appellate courts during the Civil War, where they were often overturned as not being knowing and voluntary confessions. Lucian E. Dervan*, Bargained Justice: The History and Psychology of Plea Bargaining and the Trial Penalty*, 31 Federal Sentencing Reporter 4-5, 239 (April 2019/June 2019). Guilty pleas, like all confessions at that time, were discouraged by the courts due in large part to the lack of defense counsel able to advise clients. Alschuler at 20-23. Additionally, most penalties for serious crimes were prescribed, and therefore defendants did not always receive any concession in return for the plea. Id. Both factors acted as strong barriers to plea "bargaining" as a valid method of disposing criminal cases.

At the turn of the 20th century as graft, corruption, and patronage systems took hold in most major cities, plea agreements began to proliferate in criminal justice systems. Agreements to pardon, dismiss or lessen charges, and commute punishments were offered by politicians and judges in return for personal gain. Alschuler at 24. *See also* Lucian E. Dervan and Vanessa E. Edkins, *The*

7

*Innocent Defendant's Dilemma: An Innovative Empirical Study of Plea Bargaining's Innocence Problem*, 103 J. Crim. L. & Criminology 1, 8-9 (2013). During the Prohibition Era, plea bargaining became prolific not due to corruption, but in order to handle the huge number of newly minted federal criminals who were charged with violating the Prohibition Act of 1919. Dervan at 5. For example, at the height of federal prosecutions during prohibition, the criminal docket was nearly eight times what it would be in a much larger national population at the start of the country's entry into World War II. Dervan, at 4-5. The courts and prosecutors began to use plea agreements as a vehicle to increase efficiency and clear dockets quickly. The rise in federal negotiated pleas was astounding, moving from roughly 50% of cases concluded by a pre-trial admission of guilt at the turn of that century to approximately 90% resolution of criminal cases by pleas short of trial by 1925. Id.

Although the number of federal criminal cases declined significantly after the passage of the 21st Amendment ending prohibition, the percentage of cases resolved by negotiated plea agreements remained remarkably steady through the 1970s. After that, the country saw an explosion of criminal offense legislation, adoption of sentencing guidelines, imposition of mandatory minimum sentences, parole release options either reformed or eliminated, and significant increases in collateral consequences for sentenced defendants. It was during this era that the process of negotiated pleas became formalized and viewed as "a means of preserving the integrity of trials in systems overwhelmed by criminalization."

8

American Bar Association Project on Standards for Criminal Justice, *Standards Relating to Pleas of Guilty 2* (1968). The concomitant explosion of cases and numbers of individuals incarcerated taxed court, prosecution and defense resources leading to an unsurprising increase in both the number and percentage of negotiated criminal case resolutions short of trial. Negotiated pleas became a fundamental and indispensable means to the continued functioning of the criminal justice system. *See* American Bar Association, *Criminal Justice Standards on Guilty Pleas*, (3d. Ed. 1999).[3]

By 2019, plea bargaining was by far the dominant form of case disposition, accounting for almost 98% of all indicted cases in the federal system.[4]

---

[3] In 2001, 95% of all convictions in the federal system resulted from a plea of guilty. Office of the U.S. Courts, *Statistical Tables for the Federal Judiciary*, Table D-4. U.S. District Courts – Criminal Defendants Disposed of, by Type of Disposition and Offense, During the 12-Month Period Ending December 31, 2001, www.uscourts.gov/statistics/table/d-4/statistical-tables-federal-judiciary/2001/12/31. By 2012, it was estimated that "[n]inety-seven percent of federal convictions and ninety-four percent of state convictions [were] the result of guilty pleas." *Missouri v. Frye*, 566 U.S. 134, 143 (2012).

[4] According to data compiled by the Office of the Administration of U.S. Courts only 2% of defendants in federal court convicted and sentenced as the result of an actual trial by jury or judge. Office of the U.S. Courts, *Statistical Tables for the Federal Judiciary*, Table D-4. U.S. District Courts – Criminal Defendants Disposed of, by Type of Disposition and Offense, During the 12-Month Period Ending December 31, 2019, www.uscourts.gov/statistics/table/d-4/statistical-tables-federal-judiciary/2019/12/31.

9

B. <u>The Value and Necessity of Finality in Negotiated Pleas</u>

The crux of the negotiated plea is the benefit or reward to each party within the criminal justice system, which is one reason it is favored in courts today.  The plea ensures speedy resolution, finality of decisions and ensures judicial economy.  *Blackledge v. Allison*, 431 U.S. 63, 72 (1971).  The prosecutor finds the plea valuable because it ensures conviction and saves valuable resources.  The promised benefits to the defendant are avoiding extended pretrial incarceration, speedy disposition of the case and possible reduction of sentences and dismissal of other charges.  *Id.* at 71-72.  By mitigating a harsher punishment, defendants can hope to avoid some harsh collateral consequences. However, this also means that the defendant cedes certain constitutional protections.  Cynthia Alkon, *What's Law Got to Do With It? Plea Bargaining Reform After Lafler and Frye*, 7 Y.B. On Arb. & Mediation 1, 4-6 (2015). From the court's perspective, it is an efficient way to clear its docket and save judicial resources for those cases where there is a substantial issue of guilt or innocence or where it is unclear if the state can maintain its burden of proof.  *Brady v. Maryland*, 397 U.S. 742, 752 (1970).  Some courts have also found that plea negotiation serves rehabilitation purposes as well by allowing the defendant access to correctional measures better adapted to purposes of treatment with lesser sentences and more opportunities for diversion programs and probation instead of incarceration. *Santobello v. New York*, 404 U.S. 257, 261 (1971). Additionally, plea agreements often lead to sooner closure for crime victims as well

10

as the opportunity for quicker resolution of restitution claims. Each constituent in the criminal justice system depend on the clarity and finality of a plea agreement. Finality was a critical factor when this Court accepted the constitutionality of such pre-trial "confessions" and is the primary factor driving the procedures which has allowed negotiated pleas to become the dominant method of criminal case resolution. *Santobello*, at 261. See Alkon at 4-6.

As early as 1968, the American Bar Association (hereinafter ABA) recommended the use of "bargained justice" as a means of preserving the integrity of trials in a system starting to be overwhelmed by increased criminalization, particularly regarding narcotics prosecutions. In doing so it recognized that the process of negotiated pleas required increased formalization in order to ensure protections to the defendant. Chief among these was that prosecutors needed to be bound to the promises made in any negotiated deal and that the court could rely on the plea as having been entered into in both a knowing and voluntary way. *See* ABA Project on Standards for Criminal Justice, *Standards Relating to Pleas of Guilty 2* (1968). Similarly, the Uniform Rules of Criminal Procedure (1974) (hereinafter URCP), Model Code of Pre-Arraignment Procedure and the Federal Rules of Criminal Procedure all took definitive steps to formalize the process of entering into a plea (as opposed to the negotiation itself) in order to create a contract-like product that ensured finality for all the parties.

For example, the 1974 URCP recommended model rules based on four major policies regarding

11

negotiated pleas: 1) centralize in the prosecutor the responsibility for initiation and control of criminal prosecutions (amend the charge, dismiss or not bring the charge at all); 2) eliminate unnecessary use of the court's time; 3) encourage disposition without trial; and 4) provide procedures for effective safeguarding of the defendant's constitutional rights. Unif. R. Crim. P., Rule 433, 444 (1974).

Subsequent to those early efforts, the ABA Criminal Justice Standards on Guilty Pleas 3rd Edition (1999) were crafted in recognition that state and federal sentencing guidelines, mandatory minimums, and a significant increase in collateral consequences faced by defendants required courts to engage in a meaningful colloquy to ensure that defendants entered into any plea knowingly and voluntarily. A consensus of judges, prosecutors, defense counsel, academics and other practitioners crafted these standards after concluding that permitting resolution of criminal cases through the entry of negotiated guilty pleas is an appropriate part of the criminal justice system and is necessary to ensure the functioning of the system. They reasoned that affording guilty pleas such protection was beneficial to the defendant and the state by protecting these agreements from later appellate or collateral attacks, hence enhancing the finality of such judgments. Steps to formalize negotiated plea procedures and protect the finality of the resulting plea agreement were both anticipatory and in response to this Court's evolving jurisprudence regarding plea agreements.

12

Since *Brady v. United States*, 397 U.S. 742 (1970), this Court has affirmed the constitutional legitimacy of negotiated plea agreements by affording them certain constitutional protections. In *Brady*, the defendant pleaded guilty to mitigate the possibility of the death penalty, then appealed on the ground that the concessions he made were so large that his confession was involuntary. *Id*. This Court found that the plea confession was voluntary, and the offer of leniency and punishments were permissible enticements so long as they did not overbear the will of the defendant. *Id*. at 752-758. *Brady* was a critical moment in this Court's negotiated plea jurisprudence as it recognized such agreements as constitutional in the then-evolving context of a vastly expanding criminal justice system. In its ruling, this Court enumerated three reasons for finding the plea bargain necessary and constitutional: first, the plea of guilt must be voluntary; second, that such voluntary pleas save the resources of the courts for cases where there is a substantial question of guilt or innocence as to if the state can maintain its burden and; third, it recognized that effective defense counsel is an imperative part of the reliability of such a plea in order to ensure that a properly counseled defendant will not falsely condemn themselves. *Id*. at 750, 752, 758.

In a series of subsequent cases, this Court further legitimized negotiated pleas as a constitutional aspect of a prosecution while emphasizing the values of speed, economy and finality such agreements bring to the criminal justice system. *Santobello v. New York*, 404 U.S. 257 (1971), involved an appeal of a guilty plea where the state failed to keep its

13

commitment regarding a sentencing recommendation. The Court noted that "[d]isposition of charges after a plea discussion is not only an essential part of the process but a highly desirable part for many reasons." *Id*. at 261.  Those reasons included: a prompt and final disposition of most criminal cases, avoidance of the "corrosive impact of enforced idleness during pre-trial confinement," the protection of the public from individuals prone to criminal conduct during pre-trial release and enhanced rehabilitative prospects for those who admit their guilt.  *Id*. at 261-262.

Following *Santobello*, this Court considered the specific benefits of creating rules of finality regarding plea agreements. *Blackledge v. Allison*, 431 U.S. 63 (1971).  In *Allison*, the defendant sought relief through habeas corpus proceedings arguing that his guilty plea was involuntary because the agreement he entered was not honored by the state.  *Id*.  This Court held that "[t]he advantages can be secured, however, only if dispositions by guilty pleas are accorded a great measure of finality." *Id*. at 71.  This Court again reiterated the many advantages of negotiated pleas including avoiding extensive pretrial incarceration, speedy disposition of cases and the conservation of scarce and vital resources. *Id*, Additionally, this Court expressly found that the current increase in arraignments and indictments in the criminal justice system creates a larger number of cases than officers of the court and the court itself can timely resolve without negotiated pleas.  *Id*.

This century, this Court further examined the constitutional rights of defendants surrounding

14

negotiated pleas, including the scope of the 6th Amendment Right to effective counsel in a plea negotiation. In 2010, this Court decided a case involving a lawful permanent resident who entered a guilty plea pursuant to a plea agreement. *Padilla v. Kentucky*, 599 U.S. 356 (2010). Mr. Padilla appealed his case on the grounds that his defense counsel did not advise him of the deportation consequences of his plea. *Id*. at 359. This Court agreed with the Petitioner finding that his 6th Amendment right to effective assistance had been violated. *Id*. at 369. This Court recognized that many complex factors influence a decision to enter a pre-trial plea, including the defendant's understanding of and ability to weigh the collateral consequences of such a serious decision. *Id*. at 372-373.

Two decisions followed the *Padilla* case in which this Court not only expanded the protections afforded defendants in the plea process but also made vital pronouncements regarding the role of negotiated pleas in our modern-day criminal justice system: *Lafler v. Cooper*, 566 U.S. 156 (2012) and *Missouri v. Frye*, 566 U.S. 134 (2012). In each case, this Court again considered the scope of effective assistance of counsel in the plea agreement process and reiterated the central role defense counsel has in such processes. In *Lafler*, this Court found that absent the defense attorney's ineffective assistance of counsel by wrongly advising his client that the government's case lacked strength, the defendant would have instead accepted the offered plea. *Lafler*, *supra* at 166. The Court noted that plea deals are often significant discounts from what a defendant would get if they go to trial and are convicted,

15

recognizing that "criminal justice today is for the most part a system of pleas, not a system of trials." *Id*. at 170.  In the companion *Frye* case, in which defense counsel failed to convey the prosecution's plea offer to his client before the expiration of the offer, Justice Kennedy went further in explaining the centrality of the role of plea agreements in our criminal justice system.  *Frye, supra,* at 143-144.  The Court ultimately held that the 6th Amendment right to counsel was also violated when a lawyer fails to convey a plea offer to the client in a timely fashion. *Id*. at 145.

This Court continues to recognize the vital, fundamental role plea bargaining plays in the criminal justice system.  In 2017, this Court again took up the issue of immigration collateral consequences in the context of plea bargaining in *Lee v. United States*, 582 U.S. ___, 137 S.Ct. 1958 (2017). As in *Padilla*, the defendant pleaded guilty on the mistaken assurance of defense counsel that he would not face deportation consequences.  *Id*.  In reversing the lower court's decision and finding that Mr. Lee was deprived of effective assistance of counsel, Chief Justice Roberts focused on another important aspect of the negotiated plea process, namely: "determinative issues."  *Id*.  In *Lee* the determinative issue was again the collateral consequence of deportation.  Chief Justice Roberts wrote that where a defendant is forced to choose between not having a consequence (deportation) and "almost" having that consequence due to going to trial, the "almost" may well be the determinative issue in decision-making for a defendant.  *Id*. at 1968-69.  While he did not enumerate specific

16

determinative issues or clearly define what one is,
they may  be viewed as ones that have little do with
the facts of the case but instead relate to the
potential consequences a defendant will suffer
through the decision to plea or go to trial.  While *Lee*
was decided on the specific facts, it reflects this
Court's continued interest in defining which
protections are afforded plea agreements.  *Id.* at
1968-1969.  See also Dervan at 7-8.

This Court's history of examining plea agreements
from the perspective of constitutional due process
protections demonstrates the significance it places on
the defendant's finality interest.   The swift yet
certain disposition of criminal charges is an essential
component of the administration of justice.
*Santobello*, *supra* at 261.

> This [negotiated plea] phase of the process of
> criminal justice, and the adjudicative element
> inherent in accepting a plea of guilty, must be
> attended by safeguards to insure the
> defendant what is reasonable due in the
> circumstances.

*Id.*, at 262.  The "adjudicative element" in most cases
includes criminal conviction, collateral consequences
and – in many cases like Mr. Soto's – significant
periods of incarceration. With a court's acceptance of
a plea agreement, the defendant waives certain
constitutional protections including the right to a
jury trial, the right to remain silent and regarding
most issues, the right to a further appeal.
Considering these serious consequences, such
agreements should be afforded an assurance of

17

finality -- not only to the specific count to which a defendant pleads, but at a minimum to the whole of the indictment that contains that count or charge.

Such a scope of finality benefits the entire criminal justice system. As this Court pointedly stated in *Allison*, negotiated pleas "properly administered, [] can benefit all concerned." *Allison*, *supra* at 71. Proper administration of such convictions ought to include the assurance that a defendant will not risk prosecution twice when waiving the right to trial once. However, without "accord[ing] a great measure of finality," to plea agreements all the players within the system are at a disadvantage. *Id*. The government relies on plea agreements to secure convictions and save resources. *Id*. at 71. The courts view these agreements as an efficient way to reduce the docket and preserve resources for cases where there is substantial issues of guilt or innocence. *Id*. The defendant relies on the promises made in the process to mitigate punishment and dispose of other charges. *Id*. Recognizing that the defendant is the only one ceding constitutional protections in an "essential component of the administration of justice," the issue of the scope of negotiated plea finality is ripe for determination. In order to preserve our modern criminal justice system's attendant values of efficiency, accuracy and individual liberty; this Court ought to grant certiorari in this case to consider the scope of finality protections that attach to knowing and voluntary negotiated plea agreements.

18

**II. THIS COURT SHOULD GRANT CERTIORARI TO DETERMINE WHETHER THE CRIMINAL LAW DOCTRINE OF "MERGER OF OFFENSES" IS S PROTECTED ANCILLARY TO THE DOUBLE JEOPARDY CLAUSE.**

Although this Court, lower federal courts, and state courts often deal with issues related to the double jeopardy bar to subsequent punishments and prosecutions, courts also are required to occasionally consider two ancillary doctrines in criminal law: collateral estoppel and the merger of offenses. This Court dealt with the former doctrine in *Ashe v. Swenson*, 397 U.S. 436 (1970), in which it held the Fifth Amendment guarantee against double jeopardy, applicable to the states through the Fourteenth Amendment, includes the collateral estoppel of relitigating settled issues as part of the constitutional protections afforded any defendant. *Id.* at 446 ("after a jury determined by its verdict that the petitioner was not one of the robbers, the State could [not] constitutionally hale him before a new jury to litigate that issue again"). This Court should now take the opportunity of this case to consider the second criminal law doctrine ancillary to double jeopardy – That of the "merger of offenses."

The legal doctrine of merger of offenses is studied by most every first-year law student in their introductory Criminal Law course. However, because it is understood as a well settled limitation on a state's power to charge, particularly in felony murder indictments, cases implicating the merger doctrine rarely come to the attention of appellate courts. Although the merger doctrine has been

19

relied upon in both federal court and state court criminal cases, this Court has never conclusively determined that the merger doctrine is an aspect of fundamental fairness in criminal charging required by both the Fourteenth and Fifth Amendments to the United States Constitution.  This court should take this opportunity to both answer the question regarding the due process rights relating to merger of offenses as well as articulate a test for uniform application of the doctrine in all state and federal courts.

A.  <u>Mr. Soto's Past and Present Charges</u>

In the instant case, Mr. Soto was originally charged with two counts in a single indictment.  Appendix B. Count I was for Involuntary Manslaughter which in this case, is an Ohio version of a felony murder rule and is a first-degree felony.  See, Ohio Rev. Code § 2903.04.   Count II was for the Ohio crime of "Endangering Children" which was categorized as a third-degree felony.  See, Ohio Rev. Code, § 2919.22

In the 2006 indictment, the underlying felony for Count I -- the involuntary manslaughter charge -- was simply Count II – The Endangering Children felony: "**Travis D. Soto** did cause the death of another … [his son] as a proximate result of committing felony Child Endangering…." App. at 3. The only difference between Count I (Involuntary Manslaughter) and Count II (Felony Child Endangering) is the result of "death" versus that of "serious physical harm" of which result death is certainly included.  There is no question in this case that Mr. Soto's verdict of guilty on Count II stands in

20

a double jeopardy relationship with Count I and a guilty verdict on felony Child Endangering precludes conviction on the felony murder version of Involuntary Manslaughter. Or, to put it another way, Mr. Soto was already punished for the Involuntary Manslaughter charge of Count I.

All the parties agree in this case that if Mr. Soto had in fact been found guilty of Count I (Involuntary Manslaughter), he would have prevailed on his claim to a double jeopardy bar to his prosecution. Relying on the Ohio Supreme Court's previous double jeopardy analysis from *State v. Thomas*, 40 Ohio St.3d 213, 216-217 (1988), the Ohio intermediate appellate court reasoned:

> While Aggravated Murder does contain the language of "prior calculation and design," which Involuntary Manslaughter does not have, the Supreme Court of Ohio has held that "[A]ggravated [M]urder with prior calculation and design, * * * is defined as [M]urder with an enhanced mental state. Thus the only distinguishing factor between R.C. 2903.01(A) [Aggravated Murder] and [I]nvoluntary [M]anslaughter is, as in the case of murder, the mental state involved." *Thomas*, 40 Ohio St.3d at 216. The Supreme Court of Ohio reasoned that "one cannot criminally cause another's death without committing an underlying felony or misdemeanor." *Id.* at 216. Put another way, under the Supreme Court of Ohio's construction that prior calculation and design is not an additional element but only an "enhancement" of the state of mind

21

required for both homicide offenses, an Aggravated Murder could not be committed without at least committing an Involuntary Manslaughter. As a result, under this construction, Involuntary Manslaughter does not contain an "element" of the offense that is not subsumed within Aggravated Murder, even if a rote matching test of language of the statute might differ.

*State v. Soto*, 2018-Ohio-459, ¶ 27 (2019) (Pet. App. at 40). The Ohio Supreme Court took no issue with this holding and restatement of the settled law of Ohio regarding the double jeopardy impact of an Involuntary Manslaughter conviction. Rather, the only dispute between the intermediate appellate court and the Ohio Supreme Court was whether jeopardy had in fact attached to the Involuntary Manslaughter charge.[5]

B. <u>Double Jeopardy and Lesser Included Offenses</u>

This Court defined the primary analysis for double jeopardy issues in the seminal case *Blockburger v. United States*, 284 US 299 (1932). However, it was not until decades later that this Court held that the

---

[5] See, *Soto*, at para 13, Pet. App. at 7:
Treating the dismissal of the involuntary-manslaughter charge as an acquittal, the [intermediate appellate] court concluded that further prosecution violated the Double Jeopardy Clauses because under the test in *Blockburger*, murder and aggravated murder constitute the same offense as involuntary manslaughter. But a dismissal is not equivalent to an acquittal.

22

federal interpretation of the Double Jeopardy Clause of the Fifth Amendment would be "incorporated" through the Fourteenth Amendment Due Process Clause. *Benton v. Maryland,* 395 U.S. 784 (1969). Since the *Benton* incorporation decision, *Blockburger* has been the constitutional analytic construct for most double jeopardy claims. *Blockburger* held:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

*Blockburger, supra* at 304.

Although *Blockburger* has generally stood the test of time, the statutory criminal law world of today is much different than it was in 1932. The proliferation of criminal laws, specialty crimes, and legislative acts reflecting momentary societal concerns combined with imprecise language and the lack of consensus regarding the meaning of words and phrases used in state and federal statutes, has made *Blockburger*'s proof requirement of "an additional fact which the other does not" often difficult to determine. One method courts employ to address this difficulty is the doctrine of merger of offenses.

In its simplest form, merger of offenses can be considered as a way of precluding certain crimes from acting as predicate offenses in felony murder cases. The most common example is that an

23

Involuntary Manslaughter charge cannot act as a predicate felony to a Felony Murder charge because each Manslaughter (which shares both act and result with Felony Murder) could then be charged by the unscrupulous prosecutor as a felony murder. In such a case, the manslaughter charge is said to "merge" with the felony murder charge, preventing the trial and punishment on the greater based on the evidence relevant only to the lesser. See, generally, Guyora Binder, *Making the Best of Felony Murder*, 91 B.U. L. Rev. 403, 519-551 (2011).

This simple example is not, however, the only time the merger doctrine has been employed. In cases in which one offense is so similar in definition, although perhaps not using the same exact language, Courts have found that one offense merges with another. For example, in *State v. Lucas*, 243 Kan, 462, 759 P.2d 90 (Kan. 1988) the defendant was charged with a felony of Child Abuse which was defined as "willfully torturing, cruelly beating. Or inflicting cruel or inhumane corporal punishment on any child under the age of 18 years.: The Supreme Court of Kansas held that this crime of felony Child Abuse was a "felony inherently dangerous to human life" and applied the following merger test:

> [W]hether the underlying or collateral felony is so distinct from the homicide as not to be an ingredient of the homicide. If the underlying felony does not meet this test it is said to merge with the homicide and preclude the application of felony murder....

*Id*. at 466.

24

As in the *Lucas* case, Mr. Soto was charged with, and pleaded guilty to, a charge of felony Endangering Children. Under Ohio law, felony Endangering Children is almost identical to the Kansas law as it defined in relevant part as a crime for anyone, vis a vis a child under the age of 18, to:

(1) Abuse the Child;
(2) Torture or cruelly abuse the child;
(3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner … under circumstances that creates a substantial risk of serious physical harm to the child….

Ohio Rev. Code § 2919.22(B)(1-3).  Mr. Soto's plea and sentence indicate that he "negotiated" to serve the maximum allowable punishment, 5 years in prison, for the third-degree felony based on either (2) or (3) above.  App at 5.

Mr. Soto's Endangering Children count was patently a lesser included of the Involuntary Manslaughter count as that felony to which he pleaded was the requisite underlying felony for the homicide charge.  Therefore, his Endangering Children guilty verdict should first be considered as related under double jeopardy to his current charges.  Further, his Endangering Children charge, for which he has been punished with significant prison time, should be considered a charge that merged with the current homicide charges as it is this underlying charge, that is the

25

basis of any theory of his current confinement.  Put in the language of *Lucas, supra*, in no arguable way is Mr. Soto's Endangering Children "underlying or collateral felony [] so distinct from the homicide as not to be an ingredient of the homicide."

This Court has yet to address the issues related to the constitutional role of the merger doctrine as applied to the broader constraints of double jeopardy concerns.  As this case presents an excellent factual opportunity to do so, *Amici* urge this Court to grant certiorari in order to fully brief, argue and address this issue.

## CONCLUSION

For the reasons stated above, *amici curiae* respectfully submit this brief in support of the Petition for Writ of Certiorari to the Ohio Supreme Court filed by Petitioner Travis Soto.

_____

Respectfully Submitted,

**Jeffrey Jude Pokorak**
*Counsel of Record, for*
*  Amici Curiae*
Supreme Court Clinic
Suffolk University
  Law School
120 Tremont Street
Boston, MA  02108-4977
(p) 617.305.1645
jpokorak@suffolk.edu

**Courtney A. Dunn**
*    Attorney at Law*
CPCS Mental Health,
Litigation Division
7 Palmer St., Suite 302
Roxbury, MA 02119
(p) 617.516.5835
clogan@publiccounsel.net

App. 1

## APPENDIX A
### List of *Amicus* Organizations

The **Public Defender Association** is a national non-profit corporation which advocates for justice system reform, developing punishment alternatives that support individual and community health.

**The Ohio Justice & Policy Center** is a public interest non-profit law firm that works for criminal justice reform in Ohio.

**California Attorneys for Criminal Justice** is a non-profit corporation and one of the largest statewide organizations of criminal defense lawyers in the country.

The **Florida Public Defender's Association, Inc.**, is a community of Public Defenders working to ensure high quality representation for people facing loss of liberty throughout Florida.

The **Georgia Association of Criminal Defense Lawyers** is a professional association of criminal advocates, which includes both public defenders and private counsel, working to improve the administration of criminal justice.

**Indiana Public Defender Council** is a judicial branch state agency which is mandated to "maintain liaison contact with . . . all branches of local, state, and federal government that will benefit criminal defense as a part of the fair administration of justice in Indiana." Ind. Code § 33-40-4-5.

App. 2

The **Michigan State Appellate Defender Office** represents poor people in Michigan when appealing their criminal convictions.

The **Minnesota Board of Public Defense** oversees the public defender system in Minnesota to ensure that all indigent clients are treated fairly and provided effective legal defense services.

The **Washington Defender Association** is a statewide non-profit organization that represents over 30 public defender agencies and has over 1,500 members throughout Washington State.

The **Ashtabula County Public Defender's Office** represents those criminally charged in pre-trial, trial and post-trial matters in Ashtabula County, Ohio.

The **Franklin County Public Defender** is a countywide agency that provides comprehensive legal representation to indigent clients in criminal proceedings in Franklin County, Ohio.

The **Law Office of the Hamilton County Public Defender** represents indigent criminal defendants on misdemeanor and felony offenses, at the trial level and on appeal, in Hamilton County, Ohio.

The **Law Office of the Public Defender, Montgomery County**, **Ohio**, provides legal representation to indigent citizens accused of criminal conduct that can result in a loss of freedom.

App. 3

**APPENDIX B**

**INDICTMENT**
Crim. Rule 6, 7

**The State of Ohio**
**Putnam County**

**COURT OF COMMON PLEAS**
**PUTNAM COUNTY GRAND**
**March 31, 2006    JURY Case No.** <u>06 CR 19</u>

**COUNT I**

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, at Putnam County, State of Ohio, **TRAVIS D. SOTO** did cause the death of another as a proximate result of the offender committing or attempting to commit a felony; to-wit: did cause the death of his son, John Doe, DOB: 11-21-2003, as a proximate result of committing felony Child Endangering in violation of Ohio Revised Code Section 2919.22(A) and (E)(1)(c), while at 5064 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2903.04(A), **INVOLUNTARY MANSLAUGHTER,** a felony of the 1st degree.

**COUNT II**

**THE JURORS OF THE GRAND JURY** of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the

App. 4

authority of the State of Ohio, do find and present on or about the 23rd day of January 2006, at Putnam County, State of Ohio, **TRAVIS** D. **SOTO** did, while being the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen (18) years of age, create a substantial risk to the health or safety of the child by violating a duty of care, protection or support, and which resulted in serious physical harm to said child: to-wit: his son, John Doe, DOB: 11-21-2003, by striking him with an ATV and/or failing to seek medical attention for said child thereafter resulting in serious physical harm to said child, while at 5064 Road 18, Continental, Putnam County, Ohio, in violation of Ohio Revised Code Section 2919.22(A) and (E)(1)(c), **CHILD ENDANGERING,** a felony of the 3rd degree.

A TRUE BILL

Office of the Prosecuting
Attorney Of Putnam
County, Ohio

/s/ Kimberly A. Schreiber

/s/ Gary L. Lammers

Grand Jury Foreperson

By:  Gary L. Lammers
Prosecuting Attorney

App. 5

## APPENDIX C

IN THE COURT OF COMMON PLEAS
OF PUTNAM COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO | CASE NO. 06 CR 19 |
| PLAINTIFF | PLEA OF GUILTY |
| VS. | |
| Travis D. Soto | Hon. <u>RANDALL L. BASINGER</u> |
| DEFENDANT | |

I withdraw my former not guilty plea and enter a plea of guilty to the following offenses:

| Count or Specification | Offense/ Specification | ORC Section | Level |
|---|---|---|---|
| II | Child Endangering | 2919.22 (A) E(1)(C) | F-3 |

**Maximum Penalty.** I understand that the maximum penalty as to each count is as follows:

| Offense/ Specification | Maximum Stated Prison Term (Yrs/Mos) | Maximum Fine | Mandatory Fine |
|---|---|---|---|
| II | 5 yrs. | $10,000 | no |

| License Suspension | Prison Term is Mandatory/ Consecutive | Prison Term is Presumed Necessary |
|---|---|---|
| no | no | no |

App. 6

Prison terms for multiple charges, even if consecutive sentences are not mandatory, may be imposed consecutively by the Court.

Court costs, restitution and other financial sanctions including fines, day fines, and reimbursement for the cost of any sanctions may also be imposed.

I understand that if I am now on felony probation, parole, under a community control sanction, or under post release control from prison, this plea may result in revocation proceedings and any new sentence could be imposed consecutively. I know any prison term stated will be served without good time credit.

**Post Release Control.**   In addition, a period of supervision by the Adult Parole Authority after release from prison is required in this case. If I am sentenced to prison for a felony I or felony sex offense, after my prison release I will have 5 years of post release control under conditions determined by the Parole Board. If I am sentenced to prison for a felony 2 or felony 3 which involved causing or threatening physical harm, I will have mandatory post release control of 3 years. If I receive prison for a felony 3, 4, or 5, I may be given up to 3 years of post release control. A violation of any post release control rule or condition can result in a more restrictive sanction while I am under post release control, and increased duration of supervision or control, up to the maximum term and reimprisonment even though I have served the entire stated prison term imposed upon me by this Court for all offenses. If I violate conditions of supervision while under post release

App. 7

control, the Parole Board could return me to prison for up to nine months for each violation, for a total of ½ of my originally stated prison term. If the violation is a new felony, I could receive a prison term of the greater of one year or the time remaining on post release control, in addition to any other prison term imposed for the offense.

**Community Control.** If this Court is not required by law to impose a prison sanction, it may impose community control sanctions or non-prison sanctions upon me. I understand that if I violate the terms or conditions of a community control sanction, the Court may extend the time for which I am subject to this sanction up to a maximum of 5 years, impose a more restrictive sanction, or imprison me for up to the maximum stated term allowed for the (offense/offenses) as set out above.

I understand the nature of these charges and the possible defenses I might have. I am satisfied with my attorney's advice and competence. I am not under the influence of drugs or alcohol. No threats have been made to me. No promises have been made except as part of this plea agreement stated entirely as follows; state silent as to sentence; Count 1 dismissed

I understand by pleading guilty I give up my right to a jury trial or court trial, where I could confront and have my attorney question witnesses against me, and where I could use the power of the court to call

App. 8

witnesses to testify for me. I know at trial I would not have to take the witness stand and could not be forced to testify against myself and that no one could comment if I chose not to testify. I understand I waive my right to have the prosecutor prove my guilt beyond a reasonable doubt on every element of each charge.

By pleading guilty I admit committing the offense and will tell the Court the facts and circumstances of my guilt. I know the judge may either sentence me today or refer my case for a presentence report. I understand my right to appeal a maximum sentence, my other limited appellate rights and that any appeal must be filed within 30 days of my sentence. I understand the consequences of a conviction upon me if I am not a U.S. Citizen. I enter this plea voluntarily.

Signed and Dated: __7/6/06____

/s/  Travis Soto_____
Signature of Defendant

/s/  [Illegible]_____
Attorney for Defendant

/s/  Gary L. Lammers_____
Prosecuting Attorney

**JUDGMENT ENTRY OF GUILTY**

The Court finds that this day the defendant, in open court, was advised of all constitutional rights and made a knowing, intelligent, and voluntary waiver of those rights pursuant to Crim. R. 11. The plea is accepted and is ordered filed. The Court finds the

App. 9

Defendant guilty of each offense to which defendant has entered this plea. It is HEREBY ORDERED that a pre-sentence report be prepared. A sentencing hearing is scheduled on _____, 2006 at _____. Bond is <u>continued</u>.

| | |
|---|---|
| 7/6/06 | /s/ Randall Basinger |
| Date | JUDGE RANDALL L. BASINGER |

cc:  PROS
     CBATES
     PROB OFF
     CUS

----

No. 19-7834

# In the Supreme Court of the United States

_____

TRAVIS SOTO,

*Petitioner,*

v.

STATE OF OHIO,

*Respondent.*

_____

*ON PETITION FOR WRIT OF CERTIORARI TO*
*THE SUPREME COURT OF OHIO*

_____

**BRIEF IN OPPOSITION**
_____

GARY L. LAMMERS
Putnam County
  Prosecuting Attorney
336 East Main Street
Ottawa, Ohio 45875

DAVE YOST
Attorney General of Ohio

BENJAMIN M. FLOWERS*
Ohio Solicitor General
 *Counsel of Record*
SHAMS H. HIRJI
Deputy Solicitor General
30 East Broad Street,
17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@
    ohioattorneygeneral.gov

*Counsel for Respondent*

**QUESTION PRESENTED**

When a charge is dismissed before trial as part of a plea agreement, does jeopardy automatically attach?

i

## LIST OF PARTIES

The Petitioner is Travis Soto.

The Respondent the State of Ohio.

ii

**LIST OF DIRECTLY RELATED PROCEEDINGS**

1.  *State v. Soto*, No. 2018-0416, Supreme Court of Ohio.  Judgment entered Oct. 31, 2019.

2.  *State v. Soto*, No. 12-17-05, Court of Appeals of Ohio for the Third Appellate District.  Judgment entered Feb. 5, 2018.

3.  *State v. Soto*, No. 2016 CR 00057, Court of Common Pleas for Putnam County, Ohio.  Judgment entered Apr. 13, 2017.

4.  *State v. Soto*, No. 2006 AP 00017, Court of Appeals of Ohio for the Third Appellate District.  Judgment entered Nov. 3, 2006.

5.  *State v. Soto*, No. 2006 CR 00019, Court of Common Pleas for Putnam County, Ohio.  Judgment entered Sept. 5, 2006.

iii

# TABLE OF CONTENTS

QUESTION PRESENTED ......................................................................... i

LIST OF PARTIES ................................................................................. ii

LIST OF DIRECTLY RELATED PROCEEDINGS ................................... iii

TABLE OF CONTENTS ......................................................................... iv

TABLE OF AUTHORITIES .................................................................... v

INTRODUCTION ................................................................................. 1

JURISDICTION .................................................................................... 3

STATEMENT ....................................................................................... 3

REASONS FOR DENYING THE WRIT ................................................... 5

    I.     There is no circuit split on the question actually presented in this
          case. .................................................................................................. 5

        A.    No circuit holds that jeopardy attaches to a charge merely because
              it was dismissed pursuant to a plea agreement. ..................................... 6

        B.    The split concerning whether jeopardy attaches to charges
              dismissed *with prejudice* would not be worthy of this Court's
              attention even if this case presented it. ................................................ 9

    II.    Soto and the *amici*'s policy argument is misguided. ................................ 14

    III.   The Court should decline the *amici*'s invitation to resolve an issue
           neither pressed nor passed upon below. ................................................. 15

CONCLUSION .................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Blockburger v. United States,*
   284 U.S. 299 (1932) ................................................................ 4

*Bullington v. Missouri,*
   451 U.S. 430 (1981) ................................................................ 3

*Cutter v. Wilkinson,*
   544 U.S. 709 (2005) ............................................................... 16

*Haynes v. Williams,*
   88 F.3d 898 (10th Cir. 1996) .............................................. 11

*Kepner v. United States,*
   195 U.S. 100 (1904) ................................................................ 6

*People v. Mezy,*
   453 Mich. 269 ......................................................................... 9

*Serfass v. United States,*
   420 U.S. 377 (1975) ...................................................... 6, 7, 11

*Smalis v. Pennsylvania,*
   476 U.S. 140 (1986) ................................................................ 3

*State v. Raber,*
   134 Ohio St. 3d 350 (2012) .................................................. 8

*United States v. Angilau,*
   717 F.3d 781 (10th Cir. 2013) ............................................ 13

*United States v. Derr,*
   726 F.2d 617 (10th Cir. 1984) ...................................... 10, 11

*United States v. Dionisio,*
   415 F. Supp. 2d 191 (E.D.N.Y. 2006) ............................ 12, 13

*United States v. Dionisio,*
   503 F.3d 78 (2d Cir. 2007) ................................................ 9, 13

*United States v. Faulkner,*
   793 F.3d 752 (7th Cir. 2015) ............................................... 7

v

*United States v. Garner,*
    32 F.3d 1305 (8th Cir. 1994) .................................................................................... 8

*United States v. Green,*
    139 F.3d 1002 (4th Cir. 1998) .................................................................................. 8

*United States v. Holland,*
    956 F.2d 990 (10th Cir. 1992) ............................................................................ 10, 11

*United States v. King,*
    581 F.2d 800 (10th Cir. 1978) .................................................................................. 11

*United States v. La Cock,*
    366 F.3d 883 (10th Cir. 2004) ............................................................................ 12, 13

*United States v. Marchese,*
    46 F.3d 1020 (10th Cir. 1995) ...................................................................... 11, 12, 13

*United States v. Mintz,*
    16 F.3d 1101 (10th Cir. 1994) ..........................................................................*passim*

*United States v. Nyhuis,*
    8 F.3d 731 (11th Cir. 1993) ...................................................................................... 8

*United States v. Soto-Alvarez,*
    958 F.2d 473 (1st Cir. 1992) .................................................................................... 8

*United States v. Vaughan,*
    715 F.2d 1373 (9th Cir. 1983) .................................................................................. 9

*Wade v. Hunter,*
    336 U.S. 684 (1949) ................................................................................................ 6

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. V ...................................................................................................... 1

28 U.S.C. §1257 .............................................................................................................. 3

Fed. R. Crim. P. 48 ........................................................................................................ 11

# INTRODUCTION

The Double Jeopardy Clause provides that "[n]o person shall … be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  This language prohibits putting someone *twice* in jeopardy for the same offense.  And that raises the following question:  At what point in a criminal proceeding is someone put in jeopardy?  For over a century, this Court has articulated rules and standards that help state and federal courts answer that question in any given case.  But Soto claims that the courts are now divided over an answer to the question as it arises in a particular situation.  According to him, courts are split regarding whether jeopardy attaches when the government dismisses a charge against a defendant, before trial, as part of a negotiated plea agreement.  And Soto asks the Court to grant *certiorari* to resolve this supposed split.

The Court should decline to do so.  The courts are not split on the question, at least not in any manner presented by this case.  No court, state or federal, holds that jeopardy automatically attaches to a charge dismissed before trial, merely because it was dismissed as part of a negotiated plea agreement.  And the *only* question this case presents is whether jeopardy attached *automatically*; Soto failed to incorporate the record of his first prosecution into the record of this case, so there is no way to know whether facts specific to his circumstances mean jeopardy attached.  Thus, the only way to rule for Soto and reverse the Supreme Court of Ohio is to adopt the rule that Soto proposes, which is also a rule no other court has ever adopted:  that jeopardy *always* attaches when a charged crime is dismissed as part of a negotiated plea agreement.  Said differently, this case does not implicate the

split Soto has identified.  Happily for Soto, this cases arises in an interlocutory pos-
ture.  Pet.App.5.  That means he can introduce evidence about the circumstances of
his plea agreement on remand, and come back to this Court if and when his case
more clearly implicates the question presented.

There is, to be sure, a split lurking in the background.  In particular, courts
are divided over whether jeopardy automatically attaches to a charge dismissed
*with prejudice*.  But that is not the issue in this case for the simple reason that the
charge here was not dismissed with prejudice.  At least, there is no evidence in the
record, and Soto does not argue, that it was.  And *even if* the charge was dismissed
with prejudice and the issue were properly before this Court, the question presented
*still* would not be worthy of this Court's attention.  That is because the disagree-
ment arises from one Tenth Circuit case that itself flouted earlier Tenth Circuit
precedent and that the Tenth Circuit may not (and should not) regard as binding.
One outlier decision from the Tenth Circuit does not give rise to the sort of circuit
split that cries out for resolution—at least not in a petition, like this one, from out-
side the Tenth Circuit.

It is also true that some courts employ a fact-based approach in analyzing
whether jeopardy attaches to a charge dismissed in a plea agreement and that oth-
ers, including the court below, hold categorically that jeopardy *does not* attach.  But
even if the Court were inclined to resolve that disagreement, it should wait for a
case where it could conceivably engage in that fact-based inquiry.  It cannot do that
here given the deficiencies in the record.

2

The Court should deny the petition for a writ of *certiorari*.

## JURISDICTION

The Court has jurisdiction over this case under 28 U.S.C. § 1257(a).  *See Bullington v. Missouri*, 451 U.S. 430, 437 n.8 (1981); *accord Smalis v. Pennsylvania*, 476 U.S. 140, 143 n.4 (1986).

## STATEMENT

Travis Soto killed his son, a toddler.  App.3.  At first, Soto told the police that he accidentally caused the boy's death while driving an ATV.  The State's coroner accepted that claim, and the State later indicted Soto for child endangerment and involuntary manslaughter.  In exchange for Soto's pleading guilty to the child-endangerment charge, the State agreed to drop the involuntary-manslaughter charge.  App.3-4.

About a decade later, Soto voluntarily appeared at the Putnam County Sheriff's Office and came clean:  his story about the ATV accident was a lie, and Soto in fact pummeled his son to death.  App.4.  After reviewing photos from the incident and the original coroner's report, a pediatric-abuse specialist determined that Soto was telling the truth this time.  The specialist noted, for example, that the boy did not have injuries that one would expect from an ATV accident.  The specialist concluded that Soto's earlier lies had led the coroner astray.  The boy had died from multiple blunt force trauma inflicted by his father.  App.4, 30.

So, once again, the State indicted Soto.  This time, the State charged Soto with, among other offenses, murder and aggravated murder.  Soto moved to dismiss both murder charges under the Double Jeopardy Clause.  He argued that involun-

3

tary-manslaughter—the crime with which he had been charged in his first case but which the government dropped in the plea deal—was a lesser-included offense of murder and aggravated murder. As such, Soto argued, the State would "twice" be putting him "in jeopardy of life or limb" if it prosecuted him for the more serious charges. App.4.

The trial court denied the motion. As relevant here, it concluded that involuntary manslaughter was not the "same offense" as murder or aggravated murder under the "same elements" test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932). App.5.

**2.** The state court of appeals reversed. A two-judge majority determined that involuntary manslaughter *was* a lesser-included offense of aggravated murder and murder. Because the charge had been dropped only in exchange for Soto's guilty plea, the majority reasoned, Soto had been in "jeopardy of being tried and convicted" of involuntary manslaughter. To the majority, "it seem[ed] that a subsequent prosecution would be barred in these circumstances." App.37. Judge Zimmerman dissented. He did not take a position on the *Blockburger* issue. He did not need to because, in his view, the involuntary-manslaughter charge had been dropped "*before jeopardy attached* (i.e. prior to swearing a jury or swearing in the first witness)." App.45. Accordingly, the new charges put Soto in jeopardy for the first time, not the second.

**3.** The Ohio Supreme Court reversed 6 to 1, agreeing with Judge Zimmerman's dissenting opinion in the process. App.11. Writing for the majority, Justice

4

DeWine explained that the Ohio Supreme Court had understood the bar on double jeopardy "to protect against … a second prosecution from the same offense after acquittal." Pet.App.6 (internal quotations omitted).  But the State had not violated the prohibition on such prosecutions.  "Because the involuntary-manslaughter charge was dismissed under [Soto's] plea agreement, Soto was never tried for involuntary manslaughter nor was he convicted of or punished for that crime."  In holding otherwise, the court of appeals had "ignored the principle that a dismissal entered before jeopardy attaches does not function as an acquittal and does not prevent further prosecution for the offense." App.7.

Writing in dissent, Justice Donnelly concluded that jeopardy *had* attached to the involuntary-manslaughter charge.  According to Justice Donnelly, "[b]ut for the state's agreement to drop the involuntary-manslaughter charge, Soto unquestionably faced the risk of a determination of guilt."  Thus, in "[a]ccepting Soto's plea," it followed that "the trial court" had "conclusively determined" Soto's "criminal culpability for purposes of double jeopardy."  App.20.  Justice Donnelly also concluded that involuntary manslaughter was a lesser included offense of murder and aggravated murder.  Accordingly, he would have held that double jeopardy barred the State from prosecuting Soto for murder or aggravated murder.  App.24–25.

## REASONS FOR DENYING THE WRIT

### I.   There is no circuit split on the question actually presented in this case.

The Court should deny the petition because neither the federal courts of appeals nor state supreme courts disagree on the question that is actually present-

5

ed in this case:  whether jeopardy automatically attaches to the dismissal of a charge before trial merely because it was dismissed as part of a plea agreement.

### A.   No circuit holds that jeopardy attaches to a charge merely because it was dismissed pursuant to a plea agreement.

**1.**  An "accused must suffer jeopardy before he can suffer double jeopardy." *Serfass v. United States*, 420 U.S. 377, 393 (1975).  But *when* does jeopardy "attach" in the first place?  The general rule is that jeopardy attaches at the "point in criminal proceedings at which the constitutional purposes and policies are implicated." *Id*. at 388.  Over the years, this Court has offered a substantial amount of guidance regarding what that means in particular contexts.  The Court has long recognized, for example, that jeopardy attaches in a jury trial at the time that the jury is empaneled and sworn.  *Kepner v. United States*, 195 U.S. 100, 128 (1904).  And in bench trials, it attaches when the judge begins to hear evidence.  *See Wade v. Hunter*, 336 U.S. 684, 688 (1949).

The Court has also addressed *pretrial* attachments of jeopardy.  Thus, in *Serfass*, the Court held that jeopardy had not attached to a pretrial dismissal of an indictment even though the dismissal had relied on "evidentiary acts outside of the indictment, [that] could constitute a defense on the merits at trial."  420 U.S. at 390 (internal quotation omitted).  The Court explained that jeopardy does not attach before a defendant is "put to trial before the trier of facts."  *Id*. at 389 (internal quotation omitted).  Under the circumstances in *Serfass*, "the District Court was without power to make any determination regarding petitioner's guilt or innocence."  *Id*.

6

And that defeated the petitioner's claim because, "[w]ithout risk of a determination of guilt, jeopardy does not attach." *Id.* at 391–92.

2.  *Serfass* provides the lodestar for analyzing whether jeopardy attaches to pretrial dismissals.  This case deals with one of type of pretrial dismissal:  the dismissal of a charge as part of a negotiated plea agreement.  Does jeopardy attach to such a dismissal?  Soto is right that this Court has "not yet resolved" that question.  Pet.19–20.  But he is wrong to say that the question has "produced a split amongst this country's federal and state judiciary."  Pet.i.  True, the circuits are split on whether "jeopardy … attach[e]s to charges dismissed *with prejudice* pursuant to a plea agreement."  *United States v. Faulkner*, 793 F.3d 752, 758 (7th Cir. 2015) (emphasis added) (stating that "[t]his is an unsettled proposition").  But Soto has a problem:  *that* question—whether jeopardy attaches to a charge dismissed *with prejudice*—is not presented in this case.   Everyone agrees that the State dropped Soto's involuntary-manslaughter charge in exchange for his guilty plea on the child-endangerment charge.  *See* Pet.5–6.  But nobody knows much else about Soto's original plea.  Soto explained why in his petition:  "the record in this matter does not include the record of Soto's [earlier] prosecution."  Pet.5 n.1.  As a result, the record in this case does not contain Soto's plea agreement or the transcripts of the sentencing hearings from his first prosecution.  App.11, 22 n.8.  So no one can say whether the involuntary-manslaughter charge was dismissed with prejudice.

Even if the record of the earlier prosecution had been incorporated into this case, it likely would not say whether the charges were dismissed with prejudice.

7

After all, Soto contended below "that the judgment entries and transcripts from [his earlier prosecution] did not address whether the matter would be dismissed with or without prejudice."  App.30.  If anything, the "presumption of regularity" that attaches to all judicial proceedings in Ohio requires presuming that the charges were dismissed *without* prejudice.  *State v. Raber*, 134 Ohio St. 3d 350, 355 (2012).  As Judge Zimmerman explained in his dissent in the court of appeals, the presumption of regularity requires presuming that the State dismissed the charges by entering a *nolle prosequi*.  App.45. (Zimmerman, J., dissenting).  And a "*nolle prosequi* dismisses the charge without prejudice to reindictment."  App.45 (citing *State v. Bonarrigo*, 62 Ohio St.2d 7, 12 (1980)).

All of this should doom Soto's petition.  Because so little is known about the dismissal in this case, Soto can obtain relief only by asking this Court to adopt the following categorical rule:  jeopardy *automatically* "attach[es] to … charges dismissed during execution of a negotiated plea agreement."  Pet.19.  But neither the federal courts of appeals nor state supreme courts are divided on this issue.

On the contrary, several courts (including the Ohio Supreme Court) categorically hold that jeopardy does *not* attach to such dismissals.  *See, e.g.*, App.8; *United States v. Green*, 139 F.3d 1002, 1004 (4th Cir. 1998); *United States v. Nyhuis*, 8 F.3d 731, 735 n.2 (11th Cir. 1993); *United States v. Soto-Alvarez*, 958 F.2d 473, 482 n.7 (1st Cir. 1992).  And at least one has held as much for a charge that was dismissed *with prejudice*.  *See United States v. Garner,* 32 F.3d 1305, 1311 n.6 (8th Cir. 1994).  Other courts apply more of a fact-based approach.  These courts ask

8

"whether the defendant faced the risk of a determination of guilt" before deciding whether jeopardy attached to such a dismissal.  *United States v. Dionisio*, 503 F.3d 78, 83 (2d Cir. 2007); *People v. Mezy*, 453 Mich. 269, 276 n.9; *United States v. Vaughan*, 715 F.2d 1373, 1376–77 (9th Cir. 1983).  And only one circuit *arguably* (more on that below) holds that jeopardy *automatically* attaches to charges dismissed with prejudice.  *See United States v. Mintz*, 16 F.3d 1101, 1103, 1106 (10th Cir. 1994).

Regardless of which approach is correct, *no* federal court of appeals or state supreme court holds that jeopardy attaches merely because a charge was dropped pursuant to a plea agreement.  Yet that is the only issue that is truly before this Court, because the Court would need to adopt such a rule to grant Soto any relief.  If the Court adopts a categorical rule against jeopardy's attachment, as the Ohio Supreme Court did below, Soto loses.  If the Court adopts the fact-intensive approach, Soto still loses because the "record does not contain any facts surrounding the defendant-appellant's original plea."  App.44 (Zimmerman, J., dissenting).  Finally, if the Court holds that jeopardy automatically attaches to charges dismissed with prejudice, *see Mintz*, 16 F.3d at 1103, 1106, Soto loses because there is no evidence his charge *was* dismissed with prejudice.  Soto thus seeks what amounts to an advisory opinion on the Double Jeopardy Clause's meaning.

> **B.** **The split concerning whether jeopardy attaches to charges dismissed *with prejudice* would not be worthy of this Court's attention even if this case presented it.**

Soto realizes that, to have a realistic chance at obtaining a writ of *certiorari*, he needs to identify a circuit split on the question presented.  In attempting to iden-

tify one, he points to the Tenth Circuit's decision in *Mintz*.  *See* Pet.14–15.  Because *Mintz* addressed only a question not presented here—whether jeopardy attaches to charges dismissed *with* prejudice, 16 F.3d at 1106—any split created by that decision is not presented here.

But assume for the sake of argument that Soto's charge was dismissed with prejudice.  This case would still not implicate a genuine circuit split—at least not one worthy of this Court's attention.  Why?  Because *Mintz* is an outlier case; no other state supreme court or appellate court has embraced its reasoning, and even the Tenth Circuit can, and apparently does, treat *Mintz* as non-binding.

1.  To understand *Mintz*'s outlier status, it is worth saying a bit about how the case came to be.  In *Mintz*, the Tenth Circuit held that double jeopardy barred the government from prosecuting a defendant for a conspiracy.  It determined that jeopardy had already attached when the government dismissed an earlier conspiracy charge (for the same conspiracy) against the defendants as part of a plea agreement.  *Id.* at 1106.  In reaching that decision, the court relied on a parenthetical cite to *United States v. Holland*, 956 F.2d 990 (10th Cir. 1992)—a case that did not even involve a plea agreement.  *Mintz* noted that, in *Holland*, jeopardy had "attached to [a] conspiracy count which had been dismissed with prejudice."  *Id.* at 1103.  *Holland*, in concluding that jeopardy had attached to the dismissal of a charge with prejudice, had relied exclusively on *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984).  *Holland*, 956 F.2d at 993.  And *that* is the root of the problem.  *Derr* had nothing to do with double-jeopardy principles.  *Derr* held that it was "appropriate"

to dismiss a second indictment charging the defendant with the same criminal conduct that a first indictment had charged. 726 F.2d at 619. But *Derr* deemed the dismissal appropriate not because of double-jeopardy concerns, but because the dismissal constituted a proper application of the court's authority to prevent prosecutorial harassment of defendants, the primary purpose of Rule 48(a) of the Federal Rules of Criminal Procedure. *Id.* Nowhere did *Derr* hold (or even suggest) that jeopardy attaches to a charge dismissed with prejudice. Yet *Holland* relied on *Derr* for that exact proposition, and *Mintz* relied on *Holland* for the same.

*Mintz*'s holding, far from adhering to Tenth Circuit precedented, flouted it. More than a decade before *Mintz* or *Holland*, the Tenth Circuit had read *Serfass* to mean "that the double jeopardy clause is not implicated until a proceeding commences before the trier of fact having jurisdiction to try the question of the guilt or innocence of the accused." *United States v. King*, 581 F.2d 800, 801 (10th Cir. 1978). Under this rule, double jeopardy did not attach based on charges dismissed "before the trier of fact commenced to take evidence." *Id.* at 801.

Because *Mintz* contradicts earlier binding precedent, later Tenth Circuit panels are free to disregard its holding. This follows from the well-established rule that "when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom." *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996).

Later Tenth Circuit panels have cast serious doubt on whether *Mintz* remains good law. Take, for example, *United States v. Marchese*, 46 F.3d 1020 (10th

11

Cir. 1995).  There, the district court had dismissed a thirty-four-count indictment upon the defendants' pre-trial motion.  *Id.* at 1021.  The defendants then argued that the government's appeal of that decision was "improper because any retrial would constitute a violation of the Double Jeopardy Clause."  *Id.* at 1022.  The Tenth Circuit rejected that argument, reasoning that the defendants were "not then, nor have they ever been, put to trial before the trier of facts."  *Id.* (quoting *Serfass v. United States*, 420 U.S. 377, 389 (1975) (alterations omitted).  "Without a risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy."  *Id.*  (quoting *Serfass*, 420 U.S. at 391–92).  The court then explained that, "[i]n a nonjury trial," "jeopardy does not attach until the court begins to hear evidence from which a factual determination of guilt or innocence can be made."  *Id.* (citing *Serfass*, 420 U.S. at 388).  Because the defendants' motion "did not constitute the presentation of evidence for the purpose of determining guilt or innocence," the court held, "jeopardy did not attach" to the dismissal.  *Id.* at 1023; *see also United States v. La Cock*, 366 F.3d 883, 887 n.8 (10th Cir. 2004) (holding that jeopardy had not attached to a dismissed charge before trial because "the district court could not have decided Defendant's innocence or guilt").

In light of these decisions holding that jeopardy does not attach until the court begins to hear evidence based on which guilt or innocence can be found, *Mintz* is best regarded "as an aberrance in Tenth Circuit law."  *United States v. Dionisio*, 415 F. Supp. 2d 191, 197 (E.D.N.Y. 2006).  An "aberrance" indeed.  To date, no panel

of the Tenth Circuit (or any circuit, for that matter) has relied on *Mintz* to hold that jeopardy attaches to dismissals with prejudice. Like *Marchese* and *La Cock*, they have either ignored *Mintz*, or they have avoided the double-jeopardy issue altogether. In *United States v. Angilau*, 717 F.3d 781 (10th Cir. 2013), for example, the court acknowledged that "*Mintz* [] stated, without discussion," that jeopardy attaches to a pre-trial dismissal of a charge with prejudice. 717 F.3d at 787 n.1. The government even "conceded the point on appeal." *Id.* But the Tenth Circuit observed that "*Mintz* appear[ed] to be in tension with" other decisions of the court, "both earlier … and later." *Id.* (citing *King*, 581 F.2d 801 and *Marchese*, 46 F.3d at 1022–23). So, the court avoided *Mintz*, and determined that the defendant's claim failed for an independent reason "even assuming" *Mintz* applied. *Id.* Courts in the Second Circuit have gone further and outright rejected *Mintz*. *See*, *e.g.*, *United States v. Dionisio*, 415 F. Supp. 2d 191, 196–97 (E.D.N.Y. 2006); *United States v. Dionisio*, 503 F.3d 78, 88 n.11 (2d Cir. 2007).

The bottom line is this: *Mintz* does not create a circuit split over the question actually presented in this case because the charge here was not dismissed with prejudice. And even if the earlier charge had been dismissed with prejudice, resolving the *Mintz*-created split would not be a good use of this Court's time. *Mintz* is regarded with skepticism even within the Tenth Circuit, and is probably best understood as non-binding even within the circuit. Until the Tenth Circuit holds that *Mintz* is binding—or until some other federal court of appeals or state supreme court adopts *Mintz*'s rule—there is no split worthy of this Court's attention.

13

**II.    Soto and the *amici*'s policy argument is misguided.**

Soto and the *amici* also offer a policy argument for why the Court should grant *certiorari* in this case.  They recount familiar history about how the vast majority of convictions in this country eventually came to be disposed of by guilty pleas.  Neither laments this trend, however.  Soto acknowledges that, "[w]ithout guilty pleas, the criminal justice system could not function."  Pet.30.  Likewise, the *amici* acknowledge that "negotiated pleas properly administered can benefit all concerned." Am.Br.17 (internal quotation and alterations omitted).

But Soto argues that, without a rule like the kind he proposes, "there is no legal principle preventing reindictment of every crime ever dismissed during the execution of a plea agreement save for perhaps the statute of limitations."  Pet.31.  The *amici* make a similar point in arguing that, "without according a great measure of finality to plea agreements all the players within the system are at a disadvantage." Am.Br.17 (internal quotation and alterations omitted).  The same concern drove the court of appeals' analysis below.  The majority reasoned, for example, that "the State could routinely negotiate a plea agreement wherein it would dismiss the most serious charge and later, after a defendant served his sentence thinking the matter had concluded, re-indict, try, convict, and sentence him on the greater offense."  App.38.  And Justice Donnelly echoed the same sentiment in his dissent: "Under the majority's conclusion, no plea bargain is necessarily conclusive and any plea agreement can be negated with new information. To accept this position is to declare that a plea agreement is not worth the paper it is journalized on."  App.24.

14

None of these concerns is justified.  Each fails to appreciate that a plea agreement is essentially a contract.  And the Supreme Court of Ohio succinctly explained what follows from the contractual nature of plea agreements: "Separate and apart from the constitutional protections provided by the double-jeopardy provisions, a plea agreement may bar further charges based on principles of contract law."  App.9 (citing *State v. Dye*, 127 Ohio St.3d 357, 361 (2010)). "The underlying premise is that when a plea rests on a promise made by the prosecutor, that promise must be fulfilled."  *Id.*  (citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)). Thus, defendants can avoid being prosecuted again on a dismissed charge by demanding freedom from future charges as a condition of pleading guilty.

In any event, the resolution of this case must be guided by law, not policy. And, as explained above (and in the Supreme Court of Ohio's decision below), the law stands squarely against Travis Soto.

### III. The Court should decline the *amici*'s invitation to resolve an issue neither pressed nor passed upon below.

The *amici* supporting Soto invite this Court to address an issue that was neither briefed by any of the parties nor passed on by any of the courts below.  Essentially, the *amici* ask this Court to constitutionalize the doctrine of "merger of offenses" through the Double Jeopardy Clause of the Fifth Amendment and incorporate it against the States through the Fourteenth Amendment. Am.Br.3.  The *amici* argue that, under the doctrine, the child-endangering charge Soto pleaded guilty to in his original indictment "should be considered … merged with the current homicide charges" against him. Am.Br.24.  The *amici* say this follows from the fact that the

15

child-endangering charge forms "the basis of any theory of his current confinement." Am.Br.24–25. There are many problems with this argument, but the State will limit its discussion to one, which turns out to be dispositive: the issue was neither pressed nor passed upon below. This is a "court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). Absent a compelling reason, the Court should not review an issue that no party has briefed and no court addressed below. Here, there is no compelling reason to reach the *amici*'s issue.

## CONCLUSION

The Court should deny Soto's petition for a writ of certiorari.

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

/s/ Benjamin M. Flowers
BENJAMIN M. FLOWERS*
Ohio Solicitor General
 *Counsel of Record*
SHAMS H. HIRJI
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioattorneygeneral.gov

GARY L. LAMMERS
Putnam County
 Prosecuting Attorney
336 East Main Street
Ottawa, Ohio 45875

16

No. 19-7834

IN THE
SUPREME COURT OF THE UNITED STATES
_____

Travis Soto, Petitioner

v.

The State of Ohio, Respondent

On petition for a writ of certiorari to the Supreme Court of Ohio

**REPLY BRIEF IN SUPPORT OF PETITION FOR A WRIT OF CERTIORARI**

Louis E. Grube, Esq.
*Counsel of Record*
Paul W. Flowers, Esq.
**Paul W. Flowers Co., L.P.A.**
50 Public Square, Suite 1910
Cleveland, Ohio 44113
(216) 344-9393
leg@pwfco.com

*Attorneys for Petitioner,*
*Travis Soto*

Carly M. Edelstein, Esq.
Assistant State Public Defender
**Office of the Ohio Public Defender**

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... i

ARGUMENT ............................................................................................................. 1

I.     RESPONDENT STATE OF OHIO'S PROCESS COMPLAINTS MISS THE MARK ................................................................................................. 2

     A.    THERE IS NO MEANINGFUL DISAGREEMENT ABOUT THE FACTS OF THE PRIOR PROSECUTION............................................ 2

     B.    RESPONDENT SOTO WILL NOT BE ABLE TO MOUNT A SECOND CHALLENGE TO THE RULING ON ATTACHMENT OF JEOPARDY IN THE TRIAL COURT ............................................ 3

II.    THE UNDISPUTED CIRCUIT SPLIT ................................................... 5

III.   PREJUDICE IS NOT A FACET OF DOUBLE JEOPARDY......................... 7

IV.   RESPONDENT'S POLICY VIEWS ARE MISGUIDED ................................ 9

CONCLUSION........................................................................................................ 12

# TABLE OF AUTHORITIES

CASES

*Cuffle v. Avenenti,*
  498 U.S. 996 (1990) ........................................................................................4

*Green v. United States,*
  355 U.S. 184 (1957) ....................................................................................8, 10

*Lafler v. Cooper,*
  566 U.S. 156 (2012) ...................................................................................1, 7, 11

*Lawrence v. Chater,*
  516 U.S. 163 (1996) ........................................................................................4

*Martinez v. Illinois,*
  572 U.S. 833 (2014) ........................................................................................9

i

*Missouri v. Frye,*
   566 U.S. 134 (2012) ........................................................................... 1, 7, 11

*Nolan v. Nolan,*
   11 Ohio St.3d 1, 462 N.E.2d 410 (1984) ...................................... 4

*People v. Holz,*
   No. 33, 2020 WL 2200365 (N.Y. May 7, 2020) ........................ 6, 8

*Serfass v. United States,*
   420 U.S. 377 (1975) ........................................................................ 9, 11

*State ex rel. Crandall, Pheils & Wisniewski v. DeCessna,*
   73 Ohio St.3d 180, 652 N.E.2d 742 (1995) ................................ 4

*State v. Ammons,*
   9th Dist. Summit No. 28675, 2019-Ohio-286 ......................... 10

*State v. Anderson,*
   8th Dist. Cuyahoga No. 106304, 2018-Ohio-3051 .................... 10

*State v. Anderson,*
   138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23 .................... 10

*State v. Brooke,*
   113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024 ............ 3

*State v. Carpenter,*
   68 Ohio St.3d 59, 623 N.E.2d 66 (1993) ............................... 7, 11

*United States v. Angilau,*
   717 F.3d 781 (10th Cir. 2013) ..................................................... 6

*United States v. Brown,*
   425 F.3d 681 (9th Cir. 2005) ........................................................ 7

*United States v. Faulkner,*
   793 F.3d 752 (7th Cir. 2015) ........................................................ 6

*United States v. La Cock,*
   366 F.3d 883 (10th Cir. 2004) ................................................... 5, 6

*United States v. Marchese,*
   46 F.3d 1020 (10th Cir. 1995) .................................................. 5, 6

ii

*United States v. Mintz,*
   16 F.3d 1101 (10th Cir. 1994) ..................................................................5, 6

*United States v. Nissen*,
   2020 WL 1929526 (D.N.M. Apr. 21, 2020) ..................................................6

CONSTITUTIONAL PROVISIONS

Fifth Amendment to the United States Constitution ........................................*passim*

Sixth Amendment to the United States Constitution ................................................11

RULE

Fed. R. App. P. 35(a)(1)...............................................................................................6

Fed. R. Crim. P. 11(b)(1)..............................................................................................9

Ohio Crim. R. 11(C)(2)(c).............................................................................................9

iii

## ARGUMENT

In this period of our national history, which has busied the court system with foundational questions regarding the relationship between the different branches of government, Petitioner Travis Soto ("Soto") has asked this Court to answer a fundamental question regarding the relationship between *the people* and their government. This Court should answer the question presented not because of the importance or authority of the specific individuals involved. Rather, this appeal is nationally important because an answer to the question presented would define the rights of every citizen against their government and affect most criminal convictions that have already been rendered or will be achieved in the future. At its most basic, the question that should be answered by this Court is whether a deal is truly a deal when made between defendants and prosecutors.

The State of Ohio ("State") concedes the existence of a split between the United States courts of appeals. The State does not quarrel with the broad potential impact of a decision answering whether the rights preserved by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution attach to charges dismissed during execution of a negotiated plea agreement that avoids a jury trial. Indeed, it has been conceded that there is no such rule to be found in this Court's jurisprudence despite that our criminal justice system is "for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012); *see also Missouri v. Frye*, 566 U.S. 134, 144 (2012) ("In today's criminal justice system, therefore, the negotiation of a plea bargain, rather than the unfolding of a trial, is

1

almost always the critical point for a defendant."). While recognizing that this appeal presents a question worthy of this Court's time, the State attempts to construct technical roadblocks to reviewing *this* case. But because the technical reasons the State claims review is unwarranted are unfounded, this Court should reject them and grant the requested writ of certiorari.

## I.  RESPONDENT STATE OF OHIO'S PROCESS COMPLAINTS MISS THE MARK

### A.  THERE IS NO MEANINGFUL DISAGREEMENT ABOUT THE FACTS OF THE PRIOR PROSECUTION

Despite crying foul about the adequacy of the record before this Court, Respondent State of Ohio has not identified a single fact that is the subject of any disagreement at all. *Brief in Opposition of Respondent State of Ohio docketed May 26, 2020 ("Opp. Brief"), pp. 7-9.* The State recounted the facts in a statement that parallels the statement of Petitioner Soto. *Compare Opp. Brief, pp. 3-4, with Petition for a Writ of Certiorari of Petitioner Travis Soto docketed February 27, 2020 ("Petition"), pp. 5-7.* And there has never been any disagreement about the facts during earlier litigation. *See App. 3-4, 29-30, 47-49.*

Although the State agrees with Soto that the judgment entries issued by the trial court in 2006 do not address whether the dismissal was with or without prejudice, it is vehemently argued that the dismissal must have been without prejudice as a matter of law due to the presumption of regularity. *Opp. Brief, p. 8.* It

2

is remarkable that the State argues for the first time to this Court that a judge's statement as to the preclusive effect of a dismissal could be dispositive of the constitutional question because there was certainly no such argument offered during the State's appeal to the Supreme Court of Ohio.  *Merit Brief of Appellant State of Ohio filed July 3, 2018, pp. 1-15.*[1]  In any case, the parties agree that there was no answer as to prejudice to be found in the journal entries issued during the first criminal proceeding against Soto.  And an Ohio court "speaks," if at all, "through its journal entries."  *E.g., State v. Brooke*, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, ¶ 47.  If prejudice does ultimately matter to this Court's constitutional analysis, the preclusive effect of the 2006 judgment under Ohio law may be determined by a lower court on remand based upon the silent entries.  Thus, the State has entirely failed to identify what else is needed or could be provided in the record to oppose this appeal during a merits review of the constitutional question.

B.    RESPONDENT SOTO WILL NOT BE ABLE TO MOUNT A SECOND CHALLENGE TO THE RULING ON ATTACHMENT OF JEOPARDY IN THE TRIAL COURT

The State falsely casts this appeal as preemptive.  Due to the "interlocutory posture" of the proceeding, the State argues that Soto "can introduce evidence about

---

[1] available online at:

http://supremecourt.ohio.gov/pdf_viewer/pdf_viewer.aspx?pdf=848906.pdf

3

the circumstances of his plea agreement on remand, and come back to this Court if and when his case more clearly implicates the question presented." *Opp. Brief, pp. 2.* To the contrary, Ohio courts strictly apply the law-of-the-case doctrine and its "mandate rule." Accordingly, the "decision" of the Supreme Court of Ohio in Soto's case "remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984). This is because the "Ohio Constitution does not give a court of common pleas jurisdiction to review a prior mandate of a court of appeals." *State ex rel. Crandall, Pheils & Wisniewski v. DeCessna*, 73 Ohio St.3d 180, 182, 652 N.E.2d 742 (1995). For these reasons, the Putnam County Court of Common Pleas will be bound by the decision of the Supreme Court of Ohio holding: "jeopardy attached—but only as to the child-endangering charge to which [Soto] pleaded guilty and not as to the dismissed involuntary-manslaughter charge." *App. 8.* And the trial court will be limited to conducting "further proceedings consistent with this opinion." *App. 11.*

Under these rules, there will be no fact finding in the trial court in aid of the constitutional question of attachment of jeopardy without further action by this Court. The State's entirely new argument that there is a need to supplement the record to determine the constitutional question is, if anything, a concession that this Court should at least grant certiorari, vacate the judgment below, and remand the matter for the record to be supplemented. *Lawrence v. Chater*, 516 U.S. 163, 166-68 (1996); *see Cuffle v. Avenenti*, 498 U.S. 996 (1990). Perhaps more importantly, this

4

Court could simply remand for further fact-finding in the trial court, if that becomes necessary, after pronouncing a new rule in response to a question of first impression. *Opp. Brief, p. 7* (agreeing that this Court has never resolved the question presented). That the Supreme Court of Ohio accepted the State's appeal even without the record that the State now claims it needs actually reflects that the lower courts could benefit from this Court's guidance on how to answer the constitutional question.

## II.     THE UNDISPUTED CIRCUIT SPLIT

The State agrees that there is a split among the United States courts of appeals over the question of attachment of jeopardy in the negotiated plea context. *Opp. Brief, p. 2.* The State instead grasps for a way to undermine the importance of the very real split. It is suggested that *United States v. Mintz*, 16 F.3d 1101 (10th Cir. 1994), is an outlier that was cast aside by later panels of the Tenth Circuit Court of Appeals in *United States v. Marchese*, 46 F.3d 1020 (10th Cir. 1995) and *United States v. La Cock*, 366 F.3d 883 (10th Cir. 2004). *Opp. Brief, pp. 11-12.* But that is simply not the case. Neither *Marchese* nor *La Cock* involved the dismissal of charges during execution of a plea agreement. In those instances, charges were dismissed early in the litigation due to inadequacies in the indictment. *Marchese*, 46 F.3d at 1021-22; *La Cock*, 366 F.3d at 884-88. And neither of the *Marchese* and *La Cock* panels mentioned *Mintz*. *Marchese*, 46 F.3d at 1020-24; *La Cock*, 366 F.3d at 883-89; *see Opp. Brief, p. 13.* Although a panel of the Tenth Circuit Court of Appeals questioned whether *Mintz* was still good law in a footnote in a 2014 decision, there was no

5

analysis nor any ruling on the question because doing so was not necessary to decide the case.  *United States v. Angilau*, 717 F.3d 781, 787 n.1 (10th Cir. 2013).

The State misses the point: dismissals pursuant to a plea agreement are different.  *Marchese* and *La Cock* do not account for the reasonable expectation of finality that arises when a criminal defendant pleads guilty to some charges in exchange for the dismissal of others.  And without an *en banc* decision pursuant to Fed. R. App. P. 35(a)(1), *Mintz* remains good law, just as it is viewed by at least one other United States court of appeals.  *See, e.g., United States v. Faulkner*, 793 F.3d 752, 758 (7th Cir. 2015).  Further undermining the State's view of the federal split, *Mintz* has been cited, albeit in likely dicta, for its analysis of double jeopardy as recently as April of this year.  *United States v. Nissen*, No. CR 19-0077, 2020 WL 1929526, at *14 (D.N.M. Apr. 21, 2020).  And just last month, the court of last resort for the State of New York decided that after a guilty plea, jeopardy attached to a charge to which a defendant had not pled guilty:

> A defendant who pleads guilty to one count will invariably take into consideration that other counts are satisfied by the plea.  Importantly, a count satisfied by a guilty plea bears the double jeopardy consequences of a judgment of conviction.  The judgment in this case prevents the People from prosecuting defendant again for the October 3, 2014 burglary, even though defendant did not plead to that count.

*People v. Holz*, No. 33, 2020 WL 2200365, at *4 (N.Y. May 7, 2020).  *Holz* deepens the growing conflict among the lower courts.

6

### III.   PREJUDICE IS NOT A FACET OF DOUBLE JEOPARDY

In a further attempt to undermine the split among the circuits, the State has made much of an irrelevant question: whether a trial court has indicated on the record that a dismissal of a charge in return for a guilty plea is with prejudice.  The point presumes without any basis that this Court would only rule or has already ruled that jeopardy does not attach until and unless a court pronounces that a dismissal is with prejudice.  But just as this Court has not made a rule about whether jeopardy attaches to charges dismissed in return for a guilty plea, this Court has never held that a trial court's pronouncement of prejudice causes jeopardy to attach.  The State does not and cannot cite a single case adopting that rule.  And although the State claims that ambiguous dismissals are presumed to be without prejudice, the State fails to cite any caselaw addressing such a presumption in the context of a negotiated plea agreement.

The State simply ignores the realities of the plea bargaining system, in which parties enter into plea agreements to achieve finality.  *See, e.g.*, *United States v. Brown*, 425 F.3d 681, 682 (9th Cir. 2005); *State v. Carpenter*, 68 Ohio St.3d 59, 61-62, 623 N.E.2d 66 (1993).  Over ninety percent of criminal defendants in both the state and federal systems resolve their cases by guilty pleas.  *See Lafler*, 566 U.S. at 169-70; *Frye*, 566 U.S. at 143.  They do so to achieve finality, and so regularity should dictate the opposite of what the State suggests.  This is especially true for criminal defendants like Soto who have pled guilty to a predicate offense in exchange for dismissal of the greater offense.  *App. 12-13*.  Without finality, such a defendant has

7

admitted to a substantial part of the charge that was dismissed, but to what advantage?

For certain, the majority below did not focus on whether the incantation of "prejudice" was utilized by the trial court. *App. 6-9.* It was nonetheless decided that after a plea agreement, jeopardy attaches to the convictions but not the charges that were dismissed. *Id. But see Holz*, 2020 WL 2200365, at *4. The Supreme Court of Ohio created a bright-line rule without regard to prejudice. In reality, the State places emphasis on the words "with prejudice" in the hope that doing so is enough to distinguish the question raised in Soto's appeal from that addressed by courts on either side of the federal split.

Even if the answer is that jeopardy does not attach unless a court has explicitly dismissed charges with prejudice, then this Court should answer the question in order to dispel society's strong expectation that citizens achieve finality through the dismissal of charges in return for a guilty plea. The State makes the confused argument that "defendants can avoid being prosecuted again on a dismissed charge by demanding freedom from future charges as a condition of pleading guilty." *Opp. Brief, p. 15.* At once this statement reduces the right to finality that is protected by the Double Jeopardy Clause to a bargaining chip possessed by the State and misses the reality that the public has *not* been aware they had to pay extra to the State for permanence during a plea negotiation. The State gives awfully short shrift to a right of constitutional dimension, which is subject in the ordinary course only to "voluntary knowing relinquishment." *Green v. United States*, 355 U.S. 184, 191-94 (1957) (plea

8

of former jeopardy as to a greater offense was not automatically waived by the successful appeal of a conviction to a lesser-included offense).  It is essentially unheard of that a defendant might be waiving their double jeopardy right during execution of a plea agreement, as such a waiver is not contemplated by Fed. R. Crim. P. 11(b)(1).  *See also Ohio Crim. R. 11(C)(2)(c)*.  Likewise, it has never been the rule that jeopardy only attaches when a judge is willing to recognize it on the record—attachment is automatic in other instances. *See, e.g.*, *Martinez v. Illinois*, 572 U.S. 833, 839-40 (2014) (reaffirming the bright-line rule that jeopardy attaches at the moment a jury is empaneled and sworn, without any action taken by the court or the parties); *Serfass v. United States*, 420 U.S. 377, 388 (1975) (explaining that jeopardy attaches in a bench trial as soon as the judge begins hearing evidence).  Insofar as the right not "to be twice put in jeopardy" for the "same offense" under the Fifth Amendment to the United States Constitution is a protection against overreach by the government, it would be absurd if its protections could only be triggered during a plea colloquy by the explicit statement of a prosecutor or judge as opposed to automatic attachment.

## IV.    RESPONDENT'S POLICY VIEWS ARE MISGUIDED

The State's policy argument fails to account for the current state of the law in Ohio and the on-the-ground realities of plea bargaining.  Even had Soto done exactly what the State counsels—demanding freedom from future charges as a contractual

9

condition of pleading guilty—it is not clear he would have found an adequate remedy protecting him from facing trial on a charge he believed was finally resolved.

The Double Jeopardy Clause protects a criminal defendant from being tried twice for the same offense precisely because "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity." *Green*, 355 U.S. at 187.  Yet it has only been recognized that an order denying a criminal defendant's motion to dismiss is immediately appealable if it is made on double jeopardy grounds.  *See State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, 6 N.E.3d 23, ¶ 40-60; *App. 10, n. 3.  Compare State v. Anderson*, 8th Dist. Cuyahoga No. 106304, 2018-Ohio-3051, *with State v. Ammons*, 9th Dist. Summit No. 28675, 2019-Ohio-286.  Had Soto negotiated the State's preferred finality term into his plea agreement, his first opportunity to present a contractual challenge on appeal still might have been after the expense and ordeal of a trial.  This avenue would do nothing to vindicate the right to be free from jeopardy a second time.

Regardless, if Soto did not negotiate such a term with the State, it was because he did not know he had to.  And Soto is not alone.  A criminal defendant's expectation of finality after pleading guilty to some charges in exchange for the government's dismissal of the remaining charges in an indictment is reasonable.  The only conceivable effect of such an agreement in the absence of a clear rule from this Court is to fully and finally conclude a case.  Criminal defendants across the country need

10

an answer to the question presented so that they may act in their best interests in deciding whether to enter into a plea agreement with the government and on what terms. If the State would like to dispose of only part of a criminal case through a plea agreement, it should be the burden of the State to reach out and seek a deviation from the expectation that a plea deal puts the whole prosecution to rest. *See Carpenter*, 68 Ohio St.3d at 61-62.

This Court's double jeopardy jurisprudence evolved in a system where trial was the anticipated norm, not the shadow in which bargaining occurs. However, in *Lafler* and *Frye*, this Court acknowledged that that understanding has shifted. Like the Sixth Amendment rights implicated in *Lafler* and *Frye,* the protections of the Double Jeopardy Clause must also adapt to an era in which almost all criminal prosecutions are resolved through guilty pleas. *See Frye,* 566 U.S. at 143. And just as the Sixth Amendment "right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences," so too must other provisions of the Constitution. *Lafler*, 566 U.S. at 170. Because execution of a plea deal is the "point in criminal proceedings at which the constitutional purposes and policies are implicated," the question in this case calls out for a clear and consistent answer. *Serfass*, 420 U.S. at 388.

11

## CONCLUSION

For the foregoing reasons, the petition for a writ of certiorari should be granted.

Respectfully Submitted,

/s/ Louis E. Grube
Louis E. Grube, Esq.
*Counsel of Record*
Paul W. Flowers, Esq.
**PAUL W. FLOWERS CO., L.P.A.**
50 Public Square, Suite 1910
Cleveland, Ohio 44113
(216) 344-9393
leg@pwfco.com

*Attorneys for Petitioner,*
*Travis Soto*

Carly M. Edelstein, Esq.
Assistant State Public Defender
**OFFICE OF THE OHIO PUBLIC DEFENDER**

12